# 24-644

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

*Plaintiff-Appellee,*

v.

DONALD J. TRUMP, in his personal capacity,

*Defendant-Appellant.*

On Appeal from the United States District Court
For the Southern District of New York

## BRIEF FOR DEFENDANT-APPELLANT
## PRESIDENT DONALD J. TRUMP

D. John Sauer
JAMES OTIS LAW GROUP, LLC
13321 N. Outer Forty Rd.
Suite 300
St. Louis, Missouri 63017
(314) 562-0031
john.sauer@james-otis.com

*Counsel for Defendant-Appellant*
*President Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES................................................................... iii

JURISDICTIONAL STATEMENT ......................................................1

STATEMENT OF THE ISSUES .........................................................1

PRELIMINARY STATEMENT.............................................................2

STATEMENT OF THE CASE...............................................................4

    I.     Statement Pursuant to Local Rule 28.1(b). ...........................................4

    II.    Statement of the Case.................................................................5

SUMMARY OF ARGUMENT...............................................................7

ARGUMENT ...................................................................................10

    I.     Presidential Immunity Bars Liability for the Allegedly Defamatory Statements. ...................................................................10

         A.    *Trump v. United States* Undermines This Court's Holding That Presidential Immunity May Be Forfeited. ................................10

         B.    The Law of the Case Doctrine Does Not Apply. ......................16

         C.    Presidential Immunity Absolutely Bars Liability for the Two Allegedly Defamatory Statements Here. ..................................18

    II.    The District Court Erred in Granting Issue-Preclusive Effect to the Judgment in *Carroll II*.....................................................24

         A.    *Carroll II*'s Judgment Was Erroneous and Should Be Reversed. ................................................................................24

         B.    The District Court Plainly Misconstrued the *Carroll II* Judgment. ................................................................................25

i

C.   The District Court Erred in Finding Issue Preclusion on the Issue of Actual Malice. ........................................................................30

D.   The Issue-Preclusion Error Was Devastatingly Harmful. ..........33

III.   The District Court Erred in Instructing the Jury Regarding Common-Law Malice. ..................................................................................34

A.   Contrary to the District Court's Instruction, Common-Law Malice Requires Ill Will To Be the Defendant's *Sole* Motivation. ............................................................................................34

B.   The District Court's Erroneous Instruction on Common-Law Malice Was Harmful Error. ......................................................40

IV.   The District Court's Erroneous Exclusion of President Trump's Highly Relevant Testimony Necessitates a New Trial. ...................................41

V.   The District Court Erred by Not Requiring Punitive Damages To Be Proven by Clear and Convincing Evidence. .......................................44

VI.   The Compensatory Damages Award Must Be Remitted....................49

A.   The $7.3 Million Award Compensates Only Alleged Emotional Injury, Not Reputational Harm. .................................................50

B.   The $7.3 Million Award for Emotional Damages Must Be Remitted. ..................................................................................51

VII.   The $65 Million Punitive Damages Award Must Be Remitted. .........56

CONCLUSION .........................................................................................60

CERTIFICATE OF SERVICE ...................................................................62

CERTIFICATE OF COMPLIANCE .........................................................63

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Acerra v. Trippardella,*
    34 A.D.2d 927 (1st Dep't 1970) ....................................................39

*Agostini v. Felton,*
    521 U.S. 203 (1997)......................................................................18

*Amerex Grp., Inc. v. Lexington Ins. Co.,*
    678 F.3d 193 (2d Cir. 2012) ........................................................36

*Arizona v. California,*
    460 U.S. 605 (1983)......................................................................18

*Barr v. Matteo,*
    360 U.S. 564 (1959)......................................................................20

*Bender v. City of New York,*
    78 F.3d 787 (2d Cir. 1996)...........................................................51

*Biro v. Conde Nast,*
    807 F.3d 541 (2d Cir. 2015) ........................................................32

*Blassingame v. Trump,*
    87 F.4th 1 (D.C. Cir. 2023) ..................................................... 19-21

*Boryszewski v. Brydges,*
    37 N.Y.2d 361 (1975) ..................................................................46

*Bouveng v. NYG Cap. LLC,*
    175 F. Supp. 3d 280 (S.D.N.Y. 2016)..................................... 58-59

*Boyce v. Soundview Tech. Grp.,*
    464 F.3d 376 (2d Cir. 2006)................................................ 40-41, 49

*Camillo v. Geer,*
    185 A.D.2d 192 (1st Dep't 1992) ...............................................46

*Cangemi v. United States*,
    13 F.4th 115 (2d Cir. 2021) ............................................................... 17

*Cantu v. Flanagan*,
    705 F. Supp.2d 220 (E.D.N.Y. 2010) ........................................ 54-55

*Capital v. Pattersonville*,
    56 N.Y.2d 11 (1982) .................................................................... 32-33

*Carroll v. Trump*,
    88 F.4th 418 (2d Cir. 2023) ............................... 5-6, 10-11, 13, 16

*Carroll v. Trump*,
    680 F. Supp. 3d 491 (S.D.N.Y. 2023) ............................ 4, 16, 35, 39

*Carroll v. Trump*,
    685 F. Supp. 3d 267 (S.D.N.Y. 2023) ............................. 4, 26, 29-30

*Carroll v. Trump*,
    690 F. Supp. 3d 396 (S.D.N.Y. 2023) ............................... 4, 26, 28

*Carroll v. Trump*,
    No. 22-CV-10016, 2023 WL 4612082 (S.D.N.Y. July 19, 2023) ............... 58

*Celle v. Filipino Reporter Enters. Inc.*,
    209 F.3d 163 (2d Cir. 2000) ...................................................... 30-32

*Cleghorn v. N.Y. Central & Hudson Riv. R.R. Co.*,
    56 N.Y. 44 (1874) ........................................................................ 46

*Clinton v. Jones*,
    520 U.S. 681 (1997) ............................................... 12, 21, 23-24

*Columbia Broadcasting Sys., Inc. v. FCC*,
    454 F.2d 1018 (D.C. Cir. 1971) ................................................. 22

*Corrigan v. Bobbs-Merrill Co.*,
    228 N.Y. 58 (1920) ................................................................... 46-47

iv

*Council on Am. Islamic Relations v. Ballenger*,
    444 F.3d 659 (D.C. Cir. 2006) ........................................................23

*Dalbec v. Gentleman's Companion, Inc.*,
    828 F.2d 921 (2d Cir. 1987)..........................................................30

*Dotson v. City of Syracuse*,
    No. 5:04-cv-1388, 2011 WL 817499 (N.D.N.Y. Mar. 2, 2011)...................53

*Duarte v. St. Barnabas Hosp.*,
    341 F. Supp. 3d 306 (S.D.N.Y. 2018) ....................................... 53-55

*Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*,
    472 U.S. 749 (1985).......................................................................48

*Edelman v. Jordan*,
    415 U.S. 651 (1974).......................................................................15

*Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*,
    450 U.S. 147 (1981).......................................................................15

*Fuld v. Palestine Liberation Org.*,
    82 F.4th 74 (2d Cir. 2023)..............................................................41

*Gertz v. Robert Welch, Inc.*,
    418 U.S. 323 (1974)................................................................ 48-49

*Greenbaum v. Svenska Handelsbanken*,
    979 F. Supp. 973 (S.D.N.Y. 1997) ........................................... 47-48

*Herbert v. Lando*,
    781 F.2d 298 (2d Cir. 1986)..........................................................32

*Herman & MacLean v. Huddleston*,
    459 U.S. 375 (1983).......................................................................48

*Higgins v. Cal. Prune & Apricot Grower, Inc.*,
    3 F.2d 896 (2d Cir. 1924)..............................................................17

v

*In re Seventh Judicial Dist. Asbestos Litig.*,
190 A.D.2d 1068 (4th Dep't 1993) ................................................................. 45

*In re Thelen, LLP*,
736 F.3d 213 (2d Cir. 2013) ................................................................. 34, 44

*Johnson v. Holder*,
564 F.3d 95 (2d Cir. 2009) ................................................................. 17-18

*Jones v. Parmley*,
465 F.3d 46 (2d Cir. 2006) ................................................................. 10

*J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*,
37 N.Y.3d 552 (2021) ................................................................. 46

*Kipper v. NYP Holdings Co.*,
12 N.Y.3d 348 (2009) ................................................................. 31

*Knapp v. Hughes*,
19 N.Y.3d 672 (2012) ................................................................. 48

*Lane v. Pena*,
518 U.S. 187 (1996) ................................................................. 15

*Liberman v. Gelstein*,
80 N.Y.2d 429 (1992) ................................................................. 34, 37-38

*LNC Investments, Inc. v. First Fidelity Bank, N.A.*,
173 F.3d 454 (2d Cir. 1999) ................................................................. 40

*Mahoney v. Adirondack Publ'g Co.*,
71 N.Y.2d 31 (1987) ................................................................. 49

*Malek v. Fed. Ins. Co.*,
994 F.2d 49 (2d Cir. 1993) ................................................................. 44

*Morse v. Fusto*,
No. 07-cv-4793, 2013 WL 4647603 (E.D.N.Y. Aug. 29, 2013) ................... 55

*Morsette v. "The Final Call"*,
309 A.D.2d 249 (1st Dep't 2003) ............................................8, 34-36, 38-40

*New York Times v. Sullivan*,
376 U.S. 254 (1964).......................................................................34

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982).................................................................12, 19

*Osorio v. Source Enterprises, Inc.*,
No. 05-cv-10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) ............... 54-55

*Panepinto v. N.Y. Life Ins. Co.*,
90 N.Y.2d 717 (1997) ...................................................................46

*Parker v. Blauvelt Volunteer Fire Co.*,
93 N.Y.2d 343 (1999) ...................................................................30

*PCR Harris, Inc. v. Boeing Co.*,
700 F.2d 894 (2d Cir. 1983).........................................................25

*People v. Brown*,
59 A.D.2d 928 (2d Dep't 1977).....................................................25

*People v. Suarez*,
40 A.D.3d 143 (1st Dep't 2007) ...................................................25

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*,
66 F.4th 365 (2d Cir. 2023)..........................................................24

*Plymouth Venture Partners II, L.P. v. GTR Source, LLC*,
988 F.3d 634 (2d Cir. 2021)..........................................................25

*Prozeralik v. Capital Cities Commc'ns*,
82 N.Y.2d 466 (1993) ........................................ 34, 37-38, 40, 42, 44

*Prozeralik v. Capital Cities Commc'ns*,
188 A.D. 2d 178 (4th Dep't 1993).................................................55

*Prozeralik v. Capital Cities Commc'ns*,
222 A.D.2d 1020 (4th Dep't 1995) ................................................55

*Purgess v. Sharrock*,
33 F.3d 134 (2d Cir. 1994) .............................................................54

*Randi A.J. v. Long Island Surgi-Ctr.*,
46 A.D.3d 74 (2d Dep't 2007) .......................................................45

*Richardson v. New York State Dep't of Correctional Service*,
180 F.3d 426 (2d Cir. 1999) ...........................................................15

*Robertson v. Doe*,
No. 05-cv-7046, 2010 WL 11527317 (S.D.N.Y. May 11, 2010)...................35

*Rohrbach v. Germania Fire Ins. Co.*,
62 N.Y. 47 (1875) ...........................................................................47

*Sheldon v. Khanal*,
396 F. App'x 737 (2d Cir. 2010) ...................................................25

*Simmons v. Trans Express Inc.*,
37 N.Y.3d 107 (2021) ..........................................................30, 32-33

*Sladick v. Hudson Gen. Corp.*,
226 A.D.2d 263 (1st Dep't 1996) ..................................................45

*Sooroojballie v. Port Authority of New York & New Jersey*,
816 F. App'x 536 (2d Cir. 2020) ..............................................52, 54

*Stampf v. Long Island R. Co.*,
761 F.3d 192 (2d Cir. 2014).............................................49-51, 54, 58

