# 24-644

IN THE

# United States Court of Appeals

## FOR THE SECOND CIRCUIT

◆—◆

E. Jean Carroll,

*Plaintiff-Counter-Defendant-Appellee,*

—against—

Donald J. Trump, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFF-COUNTER-DEFENDANT-APPELLEE

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
Thomas A. Lloyd
Avita Anand
Kaplan Martin LLP
1133 Avenue of the Americas,
Suite 1500
New York, New York 10036
(212) 316-9500

*Attorneys for Plaintiff-Counter-Defendant-Appellee*

# **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................ iv

PRELIMINARY STATEMENT ...........................................................1

STATEMENT OF THE ISSUES..........................................................4

STATEMENT OF THE CASE.............................................................5

SUMMARY OF THE ARGUMENT ..................................................10

ARGUMENT ...................................................................................12

    I.     DONALD TRUMP IS NOT ENTITLED TO PRESIDENTIAL IMMUNITY FOR THE STATEMENTS AT ISSUE HERE .............12

          A.     Presidential immunity is waivable. .........................................12

               1.    The Supreme Court's decision in *Trump v. United States* did not change the relevant law. ..............13

               2.    Contrary to Trump's suggestion, presidential immunity is not a jurisdictional question. ......................15

               3.    The conclusion that presidential immunity from damages lawsuits is waivable is reinforced by the fact that every other form of federal immunity can be waived. ...................................................................18

          B.     Trump waived whatever presidential immunity he might have had. .................................................................................20

                1.    The Supreme Court's decision in *Trump v. United States* did not change the relevant law with respect to waiver. .................................................................20

                2.    This Court's decision in *Carroll 3* held that Trump waived immunity. ..........................................................21

                3.    The district court correctly found that Trump waived immunity. ..........................................................21

C. Trump is not entitled to presidential immunity with respect to the claim at issue in this case. ...............................................23

II. THE DISTRICT COURT DID NOT ERR IN GRANTING PARTIAL SUMMARY JUDGMENT TO CARROLL......................29

 A. The District Court properly held that Trump's statements were false. ...............................................29

 B. The District Court properly held that Trump's statements were made with actual malice...................................32

III. THE DISTRICT COURT CORRECTLY EXCLUDED TRUMP'S IRRELEVANT AND PREJUDICIAL TESTIMONY ......................36

 A. Trump waived these arguments. ...............................36

 B. Trump's arguments are meritless in any event. ........................39

IV. THE DISTRICT COURT PROPERLY DENIED TRUMP'S MOTION FOR A REMITTUR AS TO THE $7.3 MILLION COMPENSATORY DAMAGES AWARD .......................................40

 A. The $7.3 million award reflects all compensatory damages other than the reputation repair program. .................40

 B. The $7.3 million award was reasonable.....................................42

V. THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY ON COMMON-LAW MALICE ...............................................44

VI. THE JURY INSTRUCTIONS CORRECTLY STATED THE BURDEN OF PROOF FOR AWARDING PUNITIVE DAMAGES ...........................................................48

VII. THE DISTRICT COURT PROPERLY DENIED TRUMP'S MOTION FOR A REMITTITUR AS TO THE $65 MILLION PUNITIVE DAMAGES AWARD ...........................................................51

CONCLUSION ...........................................................................56

## <u>TABLE OF AUTHORITIES</u>

**CASES**

*Anderson v. Osborne*,
2020 WL 6151249 (S.D.N.Y. Oct. 20, 2020) .......................................54

*Barkley v. United Homes, LLC*,
2012 WL 2357295 (E.D.N.Y. June 20, 2012) .......................................50

*Barrett v. Harrington*,
130 F.3d 246 (6th Cir. 1997) ................................................................27

*Belmac Hygiene, Inc. v. Belmac Corp.*,
121 F.3d 835 (2d Cir. 1997).................................................................46

*Browning v. Clinton*,
No. 98-1992 (D.C. Cir. Jan. 25, 2002)................................................17

*B-Steel of Kansas, Inc. v. Texas Indus., Inc.*,
439 F.3d 653 (10th Cir. 2006) .............................................................34

*Buckley v. Fitzsimmons*,
509 U.S. 259 (1993).............................................................................27

*Buechel v. Bain*,
97 N.Y.2d 295 (2001) ..........................................................................33

*Bundy v. Navarro*,
No. 16 Civ. 1047 (D. Nev. July 15, 2016)...........................................17

*Cantu v. Flanigan*,
705 F. Supp. 2d 220 (E.D.N.Y 2010) ..................................................44

*Carroll v. Trump*,
49 F.4th 759 (2d Cir. 2022) ...................................................................5

*Carroll v. Trump*,
66 F.4th 91 (2d Cir. 2023) ......................................................................5

*Carroll v. Trump*,
88 F.4th 418 (2d Cir. 2023) .......................................................... passim

*Carroll v. Trump*,
124 F.4th 140 (2d Cir. 2024) ........................................... 5, 7, 29, 30

*Carroll v. Trump*,
683 F. Supp. 3d 302 (S.D.N.Y. 2023) ......................................... 30, 31

*Celle v. Filipino Rep. Enters., Inc.*,
209 F.3d 163 (2d Cir. 2000) ............................................ 34, 35, 41, 49

*Cheney v. U.S. Dist. Court*,
542 U.S. 367 (2004) .............................................................................13

*Chisom v. Roemer*,
501 U.S. 380 (1991) .............................................................................17

*Cleghorn v. N.Y. Central & Hudson River Railroad Co.*,
56 N.Y. 44 (1874) ....................................................................... 49, 50

*Clinton v. Jones*,
520 U.S. 681 (1997) ................................................................. 17, 23, 26

*Cohen v. Trump*,
No. 23-25 (2d Cir. July 24, 2023) ......................................................16

*Corrigan v. Bobbs-Merrill Co.*,
228 N.Y. 58 (1920) ............................................................ 3, 48, 49, 50

*Council on American-Islamic Relations v. Ballenger*,
444 F.3d 659 (D.C. Cir. 2006) ...........................................................28

*D.C. v. Trump*,
No. 18-2488 (4th Cir. Feb. 21, 2019) ................................................16

*DiBella v. Hopkins*,
403 F.3d 102 (2d Cir. 2005) ...............................................................45

*DiSorbo v. Hoy*,
    343 F.3d 172 (2d Cir. 2003)................................................................29

*Emanian v. Rockefeller Univ.*,
    971 F.3d 380 (2d Cir. 2020)................................................................30

*Engel v. CBS, Inc.*,
    182 F.3d 124 (2d Cir. 1999)................................................................46

*Freeman v. Guiliani*,
    No. 21 Civ 3354 (D.D.C. Dec. 15, 2023) ................................... 44, 55

*Freytag v. Comm'r of Internal Revenue*,
    501 U.S. 868 (1991) .............................................................................18

*Gravel v. United States*,
    408 U.S. 606 (1972) .............................................................................15

*Greenaway v. Cnty. of Nassau*,
    327 F. Supp. 3d 552 (E.D.N.Y. 2018) ................................................55

*Greenbaum v. Svenska Handelsbank*,
    979 F. Supp. 973 (S.D.N.Y. 1997) ......................................................49

*Gross v. Rell*,
    585 F.3d 72 (2d Cir. 2009)...................................................................32

*Herbert v. Lando*,
    781 F.2d 298 (2d Cir. 1986)................................................................35

*Herlihy v. Metro. Museum of Art*,
    214 A.D.2d 250 (1st Dep't 1995) .......................................................47

*Hutchinson v. Proxmire*,
    443 U.S. 111 (1979).............................................................................28

*Imbrogno v. Chamberlin*,
    89 F.3d 87 (2d Cir. 1996).....................................................................51

*Jennings v. Yurkiw*,
18 F.4th 383 (2d Cir. 2021) ........................................................... 52, 53

*Jones v. Clinton*,
No. 94 Civ. 290 (E.D. Ark. July 3, 1997) .................................................17

*K&D, LLC v. Trump Old Post Off., LLC*,
2018 WL 6173449 (D.D.C. Nov. 26, 2018) ...........................................16

*Kline v. Sec. Guards, Inc.*,
159 F. Supp. 2d 848 (E.D. Pa. 2001) .....................................................50

*Keyter v. Bush*,
No. 03 Civ. 02496 (D.D.C. Feb. 2, 2004)...............................................17

*Lafferty v. Jones*,
2022 WL 18110184 (Conn. Super. Ct. Nov. 10, 2022).......................56

*Lee v. Edwards*,
101 F.3d 805 (2d Cir. 1996).....................................................................54

*Liberman v. Gelstein*,
80 N.Y.2d 429 (1992) .................................................................................47

*Lynch v. N.Y. Times Co.*,
171 A.D. 399 (1st Dep't 1916) ...............................................................44

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*,
746 F. Supp. 2d 575 (S.D.N.Y. 2010) ...................................................43

*Mirlis v. Greer*,
952 F.3d 36 (2d Cir. 2020).......................................................................51

*Morsette v. "The Final Call,"*
309 A.D.2d 249 (1st Dep't 2003) ........................................... 45, 47, 48

*Nevada v. Hicks*,
553 U.S. 353 (2001) ................................................................... 15, 16

*New Hampshire v. Maine,*
    532 U.S. 742 (2001) ..........................................................................35

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982) ..................................................... 13, 14, 23

*Palin v. New York Times Co.,*
    113 F.4th 245 (2d Cir. 2024) ...........................................12

*Parklane Hosiery Co. v. Shore,*
    439 U.S. 322 (1979) ..........................................................................32

*Patrolmen's Benevolent Ass'n of N.Y.C. v. City of New York,*
    310 F.3d 45 (2d Cir. 2002) ...........................................44

*Patterson v. Balsamico,*
    440 F.3d 104 (2d Cir. 2006) ...........................................42

*Payne v. Jones,*
    711 F.3d 85 (2d Cir. 2013) ...........................................54

*People v. Trump,*
    2024 WL 5295022 (N.Y. Sup. Ct., N.Y. Cnty. Dec. 16, 2024)..........................26

*Pignons S.A. de Mecanique v. Polaroid Corp.,*
    701 F.2d 1 (1st Cir. 1983) ...........................................33

*Prozeralik v. Cap. Cities Comm'cns,*
    222 A.D.2d 1020 (4th Dep't 1995) ................................. 43, 45, 46

*Prozeralk v. Capital Cities Communications, Inc.,*
    82 N.Y.2d 466 (1993) ................................................ 45, 47

*Purgess v. Sharrock,*
    33 F.3d 134 (2d Cir. 1994)..........................................43

*Rall v. Hellman,*
    770 N.Y.S.2d 860 (1st Dep't 2004) ...........................................48

*Romano v. Tine*,
    62 F. App'x 26 (2d Cir. 2003) ...................................................................32

*Rubin v. Sterling Enterprises, Inc.*,
    164 Vt. 582 (1996) ...................................................................................50

*Santos v. Chrysler Corp.*,
    1996 WL 1186818 (Mass. Super. Ct. Sept. 18, 1996) ...........................50

*Saunders v. Bush*,
    No. 92-1962 (5th Cir. Dec. 21, 1992) .....................................................17

*Schwartz v. Public Adm'r of Bronx*,
    24 N.Y.2d 65 (1969) ...............................................................................33

*Sealey v. Giltner*,
    197 F.3d 578 (2d Cir. 1999) ....................................................................32

*Sharapata v. Town of Islip*,
    56 N.Y.2d 332 (1982) .............................................................................46

*Shuford v. Cardoza*,
    2023 WL 2706255 (E.D.N.Y. Mar. 30, 2023) ........................................53

*Simpson v. Pittsburgh Corning Corp.*,
    901 F.2d 277 (2d Cir. 1990) ....................................................................49

