# 24-644

IN THE

# United States Court of Appeals
### FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

*Plaintiff-Counter Defendant-Appellee*,

v.

DONALD TRUMP, in his personal capacity,

*Defendant-Counter Claimant-Appellant*.

On Appeal from the United States District Court
For the Southern District of New York

## REPLY BRIEF FOR DEFENDANT-COUNTER CLAIMANT-APPELLANT PRESIDENT DONALD TRUMP

D. John Sauer
JAMES OTIS LAW GROUP, LLC
13321 N. Outer Forty Rd.
Suite 300
St. Louis, Missouri 63017
(314) 562-0031
john.sauer@james-otis.com

*Counsel for Defendant-Counter Claimant-Appellant President Donald Trump*

## TABLE OF CONTENTS

INTRODUCTION ..................................................................................1

ARGUMENT .......................................................................................3

I.    Presidential Immunity Bars Carroll's Claims...............................3

    A.    Waiver of Presidential Immunity Requires, at the Very Least, an "Explicit and Unequivocal Renunciation."...........................4

    B.    No "Explicit and Unequivocal Renunciation" Occurred Here. ...........6

    C.    The Law-of-the-Case Doctrine Does Not Apply..................................8

    D.    The June 21 and June 22 Statements Were Official Acts...................10

II.    The District Court Erred by Giving Issue-Preclusive Effect to the *Carroll II* Judgment.........................................................................13

III.    Common-Law Malice Requires That the Desire To Injure Be the Defendant's *Sole* Motivation. .........................................................15

IV.    The District Court Erred by Restricting and Striking President Trump's Testimony About His State of Mind...........................................17

V.    Punitive Damages Require Clear and Convincing Evidence. ......................21

VI.    The Compensatory-Damages Award Must Be Remitted..............................23

VII.    The $65 Million Punitive-Damages Award Must Be Remitted. ...................26

CONCLUSION ....................................................................................30

i

# TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Anderson v. Osborne*,
No. 17-cv-539, 2020 WL 6151249 (S.D.N.Y. Oct. 20, 2020)......................29

*Blassingame v. Trump*,
87 F.4th 1 (D.C. Cir. 2023) ............................................................10

*BMW of N. Am. v. Gore*,
517 U.S. 559 (1996).......................................................................30

*Brink's Inc. v. City of New York*,
717 F.2d 700 (2d Cir. 1983)............................................................22

*Cantu v. Flanigan*,
705 F. Supp. 2d 220 (E.D.N.Y.).......................................................25

*Carroll v. Trump*,
88 F.4th 418 (2d Cir. 2023)........................................................ 3, 6-9

*Carroll v. Trump*,
680 F. Supp. 3d 491 (S.D.N.Y. 2023)........................................6, 8, 16

*Carroll v. Trump*,
683 F. Supp. 3d 302 (S.D.N.Y. 2023) ...............................................15

*Carroll v. Trump*,
685 F. Supp. 3d 267 (S.D.N.Y. 2023) .......................................... 13-14

*Carroll v. Trump*,
690 F. Supp. 3d 396 (S.D.N.Y. 2023) ...............................................13

*Celle v. Filipino Reporter Enterprises*,
209 F.3d 163 (2d Cir. 2000)...........................................................21

*Clinton v. Jones*,
520 U.S. 681 (1997)......................................................................13

ii

*Cleghorn v. N.Y. Cent. & H.R.R.R.*,
    56 N.Y. 44 (1874) ........................................................22

*Corrigan v. Bobbs-Merrill Co.*,
    228 N.Y. 58 (1920) ......................................................21

*Council on American-Islamic Relations v. Ballenger*,
    444 F.3d 659 (D.C. Cir. 2006) ............................... 11-12

*Dotson v. City of Syracuse*,
    No. 5:04-cv-1388, 2011 WL 817499 (N.D.N.Y. Mar. 2, 2011)....................26

*Duarte v. St. Barnabas Hosp.*,
    341 F. Supp. 3d 306 (S.D.N.Y. 2018) ...........................26

*Edelman v. Jordan*,
    415 U.S. 651 (1974)................................................. 4-5

*Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*,
    450 U.S. 147 (1981)................................................. 4-5

*Greenbaum v. Svenska Handelsbanken*,
    979 F. Supp. 973 (S.D.N.Y. 1997) ...............................21

*Int'l Merger & Acquisition Consultants, Inc. v. Armac Enterprises, Inc.*,
    531 F.2d 821 (7th Cir. 1976)........................................20

*Jennings v. Yurkiw*,
    18 F.4th 383 (2d Cir. 2021)........................................29

*Johnson v. Holder*,
    564 F.3d 95 (2d Cir. 2009)..................................... 4, 8-9

*Kane v. Orange County Publications*,
    232 A.D.2d 526 (2d Dep't 1996)................................28

*Keen v. Overseas Tankship Corp.*,
    194 F.2d 515 (2d Cir. 1952).......................................20

iii

*Lane v. Pena,*
    518 U.S. 187 (1996)........................................................................ 5-6

*Liberman v. Gelstein,*
    80 N.Y.2d 429 (1992) ......................................................................16

*Mendez v. Starwood Hotels & Resorts Worldwide, Inc.,*
    746 F. Supp. 2d 575 (S.D.N.Y. 2010)......................................... 25-26

*Morse v. Fusto,*
    No. 07-cv-4793, 2013 WL 4647603 (E.D.N.Y. Aug. 29, 2013)....................25

*Morsette v. "The Final Call",*
    309 A.D.2d 249 (1st Dep't 2003) ...................................................16

*Nixon v. Fitzgerald,*
    457 U.S. 731 (1982)........................................................................3, 9

*Norton v. Sam's Club,*
    145 F.3d 114 (2d Cir. 1998)......................................................17, 21

*Osorio v. Source Enterprises, Inc.,*
    No. 05-cv-10029, 2007 WL 683985 (S.D.N.Y. Mar. 2, 2007) .....................25

*Present v. Avon Prods.,*
    253 A.D.2d 183 (1st Dep't 1999) .....................................................16

*Prozeralik v. Capital Cities Communications,*
    82 N.Y.2d 466 (1993) ............................................... 16-17, 20, 22

*Purgess v. Sharrock,*
    33 F.3d 143 (2d Cir. 1994)............................................................25

*Racich v. Celotex Corp.,*
    887 F.2d 393 (2d Cir. 1989)...........................................................22

*Reynolds v. Pegler,*
    223 F.2d 429 (2d Cir. 1955).........................................................28

