# 24-644

IN THE

# 𝕰𝖓𝖎𝖙𝖊𝖉 𝕾𝖙𝖆𝖙𝖊𝖘 𝕮𝖔𝖚𝖗𝖙 𝖔𝖋 𝕬𝖕𝖕𝖊𝖆𝖑𝖘
### FOR THE SECOND CIRCUIT

E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee*,

v.

PRESIDENT DONALD J. TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant*,

On Appeal from the United States District Court
For the Southern District of New York

## PETITION FOR REHEARING EN BANC
## OF PRESIDENT DONALD J. TRUMP

Justin D. Smith
JAMES OTIS LAW GROUP, LLC
530 Maryville Centre Drive
Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com

*Counsel for President Donald J. Trump*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .............................................................. ii

RULE 40(b) STATEMENT ................................................................1

INTRODUCTION ............................................................................ 2

I.   The Panel Erred Because Presidential Immunity Bars Carroll's
     Defamation Claim, and Was Not Waived. .......................................... 4

     A.   The law of the case doctrine does not bind the en banc Court. .. 5

     B.   The two statements underlying Carroll's defamation claim are
          protected by Presidential immunity. ......................................... 6

     C.   Presidential immunity is not waivable, but even if it were, any
          waiver would require an "explicit and unequivocal
          renunciation." ........................................................................ 10

     D.   In any event, *Carroll 3* manifestly erred by finding that
          President Trump waived Presidential immunity......................13

II.  The Panel Erred In Affirming the Grossly Excessive $65 Million
     Punitive Damages Award. ...................................................................16

CONCLUSION...............................................................................19

CERTIFICATE OF COMPLIANCE ............................................. 20

*Panel Opinion Appended*

i

# TABLE OF AUTHORITIES

**Cases**                                                     **Page(s)**

*Bacon v. Nygard,*
232 A.D.3d 407 (1st Dep't 2024) ............................................................19

*Barr v. Matteo,*
360 U.S. 564 (1959) ................................................................... 8

*Blassingame v. Trump,*
87 F.4th 1 (D.C. Cir. 2023).......................................................... 7

*BMW of N. Am., Inc. v. Gore,*
517 U.S. 559 (1996) ...................................................................17

*Bouveng v. NYG Cap. LLC,*
175 F. Supp. 3d 280 (S.D.N.Y. 2016) ................................... 18

*Brown & Williamson Tobacco Corp. v. Williams,*
62 F.3d 408 (D.C. Cir. 1995)......................................................12

*Carroll v. Trump,*
88 F.4th 418 (2d Cir. 2023)..............................................3, 13-15

*Carroll v. Trump,*
683 F. Supp. 3d 302 (S.D.N.Y. 2023) .................................... 18

*Clinton v. Jones,*
520 U.S. 681 (1997) ............................................................. 10

*Cottier v. City of Martin,*
604 F.3d 553 (8th Cir. 2010) ................................................. 6

*Council on Am. Islamic Relations v. Ballenger,*
444 F.3d 659 (D.C. Cir. 2006) ............................................... 8

*Edelman v. Jordan,*
415 U.S. 651 (1974) ...........................................................12-13

*First Nat'l Bank of Hollywood v. Am. Foam Rubber Corp.*,
530 F.2d 450 (2d Cir. 1976).................................................... 6

*Freeman v. Giuliani*,
732 F. Supp. 3d 30 (D.D.C. 2024) ..........................................19

*Honda Motor Co. v. Oberg*,
512 U.S. 415 (1994) ................................................................16

*Lafferty v. Jones*,
2022 WL 18110184 (Conn. Super. Nov. 10, 2022) ...................19

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982)................................................................. 6

*Operation Rescue Nat'l v. United States*,
147 F.3d 68 (1st Cir. 1998)...................................................... 8

*Richardson v. New York State Dep't of Correctional Serv.*,
180 F.3d 426 (2d Cir. 1999)....................................................12

*Senate Permanent Subcomm. on Investigations v. Ferrer*,
856 F.3d 1080 (D.C. Cir. 2017)............................................... 11

*Stampf v. Long Island R. Co.*,
761 F.3d 192 (2d Cir. 2014)....................................................17

*State Farm Mut. Auto. Ins. Co. v. Campbell*,
538 U.S. 408 (2003)...........................................................4, 17

*Trump v. Hawaii*,
585 U.S. 667 (2018) ................................................................ 7

*Trump v. United States*,
603 U.S. 593 (2024) ....................................... 1, 5, 7-11, 13-16

*Turley v. ISG Lackawanna, Inc.*,
774 F.3d 140 (2d Cir. 2014) ...................................... 1, 4, 17-18

iii

*United States v. Helstoski,*
    442 U.S. 477 (1979)......................................................1, 3, 11-12

*United States v. Nordic Vill. Inc.,*
    503 U.S. 30 (1992).....................................................................12

*Van Gemert v. Boeing Co.,*
    590 F.2d 433 (2d Cir. 1978)...................................................5-6

*Webber v. Dash,*
    607 F. Supp. 3d 407 (S.D.N.Y. 2022) ..................................... 18

*Wilson v. Libby,*
    535 F.3d 697 (D.C. Cir. 2008) .................................................. 8

## RULE 40(b) STATEMENT

The panel erred in deciding two exceptional questions of law warranting rehearing en banc:

1.     Whether absolute Presidential immunity, which barred Plaintiff from recovering on a defamation claim premised entirely on two statements by the President from the White House in response to press questions about his fitness for office, can be waived at all, or at least without an explicit and unequivocal renunciation of the protection?  The panel's holding conflicts with *Trump v. United States*, 603 U.S. 593 (2024), and *United States v. Helstoski*, 442 U.S. 477 (1979).

2.     Whether Plaintiff's $65 million punitive damages award against the President based on two statements made in his official capacity is grossly excessive in violation of the Fourteenth Amendment's Due Process Clause? The panel's holding conflicts with, among others, *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140 (2d Cir. 2014).

## INTRODUCTION

On June 21, 2019, in response to reporter inquiries, the White House Press Office distributed a statement from President Trump denying E. Jean Carroll's false allegations, made publicly by her, in a *New York Magazine* article. A.1887. This statement was an official White House record stamped "Authenticated U.S. Government Information."[1] On June 22, 2019, in remarks on the White House South Lawn, also distributed by the White House Press Office, President Trump responded to questions from reporters about matters of public interest, including Iran, immigration, and again Carroll's false allegations, which went to his fitness for office. A.584-A.596.[2]

Carroll's defamation claim rests entirely on these two official statements by President Trump denying her implausible, decades-old allegation that President Trump supposedly assaulted her in a Bergdorf Goodman dressing room decades ago. This alleged incident "never happened." A.1887. Until Carroll made her wrongful allegations, President Trump did not even know who she was.

---

[1]     *Available at* https://www.govinfo.gov/content/pkg/DCPD-201900410/pdf/DCPD-201900410.pdf.

[2]     *Available at* https://trumpwhitehouse.archives.gov/briefings-statements/remarks-president-trump-marine-one-departure-49/.

Both of President Trump's official statements fall squarely within the scope of Presidential immunity. The panel provided no analysis to the contrary. Instead, the panel relied on the law of the case doctrine, erroneously concluding that a 2023 panel decision in an interlocutory appeal brought by President Trump ("*Carroll 3*") had resolved the Presidential immunity issue by finding, in error, that the President had waived it. Slip Op. 20-26 (discussing *Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023)).

Based on President Trump's denials of her false claims from the White House, Carroll wrongly obtained an $83.3 million judgment. That judgment—and the panel's affirmance of it—is infected with numerous reversible errors, at least two of which warrant en banc review.

First, the President's two allegedly defamatory statements—both issued through official White House channels, both involving matters of significant public concern about his fitness for office—are protected by Presidential immunity. That immunity bars Carroll's defamation claim in its entirety and cannot be waived. The Supreme Court's holding in *Trump v. United States* placed Presidential immunity on the same footing as immunity doctrines such as Speech or Debate Clause immunity or sovereign immunity, which cannot be waived, or at the very least not without an "explicit and unequivocal renunciation." *United States v. Helstoski*, 442 U.S. 477, 490–

3

91 (1979). President Trump timely and consistently raised Presidential immunity as a defense, and arguments to the contrary are based on forfeiture theories that do not rise to the level of "explicit and unequivocal renunciation." A President must be allowed to defend himself against false allegations without fear of frivolous lawsuits and liability.

Second, the panel ignored this Court's prior decision in *Turley v. ISG Lackawanna*, which held that due process requires a lower punitive damages ratio of 1:1 when "the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases." 774 F.3d 140, 165 (2d Cir. 2014). Here, the $18.3 million compensatory damages award is both imprecise and excessive when compared with similar cases. The Fourteenth Amendment prohibits such "grossly excessive" punitive damage awards. *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003). Accordingly, under *Turley* and the Supreme Court's law on punitive damages, the $65 million punitive damages award against the President for two of his official statements must be remitted.

Each of these legal errors warrants en banc review.

## I. The Panel Erred Because Presidential Immunity Bars Carroll's Defamation Claim, and Was Not Waived.

Plaintiff's defamation claim rests solely on President Trump's official remarks, from the White House, on his fitness for office. Presidential

4

immunity fully protects his remarks. The panel did not address the merits of President Trump's Presidential immunity defense.

Instead, through the law of the case doctrine, the panel improperly relied on an earlier panel decision finding that Presidential immunity had been waived. But like other forms of immunity, Presidential immunity cannot be waived, and if it could, that would only be possible, which it is not, through an explicit and unequivocal renunciation of the protection by the President, which did not occur here. The first and second panel's holding otherwise was manifestly erroneous, conflicts with Supreme Court precedent, and threatens to fundamentally undermine Presidential immunity and the Office of the President as a whole. Presidents must be allowed to "us[e] the office's 'bully pulpit'" to defend themselves and their fitness for office. *Trump*, 603 U.S. at 629.

## A. The law of the case doctrine does not bind the en banc Court.

The panel relied exclusively on the law of the case doctrine to dismiss President Trump's entirely valid assertion of Presidential immunity. Slip Op. 20-26. But the law of the case doctrine "cannot immunize panel decisions from review by the court En banc." *Van Gemert v. Boeing Co.*, 590 F.2d 433, 436 n.9 (2d Cir. 1978) (en banc). Indeed, the en banc Court "may overrule

5

any panel decision that a majority of the active judges believes was wrongly decided, unless a party would be seriously prejudiced as a result." *Id.*

The panel's decision on Presidential immunity was wrong. In addition, no party will be prejudiced by applying Presidential immunity here because Carroll was on notice before the trial that President Trump would request judgment on the basis of Presidential immunity. *See First Nat'l Bank of Hollywood v. Am. Foam Rubber Corp.*, 530 F.2d 450, 453 n.3 (2d Cir. 1976); *see also* Argument § I.D, *infra.* Accordingly, the law of the case doctrine does not bind the en banc Court, nor does it preclude the en banc Court from reconsidering the holding of *Carroll 3. See Van Gemert*, 590 F.2d at 436 n.9; *see also Cottier v. City of Martin*, 604 F.3d 553, 557 (8th Cir. 2010) (en banc) (collecting numerous cases, including *Van Gemert*, reflecting "the uniform position of the circuits that an en banc court may overrule an erroneous panel opinion filed at an earlier stage of the same case").[3]

### B. The two statements underlying Carroll's defamation claim are protected by Presidential immunity.

A President possesses "absolute Presidential immunity from damages liability for acts within the 'outer perimeter' of his official responsibility." *Nixon v. Fitzgerald*, 457 U.S. 731, 756 (1982). This "outer perimeter"

---

[3] As explained in President Trump's briefing before the panel, the law of the case doctrine was inapplicable even at the panel stage.

encompasses a President's actions "so long as they are not manifestly or palpably beyond his authority." *Trump*, 603 U.S. at 618 (quotation omitted). Any uncertainty should be resolved in favor of immunity. *Blassingame v. Trump*, 87 F.4th 1, 21 (D.C. Cir. 2023).

The two official statements here—both issued by or on behalf of the President, from the White House, through official White House channels, and involving the President's fitness for office—clearly fall within the outer perimeter of President Trump's official responsibilities. "The President of the United States possesses an extraordinary power to speak to his fellow citizens and on their behalf." *Trump v. Hawaii*, 585 U.S. 667, 701 (2018). For this reason, "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 603 U.S. at 629.

Official White House channels distributed both communications underlying Plaintiff's defamation claim here. A President's conduct is ordinarily official—and thus absolutely immune from civil damages—when it "is organized and promoted by official White House channels and government officials and funded with public resources." *Blassingame*, 87 F.4th at 21. Even lower-ranking federal officers enjoy absolute immunity

against defamation claims for statements made in press releases issued through official channels. *Barr v. Matteo*, 360 U.S. 564, 574 (1959).

The challenged statements also undeniably involved matters of public concern and fitness for office. The President is often "expected to comment on those matters of public concern that may not directly implicate the activities of the Federal Government." *Trump*, 603 U.S. at 629. In a closely analogous context, the D.C. Circuit held that a congressman engaged in official conduct "when he discussed his marital status" in response to questions from a reporter, because "there was a clear nexus between the congressman answering a reporter's question about the congressman's personal life and the congressman's ability to carry out his representative responsibilities effectively." *Council on Am. Islamic Relations v. Ballenger*, 444 F.3d 659, 661, 665-66 (D.C. Cir. 2006); *see also Wilson v. Libby*, 535 F.3d 697, 711 (D.C. Cir. 2008) (holding that executive branch officials acted within the scope of their employment when they spoke to the press to discredit critics of President George W. Bush); *Operation Rescue Nat'l v. United States*, 147 F.3d 68, 69, 71 (1st Cir. 1998) (affirming "[i]n all respects" the decision below that found Senator Ted Kennedy was acting within the scope of his employment when he made comments to reporters following a campaign fundraiser in which he accused a pro-life organization of having a

8

"national policy [of] firebombing and even murder"). The same law applies, with even greater force, to the President, thus rendering President Trump's statements fully and undeniably covered by Presidential immunity.

At trial, Carroll herself repeatedly emphasized the official, Presidential nature of the allegedly defamatory statements, contending that the statements' official nature supposedly enhanced the injury to her reputation. *See, e.g.*, A.1100 (Carroll's opening statement) (emphasizing that President Trump was "[s]peaking from the White House" and "us[ing] the most famous platform on earth to lie about what he had done"); A.1781 (Carroll's summation) ("Wielding his position as president, [President Trump] attacked [Carroll] and her honesty."); A.71-A.72 (alleging that President Trump, as "the most powerful man on the planet, … used that platform [the Presidency] to attack" Carroll). The Supreme Court held that Presidential immunity barred the use of official actions at trial, *Trump*, 603 U.S. at 630-31, yet here the official statements are the basis of the claim.