*State v. Moore*,
298 A.D.2d 814 (3d Dep't 2002) ...................................................25

*Sullivan v. American Airlines, Inc.*,
424 F.3d 267 (2d Cir. 2005) ...........................................................18

*Tereshchenko v. Karimi*,
102 F.4th 111 (2d Cir. 2024) ........................................................... 41

*Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*,
716 F.3d 296 (2d Cir. 2013) ............................................................ 49

*Thoreson v. Penthouse Int'l, Ltd.*,
80 N.Y.2d 490 (1992) ...................................................................... 46

*Trump v. ABC, Inc.*,
No. 24-21050-CIV, 2024 WL 3519177 (S.D. Fla. July 24, 2024) ............... 26

*Trump v. Hawaii*,
585 U.S. 667 (2018) ......................................................................... 20

*Trump v. United States*,
144 S. Ct. 2312 (2024) ........................................ 8, 11-14, 19-21, 24

*Turley v. ISG Lackawanna, Inc.*,
774 F.3d 140 (2d Cir. 2014) .................................... 9, 51-52, 56-60

*United States v. Detrich*,
865 F.2d 17 (2d Cir. 1988) .............................................................. 44

*United States v. Helstoski*,
442 U.S. 477 (1979) .................................................................. 11, 14

*United States v. Nordic Vill. Inc.*,
503 U.S. 30 (1992) ........................................................................... 15

*United States v. Quintieri*,
306 F.3d 1217 (2d Cir. 2002) ......................................................... 17

*United States v. Salameh*,
152 F.3d 88 (2d Cir. 1998) .............................................................. 50

*United States v. Tenzer*,
213 F.3d 34 (2d Cir. 2000) .............................................................. 17

*United States v. Thiam*,
    934 F.3d 89 (2d Cir. 2019)....................................................................34, 44

*United States v. White*,
    692 F.3d 235 (2d Cir. 2012)............................................................................44

*Uzoukwu v. City of New York*,
    805 F.3d 409 (2d Cir. 2015)....................................................................41, 49

*Verdi v. Dinowitz*,
    188 A.D.3d 441 (1st Dep't 2020) ................................................35-36, 38-39

*Verdi v. Dinowitz*,
    204 A.D.3d 627 (1st Dep't 2022) ........................................................35, 38, 41

*Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*,
    956 F.2d 1245 (2d Cir. 1992)........................................................................17

*V.S. v. Muhammad*,
    595 F.3d 426 (2d Cir. 2010)..........................................................................36

*Warren v. Pataki*,
    823 F.3d 125 (2d Cir. 2016)....................................................................40, 49

*Webber v. Dash*,
    607 F. Supp. 3d 407 (S.D.N.Y. 2022) ..................................................... 58-59

**Statutes and Rules**

28 U.S.C. § 1291 ...............................................................................................1

28 U.S.C. § 2679(d)(2)......................................................................................1

Fed. R. Evid. 401 ............................................................................................44

Fed. R. Evid. 402 ............................................................................................44

**Other Authorities**

18 Charles A. Wright et al., *Federal Prac. and Proc.* § 4478 (1981).....................17

x

KIRCHER & WISEMAN, PUNITIVE DAMAGES: LAW & PRAC. § 9:10 (2d ed. 2024 updated) ..........................................................................................45

Leon D. Lazar & John R. Higgitt, *Ascertaining the Burden of Proof for an Award for Punitive Damages in New York?  Consult Your Local Appellate Division*, 25 TOURO L. REV. 725 (2009) ..........................................................................45

N.Y. Pattern Jury Instructions—Civil, *How to Use This Volume* (Dec. 2023) ........39

*Statement on the Assault Allegation by E. Jean Carroll*, Daily Compilation of Presidential Documents, National Archives (June 21, 2019), *available at* https://www.govinfo.gov/content/pkg/DCPD-201900410/pdf/DCPD-201900410.pdf ..................................................................................... 19-20

The White House, *Remarks by President Trump Before Marine One Departure* (June 22, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-marine-one-departure-49/...................20

*Watch the Anderson Cooper Interview Judge Blocked Donald Trump From Showing*, Newsweek (Jan. 25, 2024), at https://www.newsweek.com/watch-anderson-cooper-interview-judge-blocked-donald-trump-showing-1863998 (video embedded).........................................................................................33

## JURISDICTIONAL STATEMENT

On March 8, 2024, President Trump timely appealed from the final judgment entered by the district court on February 8, 2024.  SPA.126; A.1947, A.2212.  This Court has jurisdiction under 28 U.S.C. § 1291.  The district court had subject-matter jurisdiction pursuant to 28 U.S.C. § 2679(d)(2).

## STATEMENT OF THE ISSUES

1.     Whether Presidential immunity bars civil liability for the allegedly defamatory statements at issue here, and whether *Trump v. United States*, 144 S. Ct. 2312 (2024), supersedes this Court's previous holding that Presidential immunity may be forfeited through inaction?

2.     Whether the district court erred in granting issue-preclusive effect to the earlier judgment in *Carroll v. Trump*, No. 1:22-cv-10016-LAK (S.D.N.Y.)?

3.     Whether the district court erroneously instructed the jury regarding the common-law malice requirement for recovering punitive damages under New York law?

4.     Whether the district court erred by excluding highly relevant testimony from President Trump, including regarding the issue of common-law malice?

5.     Whether the district court erroneously instructed the jury regarding the burden of proof with respect to punitive damages?

1

6.  Whether the $7.3 million award for emotional distress must be remitted?

7.  Whether the $65 million punitive-damages award must be remitted?

## PRELIMINARY STATEMENT

This case, together with *Carroll v. Trump*, No. 1:22-cv-10016-LAK (S.D.N.Y.) ("*Carroll II*"), represents a miscarriage of justice against President Donald J. Trump ("President Trump"), perpetrated for political purposes and in seeking unjust pecuniary gain.   In 2019, Plaintiff-Appellee E. Jean Carroll ("Carroll") sued Defendant-Appellant President Trump for defamation.   Her false claims were based on two public statements denying her implausible, decades-old allegation that President Trump supposedly assaulted her in a Bergdorf Goodman dressing room decades ago.   This alleged incident "never happened." A.1887.   Until Carroll made her wrongful allegations, President Trump did not even know who she was.   No eyewitnesses, no physical evidence, no video, no DNA, no complaint, no police report, and no investigation supports Carroll's story.   Driven by political motivation and funded by President Trump's die-hard enemies, Carroll's unbelievable claims involve a series of coincidences that Carroll herself admits are "astonishing," "amazing," and "inconceivable"—such as the fact that her story is virtually identical to a plotline in a 2012 episode of Law & Order, a favorite fictional program of the Plaintiff.

2

Despite all this, the district court entered a judgment against President Trump for defamation based on two public statements, both issued through official White House channels, denying Carroll's false allegations. This judgment rests on a series of fatal, reversible errors.

First, Presidential immunity shields from liability President Trump's public statements issued in his official capacity through official White House channels. The Supreme Court's recent decision in *Trump v. United States*, 144 S. Ct. 2312 (2024), contravenes this Court's prior holding that Presidential immunity may be forfeited through inadvertence or inaction. Presidential immunity forecloses any liability here and requires the complete dismissal of all claims.

Further, the district court committed a series of highly prejudicial errors. Having erroneously refused to consolidate this case with the later-filed *Carroll II* litigation—needlessly resulting in two separate trials—the district court then wrongfully gave the *Carroll II* judgment issue-preclusive effect in this case. This error artificially reduced this case to a damages-only trial and prevented President Trump from presenting devastating evidence, such as Carroll's CNN interview where she effectively denied being raped and stated that "most people think of rape as being sexy," and her false public claims that she had President Trump's DNA on a decades-old dress.

3

Further, the district court disregarded binding New York law and gave the jury erroneous instructions on both common-law malice and the standard required to establish punitive damages. The court compounded that error by drastically and unlawfully restricting President Trump's ability to testify in his own defense, and then egregiously striking President Trump's testimony that he "just wanted to defend myself, my family, and frankly, the presidency." A.1692. Finally, the district court abandoned its duty to remit the jury's grossly excessive compensatory and punitive-damages awards.

For the reasons set forth below, the judgment must be reversed.

## STATEMENT OF THE CASE

### I.     Statement Pursuant to Local Rule 28.1(b).

This appeal arises from a judgment entered by Hon. Lewis A. Kaplan of the U.S. District Court for the Southern District of New York. Carroll brought a defamation claim in state court against President Trump for two public statements issued through official White House channels. The case was removed to federal court under the Westfall Act. The jury entered a verdict in favor of Carroll, awarding her $18.3 million in compensatory damages and $65 million in punitive damages. This appeal involves three reported decisions by the district court: *Carroll v. Trump*, 690 F. Supp. 3d 396 (S.D.N.Y. 2023); *Carroll v. Trump*, 685 F. Supp. 3d 267 (S.D.N.Y. 2023); and *Carroll v. Trump*, 680 F. Supp. 3d 491 (S.D.N.Y. 2023).

4

## II.     Statement of the Case.

On June 21, 2019, Plaintiff E. Jean Carroll falsely accused President Trump of assaulting her at some unspecified point decades ago in the dressing room of the Bergdorf Goodman department store in New York City.  A.60.  Carroll offered no plausible evidence to corroborate this decades-old claim of sexual assault, the details of which were entirely unbelievable.  Nevertheless, because President Trump was the sitting President of the United States, Carroll's accusations immediately incited intense media attention.

In response to this media attention, President Trump made two thorough and public denials of Carroll's accusations, both issued through official White House channels.  On June 21, 2019, the White House Press Office issued a statement to the press from President Trump denying Carroll's accusations and noting the absence of evidence to corroborate those accusations.  *See* A.1887 (the "June 21 Statement").  On June 22, 2019, during official remarks while speaking on the South Lawn of the White House, President Trump responded to questions from reporters by again denying Carroll's false accusations.  *See* A.1888; A.583 (the "June 22 Statement").

On November 4, 2019, Carroll brought this case ("*Carroll I*") as a state-court action against President Trump, wrongly claiming that his June 21 and June 22 Statements were defamatory.  *See* A.47.  The case was removed to federal court under the Westfall Act.  *Carroll v. Trump*, 88 F.4th 418, 423 n.10 (2d Cir. 2023).

5

While this case was pending, Carroll filed a second lawsuit against President Trump in the Southern District of New York. *See* Case No. 1:22-cv-10016-LAK (S.D.N.Y.) ("*Carroll II*"). In *Carroll II*, Carroll incorrectly contended that another public denial by President Trump was defamatory, and she also brought a false claim for battery. In May 2023, the *Carroll II* jury found in favor of Carroll and awarded her $5 million in damages. *Carroll II* is currently on appeal, and the Court conducted oral argument on September 6, 2024. *See* Case No. 23-793 (2d Cir.).

In this case, President Trump moved for summary judgment because the doctrine of Presidential immunity barred any liability against him for the two allegedly defamatory statements. A.137; A.399-A.407. The district court erroneously rejected this argument and held that the defense was waived. SPA.10-SPA.26. President Trump pursued an interlocutory appeal of this ruling. This Court affirmed in error on the ground that President Trump had supposedly forfeited his Presidential immunity defense by failing to raise it early enough during district-court proceedings. *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023).

After the *Carroll II* judgment, the district court incorrectly found that that judgment barred President Trump from contesting the merits of the defamation claim in this case under the doctrine of issue preclusion. SPA.71. The district court granted partial summary judgment in favor of Carroll, limiting the remainder of the case solely to a trial on damages. *See id.*

6

At trial, Carroll sought two distinct categories of compensatory damages. First, her expert witness testified about the cost of a theoretical "reputational repair program" to remedy the reputational harm allegedly caused by President Trump's public statements. A.1424-A.1562. The expert, based on a study that was exposed at trial to be rife with errors, valued this category of damages at between $7.2 million and $12.1 million. A.1466. Second, Carroll sought an award of compensatory damages for her alleged pain and suffering supposedly arising from President Trump's denials of her accusations. *See, e.g.*, A.1775. Carroll also sought punitive damages.