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
    538 U.S. 408 (2003) .................................................................. 52, 53, 54

*Stuart v. Stuart*,
    297 Conn. 26 (2010) ...............................................................................50

*Synder v. Phelps*,
    562 U.S. 443 (2011) .............................................................................. 2, 25

*The Berlitz Schools of Languages of Am., Inc. v. Everest House*,
    619 F.2d 211 (2d Cir. 1980) ....................................................................34

*Thomas v. G2 FMV, LLC*,
   147 A.D.3d 700 (1st Dep't 2017) ...........................................48

*Thompson v. Trump*,
   590 F. Supp. 3d 46 (D.D.C. 2022) ........................................24

*Trump v. Carroll*,
   292 A.3d 220 (D.C. 2023) ....................................................28

*Trump v. Hawaii*,
   585 U.S. 667 (2018) ..............................................................25

*Trump v. Mazars USA, LLP*,
   591 U.S. 848 (2020) ..............................................................25

*Trump v. United States*,
   603 U.S. 593 (2024) ...................................................... passim

*Trump v. Vance*,
   591 U.S. 786 (2020) ...................................................... 14, 17

*Turley v. ISG Lackawannda, Inc.*,
   774 F.3d 140 (2d Cir. 2014)........................................ 52, 53, 55

*United States v. Burr*,
   25 F. Cas. 30 (C.C.D. Va. 1807)..........................................24

*United States v. Helstoski*,
   442 U.S. 477 (1979)...................................................... 14, 15, 20

*United States v. Loc. 1804-1*,
   44 F.3d 1091 (2d Cir. 1995)..................................................39

*United States v. Nixon*,
   418 U.S. 683 (1974) ...................................................... 13, 19

*United States v. Quinones*,
   511 F.3d 289 (2d Cir. 2007)..................................................38

*United States v. Quintieri,*
    306 F.3d 1217 (2d Cir. 2002)................................................................21

*United States v. Salameh,*
    152 F.3d 88 (2d Cir. 1998)..................................................................41

*United States v. Spoor,*
    904 F.3d 141 (2d Cir. 2018)................................................................39

*United States v. Spruill,*
    808 F.3d 585 (2d Cir. 2015)................................................................38

*Warren v. Pataki,*
    823 F.3d 125 (2d Cir. 2016)................................................................30

*Zeno v. Pine Plains Cent. Sch. Dist.,*
    702 F.3d 655 (2d Cir. 2012)................................................................55

*Zivotofsky ex rel. Zivotosfky v. Kerry,*
    576 U.S. 1 (2015)................................................................................16

## FEDERAL RULES

Fed. R. Evid. 103(d) ................................................................................39

Fed. R. Evid. 403 ....................................................................................39

Fed. R. Evid. 611 ....................................................................................39

Federal Rule of Civil Procedure 12(b)(6) ..............................................17

Federal Rule of Civil Procedure 49(a) ...................................................37

## STATUTES

N.Y. CPLR § 5501(c) ..............................................................................42

## OTHER AUTHORITIES

Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701 (1995)..............................18

*Congressional Oversight of the White House*, 45 Op. O.L.C. __, 2021 WL 222744, (Jan. 8, 2021)............................................................................19

*Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, 2014 WL 10788678 (Jul. 15, 2014)....................................................19

44 N.Y. Jur. 2d, Defamation and Privacy § 230......................................................46

N.Y. Pattern Jury Instr. Civ. 3:30 ..........................................................................45

Prosser & Keeton, Torts § 2 (5th ed. 1984) ............................................................47

Robert D. Sack & Lyrissa Barnett Lidsky, *Sack on Defamation*, § 10:3.5[A] (5th ed. 2017) .......................................................................................................46

*Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, 2019 WL 2315338 (May 20, 2019) .......................................19

## PRELIMINARY STATEMENT

In *Trump v. United States*, the United States Supreme Court reiterated a fundamental principle of our democracy: "The President is not above the law." 603 U.S. 593, 642 (2024). At the very outset of this case, President Donald J. Trump ("Trump") agreed that the President is not "above the law," clarifying that "no one is seeking to 'escape accountability' here." SA.21.[1] And last year, a unanimous jury, in accordance with that central tenet of law, held Trump accountable for defaming E. Jean Carroll ("Carroll") in 2019, after she had revealed that Trump, then a private citizen, had sexually assaulted her in a dressing room at Bergdorf Goodman in 1996.

Dissatisfied with the outcome of the judicial process, Trump now asks this Court to set aside that jury verdict on the theory that he was actually immune from judicial review all along, and he could not have waived immunity, even though he clearly intended to do so. But as this Court already held in this case, presidential immunity can be waived and Trump waived it here. *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023) (Cabranes, J.) ("*Carroll 3*"). Trump contends that the Supreme Court's decision in *Trump* somehow renders this Court's decision in *Carroll 3*—and the jury's verdict—a nullity. According to him, because *Trump* establishes that

---

[1] All references to "SA.__" are to Appellee's Supplemental Appendix, __. Citations to "Br. _" are to Appellant's brief, "A._" to Appellant's Appendix, and "SPA._" to Appellant's Special Appendix.

presidential immunity is a non-waivable component of subject matter jurisdiction, the courts could not have heard this case at all. Not so. The immunity possessed by members of Congress, judges, States, and the federal government is a *defense* and thus waivable—not a lacuna of the federal courts' subject-matter jurisdiction. Nothing in *Trump* suggests anything different with respect to a president's immunity from civil suit. Indeed, *Trump* never even mentions waiver.

Even if Trump had not waived immunity, he would not be immune in this case. When a President speaks publicly, whether he enjoys any immunity depends on the "content, form, and context" of his communications. *Trump*, 603 U.S. at 629 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)). And if there were ever a case where immunity does *not* shield a President's speech, this one is it. Donald Trump was not speaking here about a governmental policy or a function of his responsibilities as President. He was defaming Carroll because of her revelation that many years *before* he assumed office, he sexually assaulted her. The defamation at issue concerned quintessentially "personal" conduct. *Id.* Trump's claim that he was merely trying to preserve "his efficacy in office," Br. 23, lies well outside the boundaries of the official acts that immunity protects.

Trump's remaining objections to the judgment below can be dispensed with fairly easily. Judge Kaplan correctly determined that, because of the jury's verdict at a prior trial, it was already established that Trump had sexually abused Carroll,

and that he made his defamatory statements with actual malice. The court also properly limited Trump's testimony based upon his counsel's own proffer and to prevent prejudice and confusion.

Finally, the trial court correctly upheld the jury's award of damages. The jury's compensatory damages award of $18.3 million did not just cover damages for Carroll's reputation repair program (*i.e.*, to rehabilitate her image) and emotional distress, as Trump claims. It also compensated Carroll for other harm, including the devastation to her career and the threats of rape and murder that she continues to see every time she looks at her phone. As for punitive damages, the district court properly instructed the jury that Carroll was only required to prove common-law malice—an instruction consistent with the overwhelming weight of case law as well as New York's pattern jury instructions—and to only do so by a preponderance of the evidence, as the New York Court of Appeals has held. *Corrigan v. Bobbs-Merrill Co.*, 228 N.Y. 58, 66 (1920). The district court properly upheld the jury's punitive damages award of $65 million as well. Throughout the trial, the jury had a front-row seat to Trump's relentless campaign of malice, including his repeated defamation of Carroll at press conferences he held and in statements he posted on social media while the trial was ongoing. The jury's award, which was just under four times the compensatory damages award, was not only just, but clearly aimed at the goal of deterring further defamation.

3

## **STATEMENT OF THE ISSUES**

1.    Whether Donald Trump was amenable to suit either because he was not entitled to presidential immunity, or because such immunity is waivable and he waived it (and cannot relitigate that issue now), and whether the Supreme Court's decision in *Trump* changes the answer to these questions.

2.    Whether the district court properly held that Trump's statements were both false and made with malice as a matter of law in light of the prior verdict and the court's factual findings at the first trial.

3.    Whether the district court properly limited Trump's testimony in light of the first trial and based on his trial counsel's concessions at the second trial.

4.    Whether the district court properly upheld the jury's award of $7.3 million in compensatory damages for harm not related to the reputation repair program.

5.    Whether the district court properly instructed the jury that in order to recover punitive damages, Carroll needed only to prove common-law malice.

6.    Whether the district court properly instructed the jury that Carroll needed only to prove punitive damages by a preponderance of the evidence.

7.    Whether the district court properly upheld the jury's $65 million punitive damages award.

## STATEMENT OF THE CASE

The factual background of this case is largely addressed in this Court's recent decision affirming the judgment in the first trial and is recounted here only as necessary. *Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024) (per curiam) ("*Carroll 4*").[2]

In 1996, while he of course was still a private citizen, Trump sexually assaulted Carroll in a dressing room at Bergdorf Goodman, the luxury department store on Fifth Avenue in Manhattan. Carroll came forward with her account in 2019. Trump responded by lying and maligning her; he falsely claimed he had never met her and falsely accused her of fabricating her story to sell books and carry out a political agenda. He also insulted her appearance and implied that she had lied about being sexually assaulted by other men. SPA.4-7. Trump at the time also warned in his public statements that Carroll had entered "dangerous territory" and that she "should pay dearly for such false accusations." SPA.5-6. She did. This was the beginning of a years-long (and continuing) defamation campaign that succeeded in destroying Carroll's name, reputation, and sense of personal safety.

---

[2] We refer to this Court's prior decisions in Carroll's two lawsuits against Donald Trump in chronological order: *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) (Calabresi, J.) ("*Carroll 1*"); *Carroll v. Trump*, 66 F.4th 91 (2d Cir. 2023) (per curiam) ("*Carroll 2*"); *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023) (Cabranes, J.) ("*Carroll 3*"); and *Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024) (per curiam) ("*Carroll 4*").

Carroll first brought this defamation action in state court on November 4, 2019. Trump was then serving his first term as President. On February 4, 2020, Trump moved to stay the state court proceedings, arguing that the Supremacy Clause "bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office." SA.6. Contrary to his arguments here, in a letter to the state court judge, Trump explicitly and unequivocally stated as follows:

> Finally, no one is seeking to "escape accountability" here. Plaintiff is free to pursue this action when the President is no longer in office. Plaintiff's repetition of the assertion that a postponement of proceedings would place the President "above the law" does not make it so, and has been squarely rejected by the Supreme Court.

SA.21 (citations omitted).

While this case was pending, and after he left office, Trump defamed Carroll again three years later in October 2022. Accordingly, Carroll brought a second action against him asserting a defamation claim based on the 2022 statement, as well as a battery claim stemming from the 1996 assault, which had been revived as a result of the passage of the New York Adult Survivors Act. That case was tried first over the course of two weeks in April 2023.[3] At the conclusion of the two-week trial, the jury unanimously returned a special verdict finding that Trump had sexually

---

[3] The district court denied the parties' proposal to consolidate the trials because "approval of the consolidation proposal would be in tension with the deference to the Second Circuit and the District of Columbia Court of Appeals," given the then still pending appellate proceedings in this action. SA.45.

abused Carroll. SPA.78. That jury also found that Trump's October 2022 statement denying the assault was defamatory. SPA.79. The jury awarded Carroll $2.02 million in compensatory and punitive damages on the battery claim and $2.98 million in compensatory and punitive damages on the defamation claim. This Court affirmed that verdict. *Carroll 4*, 124 F.4th at 178 ("The jury made its assessment of the facts and claims on a properly developed record.").