*Roginsky v. Richardson-Merrell, Inc.*,
 378 F.2d 832 (2d Cir. 1967) ........................................................... 22

*Shuford v. Cardoza*,
 No. 17-cv-6349, 2023 WL 2706255 (E.D.N.Y. Mar. 30, 2023) ..................... 29

*Simpson v. Pittsburgh Corning Corp.*,
 901 F.2d 277 (2d Cir. 1990) ........................................................... 22

*Stampf v. Long Island R. Co.*,
 761 F.3d 192 (2d Cir. 2014) ........................................................... 26

*State Farm Mutual Auto. Ins. Co. v. Campbell*,
 538 U.S. 408 (2003) ............................................................... 28-29

*Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*,
 716 F.3d 296 (2d Cir. 2013) ........................................................... 23

*Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*,
 226 A.D.2d 227 (1st Dep't 1996) ...................................................... 16

*Trump v. United States*,
 603 U.S. 593 (2024) ................................................... 1, 3, 5-6, 8, 10, 12

*Turley v. ISG Lackawanna, Inc.*,
 774 F.3d 140 (2d Cir. 2014) ....................................................... 26-30

*United States v. Chaires*,
 88 F.4th 172 (2d Cir. 2023) ........................................................... 20

*United States v. Detrich*,
 865 F.2d 17 (2d Cir. 1988) ........................................................... 21

*United States v. Helstoski*,
 442 U.S. 477 (1979) ............................................................. 1, 4-5, 9

*United States v. Nordic Vill. Inc.*,
 503 U.S. 30 (1992) .................................................................. 4, 6

*United States v. Quintieri*,
    306 F.3d 1217 (2d Cir. 2002) ..................................................... 9-10

*United States v. White*,
    692 F.3d 235 (2d Cir. 2012) ...........................................................21

*Verdi v. Dinowitz*,
    188 A.D.3d 441 (1st Dep't 2020) ..................................................16

**Federal Rules**

Fed. R. Evid. 103(b) .........................................................................20

Fed. R. Evid. 103(d) .........................................................................20

**Other Authorities**

Lazer & Higgitt, *Ascertaining the Burden of Proof for an Award for Punitive Damages in New York? Consult Your Local Appellate Division*, 25 TOURO L. REV. 725 (2009) ...............................................................22

THE FEDERALIST NO. 70 (Hamilton) ........................................................3

*Watch the Anderson Cooper Interview Judge Blocked Donald Trump From Showing*, Newsweek (Jan. 25, 2024), at https://www.newsweek.com/watch-anderson-cooper-interview-judge-blocked-donald-trump-showing-1863998 ..................................................................................2

## INTRODUCTION

The district court's judgment imposes an unjust, enormous, and baseless burden on the President of the United States for two non-tortious public statements made in his official capacity, through official White House channels, defending his character and fitness for the Presidency from then-recent, public attack. This is precisely what the doctrine of Presidential immunity prevents. A failure to uphold that doctrine here would send a chilling message to future Presidents and threaten the vigor and independence of the Executive Branch. *Trump v. United States*, 603 U.S. 593, 614 (2024) ("*Trump*"). *Trump* confirms that Presidential immunity is foundational to the structure of our government. *See id.* at 610-11. It follows that, if such immunity can be waived at all, which President Trump contests, it must be through an "explicit and unequivocal renunciation," *United States v. Helstoski*, 442 U.S. 477, 491 (1979)—which never occurred here.

As discussed in President Trump's *en banc* petition in *Carroll v. Trump*, No. 23-793 (2d Cir. filed Jan. 13, 2025) ("*Carroll II*"), E. Jean Carroll's allegations against President Trump are, by her own admission, "astonishing" and "inconceivable." *Id.* at 2-9. Not only did President Trump never commit the acts Carroll falsely alleges, he never met Carroll, irrespective of a claimed, decades-old photograph—the authenticity of which is open to question, and which could have been doctored or manipulated in many ways—allegedly taken in the photography

1

line of a charity event attended by hundreds of people.  To misdirect the jury in *Carroll II*, Carroll unlawfully propped up these "inconceivable" allegations with highly inflammatory, inadmissible propensity evidence.  *Id.* at 9-17.  The court then misapplied *Carroll II*'s erroneous judgment to unlawfully transform this case ("*Carroll I*") into a damages-only show trial.  As a result, President Trump was wrongly prevented from submitting probative evidence to demonstrate the falsity of Carroll's allegations—including evidence that Carroll's story is identical to a plotline in one of her favorite TV shows, that Carroll falsely claimed to have President Trump's DNA on a dress, and that Carroll stated that "most people think of rape as being sexy" and admitted that she was not "thrown to the ground and ravished." *Watch the Anderson Cooper Interview Judge Blocked Donald Trump From Showing*, Newsweek (Jan. 25, 2024), https://www.newsweek.com/watch-anderson-cooper-interview-judge-blocked-donald-trump-showing-1863998.

Throughout the litigation, the district court committed a series of reversible errors—including the staggering $65 million punitive-damages award, which is unlawful on multiple grounds.  The district court misidentified the burden of proof required for punitive-damages claims.  The court then incorrectly instructed the jury on the crucial element of common-law malice, ignoring New York's longstanding requirement that the defendant's *sole* motivation must be the desire to injure the plaintiff, which did not come close to being proven here.  The district court

2

compounded this error by indefensibly refusing to allow President Trump to testify about his state of mind in making the Statements, and then erroneously struck President Trump's highly relevant testimony that "I just wanted to defend myself, my family, and frankly, the presidency." A.1692. The district court also erred, among a myriad of other errors, by refusing to remit the grossly excessive awards of compensatory and punitive damages.

The unlawful and unconstitutional judgment should be reversed.

## ARGUMENT

### I.    Presidential Immunity Bars Carroll's Claims.

An "energetic executive" is "essential to 'the protection of the community against foreign attacks,' 'the steady administration of laws,' 'the protection of property,' and 'the security of liberty.'" *Trump*, 603 U.S. at 610 (quoting THE FEDERALIST NO. 70 (Hamilton)). The imposition of this $83.3 million judgment against the President of the United States cripples the "bold and unhesitating action" by Chief Executives that safeguards the foundations of our Republic. *Nixon v. Fitzgerald*, 457 U.S. 731, 745 (1982). *Trump* thoroughly undermines this Court's earlier holding in *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023) ("*Carroll*"), that Presidential immunity may be forfeited without any explicit statement. The law-of-the-case doctrine does not apply, because there is both "an intervening change in the

3

law," and "the need to correct a clear error" and "prevent manifest injustice." *Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009).