President Trump's statements fall well within the outer perimeter of his official duties, and thus President Trump enjoys absolute Presidential immunity for Plaintiff's defamation claims based entirely on those statements. The massive $83.3 million judgment here imposes liability solely based on those immune statements and must be reversed.

9

### C. Presidential immunity is not waivable, but even if it were, any waiver would require an "explicit and unequivocal renunciation."

Presidential immunity is not an ordinary affirmative defense. It derives from "the Framers' design of the Presidency within the separation of powers." *Trump*, 603 U.S. at 610. As the Supreme Court explained in *Trump v. United States*, "[t]he Framers 'sought to encourage energetic, vigorous, decisive, and speedy execution of the laws by placing in the hands of a single, constitutionally indispensable, individual the ultimate authority that, in respect to the other branches, the Constitution divides among many." *Id.* (quoting *Clinton v. Jones*, 520 U.S. 681, 712 (1997) (Breyer, J., concurring in judgment)). "The purpose of a vigorous and energetic Executive, [the Framers] thought, was to ensure good government, for a feeble executive implies a feeble execution of the government." *Id.* (quotations omitted). "There accordingly exists the greatest public interest in providing the President with the maximum ability to deal fearlessly and impartially with the duties of his office." *Id.* at 611 (quotation omitted).

The Supreme Court emphasized that Presidential "immunity is required to safeguard the independence and effective functioning of the Executive Branch, and to enable the President to carry out his constitutional duties without undue caution." *Id.* at 614. It ensures "that the President

10

would [not] be chilled from taking the bold and unhesitating action required of an independent Executive." *Id.* at 613 (quotation omitted).

*Trump*'s reasoning places Presidential immunity squarely within the line of cases holding that immunity doctrines rooted in the constitutional structure cannot be waived, or at the very least not without an affirmative, explicit, and unequivocal waiver. For example, the Supreme Court has expressed doubt that Speech or Debate immunity is waivable at all, and held that even "[a]ssuming that is possible, ... waiver can be found only after explicit and unequivocal renunciation of the protection." *Helstoski*, 442 U.S. at 490–91. That is because Speech or Debate immunity, like Presidential immunity, "preserve[s] the constitutional structure of separate, coequal, and independent branches of government." *Id.* at 491. "[A]ny lesser standard would risk intrusion by the Executive and the Judiciary into the sphere of protected legislative activities." *Id.*

*Helstoski* held that a congressman did not waive Speech or Debate immunity by voluntarily appearing eight times before a grand jury and producing documents before asserting immunity. *Id.* at 480-83, 491. Relying on *Helstoski*, circuit courts have held that legislative immunity is not waived when a Senate subcommittee filed a lawsuit to enforce a subpoena, *Senate Permanent Subcomm. on Investigations v. Ferrer*, 856 F.3d 1080,

11

1087 (D.C. Cir. 2017), or when a congressman made statements during a radio broadcast, *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 421 n.11 (D.C. Cir. 1995). Presidential immunity also is not waivable, but even if it were, which is not the case, any waiver would require an "explicit and unequivocal renunciation," *Helstoski*, 442 U.S. at 490–91, which did not occur here.

The Supreme Court has taken a similar approach to other immunities rooted in the structure of the Constitution. "Waivers of the [federal] Government's sovereign immunity, to be effective, must be 'unequivocally expressed.'" *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 33 (1992). Likewise, a State waives its Eleventh Amendment immunity only through "the most express language or by such overwhelming implications from the text as will leave no room for any other reasonable construction." *Edelman v. Jordan*, 415 U.S. 651, 673 (1974). Notably, failure to raise a structural immunity in the answer to the original complaint does *not* waive the immunity. *See, e.g.*, *Richardson v. New York State Dep't of Correctional Serv.*, 180 F.3d 426, 448 (2d Cir. 1999) (holding that State's failure to raise Eleventh Amendment immunity in answer did not waive the defense), *abrogated on other grounds by Burlington N. & Santa Fe Ry. Co. v. White*,

12

548 U.S. 53 (2006); *Edelman*, 415 U.S. at 677-78 (holding that Eleventh Amendment immunity "need not be raised in the trial court" at all).

*Trump*'s reasoning compels the conclusion that Presidential immunity—like other structural constitutional immunities—cannot be waived or forfeited through inadvertence. Run-of-the-mill defenses, which can be waived or forfeited, exist to protect the interests of the litigants themselves. But Presidential immunity "protect[s] not the President himself, but the institution of the Presidency." *Trump*, 603 U.S. at 632. Because Presidential immunity protects the Presidency—not an individual President—its constitutionally mandated purpose would be defeated if an individual President could waive or forfeit the institution's protection, especially through inadvertence.

### D. In any event, *Carroll 3* manifestly erred by finding that President Trump waived Presidential immunity.

The panel wrongly "adhere[ed] to [the] prior decision," Slip Op. 26, in *Carroll 3* that President Trump somehow waived Presidential immunity by failing to assert the defense in his original answer. *See Carroll*, 88 F.4th at 429-30. This conclusion is factually wrong.

Quite clearly, President Trump repeatedly and consistently asserted that he cannot be held liable for the alleged conduct because it constitutes official acts of the President. In his original answer—the one on which the

13

panel's incorrect waiver analysis rests—President Trump asserted as an affirmative defense that "the allegedly defamatory statements are privileged or protected by one or more immunities . . . under the Constitution of the United States." D.Ct. Doc. 14-69, at 12. Clearly, Presidential immunity constitutes an immunity arising under the United States Constitution. *Trump*, 603 U.S. at 607-15. President Trump contended through the Westfall Act that the alleged conduct constitutes official acts of the Presidency. A.37; A.39. He sought summary judgment based on Presidential immunity. A.399-415, A.851-52. He sought leave to amend his original answer to explicitly use the words "Presidential Immunity," to avoid any uncertainty about the scope of his affirmative defenses. A.850. And he expressly asserted Presidential immunity in his answer to Carroll's amended complaint. A.884-85. He also pursued an interlocutory appeal (*Carroll 3*) to assert his right to Presidential immunity. At every turn, President Trump asserted the constitutional prohibition against attempting to hold him liable for his official, proper acts as President. He thus did not waive Presidential immunity.

Nor did President Trump's counsel at the time "concede[] at oral argument that assuming the defense of presidential immunity is waivable, Defendant had waived that defense." 88 F.4th at 430; *see also* Slip Op., at

14

25 n.12. In *Carroll 3*, the parties used "waiver"—the "intentional relinquishment of a known right"—interchangeably with "forfeiture"— "action or inaction [that] is deemed to incur the consequence of loss of a right." 88 F.4th at 422 n.1. *Carroll 3*'s convoluted hypotheticals, and counsel's responses to them at a fast-paced oral argument, involved whether immunity could be forfeited, as demonstrated by the fact that *Carroll 3* "express[ed] no view on whether [President Trump] intended to relinquish his presidential immunity defense." *Id.* Forfeiture is insufficient to waive Presidential immunity under *Helstoski*'s "explicit and unequivocal renunciation" standard, and thus any "concession" relating to whether Presidential immunity may have been forfeited is legally irrelevant. *Carroll 3*'s erroneous reliance on a purported concession is yet another example of the panel's rhetorical gymnastics to avoid the merits of the immunity issue, as the merits fully favor President Trump.

The conclusion that an individual President could waive immunity through what was, at most, *his counsel's inadvertence* at an oral argument further strikes at core purposes underlying the immunity. In particular, the Supreme Court has emphasized the need "to avoid diversion of the President's attention" away from the Nation's most pressing problems. *Trump*, 603 U.S. at 611 (quotation omitted). But the panel's analysis would

15

require a sitting President to carefully parse every filing prepared by his attorneys, lest an oversight by counsel waive the constitutional protection that enables the President's "bold," "energetic, vigorous, decisive, and speedy execution of the laws." *Id.* at 610. That rule would "threaten[] to eviscerate the immunity," which would be "untenable in light of the separation of powers principles." *Id.* at 631. "The Constitution does not tolerate such impediments to the effective functioning of government." *Id.* at 636-37 (quotation omitted). If allowed to stand, *Carroll 3*'s incorrect ruling would gravely damage the institution of the Presidency.

*Carroll 3*'s holding was clearly erroneous and requires en banc review.

## II. The Panel Erred In Affirming the Grossly Excessive $65 Million Punitive Damages Award.

The jury awarded Carroll $18.3 million for emotional and reputational injuries, and it awarded her $65 million in punitive damages, yielding a ratio of punitive damages to compensatory damages of approximately 3.6:1. A.1014; SPA.126. This award violates the Due Process Clause, the Excessive Fines Clause, and federal common law, and the panel's holding to the contrary conflicts with this Court's precedent.

"[T]he Constitution imposes a substantive limit on the size of punitive damages awards," *Honda Motor Co. v. Oberg*, 512 U.S. 415, 420 (1994), because "[t]he Due Process Clause of the Fourteenth Amendment prohibits

16

the imposition of grossly excessive or arbitrary punishments on a tortfeasor," *State Farm*, 538 U.S. at 416. Indeed, "[e]lementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996).

Following the Supreme Court's "well established ... procedural and substantive constitutional limitations on [punitive damages] awards," *State Farm*, 538 U.S. at 416, this Court has previously held that, "where ... the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee," *Turley*, 774 F.3d at 165.

This Court's decision in *Turley* directly controls this case. Carroll's alleged reputational and emotional injuries constitute quintessential forms of injuries whose measure is "imprecise." *Id.*; *Stampf v. Long Island R. Co.*, 761 F.3d 192, 205 (2d Cir. 2014). "Awards for mental and emotional distress"—like Carroll's award—"are inherently speculative. There is no objective way to assign any particular dollar value to distress." *Turley*, 774 F.3d at 162. Moreover, the \$18.3 million compensatory damages award for

17

such "imprecise" injuries is "high when compared with" other New York defamation cases. *Id.* at 165; *see also, e.g.*, *Carroll v. Trump*, 683 F. Supp. 3d 302, 322 (S.D.N.Y. 2023) ($2.7 million in compensatory damages for similar alleged conduct); *Webber v. Dash*, 607 F. Supp. 3d 407, 410 (S.D.N.Y. 2022) ($400,000 in compensatory damages); *Bouveng v. NYG Cap. LLC*, 175 F. Supp. 3d 280, 348-49 (S.D.N.Y. 2016) (holding that $1.5 million compensatory damages award was "high"). Under *Turley* and the Supreme Court's punitive damages jurisprudence, Carroll's excessive punitive damages award must be remitted. Carroll's excessive compensatory damages also must be remitted.

The panel all but ignored the holding of *Turley*. It failed to consider the entirely "imprecise" nature of Carroll's improper compensatory damages award—despite *Turley* making this a central, even dispositive, consideration. *See* 774 F.3d at 165. The panel also entirely failed to consider whether the nebulous compensatory damages award here was "high when compared with similar cases," which it was—again flouting *Turley*. *Id.*

The only comparator cases cited by the panel involved the magnitude of other *punitive damages awards*, which is not what *Turley* permits. Slip Op at 68-69. Moreover, these punitives-to-punitives comparators are inapt. One case—*Lafferty v. Jones*—is entirely inapposite. Under Connecticut law,

18

common-law "punitive damages" are actually "compensatory in nature" by compensating for actual out-of-pocket attorneys' fees. *Lafferty v. Jones*, 2022 WL 18110184, at *3 (Conn. Super. Nov. 10, 2022) (quotation omitted). That compensatory award for a concrete economic harm is entirely different from the punitive damages award here. Another case cited by the panel—*Bacon v. Nygard*—involved an unopposed default judgment that was reversed on appeal for lack of service. 232 A.D.3d 407 (1st Dep't 2024). *Freeman v. Giuliani* also involved a default judgment. 732 F. Supp. 3d 30, 35 (D.D.C. 2024). The panel could not muster a single comparator case that actually involved punitive damages, was contested, and has not been reversed on appeal.

A central purpose of en banc review is ensuring that panels follow binding Circuit precedent. Here, the panel ignored it. The Court should review the panel decision en banc.

## CONCLUSION

The Court should grant rehearing en banc.

Dated: September 22, 2025      Respectfully Submitted,

/s/ Justin D. Smith
Justin D. Smith
JAMES OTIS LAW GROUP, LLC
530 Maryville Centre Drive
Suite 230
St. Louis, Missouri 63141
(816) 678-2103
Justin.Smith@james-otis.com

*Counsel for President Donald J. Trump*

## CERTIFICATE OF COMPLIANCE

This document complies with the type-volume limit of Federal Rule of Appellate Procedure 40(d)(3) because it contains 3,881 words, excluding those portions pursuant to Federal Rule of Appellate Procedure 32(f).

This document also complies with the typeface and type-style requirements of Federal Rule of Appellate Procedure 32(a)(5)-(6) because it was prepared using Word for Microsoft 365 in 14-point Georgia, a proportionally spaced typeface.

/s/ Justin D. Smith
Justin D. Smith

24-644
*Carroll v. Trump*

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

———————————

August Term 2024

(Argued:  June 24, 2025   Decided:  September 8, 2025)

Docket No. 24-644

———————————

E. JEAN CARROLL,

*Plaintiff-Counter-Defendant-Appellee,*

*v.*

DONALD TRUMP, in his personal capacity,

*Defendant-Counter-Claimant-Appellant.*[*]

———————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

———————————

Before:      CHIN, MERRIAM, and KAHN, *Circuit Judges*.

———————————

Appeal from a judgment of the United States District Court for the

Southern District of New York (Kaplan, *J.*), awarding $83.3 million in damages to

———

[*] The Clerk of Court is respectfully directed to amend the official caption as set forth above.

plaintiff-counter-defendant-appellee E. Jean Carroll against defendant-counter-claimant-appellant Donald J. Trump.  A jury found that then-President Trump acted with common law malice when he made defamatory statements about Carroll in June 2019 and awarded compensatory and punitive damages.  Trump appeals, arguing that he is entitled to presidential immunity or, in the alternative, a new trial.  Trump also contends that the jury's damages award is excessive and must be remitted.

AFFIRMED.

---

ROBERTA A. KAPLAN (D. Brandon Trice, Maximilian T. Crema, Thomas A. Lloyd, Avita Anand, *on the brief*), Kaplan Martin LLP, New York, NY, *for Plaintiff-Counter-Defendant-Appellee*.

JUSTIN D. SMITH (D. John Sauer, *on the brief*), James Otis Law Group, LLC, St. Louis, MO, *for Defendant-Counter-Claimant-Appellant*.

PER CURIAM:

On June 21, 2019, *New York* magazine published an excerpt from E. Jean Carroll's then-forthcoming book in which she alleged that Donald Trump sexually assaulted her at the Bergdorf Goodman department store in 1996. Trump responded -- both when he was President of the United States and again

after he left office -- by publicly accusing Carroll of fabricating her allegations for personal and political motives.