On January 26, 2024, the jury entered a verdict in favor of Carroll. A.1014. The jury awarded Carroll $11 million for the "reputational repair program" and $7.3 million for emotional distress. A.1014. The jury also awarded Carroll $65 million in punitive damages. A.1015.

President Trump moved for a new trial. A.1902; A.1903. The district court denied these motions. SPA.127. President Trump timely appealed. A.1947; A.2212.

## SUMMARY OF ARGUMENT

The judgment should be reversed for seven reasons.

First, the doctrine of absolute Presidential immunity bars any liability for the June 21 and June 22 Statements. *Infra*, Part I. Both statements clearly fall, at minimum, in the "outer perimeter of [President Trump's] official responsibilities."

7

*Trump*, 144 S. Ct. at 2326. Both were public statements on matters of public concern issued in President Trump's official capacity through official White House channels. The Supreme Court's recent decision in *Trump v. United States*, 144 S. Ct. 2312 (2024), supersedes and contravenes this Court's earlier holding in *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023), which erroneously held that Presidential immunity can somehow be forfeited by inaction.

Second, the district court erred by giving issue-preclusive effect to its prior judgment in *Carroll II*, which drastically reduced this case to a trial on damages only. *Infra*, Part II. The judgment in *Carroll II* must be reversed, which necessitates the reversal of the judgment here. Moreover, the district court misconstrued the trial evidence in *Carroll II* and its own jury instructions to wrongly infer that the *Carroll II* jury made preclusive findings that it never made. The district court also plainly erred by giving preclusive effect to a finding of constitutional malice with respect to a statement made three years later in a different context.

Next, the district court also made three related, prejudicial errors with respect to New York's standard of common-law malice. *Infra*, Parts III-V. Contradicting its own prior reasoning and New York appellate authority, the district court erroneously refused to instruct the jury that a finding of common-law malice requires that "the speaker was *solely* motivated by a desire to injure plaintiff, and … that the animus was the one and only cause for the publication." *Morsette v. "The Final Call"*, 309

8

A.D.2d 249, 255 (1st Dep't 2003) (cleaned up). Moreover, the district court erroneously restricted President Trump's ability to testify about his own state of mind and egregiously struck his testimony that he "just wanted to defend myself, my family, and frankly, the presidency." A.1692. Additionally, the district court erred by instructing the jury that punitive damages may be established by a preponderance of the evidence, rather than by clear and convincing evidence, which is the correct standard under applicable law.

Sixth, the district court erred by refusing to remit the $7.3 million award for alleged emotional distress. *Infra*, Part VI. Carroll testified, at most, to "garden-variety" emotional distress, *i.e.*, ordinary emotional claims involving no physical or medical symptoms. This Court's cases treat $125,000 as the outer boundary for such claims, rendering the $7.3 million award grossly excessive.

Seventh and finally, the district court erred in failing to remit the grossly excessive $65 million award of punitive damages under the Due Process Clause and federal common law. *Infra*, Part VII. Under *Turley v. ISG Lackawanna, Inc*., 774 F.3d 140, 167 (2d Cir. 2014), a one-to-one ratio of punitive-to-compensatory damages is the maximum allowable in a case involving only reputational and emotional injuries.

# ARGUMENT

## I. Presidential Immunity Bars Liability for the Allegedly Defamatory Statements.

***Standard of Review***.  The Court reviews the denial of immunity *de novo*.

*Jones v. Parmley*, 465 F.3d 46, 55 (2d Cir. 2006).

### A. *Trump v. United States* Undermines This Court's Holding That Presidential Immunity May Be Forfeited.

In *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023), this Court incorrectly held

that the defense of Presidential immunity may be "waived or forfeited," *id.* at 422,

and that President Trump had forfeited that defense in this case by failing to raise it

early enough in the proceedings, *id.* at 425.

At the outset of its opinion, this Court recognized that "[t]he term 'waiver' is

best reserved for a litigant's intentional relinquishment of a known right," while

"forfeiture" applies "[w]here a litigant's action or inaction is deemed to incur the

consequence of loss of a right." *Id.* at 422 n.1.  The Court incorrectly held, however,

that this distinction "matters not." *Id.*  The Court then reasoned that "separation-of-

powers considerations militate in favor of, not against, recognizing presidential

immunity as waivable.  A President's autonomy should be protected; thus, a

President *should* be able to litigate if he chooses to do so." *Id.* at 427.  The Court

incorrectly reasoned that "recognizing presidential immunity as waivable reinforces,

not undermines, the separation of powers and the President's decisionmaking

10

authority by affording the President an opportunity to litigate if he so chooses." *Id.* at 429.

"Having determined that presidential immunity is waivable," *id.*, this Court then held that President Trump had *forfeited* immunity by failing to raise it early enough. *Id.* at 429-33. The Court stated that President Trump failed to raise immunity in his answer to the original complaint, but had raised it for the first time in a reply brief in support of summary judgment, and then again in his answer to Carroll's amended complaint. *Id.* at 429-30. The Court incorrectly concluded that the defense was forfeited because "Defendant unduly delayed in raising presidential immunity as a defense." *Id.* at 430. The Court cited no evidence that President Trump intentionally relinquished (*i.e.*, waived) this defense, and none exists. *See id.* at 429-31.

Just months later, the U.S. Supreme Court decided *Trump v. United States*, 144 S. Ct. 2312 (2024) ("*Trump*"), which reaffirmed and reinforced the doctrine of Presidential immunity. *Trump*'s reasoning thoroughly undermines *Carroll v. Trump*. *Trump* places Presidential immunity squarely within the line of Supreme Court cases holding that immunity doctrines rooted in the separation of powers cannot be forfeited by inaction—such immunities require, if they are waivable at all, an "explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 490–91 (1979) (emphasis added).

11

*Trump* emphasized that Presidential "immunity is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* at 2331. The Court "look[ed] primarily to the Framers' design of the Presidency within the separation of powers," *id.* at 2329, and emphasized that "[t]he President 'occupies a unique position in the constitutional scheme,' as 'the only person who alone composes a branch of government,'" *id.* (citations omitted). *Trump* held that "[t]he Framers 'sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many.'" *Id.* (quoting *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring in judgment)). "The purpose of a 'vigorous' and 'energetic' Executive, [the Framers] thought, was to ensure 'good government,' because a 'feeble executive implies a feeble execution of the government.'" *Id.*

*Trump* emphasized that immunity exists so "that the President would [not] be chilled from taking the 'bold and unhesitating action' required of an independent Executive." *Id.* at 2330-31 (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 745 (1982)). The President "must make 'the most sensitive and far-reaching decisions entrusted to any official under our constitutional system.'" *Id.* at 2329. "There accordingly exists the greatest public interest in providing the President with the maximum

12

ability to deal fearlessly and impartially with the duties of his office." *Id.* (quotation marks omitted).

*Trump*'s reasoning compels the conclusion that Presidential immunity—even if it could be waived at all, which is not the case—cannot be inadvertently forfeited. Our constitutional design requires "bold and unhesitating action" from the Chief Executive, who must enjoy "the maximum ability to deal fearlessly and impartially with the duties of his office," to avoid "unique risks to the effective functioning of government." *Id.* at 2329. Thus, "the interests that underlie Presidential immunity seek to protect not the President himself, but the institution of the Presidency." *Id.* at 2341. Accordingly, Presidential immunity is not subject to forfeiture through inattention or inadvertence, neither of which even exist in this case.

*Trump*'s reasoning makes this conclusion especially clear when it comes to forfeiture by inattention or inaction. *Carroll v. Trump*, 88 F.4th at 422 n.1. *Trump* emphasized the President's need for "bold," "energetic, vigorous, decisive, and speedy execution of the laws." 144 S. Ct. at 2329. If that protection could be easily and unintentionally lost—for example, by the President's *attorneys* allegedly not raising it early enough during litigation—the cloak of immunity would lose much of its protective effect. "The essence of immunity 'is its possessor's entitlement not to have to answer for his conduct' in court." *Trump*, 144 S.Ct. at 2340. If traps for the unwary litigant sufficed to pierce immunity, that would "threaten[] to eviscerate the

13

immunity," which would be "untenable in light of the separation of powers principles." *Id.* at 2340-41.

The reasoning of *Trump*, therefore, places this case squarely within the line of cases holding that immunity doctrines rooted in the constitutional structure cannot be waived and if a court were to hold otherwise, it would require, at very least, a clear, explicit, and affirmative waiver before the immunity can be lost.  For example, the Supreme Court has expressed doubt that Speech and Debate immunity is waivable at all, and held that even "[a]ssuming that is possible, … waiver can be found only after *explicit and unequivocal renunciation* of the protection." *Helstoski*, 442 U.S. at 490–91 (emphasis added).  That is because legislative immunity, like Presidential immunity, serves "to preserve the constitutional structure of separate, coequal, and independent branches of government."  *Id.* at 491.  "[A]ny lesser standard" than an "explicit and unequivocal waiver" "would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *Id.* at 491.  So also here—Presidential immunity is not waivable, but even if it were, any waiver would require an "explicit and unequivocal renunciation," *id.*, which did not occur here.

That structure persuasively applies to other structural immunities, such as federal sovereign immunity and the States' Eleventh Amendment immunity. "Waivers of the [federal] Government's sovereign immunity, to be effective, must

14

be 'unequivocally expressed.'" *United States v. Nordic Vill. Inc*., 503 U.S. 30, 33 (1992); *see also Lane v. Pena*, 518 U.S. 187, 197 (1996). Likewise, "[i]n deciding whether a State has waived its constitutional protection under the Eleventh Amendment," the Supreme Court "will find waiver only where stated by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974). "[N]either such participation in itself, nor a concomitant agreement to obey federal law, is sufficient to waive the protection of the Eleventh Amendment." *Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981).

Notably, failure to raise such a structural immunity in the answer to the original complaint does *not* constitute an explicit and unequivocal renunciation of immunity. *See, e.g.*, *Edelman*, 415 U.S. at 677-78 (holding that "the Eleventh Amendment defense sufficiently partakes of the nature of a jurisdictional bar so that it need not be raised in the trial court" at all). "[W]aiver is found only where stated 'by the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction.' … [F]ailure to raise the defense in its answer does not constitute such an unambiguous waiver." *Richardson v. New York State Dep't of Correctional Service*, 180 F.3d 426, 448 (2d Cir. 1999),

15

*abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006).

Here, President Trump consistently asserted throughout these proceedings that he cannot be held liable for the alleged conduct because it constitutes official acts of the President. He pled in his original answer that "[t]he allegedly defamatory statements are privileged or protected by one or more immunities … under the Constitution of the United States." *Carroll*, 680 F. Supp. 3d at 498. He contended throughout the Westfall Act litigation that the alleged conduct constitutes official acts of the Presidency. A.37; A.39. He sought summary judgment based on absolute Presidential immunity. *Carroll*, 680 F. Supp. 3d at 495. President Trump sought leave to amend his original answer to assert Presidential immunity specifically, *id.* at 504, and he asserted Presidential immunity in his answer to Carroll's amended complaint as well, A.884-A.885. He also, vitally, pursued an interlocutory appeal to assert his right to Presidential immunity. *See Carroll v. Trump*, 88 F.4th 418. Thus, President Trump's litigation conduct is the very opposite of an "explicit and unequivocal renunciation" of Presidential immunity—it reflects a persistent practice of *asserting* Presidential immunity. Thus, even if President Trump's immunity were subject to waiver—which it is not—no such finding would be possible here.