This appeal involves the case that was brought first (in 2019), but tried second (at the beginning of 2024). Trump affirmatively chose to litigate Carroll's claims and elected not to raise the defense of presidential immunity—an understandable choice, given that his defamatory statements had nothing to do with his official duties. He only shifted gears on the eve of trial, when he raised the defense of presidential immunity for the first time in his reply brief on summary judgment. A.845. The district court correctly held that presidential immunity was waivable, had been waived, and further determined that immunity would not apply to Trump's defamatory statements against Carroll in any event. SPA.10-19. This Court affirmed on the first two waiver questions and did not reach the third. *Carroll 3*, 88 F.4th at 434-35. In addition, based on the findings at the first trial, the district court granted partial summary judgment to Carroll on the issue of liability. Accordingly, the scope of the trial here in this case was limited to determining the damages that resulted from the defamatory statements that Trump made in 2019. SPA.71.

At the trial whose verdict is now before this Court, Carroll testified that because of Trump's statements, she "liv[ed] in a new universe," and that when "one of the most powerful people on earth," called her "a liar for three days … 26 times," "it ended the world I had been living in." A.1169. The jury saw and heard Carroll describe the onslaught of hateful, terrifying messages that she received in the days immediately after Trump's statements and had the opportunity to see for themselves some of the messages that she later received threatening to kill and rape her, while parroting Trump's own defamatory words by calling her a liar, fraudster, ugly, and a political hack. A.1187-1192; *see also, e.g.*, A.1196 ("he wants to stick a gun in my mouth and pull the trigger"); A.1195 ("my neck stretched immediately after a quick public trial"); A.1192 ("You lying whore. You lying scag. You lying slut."); A.1193 (Carroll received image in a message of "a very dead woman on the pavement with some of her brains coming out"). Carroll further testified that while she used to write the nation's leading advice column in Elle Magazine, she lost that job, and her replacement Substack column had only 1,800 paid subscribers. A.1246-48. In addition, the jury heard from Carroll's expert witness, Professor Ashley Humphreys, who explained what it would cost to run a program to repair the damage Trump had inflicted on Carroll's reputation, with a conservative range from $7 to 12 million. A.1465.

The jury also saw and heard from Trump himself. He testified—very briefly—under oath from the stand. For the most part, he chose to make improper, unsworn statements and gestures in front of the jurors and the judge. For example, when the Court asked the prospective jurors to raise their hands if they thought "Trump is being treated unfairly by the court system," Trump raised his hand. A.1965 (citing Molly Crane-Newman & Kerry Burke, *Donald Trump Attends Jury Selection at NYC Trial Against E. Jean Carroll*, N.Y. Daily News (Jan. 16, 2024)). When he heard the jury instruction that the jury must accept that he both had sexually assaulted Carroll and later made defamatory statements about her, Trump visibly "shook his head in disgust." A.1964 (citing Larry Neumeister, et al., *Trump Scowls as Jury Is Picked to Decide How Much He Owes for Defamation in E. Jean Carroll Case*, Los Angeles Times (Jan. 16, 2024)). When the court described his assault of Carroll, Trump "made a loud 'yech' sound." A.1964-65 (citing Maggie Haberman & Kate Christobek, *At the Defense Table, Trump Uses the Courtroom as a Stage*, N.Y. Times (Jan 28, 2024)). During Carroll's testimony, Trump's counsel was warned by the judge that Trump had "been loudly saying things throughout Ms. Carroll's testimony, including things that Ms. Carroll is saying are false and noting that she seems to have now gotten her memory back." A.1183. And after the first few minutes of Carroll's closing argument, Trump, who was sitting less than ten feet

9

away from where Carroll's counsel was standing, conspicuously stood up and walked out of the courtroom in full view of the jurors. SPA.141.

The jury entered a verdict in Carroll's favor on January 26, 2024, awarding her $11 million for the reputation repair program presented by Professor Humphreys and $7.3 million in other compensatory damages. A.1014. It also awarded Carroll $65 million in punitive damages. A.1015. The district court denied Trump's motion for a new trial. SPA.127. This appeal followed.

## SUMMARY OF THE ARGUMENT

The judgment below should be affirmed.

First, Donald Trump is not immune from liability. As this Court held in *Carroll 3*, presidential immunity is waivable and he waived it here. Trump offers no legitimate reason to revisit the law of the case, and even if he could argue immunity now, the district court's analysis comports entirely with what *Trump* requires, and Judge Kaplan correctly concluded that Trump enjoys no immunity with respect to his statements about Carroll.

Second, the district court properly granted summary judgment to Carroll on the issues of falsity and actual malice. On falsity, because Trump's 2019 and 2022 statements were materially the same, the first jury's finding of falsity was preclusive. On actual malice, Trump does not challenge the district court's finding that the factual record here warranted summary judgment. The district court also correctly

ruled in the alternative that the issue of actual malice was the same across both cases, and Trump never identified any change in circumstances to warrant determining otherwise.

Third, the district court properly limited Trump's testimony at the second trial because his counsel expressly agreed to the limitations in an offer of proof, which was required due to Trump's repeated improper efforts to relitigate the issue of falsity in front of the jury. The district court's ruling was also justified to prevent Trump from presenting inadmissible evidence and to avoid confusion and prejudice.

Fourth, the district court correctly denied Trump's motion to remit the $7.3 million compensatory damages award, which was not solely for emotional distress and was not unreasonable.

Fifth, the district court properly instructed that Carroll was required only to show common-law malice for punitive damages. Trump's contention that common-law malice must be the "sole" motivation defies settled precedent.

Sixth, the district court properly instructed the jury that Carroll needed to prove punitive damages by a preponderance of the evidence in accordance with New York law, rather than by clear and convincing evidence.

Seventh, the district court properly denied remittitur of the $65 million punitive damages award. That award falls well within the governing constitutional

boundaries, and was justified by Trump's behavior at trial. The award was also warranted to attempt to deter Trump from defaming Carroll again.

## **ARGUMENT**

## I.    **DONALD TRUMP IS NOT ENTITLED TO PRESIDENTIAL IMMUNITY FOR THE STATEMENTS AT ISSUE HERE**

This Court held in *Carroll 3* that "presidential immunity is waivable," and that Trump "waived" it here. 88 F.4th at 425. That is the law of this case. *See, e.g.*, *Palin v. New York Times Co.*, 113 F.4th 245, 262 (2d Cir. 2024). Nothing in the Supreme Court's decision in *Trump v. United States* changes, let alone undermines, this Court's prior conclusion. And, as the district court held, Trump would not be immune for the statements at issue in this case in any event.

### A.    **Presidential immunity is waivable.**

As Trump concedes, the law of the case doctrine bars him from relitigating whether presidential immunity can be waived unless he can identify "an intervening change in law" or "the need to correct a clear error." Br. 17 (citation and quotation marks omitted). Trump points to *Trump*, arguing that the Supreme Court's decision somehow "supersedes and contravenes" *Carroll 3*. Br. 8. But not only is *Carroll 3* entirely consistent with *Trump*, the Supreme Court's decision does not involve waiver at all; indeed, it never mentions the word. And all of the arguments that Trump raises here were either considered by this Court in *Carroll 3* or have been waived.

12

1. <u>The Supreme Court's decision in *Trump v. United States* did not change the relevant law.</u>

Trump suggests that after the Supreme Court's decision in *Trump*, it is now clear that presidential immunity is based on the President's "unique position in the constitutional scheme, as the only person who alone composes a branch of government," as well as his need to take "bold and unhesitating action."  Br. 12 (quoting *Trump*, 603 U.S. at 610, 613).  But that has been the law for decades, *Nixon v. Fitzgerald*, 457 U.S. 731, 749 (1982), which is why this Court recognized the distinctive nature of the presidency in *Carroll 3*, yet still had no trouble concluding that presidential immunity can be waived, 88 F.4th at 428.  As this Court recognized, "separation-of-powers considerations militate *in favor of*, not against, recognizing presidential immunity as waivable," because "[a] President's autonomy should be protected; thus, a President *should* be able to litigate if he chooses to do so."  88 F.4th at 427-28 (emphasis in original); *see also Cheney v. U.S. Dist. Court*, 542 U.S. 367, 389-90 (2004) ("occasions for constitutional confrontation" between the Executive and Judiciary "should be avoided whenever possible") (quoting *United States v. Nixon*, 418 U.S. 683, 692 (1974)).[4]  Indeed, both *Trump* and *Carroll 3* relied centrally on *Fitzgerald*, a decision this Court concluded "hurts, not helps, [President Trump's] case" because its analysis reinforces that presidential immunity, like any

_____

[4] While Trump acknowledges this reasoning, Br. 10, he does not respond to it, let alone explain how *Trump* undermines it, *see id.* at 10-16.

other absolute immunity, constitutes a defense, and is not a component of subject matter jurisdiction.  88 F.4th at 426; *see Trump*, 603 U.S. at 610, 613.  *Cf. Trump v. Vance*, 591 U.S. 786, 801-02 (2020) (*Fitzgerald* "drew a careful analogy to the common law absolute immunity of judges and prosecutors" in defining presidential immunity).  And *Fitzgerald* itself relied upon a century's worth of precedent where the immunity of non-presidential officials had unquestionably been waived.  457 U.S. at 750 n. 31.

Trump next argues that the Supreme Court's decision in *Trump* "places this case squarely within the line of cases holding that immunity doctrines rooted" in the separation of powers cannot be waived.  Br. 8, 11, 14.  But there is no such "line of cases."  In the single decision Trump cites, *United States v. Helstoski*, 442 U.S. 477 (1979)—a criminal case—the Supreme Court expressly declined to decide whether immunity under the Speech or Debate Clause could be waivable.  *Id.* at 490-91.  What the Court actually held in *Helstoski* was that because the Speech or Debate Clause is intended "to preserve the constitutional structure of separate, coequal, and independent branches of government" through "exemption from *prosecution*," a waiver of legislative immunity requires an "explicit and unequivocal renunciation."  *Id.* at 491 (citation and quotations omitted) (emphasis added).  The Court concluded that the defendant had not waived immunity through his own actions, and it declined to decide whether Congress could waive such immunity on behalf of its members.

14

The Supreme Court was careful to note that "the privilege was not born primarily of a desire to avoid *private suits*," which did not raise the same concerns. *Id*. at 491 (citations and quotations omitted) (emphasis added).[5]

Nothing in *Helstoski* states or even implies that legislators are barred from waiving legislative immunity in civil cases.[6] And nothing in *Helstoski* helps Trump here. This is not a criminal prosecution (like *Trump*) that could somehow threaten the "constitutional structure of separate, coequal, and independent branches of government," *id.*; it is a private suit for damages. And Carroll is not relying on any implication to establish waiver. She is instead relying on Trump's explicit and unequivocal waiver of immunity from the very beginning of this case, as set forth above. *Helstoski*, 442 U.S. at 490-91 (emphasis added); SA.21.

> 2. Contrary to Trump's suggestion, presidential immunity is not a jurisdictional question.

As this Court explained, quoting *Nevada v. Hicks*, the Supreme Court has recognized that "there is no authority whatever for the proposition that absolute- and qualified-immunity defenses pertain to the court's jurisdiction." *Carroll 3*, 88 F.4th

---

[5] Indeed, Trump acknowledged this important difference between the criminal and civil contexts in *Trump* itself. No. 23-939, Br. of Pet. 25 (Mar. 19, 2024).