**A.    Waiver of Presidential Immunity Requires, at the Very Least, an "Explicit and Unequivocal Renunciation."**

Immunity doctrines rooted in the constitutional structure require an explicit and unequivocal statement of waiver. For example, Speech and Debate immunity's "purpose was to preserve the constitutional structure of separate, coequal, and interdependent branches of government." *Helstoski*, 442 U.S. at 491. Because that immunity arises from "the constitutional structure," "[t]he ordinary rules for determining the appropriate standard of waiver do not apply in this setting." *Id.* Accordingly, "waiver can be found only after *explicit and unequivocal renunciation* of the protection." *Id.* (emphasis added).

The same reasoning applies to the States' Eleventh Amendment immunity, which arises from the federalist structure of government. *Edelman v. Jordan*, 415 U.S. 651, 660 (1974). Waiver of that immunity requires "the most express language or … such overwhelming implications from the text as will leave no room for any other reasonable construction." *Id.* at 673 (alterations omitted); *see also Fla. Dep't of Health & Rehab. Servs. v. Fla. Nursing Home Ass'n*, 450 U.S. 147, 150 (1981). Likewise, waivers of federal sovereign immunity "must be unequivocally expressed" and are "construed strictly in favor of the sovereign." *United States v.*

4

*Nordic Vill. Inc.*, 503 U.S. 30, 33-34 (1992) (cleaned up); *see also Lane v. Pena*, 518 U.S. 187, 198 (1996).

*Trump* places Presidential immunity squarely within this group of immunity doctrines—*i.e.*, those that "preserve the constitutional structure," and thus require an "explicit and unequivocal renunciation." *Helstoski*, 442 U.S. at 491. *Trump*'s central holding is that Presidential immunity is rooted in the constitutional structure. 603 U.S. at 610-11, 614-15, 632, 636. Accordingly, if Presidential immunity can be waived at all, which we do not concede, there must be an explicit and unambiguous statement to that effect.

Carroll incorrectly argues that Presidential immunity "is not a component of subject matter jurisdiction." Carroll Br. 14; *id.* at 15-19. But regardless of whether Presidential immunity relates to subject-matter jurisdiction, any waiver must be achieved, if possible at all, through an "explicit and unequivocal renunciation." Opening Br. 10-16. That never happened here.

Carroll attempts to argue (at 14) that there is no "line of cases" holding that immunity doctrines cannot be waived. But there *is* a "line of cases" holding that immunity doctrines rooted in the constitutional structure require an "explicit and unequivocal" statement of waiver, which does not exist in this case. *Helstoski*, 442 U.S. at 491 ("explicit and unequivocal renunciation"); *Edelman*, 415 U.S. at 673 ("the most express language or … overwhelming implications from the text"); *Fla.*

5

*Dep't of Health*, 450 U.S. at 150 ("the most express language"); *Nordic Village*, 503 U.S. at 33-34 ("must be unequivocally expressed"); *Lane*, 518 U.S. at 198 ("unequivocal waiver").

Carroll contends that "a President *should* be able to litigate if he chooses to do so." Carroll Br. 13 (quoting *Carroll*, 88 F.4th at 427-28). That is irrelevant. The Supreme Court's doctrine of "explicit and unequivocal" waiver fully protects the "President's autonomy … to litigate if he chooses to do so." *Id.* More importantly, the clear-statement requirement *also* protects our constitutional structure and the vigor and independence of the Executive Branch—which Carroll's inadvertent-forfeiture argument undermines. *Trump*, 603 U.S. at 610-11.

### B. No "Explicit and Unequivocal Renunciation" Occurred Here.

President Trump never made any "explicit and unequivocal renunciation" of Presidential immunity. In fact, he asserted Presidential immunity at every stage of the proceedings. In his original state-court answer, President Trump pled that "[t]he allegedly defamatory statements are privileged or protected by one or more immunities … under the Constitution of the United States." *Carroll v. Trump*, 680 F. Supp. 3d 491, 498 (S.D.N.Y. 2023); *see also* D.Ct. Doc. 14-69, ¶ 149. In his opening brief on summary judgment, President Trump asserted Presidential immunity throughout 19 pages of briefing. A.397-98, A.399-415. President Trump again asserted Presidential immunity in his summary-judgment reply. A.845-849,

6

A.851-852.  The President even sought leave to amend his state-court answer to re-assert Presidential immunity if necessary, which it was not.  A849-851.  President Trump again asserted Presidential immunity in his interlocutory appeal.  *Carroll*, 88 F.4th 418. Clearly, there was no explicit waiver of Presidential immunity—quite the opposite, repeated assertions of it.

Carroll wrongly contends (at 1, 6, 21-22) that President Trump supposedly renounced Presidential immunity in a letter to the state court dated July 16, 2020. SA.19-21.  But that letter did not mention or discuss Presidential immunity, and it did not purport to waive immunity or any affirmative defense.  *See id.*  Carroll concedes (at 22) that the letter "address[ed] a *different* affirmative defense"—namely, a sitting President's temporary immunity from judicial process while in office.  SA.19-21.  Moreover, the language Carroll cites merely pointed out that staying the case until President Trump left office would not entail that he would "escape accountability" or place President Trump "above the law."  SA.21.  The letter did not waive President Trump's ability to litigate *any* issue—least of all Presidential immunity.  *Id.*  Such a reading of the letter would eviscerate Presidential immunity, thus gravely damaging the Presidency as we know it.

Carroll also wrongly contends that President Trump somehow "*conced[ed]* in his prior interlocutory appeal" that he had waived immunity.  Carroll Br. 20 (citing *Carroll*, 88 F.4th at 429 n.52).  This is incorrect.  *Carroll* cited footnote 18 of the

district court's opinion. 88 F.4th 429-30 nn.52. That footnote acknowledged that President Trump's brief stated that "Defendant did not waive his entitlement to presidential immunity," but stated that the brief did not provide a specific argument on that point. *Carroll*, 680 F. Supp. 3d at 499 n.18. The footnote also contended that President Trump "did not dispute that he waived the defense" in a recent letter. *Id.* The district court did not cite any statement by President Trump explicitly *renouncing* immunity, and none exists. *See id.*

### C.     The Law-of-the-Case Doctrine Does Not Apply.

President Trump has identified both "an intervening change in the law" and "the need to correct a clear error or prevent manifest injustice." *Johnson v. Holder*, 564 F.3d 95, 99-100 (2d Cir. 2009). First, *Trump* constitutes an "intervening change in the law." *Id.* at 99. *Trump* was decided after *Carroll*'s incorrect decision that Presidential immunity can be forfeited and that President Trump had forfeited it. That decision no longer controls because *Trump* was a watershed ruling by the United States Supreme Court on Presidential immunity, emphasizing that Presidential immunity is deeply rooted in the constitutional structure, *see* 603 U.S. at 610-11, 614-15, 632, and therefore requires a clear and unequivocal statement to waive. Carroll unpersuasively argues that *Trump* "never mentions the word" waiver. Carroll Br. 12, 20. But *Trump* demonstrates that Presidential immunity's "purpose was to preserve the constitutional structure of separate, coequal, and interdependent

8

branches of government," which entails that "waiver can be found only after explicit and unequivocal renunciation of the protection." *Helstoski*, 442 U.S. at 491. Such waiver has never existed in this case.