Carroll sued Trump initially for defamation based on statements he made during his first term as President ("*Carroll I*").  Later, following further developments described below, Carroll sued Trump for sexually assaulting her in 1996 and for defamation based on statements he made after his first term as President ended ("*Carroll II*").

*Carroll II* was tried first.  The jury found that Trump had indeed sexually assaulted Carroll and that he defamed her in statements he made after he left office.  The jury awarded Carroll compensatory and punitive damages totaling $5 million.  We affirmed.  *See Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024) ("*Carroll 4*") (per curiam), *reh'g en banc denied,* 141 F.4th 366 (2d. Cir. 2025).[1]

After the jury's verdict in *Carroll II* (but before this Court affirmed), the district court granted partial summary judgment in *Carroll I* in favor of Carroll on the issue of liability.  A jury thereafter awarded Carroll $83.3 million

---

[1]      As noted above, we refer to the two district court cases as *Carroll I* and *Carroll II*. We refer to the four relevant decisions of this Court as *Carroll 1, 2, 3,* and *4*, numbered in chronological order.

in compensatory and punitive damages for defamatory statements Trump made while he was still in office.

The present appeal is from the judgment in *Carroll I*.  Although a panel of this Court has already rejected Trump's claim of presidential immunity, *see Carroll v. Trump*, 88 F.4th 418 (2d Cir. 2023) ("*Carroll 3*") (Cabranes, *J.*), Trump now argues that the Supreme Court's intervening decision in *Trump v. United States*, 603 U.S. 593 (2024), warrants reconsideration of our prior decision.  He also challenges the district court's grant of partial summary judgment in favor of Carroll, its striking a portion of his testimony, its jury instructions on punitive damages, and the size of the jury's compensatory and punitive awards.

For the reasons set forth below, we conclude that Trump has failed to identify any grounds that would warrant reconsidering our prior holding on presidential immunity.  We also conclude that the district court did not err in any of the challenged rulings and that the jury's damages awards are fair and reasonable.  Accordingly, we AFFIRM the judgment of the district court.

## BACKGROUND

I.     *The Facts*[2]

In 1996, Carroll encountered Trump at the Bergdorf Goodman
department store in Manhattan where he sexually assaulted her by forcibly
inserting his fingers into her vagina without her consent.[3]

On June 21, 2019, *New York* magazine published an excerpt of
Carroll's forthcoming book, a portion of which contained her account of being
sexually assaulted by Trump.  At that time, Trump was serving his first term as
President.  On June 21 and June 22, 2019, he made two public statements in
which he denied knowing Carroll, denied sexually assaulting her, and accused
her of fabricating the assault for improper purposes.

On June 21, 2019, just hours after Carroll's accusation went public,
Trump provided the following statement to a reporter, who then published it on

---

[2]     The facts related to the 1996 sexual assault and *New York* magazine publication
are drawn from the district court's summary judgment decision.  All the remaining facts
within this section are drawn from the evidence presented at trial, and are construed in
favor of Carroll as the prevailing party.  *See Saint-Jean v. Emigrant Mortg. Co.*, 129 F.4th
124, 133 (2d Cir. 2025).

[3]     The district court instructed the jury that these facts had already been decided in
*Carroll II* and prohibited the jury from hearing any further evidence regarding the
sexual assault.  We therefore refer readers back to our prior decision, *Carroll 4*, 124 F.4th
at 150-51, for a complete recitation of the facts related to the assault.

Twitter:

**Statement from President Donald J. Trump:**

Regarding the "story" by E. Jean Carroll, claiming she once encountered me at Bergdorf Goodman 23 years ago. I've never met this person in my life. She is trying to sell a new book -- that should indicate her motivation. It should be sold in the fiction section.

Shame on those who make up false stories of assault to try to get publicity for themselves, or sell a book, or carry out a political agenda -- like Julie Swetnick who falsely accused Justice Brett Kavanaugh. It's just as bad for people to believe it, particularly when there is zero evidence. Worse still for a dying publication to try to prop itself up by peddling fake news -- it's an epidemic.

Ms. Carroll & New York Magazine: No pictures? No surveillance? No video? No reports? No sales attendants around?? I would like to thank Bergdorf Goodman for confirming they have no video footage of any such incident, because it never happened.

False accusations diminish the severity of real assault. All should condemn false accusations and any actual assault in the strongest possible terms.

If anyone has information that the Democratic Party is working with Ms. Carroll or New York Magazine, please notify us as soon as possible. The world should know what's really going on. It is a disgrace and people should pay dearly for such false accusations.

App'x at 1887. The next day, on June 22, 2019, Trump had the following

exchange with a reporter on the White House lawn:

**Reporter:** Mr. President, you had said earlier that you never met E. Jean Carroll. There was a photograph of you and her in the late 1980's --

**Trump:** I have no idea who this woman is. It is a totally false accusation. I think she was married -- as I read; I have no idea who

she is -- but she was married to a, actually, nice guy, Johnson -- a newscaster.

**Reporter:** You were in a photograph with her.

**Trump:** Standing with [my] coat on in a line -- give me a break -- with my back to the camera. I have no idea who she is. What she did is -- it's terrible, what's going on. So it's a total false accusation and I don't know anything about her.

And, you know, people have to be careful because they're playing with very dangerous territory. And when they do that -- and it's happening more and more. When you look at what happened to Justice Kavanaugh and you look at what's happening to others, you can't do that for the sake of publicity.

New York Magazine is a failing magazine. It's ready to go out of business, from what I hear. They'll do anything they can. But this was about many men, and I was one of the many men that she wrote about. It's a totally false accusation. I have absolutely no idea who she is. There's some picture where we're shaking hands. It looks like at some kind of event. I have my coat on. I have my wife standing next to me. And I didn't know her husband, but he was a newscaster. But I have no idea who she is -- none whatsoever.

It's a false accusation and it's a disgrace that a magazine like New York -- which is one of the reasons it's failing. People don't read it anymore, so they're trying to get readership by using me. It's not good.

You know, there were cases that the mainstream media didn't pick up. And I don't know if you've seen them. And they were put on Fox. But there were numerous cases where women were paid money to say bad things about me. You can't do that. You can't do that. And those women did wrong things -- that women were actually paid money to say bad things about me.

But here's a case, it's an absolute disgrace that she's allowed to do that.

*Id.* at 1893-95.  The White House Press Office released a transcript of this exchange later that afternoon.

Two days later, on June 24, 2019, the online newspaper publication, *The Hill*, released an interview in which Trump stated: "I'll say it with great respect: Number one, she's not my type.  Number two, it never happened. It never happened, OK?"  *Id.* at 599, 1167-68.[4]

## II.    *Proceedings Below*

### A. *The State Court Complaint and Removal to Federal Court*

On November 4, 2019, Carroll brought this action in New York state court against Trump in his individual capacity, alleging that his June 2019 statements were defamatory under New York law.  In February 2020, Trump moved for a stay of the proceedings by arguing that the Supremacy Clause "bars state-court subject matter jurisdiction over actions against a U.S. President while he or she is in office."  Supp. App'x at 6.  Specifically, he argued that the State of

---

[4]    Carroll withdrew her defamation claim based on this statement, but she maintained, however, that it was relevant to the question of punitive damages.  At trial, the jury was instructed that no compensatory damages were being sought for this statement, but it was permitted to consider this statement and other subsequent statements "when determining whether [Trump] spoke maliciously when he made the June 21 and 22, 2019 statements, as well as determining the amount of punitive damages, if any" to award.  App'x at 1858-59.

New York, by exercising control over him as a sitting President of the United States in the defamation case, "interfere[d] with his ability to carry out his constitutional duty of executing the laws of the United States." *Id.* at 12 (quoting *Zervos v. Trump*, 171 A.D.3d 110, 131 (1st Dep't 2019). He expressly noted, however, that he was only seeking "temporary" immunity from suit. *Id.* at 21 (July 16, 2020 Letter to the Court) ("[N]o one is seeking to 'escape accountability' here . . . . [Carroll] is free to pursue this action when the President is no longer in office."). The state court denied the motion on August 3, 2020. Decision and Order on Motion, *Carroll v. Trump*, No. 160694/2019 (N.Y. Sup. Ct. Aug, 3, 2020), Dkt. No. 110.

In September 2020, the Department of Justice intervened in the state court proceedings and certified that Trump had acted "within the scope of his office as President of the United States" when he made the public statements denying Carroll's allegations. Westfall Act Cert., *Carroll v. Trump*, No. 1:20-cv-7311 (S.D.N.Y. Sept. 9, 2020), Dkt. No. 6-2.[5] Based on this certification, the Government removed the case to federal court and moved, pursuant to the Federal Employees Liability Reform and Tort Compensation Act of 1988 (the

---

[5]     Unless otherwise indicated, docket references are to the district court docket in this case.

"Westfall Act"), to substitute the United States as the sole defendant in this case. *See* 28 U.S.C. § 2679(d)(2).

The district court denied the Government's motion to substitute, and Trump appealed. *See Carroll v. Trump*, 498 F. Supp. 3d 422 (S.D.N.Y. 2020); *Carroll v. Trump*, 49 F.4th 759 (2d Cir. 2022) ("*Carroll 1*") (Calabresi, *J.*). Litigation on the Westfall Act issues proceeded in federal and state court for the next four years, *see, e.g.*, *Carroll 1*, 49 F.4th at 780-81 (certifying question); *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) (answering certified question); *Carroll v. Trump*, 66 F.4th 91 (2d Cir. 2023) ("*Carroll 2*") (per curiam) (remanding to district court), culminating in July 2023, when the Department of Justice declined to issue a new Westfall Act certification, *Carroll I*, Dkt. No. 177-1 (declining to certify).

After the Department of Justice rescinded its certification, neither Trump nor the Department of Justice advanced any argument related to the Westfall Act until after trial concluded. In April 2025, while this appeal from the judgment in *Carroll I* was pending and after it had been fully briefed, Trump and the Government jointly renewed their request to substitute the United States as the sole defendant in this matter. We denied the motion in an order dated June 18, 2025, for the reasons laid out in our subsequent per curiam decision of

10

August 8, 2025.  *See Carroll v. Trump*, ---F.4th---, 2025 WL 2264069 (2d Cir. Aug. 8, 2025) (per curiam).[6]

### B. *Presidential Immunity and the Interlocutory Appeal*

Trump filed his answer to Carroll's complaint in New York state court in February 2020.  He did not assert absolute presidential immunity in his answer -- a fact that Trump's counsel later "conceded at oral argument" in the interlocutory appeal.  *Carroll 3*, 88 F.4th at 430 & n.53 (citing Oral Arg. Audio Recording at 9:59-10:33, 11:53-12:18).[7]  Nor did Trump raise absolute presidential immunity when he moved to amend his answer in January 2022 after the case was removed to the district court below.  Instead, he opted to assert a defense and counterclaim under New York's Anti-Strategic Lawsuit Against Public Participation law (the "anti-SLAPP law").  The district court denied this motion on March 11, 2022.

---

[6]     We refer the reader to this per curiam decision for a full discussion of the procedural history with respect to the Westfall Act issue.

[7]     Rather, as he argued in his state court motion to stay the proceedings, Trump asserted an affirmative defense in his answer that "[he was] immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States."  Answer to Complaint, Dkt. No. 14-69 at 11.  He also asserted that "[t]he alleged defamatory statements [were] privileged or protected by one or more immunities . . . under the Constitution of the United States."  *Id.*  Trump did not assert absolute presidential immunity -- that he was entitled to absolute immunity from suit by virtue of being President of the United States.

Trump invoked absolute presidential immunity for the first time in December 2022, in his brief in support of his motion for summary judgment. On July 5, 2023, the district court denied Trump's motion for summary judgment, ruling, *inter alia,* that Trump had waived any claim to absolute presidential immunity by failing to raise it in his answer to the state court complaint. *See Carroll v. Trump*, 680 F. Supp. 3d 491, 499-504 (S.D.N.Y. 2023). The district court also denied Trump's request for leave to amend his answer to add absolute presidential immunity as a defense on the grounds of undue delay and prejudice. *Id.* at 504-09.

On June 13, 2023, the district court granted Carroll leave to file an amended complaint that added, among other things, more allegedly defamatory statements by Trump. Trump filed his answer to the amended complaint on June 27, 2023, asserting absolute presidential immunity as an affirmative defense again. The district court struck the defense from the amended answer, ruling that it had been waived and "would have been insufficient as a defense" in any event. *Carroll v. Trump*, 685 F. Supp. 3d 267, 279 (S.D.N.Y. 2023).

In a consolidated interlocutory appeal, we affirmed. *See Carroll 3*, 88 F.4th at 434-35. We held that presidential immunity was waivable and non-

12

jurisdictional; that Trump had in fact waived it; and that the district court did not abuse its discretion in denying Trump's request to amend his answer. *See id.* at 425-30, 31-32.

## C. *Carroll II*

While *Carroll I* was pending, the State of New York passed the Adult Survivors Act (the "ASA"). *See* N.Y. C.P.L.R. § 214-j (McKinney 2022). The ASA provided adult victims of sexual abuse with a new one-year window in which to sue their abusers, even if an otherwise applicable statute of limitations had previously expired. *See id.* In November 2022, Carroll sued Trump again -- this time, seeking damages for the alleged sexual assault itself and defamation for the following statement made by Trump on October 12, 2022, when he was not President:

> This "Ms. Bergdorf Goodman case" is a complete con job . . . . She completely made up a story that I met her at the doors of this crowded New York City Department Store and, within minutes, "swooned" her. It is a Hoax and a lie . . . . She has no idea what day, what week, what month, what year, or what decade this so-called "event" supposedly took place. The reason she doesn't know is because it never happened, and she doesn't want to get caught up with details or facts that can be proven wrong. If you watch Anderson Cooper's interview with her, where she was promoting a really crummy book, you will see that it is a complete Scam. She changed her story from beginning to end, after the commercial break, to suit the purposes of CNN and Andy Cooper. . . . In the

13

> meantime, and for the record, E. Jean Carroll is not telling the truth,
> is a woman who I had nothing to do with, didn't know, and would
> have no interest in knowing her if I ever had the chance.

Supp. App'x at 108; *Carroll 4*, 124 F.4th at 152.  Although *Carroll II* was brought

three years after the present lawsuit was initiated, it was tried first, in April and

May 2023.  Following a nine-day trial, a jury found that Trump sexually abused

Carroll at the Bergdorf Goodman in 1996 by digitally penetrating her, and that

Trump defamed her in the statement he made in 2022 after he left office.  *See*

*Carroll 4*, 124 F.4th at 153-54.[8]  The jury awarded Carroll a total of $5 million in

compensatory and punitive damages, and we affirmed.  *See id*. at 178.

   **D.** *The Proceedings in Carroll I*

   After the Department of Justice decided not to issue a new Westfall

Act certification, proceedings in *Carroll I* resumed.  In light of the jury's verdict in

*Carroll II*, the district court granted summary judgment in favor of Carroll on her

defamation claim in *Carroll I*, based, in part, on the doctrine of issue preclusion.