**B.    The Law of the Case Doctrine Does Not Apply.**

Because the Supreme Court's intervening decision in *Trump* contravenes *Carroll v. Trump*'s erroneous holding that Presidential immunity may be forfeited, the law of the case doctrine does not apply here. "[T]he law of the case doctrine 'does not rigidly bind a court to its former decisions, but is only addressed to its good sense.'" *Johnson v. Holder*, 564 F.3d 95, 99 (2d Cir. 2009) (quoting *Higgins v. Cal. Prune & Apricot Grower, Inc.*, 3 F.2d 896 (2d Cir. 1924) (L. Hand, J.)); *see also Cangemi v. United States*, 13 F.4th 115, 140 (2d Cir. 2021) (quoting *Virgin Atl. Airways, Ltd. v. Nat'l Mediation Bd.*, 956 F.2d 1245, 1255 (2d Cir. 1992)). This Court "may depart from the law of the case for 'cogent' or 'compelling' reasons including an intervening change in law, availability of new evidence, or 'the need to correct a clear error or prevent manifest injustice.'" *Johnson*, 564 F.3d at 99-100 (quoting *United States v. Quintieri*, 306 F.3d 1217, 1230 (2d Cir. 2002)); *see also United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000).

All those facts and circumstances are present here. First, *Trump*, decided mere months after *Carroll v. Trump*, constitutes an "intervening change in law." *Johnson*, 564 F.3d at 99. In fact, an intervening ruling of a higher court stands among "[t]he easiest cases" and "the most obvious justifications for departing from the law of the case." 18 Charles A. Wright et al., *Federal Prac. and Proc.* § 4478, at 790 (1981). This Court may revisit panel authority even from a different case "where there has been an intervening Supreme Court decision that casts doubt on our controlling

17

precedent." *Sullivan v. American Airlines, Inc.*, 424 F.3d 267, 274 (2d Cir. 2005) (citation omitted). *Trump* does more than "cast[] doubt on" *Carroll v. Trump*, *id.*— *Trump* undermines it entirely.

In addition, "[t]he [law of the case] doctrine does not apply if the court is 'convinced that [its prior decision] is clearly erroneous and would work a manifest injustice.'" *Agostini v. Felton*, 521 U.S. 203, 236 (1997) (quoting *Arizona v. California*, 460 U.S. 605, 618 n.8 (1983)); *Johnson*, 564 F.3d at 99-100. *Trump* demonstrates that *Carroll v. Trump* was clearly erroneous, and enforcing it involves manifest injustice. The conduct Carroll alleges plainly is, and has always been, absolutely immune. Where the prior decision "would be decided differently under our current … law," "adherence to that decision would undoubtedly work a 'manifest injustice,' such that the law of the case doctrine does not apply." *Agostini*, 521 U.S. at 236.

### C. Presidential Immunity Absolutely Bars Liability for the Two Allegedly Defamatory Statements Here.

Presidential immunity is fatal to Carroll's claims. On June 21, 2019, Carroll publicly and falsely accused President Trump of assaulting her at some point decades ago. At the time of Carroll's accusation, President Trump was serving as the 45th President of the United States. In response to persistent media inquiries, President Trump made two public denials of Carroll's accusations. First, later on June 21, the White House Press Office issued a statement to the press from President Trump

18

denying Carroll's accusations and highlighting the absence of evidence that corroborated those accusations. *See* A.1887; *Statement on the Assault Allegation by E. Jean Carroll*, Daily Compilation of Presidential Documents, National Archives (June 21, 2019), *at* https://www.govinfo.gov/content/pkg/DCPD-201900410/pdf/DCPD-201900410.pdf. Second, on June 22, during remarks while speaking on the South Lawn of the White House, President Trump responded to questions from reporters by again denying Carroll's accusations. *See* A.1888; A.583 (unredacted version of PX-2). A transcript of that press availability, including President Trump's responses to questions about Carroll's accusations, was issued by the White House Press Office. *See id.* Those statements are the only allegedly defamatory statements at issue in this case.

Presidential immunity bars any liability for those statements. A President possesses "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Fitzgerald*, 457 U.S. at 756. This "outer perimeter" encompasses a President's actions "so long as they are not manifestly or palpably beyond his authority." *Trump*, 144 S. Ct. at 2333. To the extent that there is any uncertainty, the President "should be afforded immunity." *Blassingame v. Trump*, 87 F.4th 1, 21 (D.C. Cir. 2023).

The two statements on matters of public concern issued through official White House channels fall squarely within the outer perimeter of President Trump's official

responsibilities. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). For this reason, "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 144 S. Ct. at 2340. First, the June 21 Statement was issued by official White House staff and through official White House channels. *See* A.1887; A.1888; *Statement on the Assault Allegation by E. Jean Carroll*, https://www.govinfo.gov/content/pkg/DCPD-201900410/pdf/DCPD-201900410.pdf. The statement is stamped, "Authenticated U.S. Government Information" by the GPO. *Id.* A President's conduct is generally official—and thus absolutely immune—when it "is organized and promoted by official White House channels and government officials and funded with public resources." *Blassingame*, 87 F.4th at 21. Even lower-ranking federal officers enjoy absolute immunity against defamation claims for statements made in press releases issued through official channels. *Barr v. Matteo*, 360 U.S. 564, 574 (1959).

Similarly, the June 22 Statement was made by President Trump during an official press availability on the South Lawn of the White House. *See* A.1888. The White House published an official transcript of the remarks the day they were made. The White House, *Remarks by President Trump Before Marine One Departure* (June 22, 2019), https://trumpwhitehouse.archives.gov/briefings-statements/remarks-

president-trump-marine-one-departure-49/. During that press availability, President Trump responded to journalists' questions about a wide range of questions plainly tied to his official duties, including tariffs, economic issues, foreign policy, national security, immigration, and nuclear non-proliferation. *See* A.583 (unredacted version of PX-2). This press conference was "clothed in the trappings of an official function," further confirming that it constituted official conduct. *Blassingame*, 87 F.4th at 21.

In fact, Carroll herself repeatedly emphasized the official, Presidential nature of the Statements, contending that the statements' official nature supposedly enhanced the injury to her reputation. *See, e.g.,* A.1100 (Carroll's opening statement) (emphasizing that President Trump was "[s]peaking from the White House" and "us[ing] the most famous platform on earth to lie about what he had done"); A.1781 (Carroll's summation) ("Wielding his position as president, [President Trump] attacked [Carroll] and her honesty."); A.71-A.72 (alleging that President Trump, as "the most powerful man on the planet, … used that platform [the Presidency] to attack" Carroll).

The policy concerns underlying the doctrine of Presidential immunity also strongly support this conclusion. "[I]mmunity serves the public interest in enabling such officials to perform their designated functions effectively without fear that a particular decision may give rise to personal liability." *Clinton v. Jones*, 520 U.S.

21

681, 693 (1997). Particularly with respect to the President, "immunity is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Trump*, 144 S. Ct. at 2331. "[A] long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically, in ways that the President believes would advance the public interest." *Id.* at 2340. "He is even expected to comment on those matters of public concern that may not directly implicate the activities of the Federal Government— for instance, to comfort the Nation in the wake of an emergency or tragedy." *Id.* The same logic applies here to statements designed to protect the reputation of the Presidency itself. *See* A.1692 (President Trump testifying, "I just wanted to defend myself, my family, and frankly, the presidency."). The President's robust and unfettered communication with the public plays a central role "in the distillation of an informed public opinion." *Columbia Broadcasting Sys., Inc. v. FCC*, 454 F.2d 1018, 1020 (D.C. Cir. 1971).

The risk that the President might be wrongly held liable for defamation based on his official speech through official government channels would actually chill the President's communications with the public, thus crippling the functioning of the presidency and our federal government as a whole. For example, there can be no serious doubt that the media was addressing a matter of substantial public interest

and concern to the Presidency when it asked for President Trump's response to Carroll's false accusations.

A public official acts within the scope of his official duties when he responds to public concerns about his private life—especially when he defends himself from accusations that could undermine his efficacy in office. For example, in *Clinton*, the Supreme Court stated that President Clinton's public denials of allegations of sexual misconduct by Paula Jones "may involve conduct within the outer perimeter of the President's official responsibilities." 520 U.S. at 686. Similarly, the D.C. Circuit held that "a congressman acted 'within the scope of employment' when he discussed his marital status in his office, during regular business hours, in response to a reporter's inquiries." *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 661 (D.C. Cir. 2006). *Ballenger* held that "[a] Member's ability to do his job as a legislator effectively is tied … to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 665. Thus, "there was a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id.* at 665-66. The same logic applies, with even greater force, to the President, thus placing this case squarely within the purview of *Trump* and mandating dismissal of all claims.

Indeed, a future President might be disinclined to respond to similar legitimate press inquiries rather than risk an egregious $83 million jury award like the one entered here.  That chilling effect harms the effectiveness and transparency of the Executive Branch, and it deprives the public and the press of critical information. Avoiding such a chilling effect is precisely why the doctrine of absolute Presidential immunity exists.  *See Trump*, 144 S. Ct. at 2331; *Clinton*, 520 U.S. at 693.

## II. The District Court Erred in Granting Issue-Preclusive Effect to the Judgment in *Carroll II*.

***Standard of Review***.  The Court reviews the district court's ruling on issue preclusion *de novo*.  *Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 66 F.4th 365, 369 (2d Cir. 2023).

The district court granted Carroll partial summary judgment on whether President Trump's statements were defamatory and whether they were made with actual malice.  SPA.80-SPA.91.  The district court reasoned that, under the doctrine of issue preclusion, the judgment in *Carroll II* prevented President Trump from disputing those issues in this case.  *Id.*  This was erroneous for three reasons.

### A. *Carroll II*'s Judgment Was Erroneous and Should Be Reversed.

First, the judgment in *Carroll II* was blatantly erroneous and should be reversed.  President Trump has appealed the judgment in *Carroll II*, which should be reversed for the reasons stated in the corresponding pleadings.  *See* Br. of

24

Appellant and Reply Br. in Case No. 23-793 (2d Cir.). The reversal of the judgment in *Carroll II* mandates reversal here.

New York law governs the issue-preclusive effect of the *Carroll II* judgment. *Plymouth Venture Partners II, L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021). Under New York law, where a later judgment is based on issue preclusion from an earlier judgment, and the earlier judgment is subsequently reversed on appeal, the later judgment also must be reversed. *People v. Brown*, 59 A.D.2d 928, 928 (2d Dep't 1977) (reversing under such circumstances); *see also State v. Moore*, 298 A.D.2d 814, 815-16 (3d Dep't 2002); *People v. Suarez*, 40 A.D.3d 143, 152 (1st Dep't 2007) ("Here, where the judgment that defendant relies upon was reversed on appeal, and hence does not constitute a final and valid judgment, the jury's factual findings lose their preclusive effect" (quotation omitted)); *compare PCR Harris, Inc. v. Boeing Co.*, 700 F.2d 894, 899 n.2 (2d Cir. 1983) (Newman, J., concurring). Here, the district court incorrectly resolved the merits of Carroll's claims based on the issue-preclusive effect of the *Carroll II* judgment. Because the judgment in *Carroll II* must be reversed, the judgment in this case must also be reversed. *See id.*; *Sheldon v. Khanal*, 396 F. App'x 737, 739 (2d Cir. 2010) (reversing under similar circumstances).

**B.** **The District Court Plainly Misconstrued the *Carroll II* Judgment.**

In *Carroll II*, Carroll testified—falsely—that President Trump supposedly raped her by inserting his genitals into hers, and that he supposedly sexually abused her by inserting his finger into her genitals. A.2221-A.2222. Carroll also testified falsely that President Trump engaged in other coerced sexual contact with Carroll, such as forcible kissing and pulling down her tights. A.2219-A2220.

The *Carroll II* jury found that President Trump did not "rape" Carroll, but that he did "sexually abuse" Carroll. A.2214. The district court reasoned that, "based on all of the evidence at trial and the [*Carroll II*] jury's verdict as a whole, the jury's finding that Mr. Trump 'sexually abused' Ms. Carroll *implicitly determined that he forcibly penetrated her digitally* – in other words, that Mr. Trump in fact did 'rape' Ms. Carroll as that term commonly is used and understood…." *Carroll v. Trump*, 685 F. Supp. 3d 267, 269 (S.D.N.Y. 2023) (emphasis added) (cited in SPA.71, *Carroll v. Trump*, 690 F. Supp. 3d 396, 400 n.2 (S.D.N.Y. 2023)). *Contrast Trump v. ABC, Inc.*, No. 24-21050-CIV, 2024 WL 3519177, at *6 (S.D. Fla. July 24, 2024).