[6] Several years earlier, in *Gravel v. United States*, the Court held that such immunity extends to congressional aides, but that as a privilege "of the Senator," it can be "*waived* by the Senator." 408 U.S. 606, 617, 622 n.13 (1972) (citation omitted); *see also Helstoski*, 442 U.S. at 492 (relying on *Gravel*).

at 425 (quoting 553 U.S. 353, 373 (2001)). Trump did not acknowledge *Hicks* during his last appeal, *id.*, and he doesn't so now either—even as he asserts that *Trump* overruled *Hicks sub silentio*. Br. 10. That is because he has no response to *Hicks*. And Trump's own prior conduct in litigation belies his argument here: in the Emoluments Clause litigation during his first term as president, Trump himself argued that "[a]bsolute immunity is a 'defense on the merits, not a limit on the Court's jurisdiction.'" Trump Reply Br. at 1, *D.C. v. Trump*, No. 18-2488 (4th Cir. Feb. 21, 2019); *see also K&D, LLC v. Trump Old Post Off., LLC*, 2018 WL 6173449, at *3 n.2 (D.D.C. Nov. 26, 2018) ("during the oral argument the parties agreed that neither absolute presidential immunity nor federal preemption are threshold issues that *must* be decided before reaching the merits") (emphasis in original); Br. for Appellee, *Cohen v. Trump*, No. 23-25 (2d Cir. July 24, 2023) (raising no issue with district court dismissing claim on merits without first resolving assertion of presidential immunity).

To the extent that the law of the case does not resolve the question, the unbroken practice of Presidents (including President Trump) is instructive. *See Zivotofsky ex rel. Zivotosfky v. Kerry*, 576 U.S. 1, 23 (2015). Three times in the past three decades, the Supreme Court has addressed claims of presidential absolute immunity: *Trump*, 603 U.S. 593 (2024) (criminal prosecution); *Vance*, 591. U.S. 786 (2020) (criminal investigation); and *Clinton v. Jones*, 520 U.S. 681 (1997) (civil

16

litigation).  In each of those cases, the president argued vigorously for immunity on the merits. Yet in none of the briefs submitted by the parties (and none of the Court's own opinions) did *anyone*—not the presidents themselves or the Department of Justice ("DOJ")—describe presidential immunity as implicating a federal court's subject matter jurisdiction.  Like the proverbial "dog that did not bark," that silence speaks volumes. *Chisom v. Roemer*, 501 U.S. 380, 396 n.23 (1991).

On top of that, presidents represented by DOJ have time and again described absolute immunity in merits-based rather than jurisdictional terms.  DOJ has invoked such immunity under Federal Rule of Civil Procedure 12(b)(6), rather than Rule 12(b)(1).  They have addressed it as a merits question, and never as jurisdictional.[7] So too when presidents have been represented by private counsel.[8]

---

[7] *E.g.*, Mot. to Dismiss at 2, 14-18, *Bundy v. Navarro*, No. 16 Civ. 1047 (D. Nev. July 15, 2016); Mot. to Dismiss at 1, 3-4, *Keyter v. Bush*, No. 03 Civ. 02496 (D.D.C. Feb. 2, 2004); Br. for Appellees at 11-12 & n.4, *Saunders v. Bush*, No. 92-1962 (5th Cir. Dec. 21, 1992).

[8] *See, e.g.*, Br. for Appellees at 1, 25, *Browning v. Clinton*, No. 98-1992 (D.C. Cir. Jan. 25, 2002) (invoking Rule 12(b)(6) based upon presidential immunity); Mem. in Supp. of President Clinton's Mot. for Judgment on the Pleadings at 36, *Jones v. Clinton*, No. 94 Civ. 290 (E.D. Ark. July 3, 1997) (seeking dismissal of Paula Jones' defamation claim under Rule 12(c) because "allegations fail to state claim for defamation" due to absolute immunity).

3. <u>The conclusion that presidential immunity from damages lawsuits is waivable is reinforced by the fact that every other form of federal immunity can be waived.</u>

Trump concedes that the federal government can waive sovereign immunity. Br. 14. So can the States. Br. 14-15. And so can prosecutors and judges. *Carroll 3*, 88 F.4th at 427-28. There is no reason in precedent, common sense, or our Constitution why the President should somehow not be able to make decisions for himself about his own immunity, or why he has any less ability to waive immunity for himself than he or his subordinates have to waive immunity for the United States. *See also Freytag v. Comm'r of Internal Revenue*, 501 U.S. 868, 895 (1991) (Scalia, J., concurring in part and concurring in the judgment) (there is "no support in principle or in precedent or in policy" for a "blanket rule that arguments premised on the Constitution's structural separation of powers are not waivable"); Akhil Reed Amar & Neal Kumar Katyal, *Executive Privileges and Immunities: The Nixon and Clinton Cases*, 108 Harv. L. Rev. 701, 714 n.53 (1995) ("[Presidential] immunity is of course waivable. Surely the President in whatever spare time he has should be allowed to litigate civil damage actions—or to watch basketball for that matter—but he should not be legally obliged to do either."). As this Court previously observed, it disrespects the President's authority to deny him the ability to waive immunity. *Carroll 3*, 88 F.4th at 426.

By the same token, DOJ's Office of Legal Counsel ("OLC") has long viewed the immunity of the President and his senior advisers from compelled testimony before Congress as absolute, *see Testimonial Immunity Before Congress of the Former Counsel to the President*, 43 Op. O.L.C. __, 2019 WL 2315338, at *2 & n.1 (May 20, 2019), and it has emphasized that this immunity implicates core separation of powers concerns, *see Congressional Oversight of the White House*, 45 Op. O.L.C. __, 2021 WL 222744, at *15-20 (Jan. 8, 2021) (citing *Nixon* in analogizing such immunity to that from private litigation). Yet even so, OLC has repeatedly confirmed that the President may waive this "immunity through accommodations between the political branches," and that such a waiver preserves the separation of powers values at stake. *Testimonial Immunity Before Congress*, 2019 WL 2315338, at *8. As OLC has explained, "voluntary testimony by a senior presidential adviser represents an affirmative exercise of presidential autonomy," since the President is free to weigh "the benefit of providing such testimony" against "the potential for harassment and harm to Executive Branch confidentiality." *Immunity of the Assistant to the President and Director of the Office of Political Strategy and Outreach from Congressional Subpoena*, 38 Op. O.L.C. __, 2014 WL 10788678, at *3 n.2 (Jul. 15, 2014). The same is true here. The President should have the power to decide whether to waive absolute immunity or not, and judicial recognition of that authority preserves, rather than undermines, the separation of powers.

**B.** **Trump waived whatever presidential immunity he might have had.**

In addition to establishing that presidential immunity can be waived, the law of the case establishes that Trump waived it here.  Trump contends that *Carroll 3* is no longer good law because after *Trump*, if presidential immunity is not unwaivable, it at least requires "an explicit and unequivocal renunciation."  Br. 11 (quoting *Helstoski*, 442 U.S. at 490-91).  According to Trump, this Court erred in *Carroll 3* because it merely held that he "*forfeited* immunity by failing to raise it early enough."  *Id*. (emphasis in original).  But Trump cannot raise that argument for the first time now, and that isn't what happened or what this Court held in any event.

1. <u>The Supreme Court's decision in *Trump v. United States* did not change the relevant law with respect to waiver.</u>

As noted above, *Trump* does not suddenly create a new rule for waiver of presidential immunity—it does not discuss "waiver" at all.  And Trump obviously could have made this argument about requiring "explicit and unequivocal renunciation" in his prior interlocutory appeal in *Carroll 3* since *Helstoski* was decided in 1979.  Instead, Trump chose to argue that presidential immunity cannot be waived at all, *even conceding* in his prior interlocutory appeal that if presidential immunity is waivable, then he waived it here.  *Carroll 3*, 88 F.4th at 429 n.52.[9] While that tactic failed, Trump cannot now use the Supreme Court's recent decision

---

[9] Trump did not contest waiver at the district court either.  SPA.22.

20

as a back door to raise issues that were "ripe for review at the time of [the] initial appeal," but "nonetheless foregone." *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002).

###### 2. This Court's decision in *Carroll 3* held that Trump waived immunity.

Trump also misconstrues *Carroll 3*. This Court did not hold that he had "*forfeited* immunity." Br. 11. It explicitly held that he "*waived* this defense." *E.g.*, 88 F.4th at 423. (Emphasis added.) Trump takes issue with a footnote in *Carroll 3* where the Court recognized that although "'waiver' and 'forfeiture' … have slightly different meanings," it "matters not" here. Br. 10 (quoting, 88 F.4th at 422 n.1). But as this Court explained in the very next sentence, that was because "whether [Trump] intended to relinquish his presidential immunity defense" was "a *question of fact* reserved for the district court," and the district court had made the factual determination that he had done so. 88 F.4th at 422 n.1, 429-30 (emphasis added); *see also* SPA.11-12.

###### 3. The district court correctly found that Trump waived immunity.

The record compels the district court's factual finding that Trump waived immunity. Br. 13. The fact that Trump failed to raise presidential immunity as a defense in 2019 in his initial answer (which he previously conceded amounts to waiver) is only the tip of the iceberg. SPA.11-12. From the beginning of this case, as noted above, Trump explicitly and unequivocally represented to the courts that:

21

"no one is seeking to '*escape accountability here*.'  [Carroll] is *free to pursue this action* when the President is no longer in office."  SA.21 (internal citations omitted) (emphasis added).  Trump made this representation in addressing a *different* affirmative defense that he *did* decide to raise—namely, that the "Supremacy Clause of the U.S. Constitution bars state-court subject matter jurisdiction over actions against a U.S. President *while he or she is in office*," SA.6 (emphasis added).

When that strategy failed, Trump proceeded to litigate this case through discovery for the next *three* years, along with multiple other efforts at seeking delay.  And all that time, he and his attorneys said nothing about presidential immunity.  It was not until December 2022, on the verge of the first trial, that Trump first sought to raise the defense of presidential immunity on summary judgment.  A.399-415.  Were that not enough, after Trump lost the first trial in May 2023, he chose to affirmatively invoke the judicial process further by seeking to assert a "tit for tat" counterclaim against Carroll for defamation.  A.887-91.

These are hardly the actions of someone who has somehow forgotten to raise presidential immunity through "inattention or inadvertence."  Br. 13.  They demonstrate Trump's repeated, and intentional, use of the judicial process—in a manner that is completely at odds with any claim of presidential immunity—followed each time by an abrupt change in course once it became clear that his tactics

weren't working.  Trump cannot have it both ways.  There is no legitimate dispute that, as this Court already determined, he waived immunity in this case.

### C.    Trump is not entitled to presidential immunity with respect to the claim at issue in this case.

Even if Trump's assertion of presidential immunity were timely and not waived, it would not help him here.  The district court previously held that Trump is not entitled to presidential immunity after thoroughly considering the contours of the doctrine as well as the content and context of Trump's statements about Carroll. SPA.20-26.  And *Trump* is fully in accord with what the trial court did.[10]

As the district court explained, while "the president is entitled to absolute immunity from liability in civil damages lawsuits 'for acts within the outer perimeter of [his] official responsibility,'" the Supreme Court has "'never suggested that the President, or any other official, has an immunity that extends beyond the scope of any action take, in an official capacity.'"  SPA.21 (quoting *Nixon*, 457 U.S. at 756 and *Clinton*, 520 U.S. at 694).  The Supreme Court, in turn, has reaffirmed that "[t]he President is not above the law" and "not everything [he] does is official."  *Trump*, 603 U.S. at 642.  To the contrary, as the district court stated, "immunities are grounded in 'the nature of the function performed, not the identity of the actor who performed it.'"  SPA.22 (quoting *Clinton*, 520 U.S. at 692-95).  The point of

---

[10] This Court did not reach the issue in *Carroll 3*.  88 F.4th at 430 n.56.

presidential immunity is "to ensure that the President can undertake his *constitutionally designated functions* effectively, free from undue pressure or distortions," but "'the law does not discriminate between the president and a private citizen.'" *Trump*, 603 U.S. at 611, 615 (emphasis added) (quoting *United States v. Burr*, 25 F. Cas. 30, 34 (C.C.D. Va. 1807) (Marshall, C.J.)).