Carroll tries to claim that that "has been the law for decades." Carroll Br. 13 (citing *Fitzgerald*, 457 U.S. at 749). If so, that fact merely confirms that *Carroll*'s holding is both "clear error" and "manifest injustice," and so the law-of-the-case doctrine does not apply. *Johnson*, 564 F.3d at 99. In any event, Carroll ignores the momentous nature of *Trump* as a decision outlining the foundations of Presidential immunity, which makes it an "intervening change in the law." *Id.* Due to this fact, again, the law-of-the-case doctrine does not apply.

Carroll argues (at 12) that "all the arguments that [President] Trump raises here were either considered by this Court … or have been waived." Not so. *Carroll* never discussed the well-established clear-statement rule. *See* 88 F.4th 418. Carroll argues that President "Trump … could have made th[e] argument about requiring 'explicit and unequivocal renunciation' in his prior interlocutory appeal." Carroll Br. 20-21 (citing *United States v. Quintieri*, 306 F.3d 1217, 1229 (2d Cir. 2002)). On the contrary, *Trump* provides a new, compelling rationale that was unavailable during the interlocutory appeal, which constitutes "intervening circumstances." *Quintieri*, 306 F.3d at 1230 ("[A]n issue may be raised if it arises as a result of events that occur after the original [proceeding]."). In addition, *Quintieri* makes clear that Carroll's

9

supposed forfeiture rule comes to bear only when the law-of-the-case doctrine applies. 306 F.3d at 1229. Here, that doctrine is inapplicable. *See id.*

In any event, "even if an issue is barred by the law of the case, appellate courts may depart from the law of the case and reconsider the issue for 'cogent' and 'compelling' reasons such as 'an intervening change of controlling law, … or the need to correct a clear error or prevent manifest injustice.'" *Id.* (citation omitted). Both factors are present here. Imposing an $83.3 million judgment on the President for his official acts—thus deterring bold and unhesitating action by future Presidents—constitutes both "clear error" and "manifest injustice." *Id*.

## D. The June 21 and June 22 Statements Were Official Acts.

The June 21 and June 22 Statements plainly fall within the "outer perimeter" of the President's official responsibilities. *Trump*, 603 U.S. at 618. Public statements refuting attacks on the President's character and fitness to serve are not "manifestly or palpably beyond" the President's authority—they lie at its heartland. *Id.* (quoting *Blassingame v. Trump*, 87 F.4th 1, 13 (D.C. Cir. 2023)).

Carroll wrongly argues (at 25) that the Statements' "content, form, and context," *Trump*, 603 U.S. at 629 (citation omitted), demonstrate that they were unofficial. The opposite is true. First, the Statements' "form" and "context" were overwhelmingly *official*: (1) The White House Press Office issued the June 21 Statement, which is an official White House record stamped "Authenticated U.S.

10

Government Information." A.1887.[1] (2) President Trump made the June 22 Statement at an official White House press availability on the South Lawn of the White House. A.584. (3) The June 22 Statement responded to media inquiries at an official event that included the President's remarks on tariffs, China, Iran, ICE raids, the stock market, border security, sanctuary cities, and U.S. energy independence. A.584-590. (4) The White House Press Office issued an official transcript of that press availability. A.584. Both the "form" and "context" uniformly support the Statements' *official* nature.

Carroll, therefore, relies solely on the Statements' "content"—she argues that they supposedly related to "personal affairs." Carroll Br. 25-26. The D.C. Circuit rejected the same argument in *Council on American-Islamic Relations v. Ballenger*, 444 F.3d 659 (D.C. Cir. 2006), where a Member of Congress discussed his marital separation with a reporter. *Ballenger* correctly held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Id.* at 664. The D.C. Circuit reasoned that "a Member's ability to do his job as a legislator effectively is tied … to the Member's relationship with the public and in particular his constituents and colleagues in the Congress." *Id.* at 665. "[T]here was a clear nexus between the congressman

---

[1] *Available at* https://www.govinfo.gov/content/pkg/DCPD-201900410/pdf/DCPD-201900410.pdf.

answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Id.* at 665-66. This logic applies even more forcefully to the President of the United States.

Carroll argues that *Ballenger* addressed the Westfall Act, not Presidential immunity. Carroll Br. 28 n.11. But Presidential immunity is *broader*, not narrower, than the Westfall Act's "scope of employment" standard. *See Ballenger*, 444 F.3d at 663. Presidential immunity extends to the "outer perimeter" of the President's official duties. Moreover, the President's authority to speak to the American public is "extraordinary," and he is "the sole person charged by the Constitution" who "oversees … a vast array of activities that touch on every aspect of American life." *Trump*, 603 U.S. at 629. "For these reasons, most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities," including those "that may not directly implicate the activities of the Federal Government." *Id.*

The Statements defended President Trump's fitness for the Presidency and bolstered the public's confidence in him as President. *See* A.1692 ("I just wanted to defend myself, my family, and frankly, the presidency."). Thus, in *Clinton v. Jones*, the Supreme Court recognized that even public denials of Paula Jones' allegations made by *unofficial* intermediaries "may involve conduct within the outer perimeter

of … President [Clinton]'s official responsibilities." 520 U.S. 681, 686 (1997). That baseline is fully cleared in the instant context, where the Statements were made by the President and his White House staff, through official channels and from the White House.

Carroll herself repeatedly *emphasized* the official nature of the Statements to the jury, arguing that President Trump was "[s]peaking from the White House," A.1100; "us[ing] the most famous platform on earth," *id.*; and "[w]ielding his position as president," A.1781. The district court, too, emphasized the official nature of the Statements, stating that "[President] Trump used the office of the presidency— the loudest 'bully pulpit' in America and possibly the world" in issuing the Statements. SPA.140. Therefore, both Plaintiff and district court have concurred that the Statements were official acts.