*See generally Carroll v. Trump*, 690 F. Supp. 3d 396 (S.D.N.Y. 2023).  Specifically,

the court ruled that Trump was barred from disputing whether Trump sexually

---

[8]    Carroll also testified that Trump inserted his penis into her vagina; the jury,
however, did not find that she proved this part of her claim by a preponderance of the
evidence.

abused Carroll in 1996, whether his June 2019 statements were false or

defamatory, and whether he acted with actual malice in making those

statements. *See generally id.* The trial in *Carroll I* was therefore limited to the

issue of damages for the June 2019 statements, and the jury was instructed

accordingly.

       *Carroll I* proceeded to trial on January 16, 2024. Carroll testified for

two days. She described the onslaught of attacks that she received in the

aftermath of Trump's June 2019 statements. Many of the messages she received

repeated the claims that Trump had made in his June 2019 statements. *See, e.g.,*

App'x at 1172 (message stating that Carroll is a "liar," that "[the assault] didn't

happen" and she "only brought this accusation to promote a book"); *id.* at 1174

(message telling Carroll that she should be ashamed for "making up a fake story

because [she] make[s] it so much harder on the true victims of abuse"); *id.* at 1180

(message asking Carroll "how much George Soros paid you to lie about

[P]resident Trump"). Carroll also testified she received hundreds of death

threats. *See, e.g., id.* at 1194-95 (letter stating that Carroll should die by having

her "neck stretched immediately after a quick public trial"); *id.* at 1196 (message

stating that Carroll should "stick a gun in [her] mouth and pull the trigger"); *id.* at

15

1193 (Carroll recounting an image sent to her of a "a car accident with a very dead woman on the pavement with some of her brains coming out her head"). Over a dozen of these messages were received into evidence. Carroll testified about her continued fear for her safety and her inability to afford stronger personal security measures.

The jury also heard about the impact of Trump's statements on Carroll's reputation and career. Carroll had been a leading advice columnist at *Elle* magazine for 27 years. In the months following Trump's statements, however, she lost her job, and though she maintained an advice column through a personal blog page, she had only 1,800 paid subscribers as of the date of her testimony. Carroll described the loss of other sources of income as well. For instance, she went from making $50,000 per year for freelance work in 2017 and 2018 to $500 in 2023. Professor Ashley Humphreys, Carroll's reputation repair expert, testified that Trump's statements were viewed by between 85.8 and 104 million people and that it would cost between $7.2 and $12.1 million to run a successful campaign to repair Carroll's reputation. *See* App'x at 1465-66.

During the five years that this lawsuit was pending, Trump continued to make similar statements about Carroll -- on his social media

16

accounts, in political speeches, at press conferences, and on television.  The jury

viewed and heard over a dozen of these statements.  For example, on May 9 and

10, 2023, within a day or two after the verdict in *Carroll II*, Trump claimed that

Carroll's lawsuit was "the greatest witch hunt of all time," Dkt. No. 304-14 (PX-

96), and a "totally fabricated accusation," Dkt. No. 304-16 (PX-98); 304-18 (PX-100)

(CNN town hall); *see also* Dkt. No. 304-19 (PX-101) (similar statement made in

July 2023).  Trump repeated these statements in the weeks leading up to the

*Carroll II* trial as well.  He stated that the "Bergdorf Goodman" "stuff" is "political"

and "all made-up," Dkt. No. 304-21 (PX-144-T) (Jan. 6, 2024 speech), that he had

"no idea who this woman is," Dkt. No. 333-19 (PX-149-T) (Jan. 11, 2024 press

conference), and that Carroll's account was "totally fabricated" and "nonsense,"

Dkt. No. 304-24 (PX-152) (Jan. 14, 2024 post).  Trump then made at least four

more similar statements publicly during the trial itself.  *See* Dkt. No. 304-25 (PX-

160) (Jan. 16, 2024 post) ("I am going to the Biden encouraged Witch Hunt in

Lower Manhattan to fight against a FAKE Case from a woman I have never met,

seen, or touched . . . . It is a giant Election Interference Scam."); Dkt. No. 304-27

(PX-164-T) (Jan. 17, 2024 press conference) ("It's a rigged deal, it's a made-up,

fabricated story."); Dkt. No. 304-28 (PX-165) (Jan. 18, 2024 post) ("I've said it once

17

& I'll say it again, a thousand times. . . . I never heard of E. Jean Carroll, never

had anything to do with her, never would want anything to do with her . . . . The

whole story is a MADE UP & DISGUSTING HOAX!"); Dkt. 304-29 (PX-166) (Jan.

20, 2024 post) ("I knew nothing about this woman, never heard of her, never

touched her . . . . THIS IS A FALSE ACCUSATION.").

Trump testified briefly in his defense. The record also reflects that

he made several disruptive comments and gestures in front of the judge and jury.

During Carroll's testimony, for example, her counsel reported that they could

hear Trump making loud comments within earshot of the jury, including that her

testimony was "false," "she seems to have now gotten her memory back," "it is a

witch hunt," and a "con job." App'x at 1183, 1232. The court instructed Trump

on two occasions to keep his voice down and refrain from making comments.

When the court issued its second warning, it stated to Trump: "I hope I don't

have to consider excluding you from the trial or at least from the presence [of the

jury]. I understand that you're probably very eager for me to do that." *Id.* at

1232. Trump replied, "I would love it." *Id.* Trump also stood up and walked out

of the courtroom during Carroll's closing argument.

18

On January 26, 2024, the nine-person jury awarded Carroll $11 million for "the reputation repair program" and $7.3 million for other compensatory damages.  *Id.* at 1014.  The jury also found that Trump made the June 2019 statements with common law malice and awarded Carroll $65 million in punitive damages.  Trump filed a motion for a new trial or to amend the judgment.  The district court denied the motion in a memorandum opinion filed April 25, 2024.  *See Carroll v. Trump*, 731 F. Supp. 3d 626 (S.D.N.Y. 2024).  Judgment in the amount of $83.3 million was entered in favor of Carroll against Trump on February 8, 2024.

This appeal followed.

## DISCUSSION

Trump raises several challenges on appeal.  First, Trump argues that the Supreme Court's decision in *Trump v. United States*, 603 U.S. 593 (2024) ("*Trump*"), casts doubt on our prior decision on presidential immunity, *Carroll 3*, 88 F.4th at 425-29  Next, Trump contends that the district court erred by (1) granting preclusive effect to the judgment in *Carroll II*, (2) striking a portion of his testimony, and (3) providing, as he asserts, erroneous instructions to the jury

19

on the standard for punitive damages.  Finally, Trump disputes the amount of

the compensatory and punitive damages awards.  We address each issue in turn.

## I.    *Presidential Immunity*

On interlocutory appeal in 2023, we held, as a matter of first

impression, that presidential immunity is waivable, and that Trump waived his

immunity by failing to raise it in his answer to the state court complaint.  *See*

*Carroll 3*, 88 F.4th at 430; *see also* Mandate, Dkt. No. 305.  Despite our prior ruling,

Trump renews his argument that presidential immunity cannot be waived.  He

also argues, for the first time, that even if presidential immunity is waivable, any

such waiver requires an "*explicit and unequivocal renunciation*."  Appellant's Br. at

14 (quoting *United States v. Helstoski*, 442 U.S. 477, 490-91 (1979)).  We hold that

both arguments are foreclosed under the law of the case doctrine and reject

Trump's challenge on this ground.

The law of the case doctrine "ordinarily forecloses relitigation of

issues expressly or impliedly decided by the appellate court."  *United States v.*

*Frias*, 521 F.3d 229, 234 (2d Cir. 2008) (quoting *United States v. Quintieri*, 306 F.3d

1217, 1229 (2d Cir. 2002)).  Moreover, "where an issue was ripe for review at the

time of an initial appeal but was nonetheless foregone, it is considered waived

and the law of the case doctrine bars . . . an appellate court in a subsequent appeal from reopening such issues unless the mandate can reasonably be understood as permitting it to do so." *Id.* (quoting *Quintieri*, 306 F.3d at 1229). We "depart[] from the law of the case doctrine 'sparingly and only when presented with cogent and compelling reasons.'" *Palin v. New York Times Co.*, 113 F.4th 245, 262 (2d Cir. 2024) (quoting *United States v. Aquart*, 92 F.4th 77, 87 (2d Cir. 2024)). "The major grounds justifying reconsideration are an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent manifest injustice." *United States v. Tenzer*, 213 F.3d 34, 39 (2d Cir. 2000) (quoting *Doe v. N.Y.C. Dep't of Soc. Servs.*, 709 F.2d 782, 789 (2d Cir. 1983)). With respect to an intervening change in law, this Court has made clear that "[t]he law of the case will be disregarded only when the court has a clear conviction of error with respect to a point of law on which its previous decision was predicated." *Aquart*, 92 F.4th at 93 (internal quotation marks and citation omitted) (alteration in original).

Trump contends that the law of the case does not apply. He submits that *Trump* represents a sufficient intervening change of law and that enforcing

21

our prior decision on immunity would work a manifest injustice in light of that change.  We are not persuaded.

First, *Trump*, a case involving the criminal prosecution of a former President, did not alter the prevailing law on whether presidential immunity can be waived.  In *Trump*, the Court held that the President does enjoy "at least a *presumptive* immunity from criminal prosecution for . . . acts within the outer perimeter of his official responsibility." 603 U.S. at 614.[9]  But the Court did not discuss or even mention whether presidential immunity could be waived or forfeited, or whether such immunity is jurisdictional.  In *Trump*, there was no dispute about whether Trump had waived his immunity because, unlike here, he asserted it at the very outset of the proceedings against him.  *See id*. at 603.  Thus, *Trump* does not constitute an intervening change of law justifying reconsideration of our earlier decision.

Trump's second argument -- that a waiver of presidential immunity requires an "explicit and unequivocal renunciation," *Helstoski*, 442 U.S. at 491 -- is also foreclosed because it was "ripe for review at the time of [Trump's] initial appeal but . . . nonetheless foregone." *Palin*, 113 F.4th at 262 (quoting *Frias*, 521

---

[9]     The *Trump* Court further held that "[a]s for a President's unofficial acts, there is no immunity." *Id.* at 615.

F.3d at 234).  Trump reasons that *Trump* holds that presidential immunity is

rooted in the Constitutional separation of powers.  According to him, this makes

presidential immunity akin to other types of "structural immunities" such as

legislative immunity and sovereign immunity, which cannot be waived without

an explicit waiver.  Thus, he contends that presidential immunity may not be

waived without an unequivocal and explicit waiver.  In support of his argument,

Trump cites *Helstoski*, a case in which the Supreme Court held that a

congressmember must explicitly waive his legislative immunity under the

Speech and Debate Clause.[10]  According to Trump, "[t]he reasoning of *Trump* . . .

places this case squarely within the line of cases," such as *Helstoski*, "holding that

immunity doctrines rooted in the constitutional structure cannot be waived and

if a court were to hold otherwise, it would require, at [the] very least, a clear,

explicit, and affirmative waiver before the immunity can be lost."  Appellant's Br.

at 14.

---

[10]    Trump also cites cases involving federal and state sovereign immunity.  *See Lane v. Pena*, 518 U.S. 187, 192 (1996) ("A waiver of the Federal Government's sovereign immunity must be unequivocally expressed in statutory text."); *Edelman v. Jordan*, 415 U.S. 651, 673 (1974) (waiver of state sovereign immunity only "where stated by the most express language or by such overwhelming implications from the text" (internal quotation marks and citation omitted)).

But *Trump* did not announce new law when it observed that presidential immunity is rooted in the structural separation of powers. It simply reaffirmed long-established principles. *See Trump*, 603 U.S. at 611 ("[W]e have recognized Presidential immunities and privileges 'rooted in the constitutional tradition of the separation of powers . . . .'" (quoting *Nixon v. Fitzgerald*, 457 U.S. 731, 749, 751, 752, n.32 (1982)); *id.* at 638 ("[T]he Court's prior decisions, such as *Nixon* and *Fitzgerald*, have long recognized [the separation of powers] doctrine as mandating certain Presidential privileges and immunities . . . ."); *Fitzgerald*, 457 U.S. at 750 n.31 ("[W]e do think that the most compelling arguments [for recognition of presidential immunity] arise from the Constitution's separation of powers . . . .").[11] Indeed, in reliance on these principles, Trump asserted in his prior interlocutory appeal that presidential immunity implicates the "structural safeguard" of "separation of powers." Appellant's Br., Nos. 23-1045(L), 23-1146(con), 2023 WL 6461254, at *12-27 (2d Cir. Sept. 28, 2023).

Despite the availability of these arguments in *Carroll 3*, and the fact that *Helstoski* was decided decades ago, Trump argued only that presidential

---

[11]  *See also Fitzgerald*, 457 U.S. at 750 n.31 ("Justice Story, writing in 1833, held it implicit in the separation of powers that the President must be permitted to discharge his duties undistracted by private lawsuits." (quoting 3 J. Story, Commentaries on the Constitution of the United States § 1563, pp. 418-19 (1st ed. 1833)).

24

immunity could *never* be waived at all.  *See id.* at *12-13.  In fact, he conceded in *Carroll 3* that if presidential immunity is waivable, then he had waived it here.  *See Carroll 3*, 88 F.4th at 429-30 & n.52.  As we have explained, "it would be absurd that a party who has chosen not to argue a point on a first appeal should stand better as regards the law of the case than one who had argued and lost."  *Quintieri*, 306 F.3d at 1229 (quoting *United States v. Ben Zvi*, 242 F.3d 89, 96 (2d Cir. 2001)); *accord Aquart*, 92 F.4th at 87-88 ("[A] contrary construction of the . . . rule would effectively eviscerate it by creating an incentive for parties to hold ripe arguments in reserve.").  Trump had the opportunity and incentive to raise this challenge in his initial appeal and failed to do so; hence, he may not do so now.[12]

In any event, presidential immunity differs in both origin and purpose from the other "structural" immunities that Trump references.  Apart from the Supreme Court's recognition that presidential immunity is rooted in the constitutional structure, *Trump* does not draw any comparisons to these other immunities or reconcile these differences.  In the absence of any intervening

---

[12]    Even assuming a waiver of presidential immunity must be "explicit and unequivocal," surely Trump's concession in *Carroll 3* -- that if presidential immunity were waivable, he waived it -- meets this standard.

25

change of law on this issue, adhering to our prior decision would not work a

manifest injustice.