This holding is manifestly erroneous. The *Carroll II* jury only, and incorrectly, found "sexual abuse," *not* "forcible digital penetration." A.2214. Moreover, the jury instructions in *Carroll II* made clear that "sexual abuse" encompassed multiple alternate forms of behavior that Carroll falsely testified about, such as forced kissing and touching on the hips and buttocks, which in no way constitute rape, and which the jury could have credited.

26

The district court wrongfully instructed the *Carroll II* jury that "sexual abuse" means "sexual contact" by "forcible compulsion." A.2228. "Sexual contact," the jury was instructed, includes "any touching of the sexual or *other intimate parts* of a person for the purpose of gratifying the sexual desire of either person." A.2228 (emphasis added). The jury was then incorrectly instructed that "other intimate parts" has no precise definition, and that "[i]ntimacy … is a function of behavior and not just anatomy. Therefore, … the manner and circumstances of the touching may inform your determination whether Mr. Trump touched any of Ms. Carroll's intimate parts." A.2228-A.2229. The jury was told that it should "apply your common sense to determine whether, under general societal norms and considering all the circumstances, any area or areas … were sufficiently personal or private that it would not have been touched in the absence of a close relationship between the parties." A.2229.

In *Carroll II*, Carroll falsely testified that other contact occurred that the jury could easily have determined falls within this sweeping definition. For example, she alleged that President Trump had forcibly kissed her without consent as he physically restrained her. A.2220. The jury could have determined this forcible kissing constituting "touching …. other intimate parts" because "under general societal norms and considering all the circumstances," Ms. Carroll's lips and mouth "were sufficiently personal or private that it would not have been touched in the absence of

27

a close relationship between the parties." A.2229. Likewise, Carroll wrongly testified that President Trump pulled down her tights, inevitably involving contact with her hips and/or buttocks. A.2220. Again, the jury could have determined that this constituted "touching … other intimate parts" under the instructions it received.

Thus, the district court's holding that *only* digital penetration of the genitals could explain the jury's finding of "sexual abuse" in *Carroll II* is manifestly erroneous. Given that the jury explicitly *discredited* Carroll's claim of penile penetration, which she made in close tandem with her allegation of digital penetration, that inference is also implausible. A.2220-A.2221. It ignores both the trial record and the district court's own, broad, and incorrect instructions in *Carroll II*.

But this erroneous holding underlies the entirety of district court's issue-preclusion ruling in *Carroll I*. *See Carroll*, 690 F. Supp. 3d at 399-400 & n.2. Accordingly, the district court repeatedly and wrongfully instructed the jury in this case that it must accept that forcible digital penetration had taken place, and that Carroll did not make up this claim—two "findings" that the *Carroll II* jury never made. In its opening instructions in *Carroll I*, the district court stated that the "facts that were definitively decided in the previous trial include the following: First, Mr. Trump, in fact, sexually abused Ms. Carroll *by forcibly and without her consent inserting his fingers into her vagina*. Second, .... Ms. Carroll *did not make up her*

28

*claim of forcible sexual abuse*." A.1085. The district court mistakenly stated, "you must accept these points as true no matter what else you may hear at this trial. And because you must accept them as true, this trial is not a do-over of the previous trial which determined those facts." A.1085-A.1086. Again, after the close of evidence, the district court erroneously instructed the jury that: "First, Mr. Trump sexually abused Ms. Carroll by forcibly inserting his fingers into her vagina without her consent. Second, Ms. Carroll did not make up her claim of forcible sexual abuse by Mr. Trump." A.1851. "For your purposes, you must accept these points are true no matter what else you heard in this trial." A.1852.

This is the definition of prejudicial error. President Trump was prevented from disputing at trial, *in any way*, that he had forcibly penetrated Carroll's genitals, even though that never happened and the *Carroll II* jury had made no such finding. Further, the district court specifically instructed the jury to weigh the reprehensibility of this unproven conduct "heavily" in its award of punitive damages: "Bear in mind that [reprehensibility] would include the character of the wrongdoing and Mr. Trump's awareness of what harm the conduct caused or was likely to cause. In considering the amount of punitive damages, you should weigh this factor heavily." A.1858. The entire jury verdict must be reversed.

For the same reasons, the district court's dismissal of President Trump's defamation counterclaim against Carroll must be reversed. *Carroll*, 685 F. Supp. 3d

at 277. Again, the basis for that dismissal was the district court's erroneous determination that the *Carroll II* jury determined that President Trump "raped" Carroll by determining that he had forcibly inserted his fingers into her genitals. *Id.*

## C. The District Court Erred in Finding Issue Preclusion on the Issue of Actual Malice.

Under New York law, issue preclusion "applies only where the issue in the second action is identical to an issue which was raised, necessarily decided and material in the first action." *Simmons v. Trans Express Inc.*, 37 N.Y.3d 107, 112 (2021) (cleaned up). The proponent of issue preclusion bears the burden of establishing that these requirements have been satisfied. *Parker v. Blauvelt Volunteer Fire Co.*, 93 N.Y.2d 343, 349 (1999). Here, Carroll failed to establish either that the actual-malice issue in this case was "identical" to the issues in *Carroll II* or that it was "necessarily decided" in that case.

The "actual malice" requirement looks to "the defendant's subjective mental state." *Dalbec v. Gentleman's Companion, Inc.*, 828 F.2d 921, 927 (2d Cir. 1987). A defamation plaintiff who is a public figure must prove, by clear and convincing evidence, that the defendant made the allegedly defamatory statement with knowledge that it was false or with reckless disregard of whether it was false or not. Importantly, the plaintiff must "prove[] that the statement was made with actual malice *at the time of publication*." *Celle v. Filipino Reporter Enters. Inc.*, 209 F.3d

163, 182 (2d Cir. 2000) (emphasis added); *see also Kipper v. NYP Holdings Co.*, 12 N.Y.3d 348, 344-45 (2009).

The issue of whether President Trump made the June 21 and June 22 Statements in 2019 with actual malice is not "identical" to the issues in *Carroll II*. As noted above, actual malice is judged based on the defendant's subjective mental state "at the time of publication." *Celle*, 209 F.3d at 182. The jury had no occasion to consider those factual issues in *Carroll II*. On the contrary, the jury was instructed *not* to consider the June 2019 Statements, and to focus solely on the October 2022 statement. A.2224; A.2226. Instead, the *Carroll II* jury was required to consider President Trump's subjective mental state at the time of his October 2022 statement at issue in that case—three years later. The *Carroll II* jury instructions underscored this fact, directing the jury to make a finding regarding President Trump's mental state "when he made his October 12[, 2022] statement." A.2230-A.2231. The jury instructions did not instruct the jury to make any findings regarding, and in fact mandated that they jury ignore, President Trump's mental state during 2019 when he made his June 21 and June 22 statements at issue in this litigation. *See id.*

The question of President Trump's subjective mental state on October 12, 2022 is not "identical" to the question of his subjective mental state on June 21, 2019 or June 22, 2019. Quite clearly, an individual will not necessarily have the same subjective mental state on three different days during a time period of more than

31

three years. For one thing, the contexts in which President Trump made the June 2019 statements were markedly different from that of the October 2022 statement, where actual malice was also not present. The contexts of the statements at issue here vary substantially from the social-media post made more than three years later that was at issue in *Carroll II*. In addition, over the course of a multi-year period, an individual may learn new information or come to understand existing information in a different light. "It is self-evident that information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication." *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir. 1986); *see also Biro v. Conde Nast*, 807 F.3d 541, 546 (2d Cir. 2015). President Trump's subjective mental states on June 21, 2019; June 22, 2019; and October 12, 2022 do not present "identical" questions. Mere overlap—even if it existed—does not suffice to trigger issue preclusion. *Capital v. Pattersonville*, 56 N.Y.2d 11, 19 (1982). Issue preclusion applies only if the issues are "identical." *Simmons*, 37 N.Y.3d at 112.

For similar reasons, the relevant actual-malice questions were not "necessarily decided and material" in *Carroll II*. *Simmons*, 37 N.Y.3d at 112. To find President Trump liable in that case, the jury needed only to find that he made the October 12, 2022 statement with actual malice, which he did not. *See Celle*, 209 F.3d at 182. The jury could have made that finding even if it had believed that President Trump

32

did not act with actual malice in connection with the 2019 statements, and thus the *Carroll II* finding has no preclusive effect. *See Simmons*, 37 N.Y.3d at 112; *Capital*, 56 N.Y.2d at 19-20.

### D. The Issue-Preclusion Error Was Devastatingly Harmful.

The issue-preclusion ruling was particularly harmful, because it prevented President Trump from presenting virtually any evidence to rebut Carroll's allegations, including evidence that devastated Carroll's case, and limited the issues to damages alone. For example, the district court relied on issue preclusion to prevent President Trump from presenting Carroll's CNN interview with Anderson Cooper in which she stated, two days after making her allegations, that "I was not thrown on the ground and ravished," and "most people think of rape as being sexy." SPA.124-SPA.125; *see also Watch the Anderson Cooper Interview Judge Blocked Donald Trump From Showing*, Newsweek (Jan. 25, 2024), at https://www.newsweek.com/watch-anderson-cooper-interview-judge-blocked-donald-trump-showing-1863998 (video embedded). Likewise, President Trump was unable to present evidence about many other issues, such as Carroll's dress, which she publicly claimed—falsely—contained President Trump's DNA. SPA.103-SPA.105. He was also prevented from pointing out that Carroll's story is identical to a plotline in a 2012 episode of Law & Order, one of her favorite shows.

**III.    The District Court Erred in Instructing the Jury Regarding Common-Law Malice.**

*Standard of Review*.   The Court reviews *de novo* the propriety of jury instructions and the interpretation of state law.  *United States v. Thiam*, 934 F.3d 89, 93 (2d Cir. 2019); *In re Thelen, LLP*, 736 F.3d 213, 219 (2d Cir. 2013).

**A.    Contrary to the District Court's Instruction, Common-Law Malice Requires Ill Will To Be the Defendant's *Sole* Motivation.**

Under New York law, a defamation plaintiff can recover punitive damages only if she establishes that the defendant acted with "common-law malice." *Prozeralik v. Capital Cities Commc'ns*, 82 N.Y.2d 466, 479-80 (1993).  Unlike the constitutional or "actual malice" standard imposed by *New York Times v. Sullivan*, 376 U.S. 254 (1964), "common-law malice focuses on the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity." *Id.* at 480.  A defendant acts with common-law malice if she defames the plaintiff "out of hatred, ill will, [or] spite." *Id.*; *see also Liberman v. Gelstein*, 80 N.Y.2d 429, 437 (1992) ("Under common law, malice meant spite or ill will." (citation omitted)).

Under New York law, this common-law malice standard requires that malice or spite must be the *only* motivation for the statement.  Common-law malice requires that "the speaker was *solely* motivated by a desire to injure plaintiff, and … that the animus was *the one and only cause* for the publication." *Morsette*, 309 A.D.2d at 255 (cleaned up) (second emphasis added).  In *Morsette*, because "the record [was]

34

bereft of any evidence that the libel suffered by plaintiff was 'the one and only cause for the publication,'" the defamation plaintiff could not recover punitive damages. *Id.* Subsequent cases have followed *Morsette* to hold that defamation plaintiffs may recover punitive damages only if they establish that the defendant was *solely* motivated by a desire to injure the plaintiff. *See, e.g.*, *Verdi v. Dinowitz*, 204 A.D.3d 627, 627 (1st Dep't 2022); *Verdi v. Dinowitz*, 188 A.D.3d 441, 442 (1st Dep't 2020); *Robertson v. Doe*, No. 05-cv-7046, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010) ("Under New York law, only a finding that [defendant] 'was solely motivated by a desire to injure plaintiff' can establish common-law malice." (quoting *Morsette*)). In fact, the district court so stated in an earlier order in *this case*. *Carroll*, 680 F. Supp.3d at 516 (noting that, under *Morsette*, "a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and that there must be some evidence that the animus was the one and only cause for the publication"). Prior to the district court's post-trial order here, no reported case had criticized or declined to follow *Morsette*.