Thus, even accepting Trump's position that "he was addressing a matter of public concern because the accusation [by Carroll] impugned his character and, in turn, threatened his ability to effectively govern the nation," the question is still whether his words were "uttered in performance of official acts, or … expressed in some other, unofficial capacity." SPA.23 (quoting *Thompson v. Trump*, 590 F. Supp. 3d 46, 79 (D.D.C. 2022), *aff'd*, 87 F.4th 1 (D.C. Cir. 2023)).

Trump's statements about Carroll fell outside the "outer perimeter" of immunity that extends to the President's official responsibilities "so long as they are 'not manifestly or palpably beyond his authority.'" *Trump v. United States*, 603 U.S. at 618 (quoting *Blassingame v. Trump*, 87 F.4th 1, 13 (D.C. Cir. 2023)). When assessing Trump's potential criminal liability for his statements to supporters in connection with January 6, the Supreme Court recognized that notwithstanding the President's "'extraordinary power to speak to his fellow citizens and on their behalf'" and use "the office's 'bully pulpit' to persuade Americans," "[t]here may … be contexts in which the President, notwithstanding the prominence of his

position, speaks in an unofficial capacity." *Id.* at 629 (quoting *Trump v. Hawaii*, 585 U.S. 667, 701 (2018)). The Court recognized that the inquiry is inherently "fact specific," dependent on an "objective analysis of 'content, form, and context.'" *Id.* (quoting *Snyder*, 562 U.S. at 453). And it specifically distinguished between "the President's *personal* and official affairs." *Id.* (emphasis added) (quoting *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020)). In other words, rather than simply conclude that Trump's statements were immune because they were made to the public, the Court remanded that "necessarily fact-bound analysis" to the district court to consider the "content and context" of each of the statements at issue. *Id.*

Here, the district court engaged in exactly this analysis. *See supra* at 23-24. And if anything, *Trump* bolsters the district court's conclusion, given the Supreme Court's distinction between speech on "personal" and "official affairs." 603 U.S. at 629. It is difficult to imagine a better example of presidential speech involving "personal affairs" than this case. Trump denied an accusation of "personal wrongdoing" concerning a sexual assault that he committed long before he was in office, and he did so with "personal attacks" on Carroll, insisting that she "fabricated her sexual assault accusation and did so for financial and personal gain." SPA.25. He also threatened Carroll directly, warning that, by telling the truth about Trump sexually assaulting her, she had entered into "dangerous territory" and would "pay dearly" for it. SPA.5-6. Those statements were not connected "to any official

responsibility of the president." SPA.25. Nor did they involve any "activities" that the "President oversees," or any governmental function that Trump was performing. *Trump*, 603 U.S. at 629. It was speech about decades-old personal, private matters, and it bore zero relation to the operation or administration of the federal government.

Trump insists that his statements must be immune because they were about "matters of public concern" and "issued through official White House channels." Br. 19. But Trump's attempt to invoke the powers of his office for personal ends must fail. Were his arguments valid, the Supreme Court in *Trump v. United States* would not have issued the remand it did, which left open the question whether Trump's public speech on January 6, in which he addressed the election results on the Ellipse, was subject to immunity. 603 U.S. at 630. *Compare id.* at 621 (finding Trump immune from prosecution for alleged conduct involving discussions with DOJ officials); *see also Clinton*, 520 U.S. at 694 (president cannot prevail on immunity claims by merely insisting their conduct was "taken *within an* official capacity," since "scope of an immunity," even for official acts, depends on "performance of particular functions of [the] office"); *People v. Trump*, 2024 WL 5295022, at *24 (N.Y. Sup. Ct., N.Y. Cnty. Dec. 16, 2024) (Trump's "entirely personal" Twitter posts were not part of official conduct). Again, it is the "content, form, and context" of the statements and their relation to the President's official functions and responsibilities that controls, not the fact that the President is speaking

publicly. *Trump*, 603 U.S. at 629. And while "a long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans," *id.*, not *every* use of that power is subject to immunity. Here, Trump used that bully pulpit to smear and defame Carroll about an extremely personal issue—the fact that when he was a private citizen, he had sexually assaulted her—and the only governmental "function" he has identified is that of speaking to the public. If this is not an example of the President speaking to the public in an unofficial capacity, then everything a President says is official and immune—a result that the Supreme Court has never countenanced.

Even before *Trump*, it has been understood in every analogous setting that statements like the ones at issue in this case are not immune. Prosecutors, for example are not protected by absolute immunity for statements at press conferences such as false assertions regarding the nature of the evidence against the accused, even though press conferences "may be an integral part of a prosecutor's job." *Buckley v. Fitzsimmons*, 509 U.S. 259, 278 (1993). Nor are judges or legislators. *See Barrett v. Harrington*, 130 F.3d 246, 261 (6th Cir. 1997) ("Although it is an understandable human instinct to defend one's self in the media when attacked publicly, such a defense is not a judicial function—it is self-defense."); *Hutchinson*

*v. Proxmire*, 443 U.S. 111, 131-33 (1979) (public statements uttered outside of official congressional proceedings are not shielded by Speech or Debate Clause).[11]

At bottom, Trump is arguing that holding him accountable here would chill a president's speech in the future, and that like the Wizard of Oz, he must be given free rein to say whatever he wants whenever he wants without repercussion—no matter how knowingly false, and no matter how defamatory or damaging.  Br. 24. But it will be the rare case when a president will be responding to accusations of sexual assault, and rarer still when a president would do so in the false and destructive way that Trump did here.  And if such a case ever comes to pass, and presidential immunity is actually asserted and not waived, then the courts will have an opportunity to determine whether the case should proceed, mitigating any risk to a president's ability to speak and act.  There is no good reason to stretch the law of immunity beyond its breaking point—and erase the law of defamation as it applies to a president—simply because Trump acted the way he did as part of his personal vendetta against Carroll.

---

[11] While Trump relies on *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), Br. 23, that case involved whether a congressman acted within the scope of his employment for purposes of the Westfall Act.  444 F.3d at 664-66.  *Ballenger* does not address the question of presidential immunity and the District of Columbia Court of Appeals recognized in this case, upon certification from this Court, that *Ballenger* does not "hold that the conduct of elected officials speaking to the press is always within the scope of that official's employment." *Trump v. Carroll*, 292 A.3d 220, 239 (D.C. 2023).

## II. THE DISTRICT COURT DID NOT ERR IN GRANTING PARTIAL SUMMARY JUDGMENT TO CARROLL

Trump next challenges the district court's grant of partial summary judgment to Carroll on two issues: (1) whether his statements were false, and (2) whether they were made with actual malice.  Br. 25-33; SPA.80-91.  Neither challenge withstands scrutiny.[12]

### A. The District Court properly held that Trump's statements were false.

Trump claims that his statements were not false as a matter of law based on the first trial because the district court misconstrued the judgment to establish that he "forcibly penetrated [Carroll] digitally," when the jury's finding of "sexual abuse" could have involved less egregious conduct like "forcible kissing."  Br. 25-27.  But the district court's issue-preclusion holding was not based on what form of "sexual abuse" Trump engaged in.  It was based on the fact that: (1) the first jury found that Trump had committed sexual abuse under New York law, which rendered his 2022 statements false and defamatory; and (2) the 2019 statements at issue here were "substantially the same."  SPA.83.  Indeed, while Trump pretends that the first

---

[12] Trump separately argues that the district court could not afford preclusive effect to the first jury verdict because the judgment in that case was "blatantly erroneous." Br. 24.  This Court recently affirmed that judgment in *Carroll 4*, and while Trump has since filed a petition for rehearing *en banc*, *id.*, 23-793, ECF 184, the "pendency of an appeal does not prevent the use of the challenged judgment as the basis of collateral estoppel."  SPA.80; *accord DiSorbo v. Hoy*, 343 F.3d 172, 183 (2d Cir. 2003).

jury's unanimous finding that Trump had digitally penetrated Carroll's vagina "underlies the entirety of [the] district court's issue-preclusion ruling," Br. 28 (citing 690 F. Supp. 3d at 399-400 & n.2), the district court mentioned that finding in a single footnote in the background section, separate from and prior to its straightforward issue-preclusion analysis. And that makes sense: if Trump "sexually abused" Carroll in any way, as the first jury found, then his explicit and repeated denials of ever even encountering her at Bergdorf Goodman were obviously false.

Ultimately, what Trump complains about is not the district court's issue-preclusion ruling, but its jury instruction at the second trial that "forcible digital penetration had taken place." Br. 28-29. But Trump waived any such objection below. A.1702; *Carroll v. Trump*, 683 F. Supp. 3d 302, 325 (S.D.N.Y. 2023), *aff'd*, *Carroll 4*; *see also Emanian v. Rockefeller Univ.*, 971 F.3d 380, 387 (2d Cir. 2020) (applying plain error review after failure to object to jury instruction).[13] Trump cannot use a waived objection to the jury instructions as a back door to challenge the district court's grant of summary judgment on liability.

Trump is wrong about the implications of the verdict at the first trial in any event. As the district court held, "based on all of the evidence at trial and the jury's

---

[13] Even if Trump had intended to preserve an objection below, *see* A.1722 (appearing to backtrack on prior non-objection), the jury instructions were clearly correct and they were not prejudicial. *Warren v. Pataki*, 823 F.3d 125, 137 (2d Cir. 2016) (looking to whether instructions "influence[d] the jury's verdict").

verdict as a whole, the jury's finding that Mr. Trump 'sexually abused' Ms. Carroll implicitly determined that he forcibly penetrated her digitally." SPA.49. The jury heard evidence for two weeks, including nearly three full days of testimony from Carroll, who provided detailed testimony regarding her experience of being forcibly penetrated by Trump, which she described as "extremely painful" because "he put his hand inside me and curved his finger." SA.89-90. Carroll further testified that, as she tried to escape, Trump "inserted his penis." SA.90. Carroll acknowledged that she could not really see anything below her shoulders because Trump was pressing himself so hard against her, but was testifying on the basis of what she felt. *Id.* While Trump argued below (as he does here) that the jury might have based its sexual abuse finding on his "groping of Plaintiff's breast through clothing or similar conduct," the court rejected this argument as "frivolous" since no evidence like that was actually presented to the jury. *Carroll*, 683 F. Supp. 3d at 326 n.72.[14]

Regardless of the jury's verdict, Trump completely ignores the district court's separate finding that he "forcibly digitally penetrated Ms. Carroll's vagina." *Id.* at 325-326 & nn.70, 72. The district court made that finding pursuant to Federal Rule

---

[14] Trump makes much of the fact that the jury answered yes to Question 2—whether he committed "sexual abuse"—but no to Question 1—whether he committed "rape" within the meaning of the New York Penal Law. SPA.73; *Carroll*, 683 F. Supp. 3d at 324-27. As the district court recognized, however, "the jury's negative answer to Question 1 means *only* that the jury was unpersuaded that Mr. Trump's penis penetrated Ms. Carroll's vagina." *Carroll*, 683 F. Supp. 3d at 324.

of Civil Procedure 49(a) given that the case was submitted to the jury using a special verdict form, as is proper, and the form did not specifically address the issue of how Trump committed "sexual abuse." *See, e.g.*, *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999). Trump does not even challenge that finding on appeal because he cannot. And he has never argued—below or to this Court—that the district court's finding in this regard is not entitled to preclusive effect. *See, e.g.*, *Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 337 (1979) (granting issue-preclusive effect to judge-made findings).