## II. The District Court Erred by Giving Issue-Preclusive Effect to the *Carroll II* Judgment.

Carroll offers no convincing defense of the district court's wrongful holding that "the [*Carroll II*] jury's finding that Mr. Trump 'sexually abused' Ms. Carroll *implicitly determined that he forcibly penetrated her digitally*," which reduced the later *Carroll I* trial to damages only. *Carroll v. Trump*, 690 F. Supp. 3d 396, 399-400 n.2 (S.D.N.Y. 2023) (emphasis added) (citing *Carroll v. Trump*, 685 F. Supp. 3d 267, 269 (S.D.N.Y. 2023)). This finding is plainly erroneous. Opening Br. 25-30. In *Carroll II*, Carroll falsely testified to lesser conduct such as forcible kissing and

13

pulling down her tights. A.2219-2220. The jury instructions from *Carroll II* improperly permitted the jury to find "sexual abuse" based on such lesser conduct. A.2228-2229. Moreover, the *Carroll II* jury *discredited* a significant portion of Carroll's testimony by rejecting her claim of "rape." A.2214. The jury that discredited her claim of penile penetration also plainly discredited Carroll's closely linked claim of digital penetration. *Id.* For the same reasons, the district court's dismissal of President Trump's counterclaim was erroneous and must be reversed. *See* 685 F. Supp. 3d at 269.

Carroll argues (at 29-30) that the *Carroll II* jury found "sexual abuse" in *some* form. But the district court went far beyond instructing the *Carroll I* jury that some incident of "sexual abuse" happened. The district court provided the erroneous, repeated, and patently prejudicial instructions that "Mr. Trump, in fact, sexually abused Ms. Carroll by forcibly and without her consent inserting his fingers into her vagina," A.1085, and that "Mr. Trump sexually abused Ms. Carroll by forcibly inserting his fingers into her vagina without her consent," A.1851.

Carroll falsely argues (at 30) that President Trump "fail[ed] to object to [the] jury instruction." On the contrary, President Trump's counsel objected on this precise ground: "[T]he language that we certainly object to is where it says: 'First, Mr. Trump sexually assaulted Ms. Carroll by forcibly inserting his fingers into her vagina without her consent.' Again, that wasn't determined by the jury. It's

14

extremely inflammatory."  A.1722; *see also* A.1723 ("That's precisely the language that we have an issue with."). The district court overruled this objection on the erroneous basis that "the only point on which there was any evidence at all … that could sustain the sexual abuse finding was the evidence of digital penetration." A.1723.  That logic by the district court was circular and clear error.

Carroll cites (at 31) the district court's post-trial order in *Carroll II*.  But in that order, the district court explicitly acknowledged that forcible kissing and pulling down tights constituted "sexual abuse" under the jury instructions: "None of these actions, *other than putting his mouth against hers and perhaps pulling down her tights*, was sexual contact."  *Carroll v. Trump*, 683 F. Supp. 3d 302, 326 (S.D.N.Y. 2023) (emphasis added).  The district judge weighed the evidence differently, *see id.* n.72, but this statement alone contradicts the conclusion that the *Carroll II* jury "implicitly determined" digital penetration.  That jury did no such thing.

Carroll argues (at 31-32) that the district court in *Carroll II* supposedly made a finding under Federal Rule of Civil Procedure 49(a) that digital penetration had occurred.  If that were so, it would make no difference—any such finding would rest on the same error and be reversible on the same basis.

## III.  Common-Law Malice Requires That the Desire To Injure Be the Defendant's *Sole* Motivation.

To obtain punitive damages for defamation in New York, the plaintiff must establish common-law malice, which requires a showing that "in making the

15

statements defendant was '*solely* motivated by a desire to injure plaintiff.'" *Verdi v. Dinowitz*, 188 A.D.3d 441, 442 (1st Dep't 2020) (emphasis in original) (quoting *Morsette v. "The Final Call"*, 309 A.D.2d 249, 255 (1st Dep't 2003)). "[A] triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and … that the animus was '*the one and only cause for the publication*'." *Morsette*, 309 A.D.2d at 255 (second emphasis added); *see also Present v. Avon Prods.*, 253 A.D.2d 183, 189 (1st Dep't 1999); *Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*, 226 A.D.2d 227, 229 (1st Dep't 1996). Even the district court *in this case* acknowledged this point. *Carroll*, 680 F. Supp.3d at 516.

Carroll wrongly claims that the Court of Appeals' decision in *Prozeralik v. Capital Cities Communications*, 82 N.Y.2d 466, 478-79 (1993), rejected the sole-motivation requirement. *Prozeralik* did not directly address the sole-motivation requirement. It held that "actual malice" is insufficient for punitive damages, and that common-law malice is required instead. 82 N.Y.2d at 478-79. But in adopting the common-law malice standard in *Prozeralik*, the Court of Appeals twice cited *Liberman v. Gelstein*, 80 N.Y.2d 429 (1992)—its own decision from one year earlier, which explicitly held that common-law malice requires that "malice was *the one and only cause* for the publication." *Id.* at 439 (emphasis added). By citing *Liberman* with approval, the Court of Appeals did not purport to overrule it *sub silentio*.

16

Carroll mistakenly argues (at 47) that President Trump somehow "improperly conflates" "the test for overcoming qualified privilege" with "the test for awarding punitive damages." Not so. As *Prozeralik* itself makes clear, both tests rely on the same underlying standard, *i.e.*, common-law malice, and both apply in defamation cases. 82 N.Y.2d at 478-79. By citing repeatedly *Liberman* (a qualified-privilege case), *Prozeralik* (a punitive-damages case) makes clear that the same standard of common-law malice applies under both inquiries. No case remotely suggests that "common-law malice" could mean two different things in the same defamation case, as Carroll contends. The sole-motivation requirement clearly applies.

Carroll argues that *Morsette*'s assertion of the sole-motivation requirement is supposedly "dicta." That is incorrect. Opening Br. 38-39. Moreover, New York courts have applied the sole-motivation requirement in other cases where it is plainly not dicta—such as *Verdi*, *Present*, *Thanasoulis*, and *Liberman*.

Carroll does not argue that this error was harmless, so she has forfeited that point. *Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998).