## II.    *The Partial Summary Judgment Ruling*

The jury in *Carroll II* -- the closely related case tried in the spring of

2023 -- found that Trump sexually abused Carroll in 1996 and defamed her in a

statement made in October 2022.  Following *Carroll II*, and after considering

submissions from both parties, the district court granted partial summary

judgment in favor of Carroll on each of the liability elements of her defamation

claim in the present suit.  On appeal, Trump avers that the district court erred in

ruling that (1) the *Carroll II* verdict established that Trump's June 2019 statements

were false and that he digitally penetrated Carroll in 1996, and (2) he acted with

actual malice in making the June 2019 statements.  We find no error in either

respect.[13]

We review *de novo* the district court's ruling on issue preclusion.  *See*

*Phoenix Light SF Ltd. v. Bank of N.Y. Mellon*, 66 F.4th 365, 369 (2d Cir. 2023).  "The

---

[13]    In his brief, Trump also asserts that the judgment in *Carroll II* is not entitled to preclusive effect because it is erroneous.  We need not reach this argument as we affirmed the judgment in *Carroll II* on December 30, 2024, and on June 13, 2025, a majority of active members of this court denied the petition for rehearing *en banc*.  *See Carroll 4*, 124 F.4th at 178; *Carroll*, 141 F.4th at 366.

preclusive effect of a judgment rendered by a federal court sitting in diversity . . .

is determined by the law of the state in which the rendering court sat . . . ." *Id.* at

371. Accordingly, the preclusive effect of the verdict in *Carroll II* -- a diversity

case -- is governed by New York law. In New York, collateral estoppel precludes

a party from relitigating "an issue when (1) the identical issue necessarily was

decided in the prior action and is decisive of the present action, and (2) the party

to be precluded from relitigating the issue had a full and fair opportunity to

litigate the issue in the prior action." *Id.* (quoting *Plymouth Venture Partners, II,*

*L.P. v. GTR Source, LLC*, 988 F.3d 634, 642 (2d Cir. 2021)). The "enumeration of

these elements," however, is "intended merely as a framework." *Buechel v. Bain*,

766 N.E.2d 914, 919 (N.Y. 2001). "[T]he fundamental inquiry is whether

relitigation should be permitted in a particular case in light of . . . fairness to the

parties, conservation of the resources of the court and the litigants, and the

societal interests in consistent and accurate results." *Id.* (quoting *Staatsburg Water*

*Co. v. Staatsburg Fire Dist.*, 527 N.E.2d 754, 756 (N.Y. 1988)).

### A. *Whether Trump's 2019 Statements Were False*

We hold that the district court did not err in barring Trump from

relitigating the falsity of his statements about Carroll's allegations. Although the

27

statements at issue in *this* case were made three years earlier than the statement in *Carroll II*, the statements were identical in material respects because both accused Carroll of fabricating the sexual assault allegations for improper purposes. *Compare supra* pp. 6-8 (June 2019 statements), *with supra* pp. 13-14 (October 2022 statement).[14]

The truth or falsity of Trump's statements in both 2019 and 2022 turned on whether Carroll was lying, that is, whether Trump sexually assaulted Carroll in 1996, irrespective of the specific sexual act committed.[15]  The jury in

---

[14]    For example, in the 2022 statement -- which the *Carroll II* jury determined to be false -- Trump stated, among other things: "I have no idea who [E. Jean Carroll] is." *Carroll*, 690 F. Supp. 3d at 401.  In the June 21, 2019 statement at issue here, Trump said: "I've never met this person in my life."  App'x at 1887.  Moreover, in the 2022 statement, Trump said: "She completely made up a story that I met her . . . and, within minutes, 'swooned' her.  It is a Hoax and a lie," "it never happened," and "for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance."  Supp. App'x at 108.  In the June 21, 2019 statement, Trump said: "Shame on those who make up false stories of assault to try to get publicity for themselves," "I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened," and "[f]alse accusations diminish the severity of real assault." App'x at 1887.

[15]    In other words, the application of issue preclusion to the falsity element is proper because Trump's 2019 and 2022 statements did not turn on the specific sexual act he committed.  He did not deny, for example, digital penetration specifically.  In *all* statements, he denied *any* sexual assault, full stop.  The *Carroll II* jury found Trump's 2022 statement to be false because it found that he sexually abused Carroll.  *See Tannerite Sports, LLC v. NBCUniversal News Grp., a division of NBCUniversal Media, LLC*, 864 F.3d 236, 242 (2d Cir. 2017) (Under New York law, "to satisfy the falsity element of a

*Carroll II* decided that Carroll was telling the truth.  It found by a preponderance of the evidence that Trump sexually abused Carroll and that Trump's October 2022 statement was false.  Trump does not dispute that he had a full and fair opportunity to litigate this issue in *Carroll II*.  Accordingly, the district court did not err in ruling that Trump's 2019 statements were false based on the doctrine of issue preclusion.

Notwithstanding that Trump's denial of *any* sexual abuse rendered the 2019 and 2022 statements false, Trump primarily argues that the district court erred in instructing the jury on the specific sexual act that he engaged in.  The district court told the jury that it must accept as true that "Mr. Trump sexually abused Ms. Carroll by forcibly inserting his fingers into her vagina without her consent."  App'x at 1851; *see also id.* at 1085.  According to Trump, this instruction was not supported by the verdict in *Carroll II* because the jury could have found that he sexually abused Carroll through lesser sexual conduct such as nonconsensual kissing or pulling down her tights.[16]

---

defamation claim, [the] plaintiff must allege that the complained of statement is 'substantially false.'" (quoting *Franklin v. Daily Holdings, Inc.*, 21 N.Y.S.3d 6, 12 (1st Dep't 2015))).  That finding renders the 2019 statements equally false.

[16]     Carroll argues that Trump waived this argument by failing to object to the district court's jury instruction on this basis.  Because we conclude that the district court did not err, we need not address this waiver argument.

Trump, however, ignores the import of the special verdict in *Carroll II* and the district court's finding on this issue.  In *Carroll II*, the district court provided the jury with a special verdict form that asked the jury to decide among three theories of liability on the sexual battery claim: whether Trump (1) "raped," (2) "sexually abused," or (3) "forcibly touched" Carroll.  App'x at 2214.  The jury answered the first question -- whether Trump raped Carroll -- in the negative but found Trump liable on the second theory of sexual battery, sexual abuse.  The jury found that Carroll was "injured as a result of Mr. Trump's conduct" and determined that $2 million would "fairly and adequately compensate her for [that] injury."  *Id.*

Trump made no objection to the special verdict form and did not request the jury to make a finding on the specific sexual conduct that he committed.  Pursuant to Rule 49(a)(3) of the Federal Rules of Civil Procedure, that omission "waive[d] the right to a jury trial on that issue and permit[ed] the court to make a finding."  *Sealey v. Giltner*, 197 F.3d 578, 586 (2d Cir. 1999).[17]

---

[17]  Rule 49(a) of the Federal Rules of Civil Procedure, which governs special verdicts, provides in relevant part:
The court may require a jury to return only a special verdict in the form of a special written finding on each issue of fact. . . . A party waives the right to a jury trial on any issue of fact raised by the pleadings or evidence but not submitted to the jury unless,

30

Thus, when Trump moved for a new trial in *Carroll II*, arguing that the damages were excessive because the jury could have found that he had engaged in less serious sexual acts, *Carroll II*, No. 1:22-cv-10016 (S.D.N.Y.), Dkt. No. 205 at 1, the district court made a finding on this issue. In so doing, the court was permitted to weigh the evidence and resolve conflicting inferences, subject to clear error review. *See, e.g.*, *Roberts v. Karimi*, 251 F.3d 404, 407-08 (2d Cir. 2001); *accord Anderson v. Cryovac, Inc.*, 862 F.2d 910, 916 (1st Cir. 1988) ("[T]here is every reason to treat the district court's Rule 49 findings of fact in the same manner as findings of fact made after a bench trial, reviewable under the 'clearly erroneous' standard of Fed. R. Civ. P. 52(a)."); *Therrell v. Ga. Marble Holdings Corp.*, 960 F.2d 1555, 1563 (11th Cir. 1992) (same). While the court acknowledged that the jury could conceivably have found that Trump sexually abused Carroll only through nonconsensual kissing or pulling down her tights, it held that such a finding would be inconsistent with the jury's $2 million compensatory damages award and the repeated emphasis on digital penetration in the evidence presented at

---

before the jury retires, the party demands its submission to the jury. If the party does not demand submission, the court may make a finding on the issue. If the court makes no finding, it is considered to have made a finding consistent with its judgment on the special verdict.
Fed. R. Civ. P. 49(a)(1), (a)(3).

trial.[18]  The district court therefore held that "the jury's response to Question 2 was an implicit finding that Mr. Trump forcibly digitally penetrated Ms. Carroll's vagina" and, in the alternative, the court made the same finding itself.  *Carroll v. Trump*, 683 F. Supp. 3d 302, 325 n.70 (S.D.N.Y. 2023).  The court's finding on this issue was not clearly erroneous,[19]  was never challenged on appeal in *Carroll II*, and is entitled to preclusive effect.

Accordingly, the district court committed no error in holding that Trump's 2019 statements were false or in instructing the jury on the specific form of sexual misconduct that Trump committed.

---

[18]      At the time that *Carroll II* was tried in 2023, a rape conviction in New York required penile penetration.  *See* N.Y. Penal Law § 130.35 (effective Feb. 1, 2001 through Aug. 31, 2024); *id.* § 130.00; *see People v. Berardicurti*, 561 N.Y.S.2d 949, 949-50 (4th Dep't 1990).  Sexual abuse, by contrast, could be accomplished by "any touching of the sexual or other intimate parts of a person" "without consent [and] by the use of forcible coercion."  N.Y. Penal Law §§ 130.00, 130.65.  Therefore, the jury's determination that Trump did not "rape" Carroll "means *only* that the jury was unpersuaded that Mr. Trump's penis penetrated Ms. Carroll's vagina."  *Carroll v. Trump*, 683 F. Supp. 3d 302, 324 (S.D.N.Y. 2023).

[19]      For example, several witnesses testified about the physical pain and lasting trauma that Trump's digital penetration had on Carroll, including Carroll, Carroll's expert witness Dr. Lebowitz, and one of Carroll's "outcry witnesses," Lisa Birnbach. *Carroll*, 683 F. Supp. at 308-11, 314-15, 325-26.  No similar testimony was presented to the jury with respect to the non-consensual kissing or any other contact between Carroll and Trump.

### B. *Whether Trump Made the 2019 Statements with Actual Malice*

Trump also challenges the district court's decision to grant preclusive effect to the jury's finding of actual malice in *Carroll II*. We do not reach this question, however, because we agree with the district court's alternative holding that Carroll satisfied her burden at summary judgment on the element of actual malice.

"Actual malice requires proof that the publisher had a subjective awareness of either falsity or probable falsity of the defamatory statement, or acted with reckless disregard [to] its truth or falsity." *Celle v. Filipino Rep. Enters. Inc.*, 209 F.3d 163, 182 (2d Cir. 2000). "Although actual malice is subjective, a court typically will infer actual malice from objective facts" such as "the defendant's own actions or statements, the dubious nature of his sources, and the inherent improbability of [his] story among other circumstantial evidence." *Id.* at 183 (alterations adopted) (internal quotation marks and citations omitted); *id.* ("[W]hether [defendant] in fact entertained serious doubts as to the truth of the statement may be proved by inference, as it would be rare for a defendant to admit such doubts." (quoting *Bose Corp. v. Consumers Union of U.S., Inc.*, 692 F.2d 189, 196 (1st Cir. 1982), *aff'd*, 466 U.S. 485 (1984))).

33

Here, the district court ruled that Trump's 2019 statements were made with actual malice based on the undisputed record, observing that Trump had failed to "point to any genuine issue of material fact with respect to whether he knew that his 2019 statements were false or acted with reckless disregard to their truth or falsity." *Carroll*, 690 F. Supp. 3d at 408.

As an initial matter, Trump does not challenge this alternative holding on appeal, and we can affirm on this independent basis alone. *See Gross v. Rell*, 585 F.3d 72, 95 (2d Cir. 2009).

In any event, we find no error in the district court's ruling. The starting point is the now-indisputable fact that a jury found in *Carroll II* that Trump sexually abused Carroll in 1996, and that finding is entitled to preclusive effect. *See supra* Discussion Section II.A. Likewise, it is now indisputable that, based on the jury's findings, Carroll did not lie and that Trump uttered falsehoods in his statements accusing her of lying and acting with improper motivations. *See supra* Discussion Section II.A. Because Trump's 2019 statements about *his own personal conduct* mirrored the statements he made in 2022, a reasonable juror could only conclude that Trump knew that his statements -- that Carroll lied about him sexually assaulting her for ulterior purposes -- were false

34

or that he acted with reckless disregard to whether those statements were false.

In addition, the record makes clear that Trump acted with, at a minimum, reckless disregard for the truth.  In his deposition testimony, Trump admitted that prior to making his 2019 statements, he never read Carroll's book or the *New York* magazine publication, never contacted Bergdorf Goodman's, never did any research on Carroll, and never had anyone working for him research Carroll.  He also admitted that, before issuing his 2019 statements, he had no knowledge of Carroll's book deal, financial circumstances, or political affiliation.[20]

Indeed, the jury found by clear and convincing evidence in *Carroll II* that Trump made his materially identical 2022 statement with actual malice. And Trump fails to articulate how any of the objective facts from which actual malice can be inferred were different between 2019 and 2022.

---

[20]     In granting summary judgment in favor of Carroll on actual malice, the court was also entitled to rely on evidence of Trump's disdain towards Carroll.  "Evidence of ill will combined with other circumstantial evidence indicating that the defendant acted with reckless disregard of the truth or falsity of a defamatory statement may also support a finding of actual malice."  *Celle*, 209 F.3d at 183.  Trump launched a volley of insults at Carroll during this same deposition, calling her "very deranged," "sick," a "wack job," a "nut job," and vowed to "sue her" once the case ended.  *See* Supp. App'x at 106 ¶ 24.

35

For all these reasons, the district court did not err in granting

summary judgment in favor of Carroll on the element of actual malice.

### III.    *The Exclusion of a Portion of Trump's Testimony*

During Trump's direct examination, his counsel asked: "Did you

ever instruct anyone to hurt Carroll in your statements?"  Trump responded,

"No.  I just wanted to defend myself, my family, and frankly, the presidency."