Relying on *Morsette* and its progeny, President Trump requested a jury instruction that would permit the jury to award punitive damages only if it found "that a desire to injury [Plaintiff] and hostility toward her were the sole motive for publishing the [purportedly defamatory statements]." A.992. The district court

erroneously rejected the requested instruction.  A.1856-A.1857.  President Trump raised the issue again in his Rule 59 motion.  A.1913-A.1916.  The district court wrongfully denied the motion.  SPA.129-SPA.134.

The district court's refusal to follow the consistent precedent of the New York appellate courts constitutes reversible error.  On questions of state law, "it is [the Court's] job to predict how the New York Court of Appeals would decide the issue." *Amerex Grp., Inc. v. Lexington Ins. Co.*, 678 F.3d 193, 200 (2d Cir. 2012) (quotation omitted).  However, in the absence of authority from the New York Court of Appeals, federal courts are "bound to apply the law as interpreted by a state's intermediate appellate courts unless there is persuasive evidence that the state's highest court would reach a different conclusion."  *V.S. v. Muhammad*, 595 F.3d 426, 432 (2d Cir. 2010).  Here, New York's intermediate appellate courts have consistently held that a defamation plaintiff can recover punitive damages only if she establishes that "the speaker was *solely* motivated by a desire to injury plaintiff."  *Morsette*, 309 A.D.2d at 255; *Verdi*, 188 A.D.3d at 442.  The district court was "bound to apply" this precedent, because there was no "persuasive evidence that [the New York Court of Appeals] would reach a different conclusion" from the holdings of *Morsette* and *Verdi*.  *V.S.*, 595 F.3d at 432.

The district court identified two purported grounds for finding that "*Morsette* has no application to the present case."  SPA.132.  Neither has merit.  First, the

district court disagreed with the reasoning of *Morsette*. SPA.132-SPA.133. As noted above, a defamation plaintiff must establish common-law malice in order to recover punitive damages. *See Prozeralik*, 82 N.Y.2d at 479-80. "Common-law malice" also arises in the context of "qualified privilege." *See Liberman*, 80 N.Y.2d at 437-38. The district court observed that *Morsette*'s analysis of common-law malice in the context of punitive damages relied on cases addressing common-law malice in the context of qualified privilege. SPA.132. However, other than the conclusory assertion that the cases involve a "very different question," SPA.133, the district court provided no explanation for why those cases analyzing common-law malice—the very same standard—would be inapplicable to the punitive-damages context. SPA.132-SPA.133. That was error.

Further, the district court's analysis contradicts the Court of Appeals' reasoning in *Prozeralik*. To characterize common-law malice for punitive damages, *Prozeralik* cites *Liberman v. Gelstein*—a case involving qualified privilege. *Prozeralik*, 82 N.Y.2d at 479-80 (citing *Liberman*, 80 N.Y.2d at 437). *Liberman* specifically held that common-law malice must be "the one and only cause for the publication." *Liberman*, 80 N.Y.2d at 439 (quotation omitted).

Moreover, the common-law malice doctrine fulfills the same function in both the qualified-privilege and the punitive-damages contexts: it inquires about the defendant's motivation for making the defamatory statement. *Compare Prozeralik*,

37

82 N.Y.2d at 480 (explaining that "common-law malice focuses on the defendant's mental state … and the motive in publishing the falsity"), *with Liberman*, 80 N.Y.2d at 439 (explaining that common-law malice addresses "the speaker's motivation for making the defamatory statements").

The district court also claimed that *Morsette*'s discussion of the "solely motivated" requirement constituted non-binding dicta. SPA.133. But, even if the district court's characterization were correct, which it is not, subsequent New York appellate cases have applied *Morsette* in ways that plainly do not constitute dicta. *See Verdi*, 188 A.D.3d at 442 (affirming dismissal because "the complaint does not allege that in making the statements defendant was '*solely* motivated by a desire to injure plaintiff'" (quoting *Morsette*, 309 A.D.3d at 255)); *Verdi*, 204 A.D.3d at 627 (affirming denial of leave to amend because "[t]he pleadings allege that the defamatory statements were made with political and racial motivations, as well as a desire to shift blame, rather than, as required for punitive damages in a defamation claim, that defendant was motivated solely by malice" (citing *Morsette*)). President Trump cited *Verdi* in his post-trial briefing, *see* A.2200, but the district court did not address *Verdi* at all, *see* SPA.133.

Further, *Morsette*'s "solely motivated" requirement was not dicta. *Morsette* rejected the plaintiff's request for punitive damages because "the record [was] bereft of any evidence that the libel suffered by plaintiff was 'the one and only cause for

the publication.'" 309 A.D.2d at 255. But the court also found that there was no evidence that the defendant directed any ill-will at the plaintiff. *Id.* Accordingly, New York appellate courts have cited this portion of *Morsette* multiple times as binding authority. *See Verdi*, 188 A.D.3d at 442. Moreover, as noted above, the district court *in this case* previously cited *Morsette* for the proposition that "[t]he Appellate Division, First Department, . . . has **held** that a triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff…." *Carroll*, 680 F. Supp. 3d at 516 (emphasis added). The district court never explained its about-face on this issue.

The district court also contended that one of the New York Civil Pattern Jury Instructions ("PJI") does not include *Morsette*'s "solely motivated" language. SPA.134. But the PJIs are not binding, and "their use by a trial judge remains subject to objection by trial counsel or reversal on appeal." N.Y. Pattern Jury Instructions— Civil, *How to Use This Volume* (Dec. 2023); *see also id.* ("The charges and comments are not the official expression of the Unified Court System."). "The concededly useful pattern instructions, no matter how eminent their authors, do not take precedence over decisional law." *Acerra v. Trippardella*, 34 A.D.2d 927, 927 (1st Dep't 1970) (Stevens, P.J.). The district court was required to follow the decisions of the New York appellate courts. *See Acerra*, 34 A.D.2d at 927. The district court's erroneous instruction misled the jury regarding the correct legal

standard for awarding punitive damages and failed to adequately inform the jury on the law. *See Boyce v. Soundview Tech. Grp.*, 464 F.3d 376, 390 (2d Cir. 2006).

### B. The District Court's Erroneous Instruction on Common-Law Malice Was Harmful Error.

"An erroneous instruction requires a new trial unless the error is harmless and an error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016) (cleaned up).

The jury instruction created an erroneous impression regarding the standard of liability for punitive damages. Under New York law, a defamation plaintiff can recover punitive damages only if "the speaker was *solely* motivated by a desire to injure plaintiff." *Morsette*, 309 A.D.2d at 255. "Where jury instructions create an erroneous impression regarding the standard of liability, it is not harmless error because it goes directly to the plaintiff's claim, and a new trial is warranted." *LNC Investments, Inc. v. First Fidelity Bank, N.A.*, 173 F.3d 454, 463 (2d Cir. 1999) (quotation omitted).

Moreover, there was no direct evidence of spite or ill will, and it is unthinkable that pure malice—as opposed to desire to protect himself, his public reputation, and the Presidency as President Trump testified—was the "sole[]" or "one and only" motivation for the June 21 and June 22 Statements. *Prozeralik*, 82 N.Y.2d at 480; *Morsette*, 309 A.D.2d at 255. Carroll did not introduce any evidence directly bearing on President Trump's motivation in making the contested statements. Carroll did

40

not introduce any evidence showing that President Trump's *sole* motivation was to harm her, and no reasonable jury could have so held. For example, "political . . . motivations" and "a desire to shift blame" defeat a finding of common-law malice. *Verdi*, 204 A.D.3d at 627. It is impossible to conceive that the jury, even if it credited Carroll's account of the facts, did not believe that these alternative motivations partially explained President Trump's conduct. This Court finds harmless error only where it was "clear" that the instruction did not impact the result, or where the result was "inevitable." *See, e.g.*, *Boyce*, 464 F.3d at 391; *Uzoukwu v. City of New York*, 805 F.3d 409, 418 (2d Cir. 2015). Here, it is "clear" and "inevitable" that the jury would *not* have come to the same conclusion if properly instructed, thus there was egregious, harmful, error.

## IV. The District Court's Erroneous Exclusion of President Trump's Highly Relevant Testimony Necessitates a New Trial.

***Standard of Review***. The Court reviews the district court's exclusion of evidence for abuse of discretion. *Tereshchenko v. Karimi*, 102 F.4th 111, 124 (2d Cir. 2024). However, where (as here) that exclusion is based on an error of law, the question of law is reviewed *de novo*. *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 85 (2d Cir. 2023).

Prior to trial, the district court unconstitutionally ordered that President Trump was "precluded from arguing that he believed his statements to have been true when uttered" and from "claiming . . . that he did not make his June 21 and 22, 2019

41

statements concerning Ms. Carroll with actual malice in the constitutional sense of that term." SPA.102. However, the district court's *in limine* ruling did not prohibit President Trump from introducing evidence relevant to *common-law malice*, *i.e.*, his "mental state in relation to the plaintiff and the motive in publishing the falsity." *Prozeralik*, 82 N.Y.2d at 480.

During trial, immediately before President Trump took the stand, the district court conducted, *sua sponte*, an astonishing colloquy with President Trump's counsel regarding the scope of President Trump's anticipated testimony. The district court emphasized its prior ruling precluding testimony regarding constitutional malice. A.1678. However, the district court, also wrongfully, went on to curtail testimony relevant to *common-law malice*—which it had never ruled inadmissible. The district court unlawfully demanded that defense counsel identify "100 percent of what [President Trump] would say on the witness stand." A.1682. Among other things, President Trump's counsel indicated that he would testify regarding "his state of mind and the timing of the statements." A.1679. The district court demanded to know precisely the questions that would be asked. Defense counsel stated that she intended to ask "why did you make the statements in response to [Carroll's] accusation." A.1688. The district court directed that defense counsel could not ask that question. A.1688-A.1690. The district court specifically stated that defense

42

counsel could *not* inquire about "what was in [President Trump's] mind. Why did he do it." A.1689. This was all manifest, harmful error.

Then, during President Trump's testimony, defense counsel asked "Did you ever instruct anyone to hurt Ms. Carroll in your statements?" A.1692. President Trump responded, "No. I just wanted to defend myself, my family, and frankly, the presidency." A.1692. The district court erroneously struck all of President Trump's answer after the word "No." A.1692.

In his Rule 59 motion, President Trump argued that the exclusion of his testimony necessitated a new trial. *See* A.2201-A.2202. Although the district court acknowledged that President Trump had argued that "the Court erred in excluding evidence," SPA.128, the district court never addressed that argument or provided any justification for its wrongful and unconstitutional exclusion of President Trump's testimony, *see* SPA.127-SPA.144.

The district court erred both through its *ex ante* limitations on President Trump's testimony and its striking of President Trump's highly relevant testimony. Although the district court never provided a clear explanation for these evidentiary rulings, it appears that the court sought to prevent testimony that would be inconsistent with its, erroneous on their own, summary-judgment rulings on the issue of *constitutional* or "actual" malice. *See* A.1678-A.1688. However, the excluded testimony clearly related to the question of *common-law malice*, *i.e.*, President

43

Trump's "mental state in relation to the plaintiff and the motive in publishing the falsity." *Prozeralik*, 82 N.Y.2d at 480. That remained a live issue in the case, and thus the testimony was plainly relevant. *See* Fed. R. Evid. 401. "As a general rule, 'all relevant evidence is admissible.'" *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 53 (2d Cir. 1993) (quoting Fed. R. Evid. 402) (brackets omitted).