### B. The District Court properly held that President Trump's statements were made with actual malice.

Trump also argues that the district court erred in giving preclusive effect to the first jury's finding of actual malice. Br. 30-33. But he does not acknowledge, much less engage with, the district court's alternative holding that "even if the jury's finding in the first trial that Mr. Trump made his 2022 statement with actual malice was not issue preclusive in this case, Ms. Carroll nonetheless has satisfied her burden on summary judgment." SPA.89. That failure, in and of itself, compels affirmance. *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009) ("[I]ssues not sufficiently argued are in general deemed waived and will not be considered on appeal"); *Romano v. Tine*, 62 F. App'x 26, 27 (2d Cir. 2003) (plaintiff waived challenge to decision dismissing complaint where plaintiff failed to address alternative ground for dismissal).

Trump's challenge to the district court's issue-preclusion ruling fails regardless. He argues that the "issue" of actual malice at the first trial was not "identical" to the issue of actual malice at the second trial because his denials of sexual abuse occurred several years apart, in 2022 and 2019, respectively. Br. 30-32. But that does not matter. As the New York Court of Appeals has explained, issue preclusion is a "flexible" doctrine where "the fundamental inquiry is whether relitigation should be permitted in a particular case," considering "fairness to the parties, conservation of the resources of the court and the litigants, and the societal interests in consistent and accurate results." *Buechel v. Bain*, 97 N.Y.2d 295, 304 (2001) (citation and quotations omitted). New York courts, applying the policies underlying the doctrine, have rejected attempts, like Trump's here, to narrowly define the issue in a way that would allow a party to evade a prior adjudication on the merits. *See, e.g.*, *Schwartz v. Public Adm'r of Bronx*, 24 N.Y.2d 65, 74-75 (1969).

Courts have long recognized that differences in timing alone will not defeat issue preclusion. *See, e.g.*, *Pignons S.A. de Mecanique v. Polaroid Corp.*, 701 F.2d 1, 2 (1st Cir. 1983) (Breyer, J.) (prior determination of no likelihood of injury from alleged trademark infringement based on pre-1980 advertisements and products precluded relitigation of issue as to post-1980 advertisements and products that did not "differ in any significant respect from the old"); *see also B-Steel of Kansas, Inc.*

*v. Texas Indus., Inc.*, 439 F.3d 653, 661-65 (10th Cir. 2006) (prior determination of no antitrust injury as to pre-April 2001 period was preclusive where new evidence as to post-April 2001 period did not demonstrate material factual difference). If Trump wanted to avoid the adverse determination made at the first jury trial, then it was incumbent on him to identify some *factual* reason why the difference in time mattered. *See, e.g.*, *The Berlitz Schools of Languages of Am., Inc. v. Everest House*, 619 F.2d 211 (2d Cir. 1980). He did not because he cannot. In this regard, it is not insignificant that Trump chose not to testify at the first trial—in which the factual issue of his sexual attack on Carroll was the central question in the case.

The jury in the first trial found that Trump had sexually abused Carroll, and that in denying her allegations in 2022, he acted with knowledge (or in reckless disregard) of the fact that he had sexually abused her. These are "objective facts" from which Trump's actual malice can be inferred, whether in 2019 or 2022. *Celle v. Filipino Rep. Enters., Inc.*, 209 F.3d 163, 183 (2d Cir. 2000). As the district court observed, "no reasonable person could believe that Mr. Trump acted with actual malice in October 2022, but lacked it in June 2019." Indeed, "the statements were substantively identical," "Mr. Trump's attacks on Ms. Carroll never wavered and never varied," and "Mr. Trump (by his own admission) made absolutely no effort in

this time period to investigate the issue or to discovery any new information about the truth of Ms. Carroll's underlying allegations."  SPA.89.[15]

In response, Trump stresses that the legal issue with respect to defamation is whether he made the "statement with actual malice *at the time of publication*."  Br. 30 (quoting *Celle*, 209 F.3d at 182).  That does not defeat issue preclusion, which can apply even when the prior litigation does not even involve the same claim.  *New Hampshire v. Maine*, 532 U.S. 742, 748-49 (2001).  To be sure, while "information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication," Br. 32 (quoting *Herbert v. Lando*, 781 F.2d 298, 305-06 (2d Cir. 1986)), Trump never cited any "new information" he had in 2022 that he did not have in 2019: the position he has taken all along is that Carroll is lying.

But that is not all.  Among other things, Trump testified during his deposition in 2022 (testimony that was admitted at the first trial) that he never read Carroll's book or the excerpt of it published in *New York Magazine*, SA.103 ¶ 16; he never contacted Bergdorf's despite representing otherwise to the public, SA.103-04 ¶ 18;

---

[15] That conclusion is buttressed by Trump's demonstrated animosity and spite toward Carroll, whom he called "deranged," "really sick," and a "whack job" at his deposition. The relevant portions of the deposition video were played for the jury. SA.106 ¶ 24; A.1781-84; *see, e.g.*, *Celle*, 209 F.3d at 183 ("Evidence of ill will combined with other circumstantial evidence" indicating reckless disregard "may also support a finding of actual malice.").

he had no knowledge concerning Carroll's financial circumstances, the details of Carroll's book deal, or her political affiliation or party registration, SA.104-05 ¶¶ 19-20; and he took no steps to investigate Carroll's account, nor did he direct anyone in his administration to do so, SA.102-03 ¶¶ 13, 17. The jury at the first trial considered this evidence and concluded that Trump acted with actual malice in 2022. Trump's theory is that whatever he knew in 2022, he somehow did not know in 2019. But again, it's absurd to think that in 2022, Trump knew that he had sexually assaulted Carroll in 1996, yet somehow did not know the same thing in 2019. The first jury unanimously found that he defamed Carroll in 2022, so there can be no rational dispute that he did so in 2019 and no basis to avoid the preclusive effect of that finding.

## III. THE DISTRICT COURT CORRECTLY EXCLUDED TRUMP'S IRRELEVANT AND PREJUDICIAL TESTIMONY

Trump next argues that it was error for the district court to limit his testimony at the second trial. Br. 41-44; A.1692. However, Trump waived any objection in this regard, and the district court's limitation was nevertheless appropriate given Trump's stubborn refusal to respect the Court's issue preclusion ruling.

### A. Trump waived these arguments.

The district court's limitations on Trump's testimony were made in response to a series of efforts Trump made during the trial to circumvent the court's ruling on the truthfulness of Carroll's allegations—in other words, to relitigate whether he had

sexually abused Carroll. For example, Trump's counsel repeatedly implied during opening statements that Carroll had falsely accused Trump of sexual assault for political or financial reasons. A.1965. And Trump himself was cautioned by the district court several times for interrupting the proceedings by loudly denying the truth of Carroll's accusations in the presence of the jury. A.1183, 1687. During one such colloquy, the district court explained: "I hope I don't have to consider excluding you from the trial or at least from the presence. I understand you're probably very eager for me to do that." A.1232. Trump responded: "I would love it." *Id.* Outside the courtroom, Trump continued to repeat his defamatory statements against Carroll while the trial was ongoing, many of which were introduced into evidence. A.2146; SPA.141 & n.42.

Against this backdrop, it was entirely appropriate for the district court to be concerned that Trump's examination and testimony would contain or suggest inadmissible evidence to the jury and incumbent upon the court to try to prevent that from happening. A.1680. Trump almost immediately validated the district court's concern when he interrupted his counsel's arguments to state that he intended to testify "that he never met [Carroll] and had never seen her before." A.1683; *see also* A.1686. In response, the court directed counsel to make an offer of proof regarding Trump's anticipated testimony. *See* A.1680-86; Fed. R. Evid. 103(c).

Trump's counsel represented to the court that she intended to ask her client three questions. As to the first—"confirm[ing] that he stands by all the testimony at his deposition—the district court allowed the question. A.1681. As to the second— "why did [Trump] make statements in response to [Carroll's] accusation"—the district court did not, as Trump now claims, "direct[] that defense counsel could not ask that question." Br. 42. Rather, the district court explained that such an open-ended question would "likely" lead to an objection that would "in significant measure" be sustained. A.1689. The court permitted counsel to "elicit the fact that [Trump] made [his statements] in response" to Carroll's accusation. A.1689-90. Trump's counsel offered no objection, but instead agreed. A.1690 ("As long as we have the deposition, Your Honor, I think we will be fine."); *see also* A.1691. Trump has thus waived any challenge to the district court's ruling on appeal. *United States v. Spruill*, 808 F.3d 585, 597 (2d Cir. 2015); *United States v. Quinones*, 511 F.3d 289, 321 (2d Cir. 2007).

As to the third question, counsel herself proposed to ask her client "that he never instructed anyone to hurt Ms. Carroll in his statements [which] is *a simple yes or no question*." A.1685 (emphasis added). The district court authorized that question, and then, when Trump proceeded to go beyond the agreed-upon bounds and testify that he wanted to "defend" himself, struck the testimony. A.1692. Since no objection was lodged at the time, any challenge on this front is waived as well.

38

### B.  Trump's arguments are meritless in any event.

A district court's "discretion is broad indeed" with respect to "the regulation of the course and scope of examination of witnesses." *United States v. Loc. 1804-1*, 44 F.3d 1091, 1095 (2d Cir. 1995); *see* Fed. R. Evid. 611.  It is also incumbent upon a court, "[t]o the extent practicable," to "conduct a jury trial so that inadmissible evidence is not suggested to the jury by any means."  Fed. R. Evid. 103(d).  The district court here acted well within its broad discretion by placing limits on Trump's testimony given his prior improper comments in the presence of the jury and his stated intention to deny the truth of Carroll's accusations in violation of the district court's rulings on preclusion and summary judgment.  *See supra* at 9-10, 36-37.

The district court also properly excluded such testimony under Rule 403. *United States v. Spoor*, 904 F.3d 141, 153 (2d Cir. 2018) (court's exercise of decision will be sustained "so long [it] has conscientiously balanced the proffered evidence's probative value with the risk for prejudice").  Even after Trump's counsel agreed to a simple "yes-or-no" format for the second question, Trump disregarded the question and told the jury that Carroll had made "a false accusation"—a clear violation of the district court's orders.  A.1691-92.  And any probative value of Trump's statement that "I just wanted to defend myself, my family, and frankly, the presidency," A.1692, was outweighed by the risk of prejudice and confusion over the first jury's preclusive finding that Trump had sexually abused Carroll.  *See* Fed. R. Evid. 403.

The district court's decision to strike this testimony, which went beyond the offer of proof made by Trump's counsel, was certainly not "arbitrary or irrational." *Spoor*, 904 F.3d at 153 (quotation omitted).

## IV. THE DISTRICT COURT PROPERLY DENIED TRUMP'S MOTION FOR A REMITTUR AS TO THE $7.3 MILLION COMPENSATORY DAMAGES AWARD

Trump argues that the district court erred in denying his motion to remit the jury's $7.3 million compensatory damages award because those damages were solely for "emotional distress" and therefore excessive. Br. 51. This mischaracterizes both the record and the law.

### A. The $7.3 million award reflects all compensatory damages other than the reputation repair program.

First, the jury's $7.3 million award was not for "emotional distress"—a phrase that does not appear anywhere in the jury instructions or on the verdict form. A.1014-1040. The jury was specifically instructed to consider two and only two categories of compensatory damages: (1) damages "attributable to the June 21 and 22 statements, *excluding* the reputation repair program" that was the subject of Professor Humphreys' testimony, and (2) damages "for the reputation repair program." A.1856 (emphasis added). As a result, the verdict form broke Carroll's compensatory damages into two categories: those "*other than for the reputation repair program*," and "any compensatory damages you award *for the reputation*

*repair program only*." A.1014 (emphases in original). Further, in assessing compensatory damages, the jury was instructed to consider:

> Carroll's "standing in the community, the nature of Mr. Trump's statements made about her—the two statements in question—the extent to which those statements were circulated, the tendency of those statements to injure a person such as Ms. Carroll and all of the other facts and circumstances of the case.