## IV. The District Court Erred by Restricting and Striking President Trump's Testimony About His State of Mind.

Before President Trump testified at trial, the district court conducted a troubling and indefensible colloquy to ensure that President Trump could say almost nothing during his testimony—and, in particular, that he could not testify about *his own state of mind* in making the Statements. A.1677-1690. Then, having permitted

17

only three questions with monosyllabic responses, the district court struck President Trump's highly relevant testimony that, in making the Statements, "I just wanted to defend myself, my family, and frankly, the presidency." A.1692. That testimony alone defeats any finding of common-law malice, which requires that the desire to harm be the speaker's *sole* motivation. *Supra*, Part III. Both the upfront restrictions and the striking of that testimony are reversible errors. Opening Br. 41-44.

Carroll wrongly claims (at 38) that President Trump's counsel "waived any challenge to the district court's ruling on appeal." On the contrary, President Trump's counsel repeatedly objected, pushed back, and sought clarification of the district court's rulings over ten transcript pages. A.1681-1690. In a series of unconstitutional, unlawful, and unambiguous instructions during this colloquy, the district court shockingly and repeatedly made clear that it would not allow *any testimony at all* about President Trump's state of mind. A.1684 ("[H]e will say nothing else about his state of mind" other than that he was "defending himself"); A.1688 (President Trump could testify *only* as to "whether he stands by the [deposition] testimony …. End. That's it."); *id.* (answering "No" when asked if President Trump could address "[w]hy did you make the statements in response to her accusation"); A.1689 (ruling that President Trump could not testify as to his state of mind: "Not what was in [his] mind," and not "[w]hy did he do it"); *id.* (district court instructing that "[t]here will not be an open-ended question").

18

Nevertheless, President Trump's counsel specifically objected that he must be allowed to testify about his intention in making the Statements, because that testimony was directly relevant to common-law malice.  Counsel objected, "how do they prove common law malice when I can't have my client defend himself and say … he was defending himself at the time?" A.1689.  Again, she objected: "But I have a right to ask about his intent, they have an obligation to prove his intent."  A.1689. The district court specifically overruled this objection: "I will decide what he has a right to do here. That's my job, not yours."  A.1689.

Thus, after arguing extensively, objecting, and having her objections overruled for over ten transcript pages, President Trump's counsel—left with no other choice—conducted the absurdly truncated, three-question direct examination mandated by the court's rulings.  It was in this context that counsel made the comment (cited by Carroll, at 38) that "[a]s long as we have the deposition, your Honor, I think we will be fine." A.1690.  Taken in its proper context, that statement did not concede or waive anything.  To the contrary, it underscored how erroneous and wrong the court's rulings and prohibitions on President Trump's testimony were.

Those objections preserved this issue for appeal.[2]  "Once the court rules definitively on the record—either before or at trial—a party need not renew an

---

[2] Even if they did not, which they did, the errors are reversible under plain-error review for the same reasons discussed herein—they are "clear and obvious," they affect "substantial rights," and they "seriously affect[] the fairness, integrity [and]

objection or offer of proof to preserve a claim of error for appeal." Fed. R. Evid.

103(b). Once a party "ha[s] made his point clearly" and "the judge ha[s] overruled

him," the party need not engage in "reiterated insistence upon a position which the

judge has once considered and decided" to preserve claims for appeal. *Keen v.*

*Overseas Tankship Corp.*, 194 F.2d 515, 519 (2d Cir. 1952) (Hand, J.).

Carroll attempts to claim (at 36-37, 39-40) that the district court's rulings were

justified under Rule 103(d) to bar inadmissible testimony. *See also* A.1680. On the

contrary, Rule 103(d) does not authorize the prophylactic exclusion of *admissible*

evidence to prevent the admission of *inadmissible* evidence. Instead, it provides

that, "*[t]o the extent practicable*, the court must conduct a jury trial so that

inadmissible evidence is not suggested to the jury by any means." Fed. R. Evid.

103(d) (emphasis added). "To the extent practicable" does not mean excluding

*admissible* evidence. On the contrary, where "the evidence" in question "was not

inadmissible, Rule 103([d]) has no applicability." *Int'l Merger & Acquisition*

*Consultants, Inc. v. Armac Enterprises, Inc.*, 531 F.2d 821, 824 (7th Cir. 1976).

President Trump's testimony about his mental state in making the Statements

was unquestionably relevant and admissible on the key disputed question of

common-law malice. *Prozeralik*, 82 N.Y.2d at 480 ("[C]ommon-law malice focuses

---

public reputation of judicial proceedings." *United States v. Chaires*, 88 F.4th 172,
177 (2d Cir. 2023).

on the defendant's mental state…."). The district court misapplied Rule 103(d) by erroneously blocking President Trump from offering any meaningful testimony about his state of mind—and then striking his relevant, admissible testimony that "I just wanted to defend myself, my family, and frankly, the presidency." A.1692.

Carroll also contends (at 39) that "[t]he district court properly excluded such testimony under Rule 403." But the district court did not make any such ruling. This Court should reject Carroll's *post hoc* attempt to rationalize clear error. In any event, Rule 403 could not plausibly authorize the district court to exclude *all evidence* from President Trump on a crucial element of Carroll's case—*i.e.*, common-law malice. *See, e.g., United States v. White*, 692 F.3d 235, 251-52 (2d Cir. 2012); *United States v. Detrich*, 865 F.2d 17, 21 (2d Cir. 1988).

Because Carroll does not contend that this error was harmless, she has forfeited that point. *Norton*, 145 F.3d at 117.

## V.  Punitive Damages Require Clear and Convincing Evidence.

In New York, entitlement to punitive damages must be shown by clear and convincing evidence. Opening Br. 44-45. Carroll (at 49) relies on *Corrigan v. Bobbs-Merrill Co.*, 228 N.Y. 58, 66 (1920), but *Corrigan* provided only unconsidered, non-binding dicta that "has since been effectively overruled by" subsequent cases. *Greenbaum v. Svenska Handelsbanken*, 979 F. Supp. 973, 978 (S.D.N.Y. 1997) (Sotomayor, J.). Carroll (at 49) cites *Celle v. Filipino Reporter*

21

*Enterprises*, 209 F.3d 163, 184 (2d Cir. 2000), but *Celle* merely recited the preponderance standard without analysis—citing only *Prozeralik*, 82 N.Y.2d at 466, which does not mention the standard. Carroll (at 49) also cites *Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 282 (2d Cir. 1990), but *Simpson* merely held that the "clear and convincing" standard is not constitutionally mandated, *id.* at 282-83.