App'x at 1692.  Carroll's counsel objected and the district court sustained the

objection, instructing the jury to disregard everything after the word "no."  *Id.*

Trump argues that the court's ruling was erroneous because it curtailed his

ability to introduce evidence relevant to common law malice, and that the error

necessitates a new trial.[21]

We review evidentiary rulings for abuse of discretion, *see Carroll 4*,

124 F.4th at 157, "mindful that [the trial court] sees the witnesses, the parties, the

---

[21]    Actual malice and common law malice are distinct.  The former is an element of defamation per se and was not at issue at the trial in *Carroll I*, because the district court granted summary judgment to Carroll on that element.  But, and as discussed in greater detail *infra*, to be entitled to an award of punitive damages, Carroll had to show that Trump made the statements with common law malice; that is, with "spite or ill will." *Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) (citing *Liberman v. Gelstein*, 605 N.E.2d 344, 347 (N.Y. 1992)).  "The critical difference between common-law malice and constitutional [*i.e.*, 'actual'] malice . . . is that the former focuses on the defendant's attitude toward the plaintiff, the latter on the defendant's attitude toward the truth." *Id.* (quotation marks and citation omitted).

jurors, and the attorneys, and is thus in a superior position to evaluate the likely impact of the evidence," *United States v. Paulino*, 445 F.3d 211, 217 (2d Cir. 2006) (internal quotation marks omitted).[22]  Even if we find manifest error, we will affirm and not require a retrial if we conclude that the error was harmless.  *See Cameron v. City of New York*, 598 F.3d 50, 61 (2d Cir. 2010).  "[A]n erroneous evidentiary ruling warrants a new trial only when 'a substantial right of a party is affected,' as when 'a jury's judgment would be swayed in a material fashion by the error.'"  *Lore v. City of Syracuse*, 670 F.3d 127, 155 (2d Cir. 2012) (quoting *Arlio v. Lively*, 474 F.3d 46, 51 (2d Cir. 2007)).

We conclude that the district court did not err, and that, even if it did, any error was harmless in light of the other evidence submitted at trial.

---

[22]     Trump submits that our review should be *de novo* because, according to him, the ruling was based on legal error.  He asserts that it was legal error to (1) prevent him from stating that believed his statements to be true because this was relevant to actual malice, and (2) to exclude testimony about his state of mind because this was relevant to common law malice.  But as discussed above, there was no legal error with respect to the district court's summary judgment ruling on actual malice.  The district court also acknowledged that Trump's state of mind was relevant to common law malice.  *See, e.g.*, App'x 1116-17 (permitting defense counsel, over plaintiff's objection, to argue in opening statements that Trump was defending himself when he made the 2019 statements).  Thus, we must decide whether the district court erred in excluding potentially relevant testimony.  We review such rulings for abuse of discretion only.

At the outset, Trump forfeited this challenge on appeal because he failed to object to the exclusion of this specific testimony below. "To preserve an evidentiary claim on appeal, a party must 'timely object' *and* 'state the specific ground, unless it is apparent from context.'" *United States v. Williams*, 930 F.3d 44, 64 (2d Cir. 2019) (alterations adopted) (quoting Fed. R. Evid. 103(a)). "This Court 'ordinarily applies Rule 103(a) strictly' . . . ." *Id.* (alteration adopted) (quoting *United States v. Hutcher*, 622 F.2d 1083, 1087 (2d Cir. 1980)).

The district judge asked counsel to proffer the testimony that would be elicited from Trump during his direct examination. Counsel listed only three questions she wished to ask: (1) whether Trump stood by his October 2022 deposition testimony, (2) why Trump made the statements in response to Carroll's accusation, and (3) whether Trump ever instructed anyone to hurt Carroll.[23] Only Trump's response to the third question is at issue on appeal. Defense counsel proposed the form of this question and assured the court that it would be a "simple yes or no question." App'x at 1685. When Trump went

---

[23] The district court rejected the form of the second question and instructed defense counsel that she could only ask Trump: "Did you deny the allegation because Ms. Carroll made an accusation?" App'x at 1691. While defense counsel objected to that limitation, she made no objection to the proposed format of the third question. *See id.* at 1692.

38

beyond a "yes or no" answer, Carroll's counsel objected.  The defense made no

argument in response to that objection.  The district court sustained the objection

and struck everything after "No."  The defense did not object.

Regardless, we find neither an abuse of discretion nor plain error in

the court's decision to exclude this portion of Trump's testimony.  "To the extent

practicable, the court must conduct a jury trial so that inadmissible evidence is

not suggested to the jury by any means."  Fed. R. Evid. 103(d).  In addition, "[t]he

court may exclude relevant evidence if its probative value is substantially

outweighed by a danger of," among other things, "unfair prejudice, confusing the

issues, [or] misleading the jury."  Fed. R. Evid. 403.

Here, despite the district court's collateral estoppel and summary

judgment rulings on the issues of falsity and actual malice, Trump repeatedly

sought to relitigate these issues.  During opening statements, defense counsel

suggested that Carroll went public with the assault for personal gain.  *See* App'x

at 1118 ("She waited 30 years for the opportune time when she actually was

making less to maximize coverage."); *id.* at 1120 ("[B]efore she came out with her

allegation against Donald Trump, her career was dwindling and it needed a

spark.").  Trump also continued to claim that Carroll was lying throughout the

trial -- in open court, on his social media accounts, and at press conferences.

With this context in mind, the district court's ruling was neither arbitrary nor

irrational. Trump's statement, "I just wanted to defend myself, my family, and

frankly, the presidency," not only went beyond the scope of the agreed-upon "yes

or no" question but also implied that Carroll's accusations were false and

improper. The district court reasonably sought to prevent the jury from hearing

testimony that bore on elements of Carroll's claim that had been previously

decided.

        Further, any potential error was harmless because the jury received

ample other evidence of Trump's state of mind toward Carroll, as relevant to

common law malice. *See Yates v. Evatt*, 500 U.S. 391, 403 (1991) (explaining that

an error is harmless when the proof at issue is "unimportant in relation to

everything else the jury considered on the issue in question, as revealed in the

record"). For instance, Trump confirmed that he "den[ied] [Carroll's]

allegation[s] because [she had] made an accusation." App'x at 1691. The

intended and apparent import of this testimony was to show that Trump made

the statements to defend himself. *See id.* at 1684 (defense counsel explaining that

she "would just like [Trump] to confirm that he stands by all the testimony at his

40

deposition, also that he made the statements in response to her accusations"). Defense counsel was able to make a similar point during her opening statement as well. *See id.* at 1116 ("The evidence will show that [P]resident Trump was merely defending himself.").

Most significantly, Trump's 2022 deposition was played for the jury in which he testified about his state of mind in relation to the substantively identical defamatory statement from 2022. In that deposition, he explained that he issued the 2022 statement "[b]ecause [he] was offended at this woman's lie . . . [and he] was offended that she could just make up a story out of cold air . . . ." *Id.* at 2190. Trump's state of mind with respect to his 2022 statement was highly probative of his state of mind in relation to the materially identical 2019 statements.[24] Trump was able to establish this connection as well. In a colloquy prior to Trump's direct examination, his counsel noted that "[a]s long as we have the deposition, your Honor, I think we will be fine." *Id.* at 1690. Then, during his examination, defense counsel asked Trump "[d]o you stand by your testimony at

---

24 Moreover, in the deposition, Trump was asked to read both his June 21 and June 22, 2019 statements. After each, he was asked, "[s]itting here today, do you stand by th[ese] statement[s]?" to which he replied, "[y]es." App'x at 2168; *id.* at 2171 ("Q. I take it you stand by that statement today? A. Yes.").

the deposition?" *Id.* at 1691.  He replied, "100 percent.  Yes." *Id.*[25]  Any possible

error was harmless on this record in light of the other evidence that the jury

considered with respect to Trump's state of mind.

**IV.    *The District Court's Jury Instructions on Punitive Damages***

Trump argues that the trial court's jury instructions on punitive

damages were erroneous in two respects.  "We review challenges to a district

court's jury instructions *de novo*." *Saint-Jean v. Emigrant Mortg. Co*, 129 F.4th 124,

147 (2d Cir. 2015).  "We will overturn a verdict on a challenge to jury instructions

only if (1) the instructions were erroneous, and (2) the error was prejudicial." *Id.*

Because Carroll brought her defamation claim against Trump under New York

state law, we are "bound to apply New York law as determined by the New York

Court of Appeals." *Engel v. CBS, Inc.*, 182 F.3d 124, 125 (2d Cir. 1999) (per

curiam).

**A. *The Common Law Malice Charge***

The parties below agreed that, to recover punitive damages, Carroll

_____

[25]    Throughout the deposition, Trump made numerous other comments relevant to
his state of mind concerning Carroll.  *See* App'x at 2185 ("This woman is sick. There's
something wrong with her, and it's a false story."); *id.* at 2190 ("The woman -- there's
something wrong with her in my opinion."); *id.* at 2193 ("I think she's a wack job."); *id.* at
2194 ("I think she's sick, mentally sick."); *id.* at 2197 ("She's a liar and she's a sick person
in my opinion. Really sick. Something wrong with her.").

was required to show that when Trump made the June 2019 statements, he was motivated by common law malice. Trump, however, requested a jury instruction that would have permitted the jury to award punitive damages only if it found that he was *solely* motivated by common law malice when he made the defamatory statements. The district court rejected that request both at trial and in its decision denying Trump's new trial motion. The district court concluded that "New York's highest court would reject defendant's contention that the Court should have instructed the jury that it could award punitive damages only if it found that Mr. Trump was motivated *solely* by . . . common law malice and nothing else." *Carroll*, 731 F. Supp. 3d at 631. Upon our *de novo* review of the relevant case law, we agree; a defendant must be *solely* motivated by common law malice *only* where he is otherwise entitled to a qualified or conditional privilege.

To impose punitive damages based on a finding of common law malice, the New York Court of Appeals requires a showing that the conduct at issue is "malicious, wanton, reckless, or in willful disregard for another's rights" and motivated by "hatred, ill will, spite, [or a] criminal mental state." *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 626 N.E.2d 34, 42 (N.Y. 1993). Thus, unlike "actual

43

malice," in the constitutional sense, which focuses on the defendant's state of mind with respect to the truth or falsity of the defamatory statement(s), *New York Times Co. v Sullivan*, 376 U.S. 254, 279-80 (1964), "common-law malice focuses on the defendant's mental state *in relation to the plaintiff* and the motive in publishing the falsity," *Prozeralik*, 626 N.E.2d at 42 (emphasis added).

Proof of malice in the common law sense serves two distinct purposes in New York defamation cases.  First, as relevant here, a plaintiff may not recover punitive damages for defamation unless she demonstrates that the defendant acted with common law malice.  *See id.* at 41-42.  Separately, proof of common law malice is also required to overcome a conditional or qualified privilege against a defamation suit.  *See Stukuls v. State*, 366 N.E.2d 829, 833-34 (N.Y. 1977).

With respect to the latter purpose, "[c]ourts have long recognized that the public interest is served by shielding certain communications, though possibly defamatory, from litigation, rather than risk stifling them altogether." *Liberman v. Gelstein*, 605 N.E.2d 344, 349 (N.Y. 1992).  One conditional privilege, known as the "common interest privilege," "extends to a communication made by one person to another upon a subject in which both have an interest." *Id.*

44

(internal quotation marks omitted) (applying privilege to statements between members of a tenants' organization); *Stukuls*, 366 N.E.2d at 830 (communications between members of a faculty committee).

Although the standard for recovering punitive damages and overcoming a qualified privilege both require proof of common law malice, they require different showings. In the privilege context, common law malice must be "the one and only cause for the publication." *Liberman*, 605 N.E.2d at 350 (quoting *Stukuls*, 366 N.E.2d at 835); *see also Chandok v. Klessig*, 632 F.3d 803, 815 (2d Cir. 2011) ("[W]hile either actual malice or common-law malice will suffice to defeat a conditional privilege, common-law malice will defeat such a privilege only if it was the one and only cause for the publication.") (internal quotation marks and citations omitted)). That is because if "the defendant's statements were made to further the interest protected by the privilege," it does not matter if the "defendant *also* despised plaintiff." *Liberman*, 605 N.E.2d at 350. No similar rationale is present with respect to a punitive damages award. The policy underlying punitive damages is "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." *Prozeralik*, 626 N.E.2d at 42 (quoting *Vassiliades v. Garfinckel's, Brooks Bros.*, 492

45

A.2d 580, 593 (D.C. 1985)).  It is the "outrageous conduct" itself that warrants punishment -- not whether the speaker was motivated *solely* by a desire to harm.  Accordingly, common law malice may be a partial motivation for the defendant's defamatory statement for the purpose of sustaining a punitive damages award.

Despite this distinction and the absence of any state-law privilege in this case, Trump seeks to import the "sole intent" requirement to *every* defamation action in which a plaintiff seeks punitive damages.  But, consistent with our view, the New York Court of Appeals has never ruled that common law malice must be the *only* motivation behind a defamatory statement to sustain an award of punitive damages.  *See, e.g.*, *id.* at 42 (elaborating on the definition of common law malice required to sustain a punitive damages award in a defamation case).  The New York Civil Pattern Jury Instructions on punitive damages in defamation cases and Second Circuit cases applying New York law likewise have not recognized any similar requirement to cases not involving a privilege.  *See* N.Y. Pattern Jury Instr. -- Civil 3:30 (2024) (no requirement that malice be the "sole" motivation for punitive damages to be warranted); *DiBella v. Hopkins*, 403 F.3d 102, 122 (2d Cir. 2005) (recognizing that *Prozeralik* is the controlling standard for the purpose of punitive damages in a defamation case

and that "New York Pattern Jury Instruction § 3:30" is "in accord with that standard"); *see also* 44 N.Y. Jur. 2d, Defamation and Privacy § 230.

In urging otherwise, Trump relies on *Morsette v. "The Final Call"*, 764 N.Y.S.2d 416 (1st Dep't 2003). There, the Appellate Division for the First Department held that an award of punitive damages for defamation required the plaintiff to show "that the speaker was *solely* motivated by a desire to injure plaintiff." *Id.* at 421. In so holding, however, the First Department exclusively cited cases that applied malice in the context of overcoming a conditional privilege against litigation. In doing so, it improperly extended the "sole motivation requirement" from the privilege context into the punitive damages context without any reasoning. *See id.* (collecting cases).[26] New York Court of

---

[26] *Present v. Avon Prods. Inc.*, 687 N.Y.S.2d 330, 334 (1st Dep't 1999) (explaining that the malice must be the "one and only cause" for the publication to overcome the common interest privilege); *Stukuls*, 42 N.Y.2d at 282 (same); *Thanasoulis v. Nat'l Ass'n for Specialty Foods Trade, Inc.*, 640 N.Y.S.2d 562, 563-64 (1st Dep't 1996) (same); *Ackerman v Bechhoefer*, 706 N.Y.S.2d 286, 287 (4th Dep't 2000) (same); *Grier v. Johnson*, 648 N.Y.S.2d 764, 767 (3d Dep't 1996) (same); *Weir v. Equifax Servs. Inc.*, 620 N.Y.S.2d 675, 677 (4th Dep't 1994) (same).

Trump cites three additional cases that, like *Morsette*, hold that an award of punitive damages requires the speaker to be solely motivated by a desire to injure the plaintiff. Each case, however, relies solely on *Morsette* for this proposition. *See Verdi v. Dinowitz*, 168 N.Y.S.3d 24, 26 (1st Dep't 2022); *Verdi v. Dinowitz*, 133 N.Y.S.3d 567, 569 (1st Dep't 2020); *Robertson v. Doe*, No. 05-cv-7046, 2010 WL 11527317, at *5 (S.D.N.Y. May 11, 2010).