This erroneous evidentiary ruling was not harmless. Where "[t]he excluded evidence spoke directly to a critical element of [one side's] case and its exclusion prevented [the defendant] from presenting a complete defense," that evidentiary error is "far from harmless." *United States v. White*, 692 F.3d 235, 251-52 (2d Cir. 2012). Here, the district court foreclosed President Trump from presenting any evidence at all on the issue of common-law malice, a central issue at trial. It is not "harmless to exclude a statement that would have supported the main theory of the defense." *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988) (quotation omitted). This was harmful error.

## V.    The District Court Erred by Not Requiring Punitive Damages To Be Proven by Clear and Convincing Evidence.

***Standard of Review***. The Court reviews the propriety of jury instructions and the application of state law *de novo*. *Thiam*, 934 F.3d at 93; *Thelen*, 736 F.3d at 219.

The district court erroneously instructed the jury that Carroll could prove punitive damages "by a preponderance of the evidence." A.1857. New York law requires clear and convincing evidence, not a preponderance.

44

President Trump requested an instruction that the jury must find common-law malice by clear and convincing evidence. A.994. The district court incorrectly rejected that request. *See* A.1856-A.1857. President Trump moved for a new trial based on the district court's instruction, A.1926-A.1928, and the district court denied that request, SPA.134-SPA.136.

The First and Second Departments of the New York Supreme Court, Appellate Division have held that a plaintiff must prove entitlement to punitive damages by clear and convincing evidence. *See, e.g.*, *Randi A.J. v. Long Island Surgi-Ctr.*, 46 A.D.3d 74, 86 (2d Dep't 2007); *Sladick v. Hudson Gen. Corp.*, 226 A.D.2d 263, 264 (1st Dep't 1996). The Fourth Department, by contrast, has held that a plaintiff need only prove entitlement to punitive damages by a preponderance of the evidence. *In re Seventh Judicial Dist. Asbestos Litig.*, 190 A.D.2d 1068, 1069 (4th Dep't 1993).

The decisions of the First and Second Departments persuasively predict how the New York Court of Appeals would resolve this issue. "[T]he standard endorsed by the First and Second Departments—clear and convincing evidence—is also the standard applied by the majority of New York's sister states." Leon D. Lazar & John R. Higgitt, *Ascertaining the Burden of Proof for an Award for Punitive Damages in New York? Consult Your Local Appellate Division*, 25 TOURO L. REV. 725, 733 (2009); *see also* KIRCHER & WISEMAN, PUNITIVE DAMAGES: LAW & PRAC. § 9:10 (2d ed. 2024 updated). The Court of Appeals frequently considers the weight of

authority from other States to decide such issues. *See, e.g.*, *Panepinto v. N.Y. Life Ins. Co.*, 90 N.Y.2d 717, 721-23 (1997); *Boryszewski v. Brydges*, 37 N.Y.2d 361, 364 (1975).

Moreover, the "clear and convincing" standard accounts for the quasi-criminal nature of punitive damages under New York law. Punitive damages represent a "hybrid between a display of ethical indignation and the imposition of a criminal fine." *Thoreson v. Penthouse Int'l, Ltd.*, 80 N.Y.2d 490, 497 (1992) (quotation omitted). Like criminal penalties, "the purpose of punitive damages is solely to punish the offender and to deter similar conduct and not to compensate or reimburse an injured party." *J.P. Morgan Secs. Inc. v. Vigilant Ins. Co.*, 37 N.Y.3d 552, 564 (2021) (cleaned up). Recognizing that the conduct justifying punitive damages "must be close to criminality," the First Department has held that "[a]n award for punitive damages must be supported by clear, unequivocal and convincing evidence." *Camillo v. Geer*, 185 A.D.2d 192, 194 (1st Dep't 1992) (cleaned up); *see also Cleghorn v. N.Y. Central & Hudson Riv. R.R. Co.*, 56 N.Y. 44, 48 (1874) (holding that punitive damages must be based on conduct "of a criminal nature, and clearly established").

The district court incorrectly reasoned that the Court of Appeals' 1920 decision in *Corrigan v. Bobbs-Merrill Co.* adopted the preponderance standard. SPA.134-SPA.135. *Corrigan* involved a defamation suit brought by a public figure

46

against a book publisher. 228 N.Y. 58, 62-63 (1920). Although the proper burden of proof was not at issue, the court stated in dicta that "plaintiff was bound to [prove common-law malice] by a fair preponderance of the evidence." *Id.* at 66. The court went on to reverse the jury verdict on the ground that certain evidence had been improperly admitted against the publisher. *Id.* at 68-71.

*Corrigan* is inapplicable. First, as then-Judge Sotomayor observed, *Corrigan* "has since been effectively overruled by" cases "requir[ing] that the libel case be proven by clear and convincing evidence." *Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973, 978 (S.D.N.Y. 1997). *Corrigan* relies on earlier caselaw applying a preponderance standard to defamation claims brought by public figures. *Corrigan*, 228 N.Y. at 66. The Supreme Court abrogated those cases. *Greenbaum*, 979 F. Supp. at 978.

Second, the relevant passage from *Corrigan* is dictum unsupported by any reasoning or citation of authority. *Corrigan* did not involve a dispute regarding the applicable burden of proof, and that issue had no impact on the holding. *See* 228 N.Y. at 63-72. Thus, the court's passing reference to the preponderance standard is non-binding dictum. *Rohrbach v. Germania Fire Ins. Co.*, 62 N.Y. 47, 58 (1875). The Court of Appeals provided no argument in favor of the preponderance-of-the-evidence standard over any other possible standard. *See Corrigan*, 228 N.Y. at 66. Nor did the court cite any case supporting the application of the preponderance-of-

47

the-evidence standard. *Id.* The Court of Appeals has not hesitated to reject dicta from its own cases, where the dicta are not persuasive. *See, e.g.*, *Knapp v. Hughes*, 19 N.Y.3d 672, 677 (2012).

President Trump's proposed instruction is also supported by the additional factors cited by then-Judge Sotomayor in *Greenbaum*. First, the burden of proof for punitive damages ordinarily should match the burden of proof for other damages, that is, the burden of proof for establishing liability. *Greenbaum*, 979 F. Supp. 2d at 982. Second, New York law generally imposes a higher burden of proof only "in a limited class of cases in instances such as the denial of personal or liberty rights, particularly important personal interests are at stake, or to establish certain interests in realty, fraud, and the like." *Id.* (quotation omitted); *see also Herman & MacLean v. Huddleston*, 459 U.S. 375, 389 (1983).

Here, both *Greenbaum* guideposts are appliable. Carroll is a public figure who can establish liability "only on clear and convincing proof…." *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 342 (1974). Likewise, the award of punitive damages in a defamation case raises precisely the sorts of weighty personal and constitutional interests that trigger a higher burden of proof under New York law. *See Greenbaum*, 979 F. Supp. at 982; *Herman & MacLean*, 459 U.S. at 389. "It is speech on matters of public concern that is at the heart of the First Amendment's protection." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 758-59 (1985) (cleaned

up); *see also id.* at 767-68 (White, J., concurring in the judgment); *Gertz*, 418 U.S. at 344-45. Indeed, the Court of Appeals has questioned "whether punitive damages are ever recoverable in libel actions involving matters of public concern." *Mahoney v. Adirondack Publ'g Co.*, 71 N.Y.2d 31, 41 (1987).

This erroneous instruction was not harmless. "An erroneous instruction requires a new trial unless the error is harmless and an error is harmless only if the court is convinced that the error did not influence the jury's verdict." *Warren*, 823 F.3d at 137 (cleaned up). "Under [this Court's] precedent, it is accepted that an error in instructing a jury on the burden of proof is ordinarily harmful." *Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*, 716 F.3d 296, 298 (2d Cir. 2013).

Moreover, Carroll submitted nothing remotely resembling "clear and convincing" evidence of common-law malice. *See supra*, Part III.B. The Court ordinarily finds jury-instruction errors harmless only where it was "clear" that the instruction did not impact the result, or where the result was "inevitable." *See, e.g.*, *Boyce*, 464 F.3d at 391; *Uzoukwu*, 805 F.3d at 418. As noted above, the opposite is true here.

## VI. The Compensatory Damages Award Must Be Remitted.

***Standard of Review***. The Court "review[s] a district court's denial of remittitur for abuse of discretion." *Stampf v. Long Island R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014). However, when reviewing the excessiveness of an emotional-distress

award, "there must be an upper limit, and whether that has been surpassed is … a question of law." *Id.* (quotation omitted).

### A. The $7.3 Million Award Compensates Only Alleged Emotional Injury, Not Reputational Harm.

The jury awarded Carroll two categories of compensatory damages. First, it awarded $11 million for a potential, theoretical "reputational repair" program that would compensate her for alleged injuries to her reputation. A.1014. This award was baseless in its entirety. Second, it awarded $7.3 million for alleged emotional distress. A.1014. The district court instructed the jury that it could award damages only for two classes of damages, reputational injury and emotional distress: "[1] the injury to Ms. Carroll's reputation and [2] the humiliation and mental anguish in her public and private lives." A.1853-A.1854; *see also* A.1853. "Juries are presumed to follow their instructions." *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (cleaned up).

As Carroll's counsel argued in closing, the $11 million damages for the reputational-repair program were designed to compensate the harm to Carroll's reputation. *See* A.1773-A.1774; A.1775. With respect to the reputational-repair program, Carroll's counsel urged the jury to ask "what will it take to fix the damage that Donald Trump caused to Ms. Carroll's reputation?" A.1795. The reputational-repair award compensates reputational injury, and so the $7.3 million award for emotional distress does not include reputational harm. "A basic principle of

50

compensatory damages is that an injury can be compensated only once." *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996); *see also* A.1854 (instructing the jury that it "may not award compensatory damages more than once for the same injury"); A.1856 (instructing the jury to exclude the reputational-repair program from the other category of compensatory damages).

The $7.3 million award thus compensates Carroll's alleged "humiliation and mental anguish." A.1853-A.1854. That is what Carroll's counsel argued to the jury. *See* A.1775 ("The second category of compensatory damages is where you need to decide how much to award Ms. Carroll for the pain and suffering that she has been experiencing.").

### B. The $7.3 Million Award for Emotional Damages Must Be Remitted.

"[W]hen juries grant large compensatory awards for intangible and unquantifiable injuries, such as emotional distress, pain, and suffering," the Court is "required to subject the trial court's discretion to substantial constraints." *Turley*, 774 F.3d at 162 (quotation omitted). "Awards for mental and emotional distress are inherently speculative. There is no objective way to assign any particular dollar value to distress." *Id.* Moreover, "[e]xcessive awards for psychological and emotional distress not only disproportionately inflict harm on the tortfeasor and his or her dependents, they also impose burdensome costs on society." *Stampf*, 761 F.3d at 205. Thus, the Court carefully scrutinizes large awards to "ensure proportionality,

51

to control for the inherent randomness … concerning appropriate compensation for intangible harm, and to reduce the burdensome costs on society of over-extensive damages awards." *Turley*, 774 F.3d at 162 (quotation omitted).

"In assessing whether a jury award for compensatory damages is excessive, courts in the Second Circuit have routinely identified three categories of damages for emotional distress: (1) garden variety; (2) significant; and (3) egregious[.]" *Sooroojballie v. Port Authority of New York & New Jersey*, 816 F. App'x 536, 546 (2d Cir. 2020). "In garden-variety claims, the evidence of emotional harm is limited to the plaintiff's testimony, which describes his or her injuries in vague or conclusory terms, and fails to relate the severity or consequences of the injury. These claims typically lack extraordinary circumstances and are not supported by medical testimony." *Id.* "Significant emotional distress claims are based on more substantial harm or offensive conduct and may be supported by medical testimony, evidence of treatment by a healthcare professional, and testimony from other witnesses." *Id.*

Here, any emotional distress constituted "garden variety" distress. Carroll's emotional-distress claim rested entirely on her own testimony, which described it in vague, highly abstract, metaphorical terms. *See, e.g.,* A.1175 ("[T]his laid me low"); A.1180 ("[I]t hurt my feelings"); A.1169 ("[I]t ended the world that I had been living in, and I – and a new world"); A.1170 ("I had left the world of facts, a lovely world, and I was living in a new universe."); A.1188 ("It makes it hard for a girl to get up

in the morning, really. … You know, it makes me feel bad."). These are the clear hallmarks of "garden-variety" distress, the presence of which is wholly contradicted by the Plaintiffs actions and earnings.