A.1854. While Trump acknowledges that "[j]uries are presumed to follow their instructions," Br. 50 (quoting *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998)), the instructions (and verdict form) here contradict his argument.

Trump points to the district court's instruction that "[a] person who has been defamed is entitled to fair and just compensation for the injury to her reputation and for any humiliation and mental anguish in her public and private lives that was caused by the defamatory statement in question." Br. 50 (citing A.1853). But there is clearly a distinction between damages to "*fix* the damage that Donald Trump caused to Ms. Carroll's reputation," *id.* (quoting A.1795) (emphasis added)—the reputation repair program formulated by Carroll's expert witness—and other damages that Carroll suffered on account of his defamatory statements. These include, among other things, the loss of her career at Elle Magazine, and continuing

economic and psychological injury.  *E.g.*, A.1169, A.1188, A.1202-04, A.1246-48.[16]

Nothing in the instruction Trump cites, which must be read in conjunction with the

rest of the jury instructions, mentions "emotional distress," as a stand-alone

category.  Indeed, the instructions reflect the fact that the jury heard extensively from

Carroll about the harm she suffered beyond the cost of her reputational repair

program.  A.1023.

### B.     The $7.3 million award was reasonable.

It was also reasonable for the jury to award Carroll $7.3 million for her

compensatory damages other than the reputation repair program.  SPA.135-37.  The

district court looked to several comparator cases in the defamation context in

considering whether the award "deviates materially from what would be reasonable

compensation."  *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (citing

N.Y. CPLR § 5501(c)).  Those cases upheld comparable verdicts on "much thinner

evidence of harm" than here, where Donald Trump disseminated "malicious and

unceasing attacks on Ms. Carroll" to "*more than 100 million* people," including

"public threats and personal attacks" that "endangered [her] health and safety."

SPA.136-37.

---

[16] What's more, Trump by and large proposed these instructions.  A.992-93.  And
he recognized that the two categories here could reasonably be construed as damages
*beyond* reputation repair program damages and emotional distress.  *See* A.1701.

Trump tries to distinguish those cases by arguing that the awards did not involve damages solely for emotional distress. Br. 54-55. But it is the actual jury instructions and verdict that control, and here, the instructions and verdict do not provide a basis to parse out emotional distress from other compensatory damages. The jury's $18.3 million award is eminently reasonable given awards in far less severe cases. *See, e.g.*, *Prozeralik v. Cap. Cities Comm'cns*, 222 A.D.2d 1020, 1020 (4th Dep't 1995) ($19.2 million award, adjusted for inflation, in economic and non-economic damages for defamatory comment on local radio and television station), *leave denied*, 88 N.Y.2d 812 (1996) (table);[17] *Purgess v. Sharrock*, 33 F.3d 134, 142 (2d Cir. 1994) ($7.3 million award, adjusted for inflation, for economic damages alone resulting from defamation); SPA.137-38 (citing same).

Even if the award of $7.3 million were solely for emotional distress, it would still be proper. Trump argues Carroll could not recover for more than "'garden variety' distress" because her "emotional-distress claim rested entirely on her own testimony," and not "medical testimony or objective evidence reflecting psychological, mental, or physical harm." Br. 52-53. It is well-settled, however, that "a court is not required to remit a large non-economic damage award, even

---

[17] While Trump argues that the award in *Prozeralik* included damages for physical injury, Br. 55, the majority decision in that case did not mention "physical injuries, 222 A.D.2d at 1020, nor does an earlier decision in the case, *Prozeralik v. Capital Cities Comm'ncs, Inc.*, 188 A.D.2d 178, 184-85 (4th Dep't 1993).

where evidence of emotional damage consists solely of plaintiff's testimony." *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010) (citation omitted). And here, the "objective circumstances of the violation itself" substantiate Carroll's testimony as to the gravity of the emotional harm she suffered. *Patrolmen's Benevolent Ass'n of N.Y.C. v. City of New York*, 310 F.3d 45, 55 (2d Cir. 2002).

New York courts have long held that "[i]n a libel case, more, perhaps, than in any other, the jury is generally considered to be the supreme arbiter on the question of damages," *Lynch v. N.Y. Times Co.*, 171 A.D. 399, 401 (1st Dep't 1916). In *Cantu v. Flanigan*, for example, the court upheld $150 million in non-economic damages in a defamation action. 705 F. Supp. 2d 220, 222 (E.D.N.Y 2010). That award was more than twenty times the $7.3 million that Carroll received here. Moreover, while the $150 million included harm to the plaintiff's reputation as well as "humiliation and mental anguish" and did not indicate how much was attributable to each, it would clearly be reasonable to infer that *at least* $7 million (or roughly 5%) was attributable to emotional distress, given that the defendant's conduct "served to enhance the mental suffering that Cantu experienced." *Id.*; *see also Freeman v. Guiliani*, No. 21 Civ. 3354 (D.D.C. Dec. 15, 2023), ECF 135 (Dec. 15, 2023) ($20 million award to each plaintiff for emotional distress).

## V. THE DISTRICT COURT CORRECTLY INSTRUCTED THE JURY ON COMMON-LAW MALICE

Trump's contention that Carroll needed to show that he was "solely motivated" by ill will to obtain punitive damages borders on frivolous.

The district court instructed the jury that it could award punitive damages if it found that Trump made his defamatory statements about Carroll with common-law malice, defined as "deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights." A.1857. That instruction follows directly from the New York Court of Appeals' decision in *Prozeralik v. Capital Cities Communications, Inc.*, 82 N.Y.2d 466, 478-79 (1993), which this Court has recognized is governing New York law, *see, e.g.*, *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005) (citing same), as well as New York's Pattern Jury Instructions, N.Y. Pattern Jury Instr. Civ. 3:30.

Trump argues that Carroll was required to also show that common-law malice was "the *only* motivation for the statement," citing the New York Appellate Division, First Department's decision in *Morsette v. "The Final Call*," 309 A.D.2d 249 (1st Dep't 2003). Br. 34-35. But as the district court explained, "when the New York Court of Appeals first clarified the relationship between actual, or constitutional, malice and common law malice in *Prozeralik*, … it said nothing to suggest that a seeker of punitive damages must prove that common law malice was the *sole* motive for a defendant's defamation." SPA.131. Moreover, both before

45

and after *Morsette*—the Court of Appeals and the Second Circuit "repeatedly have applied the *Prozeralik* common law malice test for punitive damages without ever adding a 'sole motivation' requirement." *Id.* 131 & n.11 (collecting cases). As a federal court sitting in diversity, the district court's role was to "follow the law directed by the highest court" of New York, not apply so-called "refinements" proposed by a state intermediate court. *Belmac Hygiene, Inc. v. Belmac Corp.*, 121 F.3d 835, 840 (2d Cir. 1997) (citations and quotations omitted); *see also Engel v. CBS, Inc.*, 182 F.3d 124, 125 (2d Cir. 1999).

Even if it were the federal courts' role to second-guess *Prozeralik*, Trump's arguments for raising the burden for punitive damages in defamation cases lack merit. The standard articulated in *Prozeralik*, itself a defamation case, reflects a broad consensus that proof of common-law malice is sufficient to warrant punitive damages, including in actions for defamation. *See, e.g.*, Robert D. Sack & Lyrissa Barnett Lidsky, *Sack on Defamation*, § 10:3.5[A] (5th ed. 2017) ("As a general rule, [punitive damages] may be awarded if the trier of fact finds the defendant to be guilty of 'malice' in the common-law sense[.]"); Restatement (Second) of Torts § 908 (Am. L. Inst. 1977) (hereinafter "Restatement"), *cited with approval in Sharapata v. Town of Islip*, 56 N.Y.2d 332, 335 (1982). New York law treatises also follow *Prozeralik* in defamation cases. *See, e.g.*, 44 N.Y. Jur. 2d, Defamation and Privacy § 230.

46

As the district court explained, Trump's argument for a higher burden improperly conflates two separate and distinct inquiries: (1) the test for overcoming a qualified privilege, and (2) the test for awarding punitive damages. SPA.131. While both tests reference common-law malice, they require very different showings. SPA.129-31. Where an allegedly defamatory statement is shielded by a qualified privilege, such as communications between employees, *Herlihy v. Metro. Museum of Art*, 214 A.D.2d 250, 259 (1st Dep't 1995), a plaintiff can only overcome the privilege by showing that the statement was not, in whole or in part, "made to further the interest protected by the privilege," *Liberman v. Gelstein*, 80 N.Y.2d 429, 439 (1992). Punitive damages, by contrast, are intended "to punish" and "are awarded in tort actions 'where the defendant's wrongdoing has been intentional and deliberate, and has the character of outrage frequently associated with crime.'" *Prozeralik*, 82 N.Y.2d at 479 (cleaned up) (quoting Prosser & Keeton, Torts § 2 (5th ed. 1984)). In other words, it is the "outrage or malice" itself that warrants punishment—not whether the speaker was motivated solely by a desire to harm. *Id.* at 479.

In the *Morsette* case cited by Trump, Br. 34, a sharply divided First Department panel overturned a punitive damages award in a defamation action for lack of *any* evidence that "malice or ill will was directed specifically at plaintiff." 309 A.D.2d at 255. While the majority went on to state that "a triable issue of

47

common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff," *id.*, that was dicta.  Moreover, as the district court observed, the majority cited exclusively to cases including the standard that a plaintiff must meet to overcome a conditional privilege, *see* SPA.132 & n.15, and "erroneously carried over" that standard into the context of punitive damages, SPA.132; *accord Morsette*, 309 A.D.2d at 261 (Rosenberger and Marlow, JJ., dissenting) (explaining majority relied on cases concerning "the defense of privilege" that did not "deal[] with the issue of punitive damages").  Presumably for this reason, for the past twenty years, that dicta in *Morsette* has largely been ignored by the New York courts.  *See, e.g.*, *Thomas v. G2 FMV, LLC*, 147 A.D.3d 700, 701 (1st Dep't 2017) (citing *Prozeralik* and *Morsette* without reference to any sole-motivation requirement); *Rall v. Hellman*, 770 N.Y.S.2d 860, 860 (1st Dep't 2004) (citing *Prozeralik*).

## VI.  THE JURY INSTRUCTIONS CORRECTLY STATED THE BURDEN OF PROOF FOR AWARDING PUNITIVE DAMAGES

Trump argues that the district court improperly instructed the jury that Carroll was required to prove punitive damages by a preponderance of the evidence.  Br. 44; A.1857.  But the district court's instruction followed applicable state law as well as

the decisions of this Court.[18]

In *Corrigan v. Bobbs-Merrill Co.*, the New York Court of Appeals established that "in order to recover punitive damages [for libel] plaintiff is bound to satisfy a jury by a fair preponderance of the evidence." 228 N.Y. 58, 66 (1920). Trump contends that this Court should disregard *Corrigan* because it has somehow been overruled. Br. 47. But as the district court observed, while "the Appellate Divisions have since split," the New York Court of Appeals has "never has so much as hinted"—in the last one hundred years—"that it would modify, limit, or restrict its rule in *Corrigan*," and it is the Court of Appeals' decision that controls. SPA.135. Equally as important, this Court "has made clear that it takes the fair preponderance standard as the binding statement of New York law on this point." *Id.* (citing, *e.g.*, *Celle*, 209 F.3d at 184; *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277 (2d Cir. 1990)).