By contrast, pertinent Second Circuit cases have applied the "clear and convincing" standard for punitive damages. *See Racich v. Celotex Corp.*, 887 F.2d 393, 397 (2d Cir. 1989) (approving a jury instruction that required punitive damages to be "clearly established"); *Brink's Inc. v. City of New York*, 717 F.2d 700, 706 n.4 (2d Cir. 1983) (approving an instruction that required "clear and convincing evidence" for punitive damages). Indeed, the most carefully considered Second Circuit decision—by Judge Friendly—held that a claim of punitive damages requires "clear, unequivocal, and convincing evidence" under New York law. *Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 851 (2d Cir. 1967) (citing *Cleghorn v. N.Y. Cent. & H.R.R.R.*, 56 N.Y. 44, 48 (1874)).

Carroll says (at 50) that New York's "sister states" have adopted the preponderance standard, but she cites only four States. In fact, 32 States and the District of Columbia, like New York, require clear and convincing evidence, and only nine States apply the preponderance standard. *See* Lazer & Higgitt, *Ascertaining the Burden of Proof for an Award for Punitive Damages in New York?*

22

*Consult Your Local Appellate Division*, 25 TOURO L. REV. 725, 733 nn.36, 37 (2009). New York's law reflects this majority position.

Carroll contends (at 51) that this error was harmless, but "an error in instructing a jury on the burden of proof is ordinarily harmful." *Terra Firma Investments (GP) 2 Ltd. v. Citigroup Inc.*, 716 F.3d 296, 298 (2d Cir. 2013). That was clearly the case here. Opening Br. 49.

## VI. The Compensatory-Damages Award Must Be Remitted.

Carroll (at 40-41) fails to identify any damages other than emotional injury that the $7.3 million award could have compensated, thus mandating that it be remitted. She baselessly claims that the award included "the loss of her career at Elle Magazine, and continuing economic and psychological injury." Carroll Br. 41-42. But "psychological injury" is just another way of saying "emotional damages." Carroll's two other asserted injuries are *economic—i.e.*, "the loss of her career at Elle Magazine," and "continuing economic … injury." *Id.* The jury instructions did not authorize recovery for such economic injuries, and Carroll did not put on any financial evidence to support them.

By their plain terms, the instructions authorized the jury to award compensatory damages only for reputational and emotional injuries, not economic injuries: "A person who has been defamed is entitled to fair and just compensation for *the injury to her reputation* and for any *humiliation and mental anguish* in her

public and private lives that was caused by the defamatory statement in question." A.1853 (emphases added). Again, the jury was instructed to award "compensation for the injury to Ms. Carroll's reputation and the humiliation and mental anguish in her public and private lives." A.1853-1854. The jury was further instructed that "you may not award compensatory damages more than once for the same injury." A.1854. These instructions plainly authorized the jury to award damages for only two kinds of injury: (1) "injury to her reputation," and (2) "humiliation and mental anguish." A.1853-1854. Neither injury occurred, let alone was proven.

Moreover, Carroll's counsel repeatedly admitted during the instruction conference that "reputational repair" and "pain and suffering" were the only two categories of damages for which she sought compensation—neither of which was proven. A.1696; *see also* A.1698 (Carroll's counsel stating that she was seeking recovery for "emotional and reputational effects"); A.1700 (Carroll's counsel admitting that she was seeking "two categories of compensatory damages"). President Trump's counsel agreed that Carroll was seeking damages only for "reputational harm and emotional harm." A.1701.

Carroll's reliance on comparator cases fails, because those cases—unlike the $7.3 million award here—"did not involve damages solely for emotional distress." Carroll Br. 43. Carroll cites *Prozeralik*, 222 A.D.2d at 1020, but she admits that it involved both "economic and non-economic damages." Carroll Br. 43. She cites

*Purgess v. Sharrock*, 33 F.3d 143, 142 (2d Cir. 1994), but again she admits that it involved "economic damages alone." Carroll Br. 43. These cases underscore President Trump's point that $7.3 million for "garden-variety" emotional distress is grossly excessive. Likewise, Carroll's discussion (at 44) of *Cantu v. Flanigan*, 705 F. Supp. 2d 220, 222 (E.D.N.Y.), overlooks that *Cantu* included "evidence demonstrating that the injury to Cantu's reputation led to lost contracts valued at $298,950,000 and $69,000,000," *id.* at 231—*i.e.*, specific financial evidence of *economic* injuries. Carroll provided nothing like that here. In any event, *Cantu* is inapposite because it did not discuss or apply this Court's standards for scrutinizing awards for "garden-variety" emotional injuries. *See id.*

Carroll contends that "a court is not required to remit a large non-economic damage award, even where evidence of emotional damage consists solely of plaintiff's testimony." Carroll Br. 43-44 (quoting *Mendez v. Starwood Hotels & Resorts Worldwide, Inc.*, 746 F. Supp. 2d 575, 601 (S.D.N.Y. 2010)). But *Mendez* cited *Osorio* for this proposition, and *Osorio* combined reputational injury with emotional harm. *Osorio v. Source Enterprises, Inc.*, No. 05-cv-10029, 2007 WL 683985, at *10 (S.D.N.Y. Mar. 2, 2007); *see also Morse v. Fusto*, No. 07-cv-4793, 2013 WL 4647603, at *28 (E.D.N.Y. Aug. 29, 2013) (finding that this fact renders *Osorio* inapplicable when assessing emotional-distress awards). Moreover, *Mendez* reaffirmed that remittitur should apply to "a run of the mill mental anguish claim,

25

defined as one where the evidence is limited to the testimony of the plaintiff and there is little or no medical documentation of any injuries." 746 F. Supp. 2d at 601. Carroll provided no "medical documentation," *id.*, and her evidence of emotional harm consisted solely of her own self-serving, highly metaphorical testimony. A.1169-1170, A.1175, A.1180, A.1188. This testimony falls squarely within the line of cases involving "garden-variety" emotional distress. *See, e.g., Duarte v. St. Barnabas Hosp.*, 341 F. Supp. 3d 306, 320 (S.D.N.Y. 2018); *Dotson v. City of Syracuse*, No. 5:04-cv-1388, 2011 WL 817499, at *15 (N.D.N.Y. Mar. 2, 2011).

In *Turley v. ISG Lackawanna, Inc.*, this Court held that an award of $1.32 million for emotional suffering "tests the boundaries of proportionality and predictability," even though the case was "unique, combining years of grotesque psychological abuse leading to a marked decline in Turley's mental health and well-being." 774 F.3d 140, 163 (2d Cir. 2014). The $7.3 million award is grossly excessive and should be remitted, especially since no economic injury was actually alleged or proven. *Duarte*, 341 F. Supp. 3d at 320; *see also Stampf v. Long Island R. Co.*, 761 F.3d 192, 207 (2d Cir. 2004).