Appeals decisions make clear that this is not the law in New York.[27]

Accordingly, New York defamation law does not require a plaintiff to show that the defendant was solely motivated by common law malice to sustain an award of punitive damages. *See Prozeralik*, 626 N.E.2d at 42; *see also* N.Y. Pattern Jury Instr. -- Civil 3:30 (2024).[28] Here, the district court instructed the jury that "[a] statement is made maliciously . . . if it is made with a deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights." App'x at 1857. The court's instructions were consistent with New York Civil Pattern Jury Instruction 3:30 and the standard for common law malice for the purpose of recovering punitive damages under New York law.

B. *The Burden of Proof Charge*

Trump also contends that the district court erred in charging the jury

---

[27]    Moreover, Trump argues that the New York Court of Appeals in *Prozeralik* cited *Liberman v. Gelstein*, 605 N.E.2d 344 (N.Y. 1992), and thus the *Prozeralik* court required that malice be the sole motivation. But *Liberman*, too, was a privilege case.

[28]    The district court below also persuasively observed that "the current [2023] instructions for punitive damages are consistent with how the New York Pattern Jury Instructions were written *before* the *Morsette* decision as well, indicating that its authors did not consider *Morsette* to have changed the relevant law on punitive damages at all." *Carroll*, 731 F. Supp. 3d at 631 n.19 (citing N.Y Pattern Jury Instr. -- Civil § 3.30 (2000)). Moreover, in the commentary to the instructions, the authors acknowledge that *Morsette* is an outlier. *See* N.Y. Pattern Jury Instr. -- Civil § 3.30 (2000).

on the appropriate standard of proof for sustaining a punitive damages award.

Trump submits that Carroll was required to prove common law malice by "clear

and convincing evidence" to sustain an award of punitive damages and that the

district court erred in instructing the jury that the burden of proof was by a

"preponderance of the evidence."  We disagree.

In *Corrigan v. Bobbs-Merrill Co.*, the New York Court of Appeals

declared that a public-figure defamation plaintiff may recover punitive damages

upon proof "by a *fair preponderance of evidence* that [the] defendant (1) was

animated, in such publication, by conscious ill will toward him, or (2) did not

publish the [alleged libel] in good faith and in the honest belief that it was fiction,

but was indifferent as to whether [it] would injure some real party actually

referred to by the author."  126 N.E. 260, 263 (N.Y. 1920) (emphasis added).

Likewise, in *Celle v. Filipino Reporter Enterprises Inc.*, which involved a New York

public figure defamation claim, we held that the plaintiffs must "prove by a

*preponderance of the evidence* that the libelous statements were made out of hatred,

ill will, or spite" to sustain an award of punitive damages.  209 F.3d at 184

(emphasis added) (alteration adopted) (internal quotation marks and citation

omitted)); *cf. Chandok*, 632 F.3d at 816 ("Preponderance is the normal quantum of

proof applicable in civil cases, and none of the New York cases discussed above suggests that more than a preponderance is required to establish common-law malice [necessary for overcoming a qualified privilege].").  In light of these decisions, the district court correctly concluded that the first prong of the standard announced in *Corrigan* -- the burden of proof relating to common law malice -- remains the authoritative law of the highest court of the state and applied it accordingly.[29]

Trump argues that *Corrigan* has been "effectively overruled" by *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964).  We have explained, however, that *Sullivan* "established clear and convincing evidence as the burden of proof necessary only for actual malice, without expressly altering the burden of proof"

---

[29]     Our prior decisions have offered conflicting views on the burden of proof for punitive damages under New York law.  *Compare Roginsky v. Richardson-Merrell, Inc.*, 378 F.2d 832, 850-51 (2d Cir. 1987) (holding that the burden of proof for punitive damages in products liability cases is clear and convincing evidence), *with Simpson v. Pittsburgh Corning Corp.*, 901 F.2d 277, 282 (2d Cir. 1990) ("[B]urden of proof under New York law for punitive damages in products liability cases is 'preponderance of the evidence.'").  However, in our two most recent cases on the issue, including *Celle*, we concluded that the burden of proof under New York law for punitive damages is preponderance of the evidence.  *See Celle*, 209 F.3d at 184; *Simpson*, 901 F.2d at 282; *see also Chandok*, 632 F.3d at 816 (common law malice provable by a preponderance).  District courts within this Circuit continue to apply the preponderance standard as well.  *See, e.g., Paravas v. Tran*, No. 21-cv-807, 2022 WL 718842, at *9 (S.D.N.Y. Feb. 22, 2022), *report and recommendation adopted,* 2022 WL 718587 (S.D.N.Y Mar. 10, 2022); *Fischer v. OBG Cameron Banfill LLP*, No. 08-cv-7707, 2010 WL 3733882, at *3 (S.D.N.Y. Sept. 24, 2010).

for any other elements of libel. *Celle*, 209 F.3d at 181 (citing *Goldwater v. Ginzburg*, 414 F.2d 324, 341 (2d Cir. 1969)). Accordingly, while *Sullivan* abrogated the second prong of the *Corrigan* standard, relating to *actual* malice, its holding had no impact on the first prong of the test relating to common law malice. Moreover, we have identified no New York Court of Appeals decision that suggests the evidentiary standard for punitive damages in defamation cases has been overruled post-*Sullivan*. *See West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 236 (1940) ("[T]he highest court of the state is the final arbiter of what is state law. When it has spoken, its pronouncement is to be accepted by federal courts as defining state law unless it has later given clear and persuasive indication that its pronouncement will be modified, limited or restricted."). In accordance with *Sullivan*, the district court here applied the "clear and convincing" burden of proof to the "actual malice" element of Carroll's defamation claim in *Carroll I* and *Carroll II*.

Trump also cites several New York cases -- from the Appellate Divisions for the First and Second Departments -- that required clear and convincing evidence for the imposition of punitive damages. But none of these cases involved a defamation claim. *See Randi A.J. v. Long Island Surgi-Ctr.*, 842

51

N.Y.S.2d 558, 562, 568 (2d Dep't 2007) (claims for breach of confidentiality,

privacy, and fiduciary duty against a medical clinic for disclosing confidential

information); *Camillo v. Geer*, 587 N.Y.S.2d 306, 308-09 (1st Dep't 1992) (personal

injury negligence action against a corporation); *Sladick v. Hudson Gen. Corp.*, 641

N.Y.S.2d 270, 270-71 (1st Dep't 1996) (personal injury action).[30]  Indeed, Trump

fails to cite a single defamation case in which the plaintiff was required to prove

punitive damages by "clear and convincing evidence."[31]

 The New York Court of Appeals decision in *Corrigan* made clear that

the burden of proof for punitive damages in defamation cases is preponderance

of the evidence.  Indeed, the New York Court of Appeals has continued to cite

*Corrigan* approvingly with respect to punitive damages.  *See Mahoney v.*

---

[30]     Trump also cites *Cleghorn v. N.Y. Cent. & H.R.R. Co.*, 56 N.Y. 44, 48 (1874).  In
*Cleghorn*, a personal injury negligence action, the Court of Appeals held that an
employer is liable in punitive damages for only the "gross misconduct" of his employee,
which must be "reckless[,] . . . of a criminal nature, and clearly established."  *Id.* at 47-48.
But to the extent *Cleghorn* imposed a heightened burden of proof for punitive damages,
it has been overruled, at least in the defamation context, by the subsequent New York
Court of Appeals decision in *Corrigan.*
[31]     The New York defamation cases that have employed a heightened burden of
proof have done so with respect to the elements of actual malice and falsity -- not
punitive damages.  *See Freeman v. Johnston*, 637 N.E.2d 268, 271 (N.Y. 1994) (requiring
clear and convincing evidence that the speaker acted with *actual* malice); *Mahoney v.
Adirondack Publ'g Co.*, 517 N.E.2d 1365, 1367 (N.Y. 1987) (assessing whether the plaintiff
satisfied his burden of proving actual malice and declining to reach the issue of punitive
damages).

*Adirondack Publ'g Co.*, 517 N.E.2d 1365, 1368 (N.Y. 1987). The district court's charge on punitive damages was consistent with the law announced by the Court of Appeals in *Corrigan* and therefore was not erroneous.

**V.    *Damages***

Trump's final challenge to the judgment below concerns the jury's award of damages. He contends that the damages were excessive and that the district court ~~erred~~ abused its discretion in denying his motion for remittitur.[32] We address the compensatory damages first, before turning to the award of punitive damages.

**A. *Compensatory Damages***

On the issue of compensatory damages, the jury was broadly instructed to decide the "fair and just compensation for the injury to Ms. Carroll's reputation and the humiliation and mental anguish in her public and private lives . . . [that] was caused by" Trump's statements. App'x at 1853-54. The jury was then asked to decide on two categories of compensatory damages. First, it was asked to assign a dollar amount to the "damages attributable to the June 21

---

[32]    "Remittitur is the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014) (citation omitted).

and 22 statements, *excluding the reputation repair program* that was discussed

during Professor Humphreys's testimony." *Id.* at 1856 (emphasis added).

Second, it was asked to fill in the amount of damages, if any, that it awarded "*for*

*the reputation repair program.*" *Id.* (emphasis added); *see id.* at 1014 (verdict form).

The jury awarded Carroll $7.3 million in compensatory damages other than for

the reputation repair program and $11 million for the reputation program itself.

While Trump does not challenge the $11 million reputation repair program

award on appeal, he submits that the district court erred in denying his motion

for remittitur as to the jury's award of $7.3 million because it was solely for

emotional distress and therefore subject to substantial constraints.  The district

court found that Carroll's compensatory damages "were not awarded solely for

her emotional distress; they were not for garden variety harms; and they were

not excessive." *Carroll v. Trump*, 731 F. Supp. 3d at 633.  As set forth below, we

find no basis to disturb the district court's determinations.

In reviewing the amount of damages awarded on a New York state

law claim, federal courts are bound to apply substantive New York law.  *See*

*Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005).  In New York, an

award is "excessive or inadequate if it deviates materially from what would be

reasonable compensation." *Patterson v. Balsamico*, 440 F.3d 104, 119 (2d Cir. 2006) (quoting N.Y. C.P.L.R. § 5501(c)). "To determine whether a jury award is excessive within the meaning of § 5501(c), New York courts compare it with awards in similar cases." *Stampf v. Long Island R.R. Co.*, 761 F.3d 192, 204 (2d Cir. 2014). The relevant standard "is not whether an award deviates *at all* from past awards -- it is whether an award deviates *materially* from *reasonable compensation*." *Id.* (quoting *Okraynets v. Metro. Transp. Auth.*, 555 F. Supp. 2d 420, 439 (S.D.N.Y. 2008)). "This standard requires a more exacting review than the 'shocks the conscience' standard generally applied by federal courts." *Patterson*, 440 F.3d at 119.

We, in turn, review the district court's decision on a motion for remittitur for abuse of discretion. *Stampf*, 761 F.3d at 204. "The calculation of damages is the province of the jury, and we will not vacate or reduce a jury award merely because we would have granted a lesser amount of damages." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 162 (2d Cir. 2014) (internal quotation marks and citations omitted). Nonetheless, this discretion has limits "and whether that has been surpassed is not a question of fact with respect to which reasonable men may differ, but a question of law." *Stampf*, 761 F.3d at 204

(quoting *Payne v. Jones*, 711 F.3d 85, 97-98 (2d Cir. 2013)).  Courts have "an

obligation to ensure that" awards for "intangibles" such as emotional and mental

distress are "fair, reasonable, predictable, and proportionate."  *Id.* at 205 (quoting

*Payne*, 711 F.3d at 93).

　　　　　　First, we reject Trump's contention that the $7.3 million award was

limited to emotional distress damages.  The jury here was permitted to consider

more than emotional distress for the first category of damages, so long as it

excluded the reputation repair program costs.  Again, the jury was asked to

assign a dollar amount for two distinct categories of damages: (1) any

compensatory damages you award "*other than for the reputation repair program*"

and (2) any compensatory damages you award "*for the reputation repair program*

*only*."  App'x at 1014 (verdict form).  The second category was limited to the cost

of Professor Humphreys's reputational repair program.  For the first category,

however, the jury was permitted to consider the fair compensation for Carroll's

humiliation, mental anguish, *and other* reputational harms -- such as the loss of

Carroll's career at *Elle*, the reduction in freelance work, and the cost of increased

security measures.  *See* App'x at 1853 (instructing the jury that "[a] person who

has been defamed is entitled to fair and just compensation for the injury to her

56

reputation *and* for any humiliation and mental anguish in her public and private lives that was caused by the defamatory statement in question" (emphasis added)). Moreover, in determining the amount of damages for this category, the jury was instructed to consider five other factors that were not necessarily tied to emotional distress: Carroll's "standing in the community, the nature of Mr. Trump's statements made about her[,] . . . the extent to which those statements were circulated, the tendency of those statements to injure a person such as Ms. Carroll and all of the other facts and circumstances of the case." *Id.* at 1854; *see also* N.Y. Pattern Jury Instr. -- Civil 3:29 (2024).

       Trump argues that this reading of the verdict means that Carroll was compensated twice for the same reputational harm. We disagree. At the outset, the jury was instructed that it could "not award compensatory damages more than once for the same injury." App'x at 1854. Moreover, there is a difference between the costs required to *repair* an individual's reputation and the costs arising from the damaged reputation itself. Professor Humphreys's damages estimate was based only on the former category -- the amount it would take to run a successful reputation repair campaign aimed at changing the minds of people who believed Trump's false statements about Carroll. As Professor

Humphreys testified at trial, a reputation repair campaign consists of hiring "a

number of trusted sources" who are tasked with sharing positive messages about

"the attitude that you want to change."  *Id.* at 1460.  These costs are distinct from

the other damages that flowed from the reputational harm.[33]  For these reasons,

the $7.3 million award in this case was not limited to emotional distress.

Second, the district court did not abuse its discretion in finding that

the award was reasonable under New York law.  The district court correctly

determined that Carroll's $7.3 million award falls within the range of

compensatory damages that have been upheld in other New York defamation

claim cases.  In *Prozeralik v. Capital Cities Communications*, a businessman sued a

television and radio station for falsely reporting him as the victim of an

abduction and stating that he was under investigation by the FBI for debt owed

to organized crime figures.  593 N.Y.S.2d 662, 664-67 (4th Dep't 1993) ("*Prozeralik*

---

[33]     Trump points out that Carroll's counsel stated in summation that the first bucket of compensatory damages was for "pain and suffering."  *See* App'x at 1775-76.  But she discussed the other injuries that Carroll suffered in her closing argument as well.  *See, e.g., id.* at 1769 (recounting how Carroll's five-decade career as an advice columnist was "shattered" in "less than 24 hours"); *id.* at 1770-71 (discussing Carroll's blog with only 1,800 paid subscribers and the reduction in freelance work).  The district court also reminded the jury that the attorneys' arguments were "not evidence," *id.* at 1862, and that it was required to "follow the rules of law" as the court gave them, *id.* at 1874; *see United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) ("Juries are presumed to follow their instructions." (alteration adopted and citation omitted)).