Moreover, Carroll testified that, after the June 21 and 22 Statements, she felt embraced by the public, that people were "coming up to [her] in the street to praise [her]," A.1302, and that she had a feeling of "warmth and [she] enjoyed it immensely," A.1307. She testified that she has experienced "[w]onderful, really wonderful support," A.1214, and that she frequently feels "optimistic and wonderful," A.1235.

Notably, Carroll did not introduce any medical testimony or objective evidence reflecting psychological, mental, or physical harm. *See Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 320 (S.D.N.Y. 2018) ("In this Circuit, 'significant' emotional distress is generally found only where a plaintiff has offered medical, psychological, or therapist evidence of substantial, long-term psychological harm."). She also did not introduce any evidence showing that she received medical treatment or was diagnosed with any medical condition. *Dotson v. City of Syracuse*, No. 5:04-cv-1388, 2011 WL 817499, at *15 (N.D.N.Y. Mar. 2, 2011) ("Where emotional distress encompasses humiliation, shame, shock, moodiness and being upset but is devoid of any medical treatment or physical manifestation, it is considered to be 'garden variety.'"). "Garden variety emotional distress claims

generally merit $30,000.00 to $125,000.00 awards." *Duarte*, 341 F. Supp. 3d at 320 (quotation omitted); *see also Stampf*, 761 F.3d at 207 ("$100,000 appears to reflect the upper end of the range of awards in comparable cases."). Thus, the emotional-distress award here should be remitted to no more than $125,000. *Stampf*, 761 F.3d at 207-08; *Duarte*, 341 F. Supp. 3d at 320.

Moreover, "[i]n cases with 'significant' emotional distress claims, awards usually range from $50,000.00 to $200,000.00, but courts have, in some instances, upheld awards exceeding $200,000.00." *Sooroojballie*, 816 F. App'x at 547 (cleaned up). Even if Carroll had established "significant" emotional distress—which she did not—the jury award should be remitted to no more than $200,000. *See id.*

Wrongfully disregarding these arguments, the district court instead cited jury verdicts from other cases, all of which are inapposite. *See* SPA.137-SPA.139. In *Purgess v. Sharrock*, this Court upheld a $3.5 million compensatory-damages award that was based on lost earnings, which are not present here, supported by concrete evidence about salaries at various employers. 33 F.3d 134, 142 (2d Cir. 1994). *Purgess* did not involve any damages for emotional distress or any other sort of intangible harm. *See id.*

In both *Osorio v. Source Enterprises, Inc.* and *Cantu v. Flanagan*, the non-economic damages awards included both emotional distress *and* reputational harm. *See Cantu*, 705 F. Supp.2d 220, 225 (E.D.N.Y. 2010); *Osorio*, No. 05-cv-10029,

2007 WL 683985, at *10 (S.D.N.Y. Mar. 2, 2007).  Here, the $7.3 million award does not include Carroll's alleged reputational harm.  *See Morse v. Fusto*, No. 07-cv-4793, 2013 WL 4647603, at *28 (E.D.N.Y. Aug. 29, 2013) (finding that this fact made *Osorio* irrelevant to assessment of an emotional-distress award); *Duarte*, 341 F. Supp.3d at 323 n.10 (similar).  Moreover, in both *Osorio* and *Cantu*—unlike here—the substantial reputational damages were tethered to concrete, quantifiable economic harms.  *See Cantu*, 705 F. Supp. 2d at 230-31; *Osorio*, 2007 WL 683985, at *1.

In *Prozeralik v. Capital Cities Communications*, the relevant award was "for emotional *and physical injury*."  222 A.D.2d 1020, 1021 (4th Dep't 1995) (Lawton and Doerr, J.J., dissenting) (emphasis added).  Moreover, as in *Osorio* and *Cantu*, the non-economic damages in *Prozeralik* were tethered to a substantial award for concrete, quantifiable economic losses.  *See Prozeralik v. Capital Cities Communications, Inc.*, 188 A.D. 2d 178, 185 (4th Dep't 1993) (noting "the award of $1,487,525 as damages for plaintiff's direct financial loss").  Finally, *Prozeralik* does not provide any meaningful explanation for why the non-economic damages award was permissible, nor did it purport to apply the garden-variety/significant/egregious framework that this Court has found persuasive in analyzing emotional-distress awards.  *See Prozeralik*, 222 A.D.2d at 1020.

## VII.  The $65 Million Punitive Damages Award Must Be Remitted.

***Standard of Review***.  The Court "review[s] *de novo* a district court's determination that a punitive damages award is not grossly excessive in violation of the United States Constitution."  *Turley*, 774 F.3d at 164.  Under federal common law, the Court reviews the district court's decision regarding the remittitur of punitive damages for abuse of discretion.  *Id.*

The jury's verdict, as reflected in the judgment, awarded Carroll $7.3 million in compensatory damages for emotional injuries and $11 million in compensatory damages for repair of her reputation, for a total of $18.3 million in compensatory damages.  A.1014; SPA.126.  The jury awarded Carroll $65 million in punitive damages, creating a ratio of punitive damages to compensatory damages of approximately 3.6:1.  *See id.*  President Trump moved to remit the punitive damages award, emphasizing *Turley*.  *See* A.1940-A.1945.  The district court rejected that request, all but ignoring *Turley*.  *See* SPA.139-SPA.142.  The district court committed an error of law and abused its discretion by failing to remit the punitive damages award.

Both federal common law and the Due Process Clause limit the permissible magnitude of punitive damages awards.  *Turley*, 774 F.3d at 164-65.  The Court "exercise[s] relatively stringent control over the size of punitive awards in order to ensure that such damages are fair, reasonable, predictable, and proportionate, to

56

avoid extensive and burdensome social costs, and to reflect the fact that punitive awards are imposed without the protections of criminal trials." *Id.* at 164 (cleaned up). When exercising this "relatively stringent control," the Court looks to three principal "guideposts": "(1) the degree of reprehensibility associated with the defendants' actions; (2) the disparity between the harm or potential harm suffered and the size of the punitive award; and (3) the difference between the remedy in this case and the penalties imposed in comparable cases." *Id.* at 165 (cleaned up).

In *Turley*, the Court held that "where . . . the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, a lesser ratio, perhaps only equal to compensatory damages, can reach the outer limit of the due process guarantee." *Id.* at 165. *Turley* involved a suit "for violations of state and federal anti-discrimination statutes, and for intentional infliction of emotional distress under New York law," based on "a pattern of extreme racial harassment in the workplace." *Id.* at 146; *see also id.* at 147-48. The district court awarded $1.32 million in compensatory damages and $5 million in punitive damages—a ratio of 3.8:1, very close to the 3.6:1 ratio here. *Id.* at 147. Notwithstanding the egregious nature of the conduct, which left the plaintiff "psychologically scarred and deflated," *id.* at 146, this Court held that, even after it was remitted to $5 million, "the punitive damages award exceed[ed] the bounds of reasonableness." *Id.* at 164. Considering the uniquely egregious nature of the

conduct in *Turley*—a three-year long pattern of extreme racist harassment and death threats—the Court concluded that "a roughly 2:1 ratio of punitive damages to what, by its nature, is necessarily a largely arbitrary compensatory award, constitutes the maximum allowable in these circumstances." *Id.* at 166. But the Court also instructed that, in most cases, a 1-to-1 ratio would likely be the maximum allowable. *Id.* at 167.

Under *Turley*, the punitive damages award in this case must be reduced to no more than an amount equal to the compensatory damages award—which itself must be reduced for the reasons discussed above, *supra* Part VI. As in *Turley*, the compensatory damages award here is "imprecise because of the nature of the injury." *Turley*, 774 F.3d at 165. Reputational and emotional injuries constitute quintessential forms of "imprecise" injury. *See id.*; *Stampf*, 761 F.3d at 205. In addition, as in *Turley*, the compensatory damages awarded here are "high" in comparison to most other New York defamation cases. *See, e.g.*, *Carroll v. Trump*, No. 22-CV-10016, 2023 WL 4612082, at *17 (S.D.N.Y. July 19, 2023) ($2.7 million in compensatory damages for similar conduct, less than 15 percent of the compensatory award here); *Webber v. Dash*, 607 F. Supp. 3d 407, 410 (S.D.N.Y. 2022) ($400,000 in compensatory damages, just over 2 percent of the compensatory award here); *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 348-49 (S.D.N.Y. 2016) (holding that "the compensatory award on Plaintiff's defamation claim is

high" when the jury awarded $1.5 million). Thus, a one-to-one ratio of compensatory to punitive damages here would "reach the outer limit of the due process guarantee." *Turley*, 774 F.3d at 165.

The district court did not attempt to distinguish this case from *Turley*, nor did it attempt to square its analysis with *Turley*. SPA.139-SPA.142. The district court entirely ignored *Turley*'s second and third "guideposts." The second guidepost—the ratio of compensatory to punitive damages—strongly supported remittitur for the reasons discussed above. The third guidepost—"the difference between the remedy in this case and the penalties imposed in comparable cases"—also strongly supported remittitur. 774 F.3d at 164. In particular, the 3.6:1 ratio awarded by the jury here is entirely out of step with the ratios in comparable New York defamation cases, where punitive damages awards have been equal to, or less than, the compensatory damages awards. *See, e.g.*, *Bouveng*, 175 F. Supp. 3d at 350 (holding, in a defamation case involving "conduct … at the extreme end of the spectrum," "that a punitive damage award yielding a ratio of no more than 1:1 as to each defendant is appropriate"); *Webber*, 607 F. Supp. 3d at 410, 417 (in defamation case where "[t]he degree of Defendants' reprehensibility . . . [was] high," punitive damages award less than compensatory damages award).

The district court instead improperly emphasized its view that the conduct at issue here was particularly reprehensible. *See* SPA.139-SPA.142. This argument is

59

baseless, when the conduct involves mere public denials of inflammatory, decades-old allegations of sexual misconduct. But even if the district court's assessment of reprehensibility were correct, which it is not, that would provide no basis for ignore *Turley*. The misconduct at issue in *Turley* "was egregious in the extreme," 774 F.3d at 165, far exceeding anything alleged, let alone proven, by Carroll. The plaintiff in *Turley* was subjected to three years of constant, pervasive harassment and abuse, which led to concrete medical and physical harms, including PTSD, depression, and the loss of thirty pounds. *See generally id.* at 148-51. Nothing of the sort was even alleged in this case. Notwithstanding this, *Turley* remitted the punitive damages award whose proportion to compensatory damages was similar to the award here.

For these reasons, any punitive award must be remitted to, at most, a one-to-one ratio with compensatory damages, which must be reduced. The necessary remittitur of compensatory damages, *supra* Part VI, should proportionally reduce any punitive-damage award as well.

## **CONCLUSION**

The Court should reverse the district court's judgment.

Dated: September 13, 2024                Respectfully submitted,

<u>*/s/ D. John Sauer*</u>
D. John Sauer
JAMES OTIS LAW GROUP, LLC
13321 N. Outer Forty Rd.
Suite 300
St. Louis, Missouri 63017
(314) 562-0031
john.sauer@james-otis.com

*Attorney for Defendant-Appellant President Donald J. Trump*

61

## CERTIFICATE OF SERVICE

I hereby certify that, on September 13, 2024, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Circuit Rule 32.1(a)(4) because it contains 13,996 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*