Other than *Corrigan*, Trump's sole authority from the New York Court of Appeals is *Cleghorn v. New York Central & Hudson River Railroad Co.*, an 1874 case stating that if a defendant "is also chargeable with gross misconduct," "[s]omething more than ordinary negligence is requisite." 56 N.Y. 44, 47-48 (1874);

---

[18] In fact, the jury instructions on punitive damages that Trump proposed in connection with the first trial did not reference the "clear and convincing" standard. SA.66-67.

49

Br. 46.  But the Court of Appeals' 1874 decision in *Cleghorn* obviously could not have overruled its 1920 decision in *Corrigan*.  In any event, *Cleghorn*'s use of the phrase "clearly established" does not refer to a burden of proof; it refers to the nature of the conduct at issue.  *Id.* at 48.

In addition to relying on *Cleghorn*, Trump cites to then-Judge Sotomayor's decision in *Greenbaum v. Svenska Handelsbank*, 979 F. Supp. 973 (S.D.N.Y. 1997). Br. 47-48.  But that case actually undermines his argument.  There, after conducting an exhaustive survey of New York federal and state law—including *Corrigan* and *Cleghorn*—the court concluded that "the preponderance standard is the appropriate standard under New York law."  979 F. Supp. at 982.  Indeed, then-Judge Sotomayor rejected the reliance of the defendant in that case on *Cleghorn*, reasoning that it "focuses all of its analysis on the substantive standard of conduct warranting punitive damages rather than any evidentiary standard applicable thereto."  *Id.* at 978. Trump's contention that most of New York's "sister states" apply the "clear and convincing" standard is also incorrect.  Br. 45.  Nearly every state that borders New York (Vermont, Pennsylvania, Connecticut, and Massachusetts) applies the preponderance standard to award punitive damages.  *See, e.g.*, *Rubin v. Sterling Enterprises, Inc.*, 164 Vt. 582 (1996); *Kline v. Sec. Guards, Inc.*, 159 F. Supp. 2d 848, 850 (E.D. Pa. 2001) (applying Pennsylvania law); *Stuart v. Stuart*, 297 Conn.

26, 38 (2010); *Santos v. Chrysler Corp.*, 1996 WL 1186818, at *3 (Mass. Super. Ct. Sept. 18, 1996).

But even if a clear and convincing standard controlled here (and it does not), the "exceptional record," including Trump's statements that Ms. Carroll would "pay dearly" for what she had said about him and his continued defamation of Carroll during the trial itself, SPA 140-42, is "sufficient evidence" to award punitive damages "under either standard." *Barkley v. United Homes, LLC*, 2012 WL 2357295, at *15 (E.D.N.Y. June 20, 2012), *aff'd*, 557 F. App'x 22 (2d Cir. 2014), *as amended* (Jan. 30, 2014) (acknowledging disagreement in New York state courts, but declining to resolve conflict where evidence was sufficient to support a verdict under either standard.)

## VII.  THE DISTRICT COURT PROPERLY DENIED TRUMP'S MOTION FOR A REMITTITUR AS TO THE $65 MILLION PUNITIVE DAMAGES AWARD

Finally, Trump contends that the district court erred in refusing to remit the jury's $65 million punitive damages award.  But again, he misconstrues governing precedent and downplays the uniquely egregious and devastating nature of his own conduct, including while the trial was ongoing.

As an initial matter, to the extent that Trump challenges the punitive damages award under federal common law standards, *see* Br. 56, Trump is applying the wrong test.  "In deciding remittitur motions in diversity cases" such as this one, "federal

courts apply federal procedural standards and state substantive law." *Mirlis v. Greer*, 952 F.3d 36, 48 (2d Cir. 2020) (quoting *Imbrogno v. Chamberlin*, 89 F.3d 87, 90 (2d Cir. 1996)).[19]  And because Trump has never argued that the punitive damages award runs afoul of New York law, he has waived any challenge on that basis.  Accordingly, the jury's award should be reviewed solely as a matter of constitutional due process.

As Trump observes, under this Court's decision in *Turley v. ISG Lackawannda, Inc.*, 774 F.3d 140, 165 (2d Cir. 2014), there are three "guideposts" for reviewing punitive damages awards for purposes of due process.  Br. 57.  The first, "the degree of reprehensibility" associated with the defendant's actions, is "the most important indicium of a punitive damages award's reasonableness."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 409 (2003).  Even so—and not surprisingly—Trump gives this factor short shrift, summarily asserting that his conduct "involve[d] mere public denials of inflammatory, decades-old allegations of sexual misconduct."  Br. 59-60.

---

[19] While this case was removed from state to federal court under the Westfall Act, as Judge Kaplan has noted: "[w]hen a party brings a state law claim in federal court, the federal court must apply state substantive law and federal procedural law." SA.31.

Nothing could be farther from the truth. Trump not only sexually abused Carroll, he then proceeded to make dozens of statements calling her a liar driven by money who was too unattractive for him to have sexually assaulted thereby ruining her career as a trusted advice columnist. He threatened her repeatedly, saying that she would "pay dearly" and had entered "dangerous territory" by coming forward. SPA.5-6; *see, e.g.*, *Jennings v. Yurkiw*, 18 F.4th 383, 390 (2d Cir. 2021) (looking to "threat[s] of violence" and "intentional malice"). Moreover, these statements persisted for five years while the case approached trial, increased in frequency as the trial grew closer, increased further after Trump was found liable for sexual abuse and defamation in at the first trial, and continued both in and outside the courtroom during the second trial. SPA.140; *State Farm*, 538 U.S. at 409 (looking to repetitive nature of actions). At the trial, the jury was able to watch video footage of Trump continuing to defame Carroll outside the courtroom in the days leading up to and during the trial. SPA.141 & n.42. The district court rightly determined that this "exceptional record" as to Trump's reprehensible conduct justified the punitive damages award on its own. SPA.142.

The second guidepost under *Turley* is "the disparity between the harm or potential harm suffered and the size of the punitive award." 774 F.3d at 165 (citation and quotation marks omitted). The Supreme Court has explicitly refused to identify rigid constitutional limits on the ratio between harm and the punitive damages

award. But its declaration that "few awards exceeding a *single-digit* ratio between punitive and compensatory damages" raise constitutional concerns, *State Farm Mut.*, 538 U.S. at 410 (emphasis added), suggests that a lower ratio normally does not. Here, the ratio was nowhere near 9:1. It was 3.6:1—very close to the "treble damages" available in other types of civil cases. Indeed, the 3.6:1 ratio in this case is actually *lower* than other recent cases upholding punitive damages awards. *See e.g., Jennings*, 18 F.4th at 392 (upholding 4:1 ratio, noting "punitive damages awards that are a multiple higher may be warranted because of the deterrent function"); *see also Shuford v. Cardoza*, 2023 WL 2706255, at *16 (E.D.N.Y. Mar. 30, 2023) (4:1 ratio "does not raise constitutional concerns"); *Anderson v. Osborne*, 2020 WL 6151249, at *8 (S.D.N.Y. Oct. 20, 2020) (7.6:1 ratio did not "shock the judicial conscience."). Contrary to Trump's contention that Carroll's compensatory damages are too small to support the punitive damages award, Br. 58, "when the compensable injury [is] small but the reprehensibility of the defendant's conduct [is] great, the ratio of a reasonable punitive award to the small compensatory award will *necessarily* be very high." *Payne v. Jones*, 711 F.3d 85, 102 (2d Cir. 2013) (emphasis added).[20]

---

[20] Nor was the nature of Carroll's injuries "imprecise," Br. 57, given Carroll's concrete evidence as to her economic harms, including the reputation repair program.

Trump also ignores the deterrence factor, which is "directly related to what people can afford to pay." *Lee v. Edwards*, 101 F.3d 805, 813 (2d Cir. 1996). Trump never denied that he was a billionaire and he offered no evidence to the contrary at trial. Instead, the jurors had the benefit of seeing for themselves just how completely ineffective the first trial had been in deterring Trump's continuing defamatory conduct. Obviously, the jury was justified in concluding that a very significant amount (to Trump) was necessary to (try to) deter Trump from defaming Carroll yet again.[21] *State Farm*, 538 U.S. at 419 ("punishment" and "deterrence" are appropriate considerations).[22]

Finally, the third factor is "the difference between the remedy in this case and the penalties imposed in comparable cases." *Turley*, 774 F.3d at 165. As noted above, to some extent, Trump's conduct here is without precedent: very few famous people engage in a public, years-long campaign of defamation. And arguably even fewer civil defendants would openly invite further legal action by continued defamation even after they've been successfully sued for similar statements. In "the

---

[21] During closing argument, Carroll's counsel was straightforward about this, asking the jury to consider "how much will it take to make [Trump] stop?" A.1787.

[22] Trump's reliance on *Turley* and its 2:1 ratio doesn't work (Br. 59) since that ratio was imposed under federal common law, not constitutional due process. In any event, this is not a case involving a hostile work environment, where punitive damage awards rarely exceed $1.5 million. 774 F.3d at 166. And unlike Trump, the employer in *Turley* "did not seriously dispute the gravity of the underlying conduct." *Id.* at 147.

absence of comparable cases," a court "is left to be guided by the principle that courts should endeavor to be the 'most faithful to the jury's verdict.'" *Greenaway v. Cnty. of Nassau*, 327 F. Supp. 3d 552, 569 (E.D.N.Y. 2018) (citing *Zeno v. Pine Plains Cent. Sch. Dist.*, 702 F.3d 655, 671 (2d Cir. 2012)). Faithful adherence to the jury's verdict here recognizes that the jury imposed punitive damages in order to send a message that jury verdicts (like the first one here) should be respected, that Trump should think twice about defaming Carroll again, and that even the richest and most powerful can be held responsible under our legal system.

Even so, this case is not without precedent. Trump's former lawyer, Rudy Giuliani, was ordered to pay two election workers he defamed $75 million dollars in punitive damages. *See Freeman*, 2023 WL 9783148, at *1. Notably, Mr. Giuliani's attacks on the two women he defamed did not reach as wide an audience as here, *see* SPA.140, nor did he defame his victims during the trial. And unlike Mr. Guiliani, who has since declared bankruptcy, Trump does not contend that the damages awarded to Carroll would be financially ruinous to him. Similarly, in *Lafferty v. Jones*, the Connecticut Superior Court awarded $473 million in punitive damages in an eleven-plaintiff action (roughly $43 million per plaintiff) brought by families of victims of Sandy Hook school shooting against Alex Jones. 2022 WL 18110184 (Conn. Super. Ct. Nov. 10, 2022). The jury's award of $65 million against Trump

here is therefore hardly out of line with other recent high-profile, high-damage defamation lawsuits.

## **CONCLUSION**

For all the reasons set forth above, the judgment should be affirmed.

Dated: New York, New York
      January 27, 2025

Respectfully submitted,

Roberta A. Kaplan
D. Brandon Trice
Maximilian T. Crema
Thomas A. Lloyd
Avita Anand
KAPLAN MARTIN LLP
1133 Avenue of the Americas,
Suite 1500
New York, New York 10036
(212) 316-9500

*Attorneys for Plaintiff-Appellee E. Jean Carroll*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the length limits requirements of Local Rule 32.1(a)(4) because this brief contains 13,875 words, excluding the parts of the document excluded by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word for Office 365 in size 14 Times New Roman font.

Dated:  New York, New York
       January 27, 2025

Roberta A. Kaplan

## **CERTIFICATE OF SERVICE**

I, Roberta A. Kaplan, counsel for Plaintiff-Appellee and a member of the Bar of this Court, certify that, on January 27, 2025, copies of the foregoing brief were filed with the Clerk through the Court's electronic filing system, which will send notice of such filing to all counsel of record.

Dated:  New York, New York
        January 27, 2025

_____
Roberta A. Kaplan