## VII.  The $65 Million Punitive-Damages Award Must Be Remitted.

This case involves a grossly excessive compensatory award totaling $18.3 million and an even more excessive punitive award of $65 million. Carroll's claim (at 51-52) that federal common law does not restrict the punitive-damages award

cannot be squared with *Turley*. *Turley* applied federal common-law standards to an excessive award of punitive damages in a case involving "violations of state and federal anti-discrimination statutes, and … intentional infliction of emotional distress under New York law." *Turley*, 774 F.3d at 146. As in *Turley*, this Court is "required to police closely the size of awards rendered in the trial courts," and "oversee [them] with care" to avoid "the individual and social harms associated with excessive awards of compensatory and punitive damages." *Id.* at 147. The Court must therefore "scrutinize [such] awards for fairness, consistency, proportionality, and … constitutionality." *Id.*

Carroll claims that President Trump's conduct was supposedly "reprehensible" because he denied Carroll's false claims in "dozens of statements." Carroll Br. 53. But President Trump's consistent denials, protected by the heart of the First Amendment, responded to Carroll's conduct in repeatedly pushing her false accusations into the spotlight through endless media appearances and litigation.

President Trump's public statements denying Carroll's politically motivated, decades-old allegations are not remotely "reprehensible." On the contrary, as responses to criticisms of the President, they are core political speech protected by the First Amendment. As President Trump sought to testify, the Statements served to "defend myself, my family, and frankly, the presidency." A.1692. Indeed, comparable denials of public accusations are generally privileged from defamation

27

liability precisely because their *defensive* nature makes them not reprehensible, but lawful. *See, e.g., Kane v. Orange County Publications*, 232 A.D.2d 526, 527 (2d Dep't 1996); *Reynolds v. Pegler*, 223 F.2d 429, 433 (2d Cir. 1955).

Carroll says (at 53) that President Trump "threatened her" by using the phrases "dangerous territory" and "pay dearly" in the June 21 and 22 Statements. But Carroll takes these phrases out of context. President Trump described false accusations of sexual assault as "dangerous territory" in comparing them to the false accusations against Justice Brett Kavanaugh—which undermined the credibility of genuine allegations. SPA.6. President Trump correctly stated that false accusations of sexual assault are "a disgrace and people should pay dearly for such false accusations," SPA.5, indicating that there should be financial and legal consequences—such as President Trump's counterclaim against Carroll in this case.

Carroll claims (at 54) that the punitive-to-compensatory damages ratio was acceptable because it was less than 9:1. But *Turley* makes clear that "where, as here, the compensatory damages award is imprecise because of the nature of the injury and high when compared to similar cases, 'a lesser ratio, *perhaps only equal to compensatory damages*, can reach the outermost limit of the due process guarantee.'" *Turley*, 774 F.3d at 165 (emphasis added) (quoting *State Farm Mutual Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003)). In *Turley*, this Court rejected the same ratio that Carroll now advocates: "Where the compensatory award is

28

particularly high, as the one in this case assuredly was, a four-to-one ratio of punishment to compensation … serves neither predictability nor proportionality." *Id.* Thus, *Turley* held that a 3.8:1 ratio was plainly excessive. *Turley*, 774 F.3d at 166. The same is true here. The compensatory award is unquestionably "high" and reflects "imprecise" emotional and reputational injury, and thus the 3.6:1 ratio exceeds "the maximum allowable." *Id.*

The police-brutality cases cited by Carroll (at 54) are distinguishable, because they involved neither "particularly high" awards nor "intangible—and therefore immeasurable—emotional" and reputational damages. *Turley*, 774 F.3d at 165. Instead, those cases involved relatively low compensatory damages and concrete, brutal physical injuries. *See Jennings v. Yurkiw*, 18 F.4th 383, 386 (2d Cir. 2021) (upholding $90,000 compensatory and $355,000 punitive damages for unprovoked police beating); *Shuford v. Cardoza*, No. 17-cv-6349, 2023 WL 2706255, at *16 (E.D.N.Y. Mar. 30, 2023) (4:1 ratio, $1,000,000 and $250,000, for similar police brutality); *Anderson v. Osborne*, No. 17-cv-539, 2020 WL 6151249, at *8 (S.D.N.Y. Oct. 20, 2020) (compensatory damages of $50,000 and total punitive damages of $575,000, spread among four defendants, for brutal police misconduct).

Carroll claims (at 55) that a high award provides deterrence because President Trump is a high-net-worth individual. But "[t]he wealth of a defendant cannot justify an otherwise unconstitutional punitive damages award." *State Farm*, 538 U.S. at

29

427; *see also BMW of N. Am. v. Gore*, 517 U.S. 559, 585 (1996) ("The fact that BMW is a large corporation rather than an impecunious individual does not diminish its entitlement to fair notice…."). The award cannot exceed the guidelines set forth in *Turley*, regardless of President Trump's net worth.

Attempting to end-run *Turley*'s third guidepost, 774 F.3d at 165, Carroll argues (at 55-56) that there is an "absence of comparable cases" because President Trump's conduct is supposedly "without precedent." On the contrary, this case involves the closest conceivable "comparable case[]"—*i.e.*, the jury verdict in *Carroll II*, which authorized only $280,000 in punitive damages for a very similar statement by President Trump in October 2022. App'x A.3095 in *Carroll v. Trump*, No. 23-0793-cv (2d Cir. filed Nov. 20, 2023). The ridiculously excessive $65 million punitive award exceeds the punitive award in *Carroll II* ($280,000)— imposed for virtually identical conduct—by a factor of *232*. That is grossly excessive by any standard.

## CONCLUSION

The district court's judgment should be reversed.

Dated: February 18, 2025

Respectfully submitted,

*/s/ D. John Sauer*
D. John Sauer
JAMES OTIS LAW GROUP, LLC
13321 N. Outer Forty Rd.
Suite 300
St. Louis, Missouri 63017
(314) 562-0031
john.sauer@james-otis.com

*Counsel for Defendant-Counter Claimant-Appellant*
*President Donald Trump*

31

## CERTIFICATE OF SERVICE

I hereby certify that, on February 18, 2025, I caused a true and correct copy of the foregoing to be filed by the Court's electronic filing system, to be served by operation of the Court's electronic filing system on counsel for all parties who have entered in the case.

*/s/ D. John Sauer*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Circuit Rule 32.1(a)(4) because it contains 6,974 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f), according to Microsoft Word.

This document complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it was prepared in a proportionally spaced typeface in Microsoft Word utilizing 14-point Times New Roman font.

*/s/ D. John Sauer*