58

I"), *rev'd on other grounds*, 626 N.E.2d 34 (N.Y. 1993).  The Appellate Division

upheld an award of $4 million for non-economic "humiliation, mental anguish

and injury" to plaintiff's reputation.  *Prozeralik I*, 593 N.Y.S.2d at 667.  Following

remand on other grounds and a new trial, the Appellate Division affirmed an

even larger award -- $6 million for non-economic "injury to the plaintiff's

reputation and standing in the community," and $3.5 million for non-economic

"emotional and physical injuries." *Prozeralik v. Cap. Cities Commc'ns, Inc.*, No.

48424, 1995 WL 17810583 (N.Y. Sup. Ct. Mar. 24, 1995) ("*Prozeralik II*"); *Prozeralik*

*v. Cap. Cities Commc'ns, Inc.*, 635 N.Y.S.2d 913, 914 (4th Dep't 1995).  Though

Carroll did not claim physical injury, the $9.5 million non-economic

compensatory award in *Prozeralik II* is instructive.  Taking inflation into account,

its value is close to triple the amount of the $7.3 million award here, and

surpasses the total compensatory award of $18.3 million as well.[34]  *See also Cantu*

*v. Flanagan*, 705 F. Supp. 2d 220, 226-31 (E.D.N.Y. 2010) (upholding award of $150

million in non-economic damages for the defamation of a prominent Mexican

businessman who was falsely accused of engaging in criminal conduct); *Osorio v.*

---

[34]     According to the Bureau of Labor Statistics' Inflation Calculator, $9.5 million in December 1995 amounts to nearly $20 million in June 2025.  *CPI Inflation Calculator*, U.S. Dep't of Lab., http://www.bls.gov/data/inflation_calculator.htm [https://perma.cc/DF6P-C6JP] (last visited July 29, 2025).

59

*Source Enters., Inc.*, No. 5-cv-10029, 2007 WL 683985, at *10 (S.D.N.Y. 2007)

(upholding award of $3.5 million in non-economic compensatory damages for

the defamation of an employee of a hip-hop magazine who had been falsely

accused of extortion).[35]

   Finally, we cannot say that the jury's award was unreasonable based

on the factors it was instructed to consider under New York law and the

evidence that was presented at trial.  It is well-settled in New York that "[t]he

question of the amount of damages to be awarded in defamation actions is

peculiarly within the jury's province," *Prozeralik I*, 593 N.Y.S.2d at 667, and "the

discretion of a . . . court over damage awards should be exercised sparingly,"

*Calhoun v. Cooper*, 614 N.Y.S.2d 762, 762 (2d Dep't 1994).  After Trump released

his statements, which were viewed by between 85.8 to 104 million people, Carroll

was instantly and continuously attacked on Twitter and Facebook and in emails.

She received thousands of such attacks, including hundreds of death threats.  *See*

*supra* pp. 15-16.  Carroll described how she continued to fear for her safety as a

---

[35] These awards amount to approximately $5.65 million (*Osorio*) and $222 million (*Cantu*) in 2025 dollars.  *See CPI Inflation Calculator,* U.S. Dep't of Lab., http://www.bls.gov/data/inflation_calculator.htm [https://perma.cc/H55H-FB6B] (last visited July 29, 2025).

result of these attacks, but that she could not afford stronger personal security measures.

Moreover, in the months following the attack, Carroll lost her decades-long career at *Elle* where she had been one the most prominent and successful advice columnists in the country. Carroll's replacement blog only had 1,800 paid subscribers, and her income from freelance work decreased by 99%. Other business opportunities, such as invitations to appear on TV shows, completely dried up as well.

On this record, we find no abuse of discretion in the district court's decision to deny remittitur. The $7.3 million award for Carroll's harm was fair and did not deviate materially from what has been found to be reasonable compensation in other New York defamation cases.

## B. *Punitive Damages*

Finally, Trump argues that the jury's punitive damages award of $65 million was grossly excessive under constitutional and federal common law principles. Given the unique and egregious facts of this case, we conclude that the punitive damages award did not exceed the bounds of reasonableness under either standard.

We review the district court's denial of remittitur under federal common law "pursuant to the federal appellate courts' supervisory authority over trial courts." *Turley*, 774 F.3d at 164.[36] While this review is limited to abuse of discretion, "the degree of discretion enjoyed by trial courts in these matters is relatively narrow" and "a degree of excessiveness less extreme than 'grossly excessive' will support remanding for a new trial or remittitur of damages." *Id.* (quoting *Payne*, 711 F.3d at 97, 100). We must ensure that the punitive damage award is "'fair, reasonable, predictable, and proportionate,' to avoid extensive and burdensome social costs, and to reflect the fact that punitive awards are imposed without the protections of criminal trials." *Id.* (quoting *Payne*, 711 F.3d at 93-96). Our review under constitutional principles is *de novo* and an award will be found excessive under the Constitution only if it is "grossly excessive." *Id.*[37]

———————————

[36]    Carroll asserts that federal common law is inapplicable because Trump never asserted that the punitive damages violated New York law. Our review under federal common law, however, derives from our supervisory authority over federal district courts and applies regardless of whether the case involved state or federal claims. *See Payne*, 711 F.3d at 96-97, 100 (observing that a federal appellate court's review of a *state court* damages award is limited to a constitutional analysis while a federal court's review of a federal district court's damages award is reviewed under both federal common law and the Constitution).

[37]    Although Trump does not challenge the punitive award under state law, as with the compensatory damages, "a federal court in a case governed by state law must apply

The Supreme Court has identified three "guideposts" for reviewing punitive damages awards, which "apply irrespective of whether our review is constitutional or supervisory in nature." *Turley*, 774 F.3d at 165. We review (1) "'the degree of reprehensibility' associated with the defendants' actions," (2) "'the disparity between the harm or potential harm suffered' and the size of the punitive award," and (3) "the difference between the remedy in this case and the penalties imposed in comparable cases." *Id.* (citing *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996)). The first factor, the "degree of reprehensibility," is "the most important indicium of the award's reasonableness." *Motorola Credit Corp. v. Uzan*, 509 F.3d 74, 85 (2d Cir. 2007) (quoting *Gore*, 517 U.S. at 575) (alteration adopted).

### 1.  *The Degree of Reprehensibility*

The record in this case supports the district court's determination that the "'the degree of reprehensibility' of Mr. Trump's conduct was remarkably high, perhaps unprecedented." *Carroll*, 731 F. Supp. 3d at 634. There was ample

---

the state law standard for appropriateness of remittitur." *Payne*, 711 F.3d at 97 n.8. Therefore, as discussed above, damages awards are excessive under New York law if they "deviate[] materially from what would be reasonable compensation." N.Y. C.P.L.R. § 5501(c). Nonetheless, we do not make two different rulings because we conclude that the punitive damages award was not unreasonable under either standard. *See Payne*, 711 F.3d at 97 n.8 (declining to make two distinct rulings).

63

evidence that Trump was recklessly indifferent to Carroll's health and safety. As the district court explained, Trump "issue[d] multiple statements castigating Ms. Carroll as a politically and financially motivated liar, insinuating that she was too unattractive for him to have sexually assaulted [her], and threatening that she would 'pay dearly' for speaking out." *Id.* at 634-35. Trump's statements had a domino effect: As discussed more fully above, *see supra* pp. 15-16, Carroll was subjected to ongoing and prolific harassment as a result of these statements, including a multitude of death threats and other threats of physical injury. *See Gore*, 517 U.S. at 581 (considering, when reviewing punitive damages awards, "the harm likely to result from the defendant's conduct as well as the harm that actually has occurred" (emphasis omitted)).

Moreover, Trump's attacks against Carroll were not isolated; rather, they continued throughout the pendency of the nearly five-year litigation and became more extreme and frequent as the trial approached. *See Turley*, 774 F.3d at 149 (considering, for purposes of punitive damages award, defendants' "campaign of racial harassment" which included actions taken in the years after the incidents specifically alleged in the operative complaint and "intensified" during pendency of litigation). Trump repeated his attacks -- despite the jury's

finding in *Carroll II* that his 2022 statement was defamatory and despite the district court's summary judgment ruling in this case finding his 2019 statements defamatory as well.  He also continued these same attacks during the trial itself.  In one such statement, issued two days into the trial, Trump proclaimed that he would continue to defame Carroll "a thousand times."  Dkt. No. 304-28 (PX-165).

In sum, as observed by the district court, the conduct here supports a significant punitive damages award—it involved malice and deceit, caused severe emotional injury, and continued over at least a five-year period.  *See State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 419 (2003) (setting out the factors for assessing the degree of reprehensibility); *see also Stampf*, 761 F.3d at 209 ("Conduct that involves deceit or malice is more reprehensible than conduct involving mere negligence.  Likewise, conduct that could cause serious physical or emotional injury is more reprehensible than conduct that risks only minor injuries or economic damages." (citations omitted)).

### 2. *Disparity Between the Harm and Size of the Punitive Award*

The ratio of the $65 million punitive damages award to Carroll's $18.3 million compensatory award is approximately 3.6:1.  We acknowledge that this ratio approaches the upper limit of reasonableness.  *See State Farm*, 538 U.S.

at 425 ("[A]n award of more than four times the amount of compensatory damages might be close to the line of constitutional impropriety."); *Turley*, 774 F.3d at 165 (Where "the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, a lesser ratio, perhaps only equal to compensatory damages, can reach the outermost limit of the due process guarantee." (internal quotation marks and citation omitted)).  Nonetheless, the Supreme Court has "repeatedly stressed the impossibility of making any bright-line test, as the propriety of the ratio can *vary enormously* with the particular facts of the case."  *Payne*, 711 F.3d at 102 (emphasis added); *e.g.*, *Gore*, 517 U.S. at 582-83 ("We need not, and indeed we cannot, draw a mathematical bright line between the constitutionally acceptable and the constitutionally unacceptable that would fit every case."); *accord Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 149 (2d Cir. 2015) ("[T]here is no rigid upper limit on a ratio of punitive damages to compensatory damages.").  Moreover, "[e]ven where compensatory damages are substantial, punitive damages awards that are a multiple higher may be warranted because of the deterrent function of punitive damages."  *Jennings v. Yurkiw*, 18 F.4th 383, 391-92 (2d Cir. 2021) (upholding a punitive damages award representing a 4:1 ratio to compensatory damages

66

"[g]iven the constellation of intentional misbehavior by the [defendants]"); *accord Lee v. Edwards*, 101 F.3d 805, 809 (2d Cir. 1996) (quoting *Vasbinder v. Scott*, 976 F.2d 118, 121 (2d Cir. 1992) ("In gauging excessiveness, we must keep in mind the purpose of punitive damages: 'to punish the defendant and to deter him and others from similar conduct in the future.'").

In fashioning the punitive award, the jury was instructed to consider, among other factors, the amount "necessary to deter Mr. Trump from continuing to defame Ms. Carroll." App'x at 1858. Upon review of the evidence, we agree with the district court that the jury was entitled to find that Trump would not stop defaming Carroll unless he was subjected to a substantial financial penalty.[38] *See Carroll*, 731 F. Supp. 3d at 635. For nearly five years, Trump never wavered or relented in his public attacks on Carroll -- even when faced with the jury's unanimous verdict in *Carroll II* and the district court's ruling in this case. He made three of these attacks within 48 hours of the verdict in *Carroll II*, Dkt. No. 304-14 (PX-96); *see also* Dkt. No. 304-16 (PX-98); 304-18 (PX-

---

[38] The jury was asked to also consider "Mr. Trump's financial condition and the impact that any punitive damages you may award will have on him." App'x at 1858. While we have noted that "the defendant's financial status has occupied no place in the Supreme Court's due process review," *Motorola*, 509 F.3d at 85, it remains relevant to the question of deterrence, *see Lee*, 101 F.3d at 813.

100), and launched similar attacks against Carroll in the days and weeks leading up to this trial, s*ee* Dkt. No. 304-21 (PX-144-T); Dkt. No. 333-19 (PX-149-T); Dkt. No. 304-24 (PX-152).  He then made at least four more statements during the course of the trial itself.  The statements all shared common themes: Trump continued to assert that Carroll was lying about the 1996 sexual assault and that she was motivated to do so for personal, financial, and political reasons, and to imply that Carroll was too unattractive to be sexually assaulted.  He also began to claim that Carroll's lawsuit was part of a conspiracy to interfere with the 2024 election, Dkt. No. 304-27 (PX-164-T); Dkt. No. 304-25 (PX-160), and vowed to continue to make similar statements in the future, Dkt. No. 304-28 (PX-165).  Given this extraordinary and unprecedented conduct, we conclude that the 3.6:1 ratio was neither unpredictable nor unreasonable in relation to the actual harm that had occurred and "the harm likely to result."  *Payne*, 711 F.3d at 102 (emphasis omitted).

### 3.  *Comparison with Penalties Imposed in Similar Cases*

Finally, the punitive damages award here is not out of step with awards in other recent and comparable defamation suits.  *See Payne*, 711 F.3d at 104 ("Courts have often found it helpful in deciding whether a particular

68

punitive award is excessive to compare it to court rulings on the same question in other cases.").  In 2023, for example, former New York City Mayor Rudolph Giuliani was ordered to pay $75 million in punitive damages to two election workers he had falsely accused of ballot fraud.  *See Freeman v. Giuliani*, 732 F. Supp. 3d 30, 41 (D.D.C. 2024).  More recently, in 2024, the Connecticut Court of Appeals upheld an award of $321,650,000 in common law punitive damages in the form of attorneys' fees to 11 plaintiffs against Alex Jones who had falsely stated that the Sandy Hook shooting was a staged event.  *See Lafferty v. Jones*, 327 A.3d 941, 951, 981 (Conn. App. Ct. 2024).  Likewise, a New York state trial court awarded Louis Bacon $100 million in punitive damages against fashion mogul Peter Nygard for defamation.  Order Awarding Damages at 4, *Bacon v. Nygard*, No. 150400/2015 (N.Y. Sup. Ct. June 6, 2023), Dkt. No. 1287.  While that judgment was vacated and remanded due to a defect in service of process, *Bacon v. Nygard*, 220 N.Y.S.3d 286, 286-87 (1st Dep't 2024), it remains a useful point of reference as to the amounts that other courts have found acceptable.

We have determined that each of the *Gore* factors supports the jury's award of punitive damages in this case.  Accordingly, we conclude that the

district court did not err in denying Trump's motion for remittitur with respect to punitive damages.

## CONCLUSION

We hold that the district court did not err in any of the challenged rulings and that the jury's duly rendered damages awards were reasonable in light of the extraordinary and egregious facts of this case.  For the reasons set forth above, we AFFIRM the district court's judgment.