24-644
*Carroll v. Trump*

MENASHI, *Circuit Judge*, joined by PARK, *Circuit Judge*, and joined by LIVINGSTON, *Chief Judge*, except as to Part II.E.1, dissenting from the denial of rehearing *en banc*:

In this case, the panel issued two separate decisions that are each the subject of a petition for rehearing *en banc*. The first decision rejected the motion of the United States to substitute the United States as the defendant after the Attorney General certified that the President "was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d). The United States has petitioned for rehearing of that decision.[1] The second decision affirmed the judgment awarding $83.3 million in compensatory and punitive damages and denying the President's motion for a new trial or judgment as a matter of law. President Trump has petitioned for rehearing of that decision,[2] and the United States has filed a brief in support of that petition.[3]

I would grant both petitions because both decisions were erroneous. The panel opinion denying the motion for substitution made three primary errors. First, the panel erroneously determined that Attorney General Bondi had "waived" the right to make a Westfall Act certification because Attorney General Garland had previously declined to certify—even though (1) Garland himself had reversed a prior certification by Attorney General Barr, (2) the Act

---

[1]  *See* Petition for Panel Rehearing and En Banc Determination of the United States and President Donald J. Trump, *Carroll v. Trump*, No. 24-644 (2d Cir. Aug. 22, 2025), ECF No. 132.1.

[2]  *See* Petition for Rehearing En Banc of President Donald J. Trump, *Carroll v. Trump*, No. 24-644 (2d Cir. Sept. 23, 2025), ECF No. 138.1.

[3]  *See* Brief for the United States as Amicus Curiae, *Carroll v. Trump*, No. 24-644 (2d Cir. Sept. 29, 2025), ECF No. 139.1.

contains no time limitation for making a certification, and (3) no Attorney General was ever a party to the case and subject to any waiver rules. Second, the panel misread the Westfall Act to prohibit substitution following trial when a case begins in state court even though everyone agrees that the Act allows substitution following trial when a case begins in federal court. There is no justification for the differential treatment. Third, the panel failed to correct the decision of the district court that the President does not act within the scope of his office when he makes public remarks to the press from the White House.

The panel opinion affirming the judgment then made three additional errors. First, the panel refused to address the effect of presidential immunity under *Trump v. United States*, 603 U.S. 593 (2024). It did so on the doubly erroneous premise that President Trump "waived" any immunity defense and that *Trump v. United States* "simply reaffirmed long-established principles," so nothing prevented the President from raising the exact same arguments before *Trump v. United States* was even decided. *Carroll v. Trump*, 151 F.4th 50, 67 (2025). That holding is not credible. Whatever one thinks about the merits of *Trump v. United States*, everyone agrees that it represents a significant legal development.[4] Second, the panel wrongly held that President Trump was properly denied a jury trial. The panel reasoned that his liability for defamation for statements made in 2019 was predetermined by a trial about different statements made in 2022. But the jury verdict about a purported defamation in 2022 did not resolve the question of whether he was liable for different statements made

---

[4] *See, e.g., Trump*, 603 U.S. at 685 (Sotomayor, J., dissenting) ("The relationship between the President and the people he serves has shifted irrevocably.").

2

under different circumstances in 2019. Third, the panel upheld a damages award that included unauthorized damages, duplicative compensatory damages, and a grossly excessive monetary figure for a defamation claim.

I would rehear the case *en banc* to bring our case law about the scope of presidential duties and immunity into conformity with decisions of the Supreme Court and to resolve these questions of exceptional importance in line with the constitutional separation of powers and normal judicial practice. *See* Fed. R. App. P. 40(b)(2)(B)-(D). "In my view, the same rules should apply equally to all defendants." *Carroll v. Trump*, 141 F.4th 366, 368 (2d Cir. 2025) (Menashi, J., dissenting from the denial of rehearing en banc).

**I**

Congress enacted the Westfall Act "to protect Federal employees from personal liability for common law torts committed within the scope of their employment." Federal Employees Liability Reform and Tort Compensation Act, Pub. L. No. 100-694, § 2(b), 102 Stat. 4563, 4564 (Nov. 18, 1988), *codified at* 28 U.S.C. § 2671 note. The Act authorizes the Attorney General to certify "that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1)-(2). Upon such certification, two things will happen. First, the action will be removed to federal court if it was commenced in state court and a trial has not yet occurred. *See id.* § 2679(d)(2). Second, the action "shall be deemed an action against the United States" and "the United States shall be substituted as the party defendant." *Id.* § 2679(d)(1); *id.* § 2679(d)(2) (similarly providing for substitution).

3

The paradigmatic cases of substitution under the Westfall Act are those in which a driver conducting government business allegedly injures someone in a car accident, *see, e.g.*, *De Martinez v. Lamagno*, 515 U.S. 417, 420-21 (1995), or in which a doctor employed by the government injures a patient through alleged malpractice, *see, e.g.*, *Sanchez v. United States*, 740 F.3d 47, 49-50 (1st Cir. 2014). The Attorney General will certify that the driver or the doctor was acting within the scope of his government employment when driving or when treating patients—not that the tortious conduct itself was an official act—and then the tort suit will proceed against the United States. "Ordinarily, scope-of-employment certifications occasion no contest." *De Martinez*, 515 U.S. at 422.

It is a unique circumstance when this statutory framework applies to the President of the United States. The President may be an "employee of the government," 28 U.S.C. § 2671, but he also "alone composes a branch of government," *Trump v. Mazars USA, LLP*, 591 U.S. 848, 868 (2020). This circumstance should make it *easier* to determine that the President was acting within the scope of his office when the purportedly tortious conduct occurred: The President, compared to other government employees, has an especially broad scope of office. "[T]here is not always a clear line between his personal and official affairs," *id.*, because "unlike anyone else, the President is a branch of government, and the Constitution vests in him sweeping powers and duties," *Trump*, 603 U.S. at 639-40. In this case, the President made the allegedly defamatory statements when he issued a press release and responded to press inquiries from the White House. Making public statements to the press is part of the President's job. When the President engages in "public communications," he discharges "official responsibilities" and therefore acts within the

4

scope of the office. *Id.* at 629.[5] That principle is well-established with respect to other elected officials. *See CAIR v. Ballenger*, 444 F.3d 659, 661 (D.C. Cir. 2006) ("In this defamation action, we consider whether a congressman acted 'within the scope of employment' when he discussed his marital status in his office, during regular business hours, in response to a reporter's inquiries. The District Court held that he did, and we agree."). Compared to the public communications of a congressman, the President's public comments present an *easier* case because the Supreme Court has expressly said that public communications fall within the scope of his office.

The decisions here, however, suggested that the President of the United States has a much *narrower* scope of office than a government driver or doctor. The district court rejected Attorney General Barr's certification on the ground that "the question of whether government employees are acting within the scope of their employment" must be resolved "under the *respondeat superior* doctrine" of the state—or the federal district—in which the purportedly tortious conduct occurred. *Carroll v. Trump*, 498 F. Supp. 3d 422, 443-44 (S.D.N.Y. 2020). The district court explained that "the *respondeat superior* doctrines of New York and the District of Columbia" provide that "*respondeat superior* liability does not apply … unless the employer exercises, or has the ability to exercise, control over the employee's relevant actions." *Id.* at 446. Because no one "directed or controlled President Trump when he commented on the plaintiff's accusation," the President "was not acting within the

---

[5] "[A] long-recognized aspect of Presidential power is using the office's 'bully pulpit' to persuade Americans, including by speaking forcefully or critically," and the President "is even expected to comment on those matters of public concern that may not directly implicate the activities of the Federal Government." *Trump*, 603 U.S. at 629.

scope of his employment when he made them, and the Attorney General's certification under the Westfall Act was erroneous." *Id*. at 450.

That analysis was incorrect. It meant that the President acts within the scope of his office only to the extent that he carries out the orders of someone else. In our constitutional system, however, the President directs executive officers rather than the other way around.[6] And the head of an organization certainly can act within the scope of his employment.[7] Putting aside for the moment how bizarre it is to determine the scope of the presidential office by reference to state employment law rather than to the U.S. Constitution,[8] the analysis of the district court did not make sense even on its own terms. It rendered the President's actions within the scope of his office a null set. That was clearly wrong; the President is the executive official with the broadest scope of office. *See Barr v. Matteo*, 360 U.S. 564, 573 (1959) ("[T]he occasions upon which the acts of the head of an executive department will be protected by the privilege are doubtless far

---

[6] The Constitution "establishes the President as the chief constitutional officer of the Executive Branch, entrusted with supervisory and policy responsibilities of utmost discretion and sensitivity. These include the enforcement of federal law … and management of the Executive Branch." *Nixon v. Fitzgerald*, 457 U.S. 731, 750 (1982); *see also Alpine Sec. Corp. v. FINRA*, 121 F.4th 1314, 1338 (D.C. Cir. 2024) (Walker, J., concurring in the judgment in part and dissenting in part) ("[E]xecutive power can be exercised only by the President (accountable to the nation) and his executive officers (accountable to him).").

[7] *Cf. Perconti v. Thornton Oil Corp.*, No. 18630, 2002 WL 982419, at *4 (Del. Ch. May 3, 2002) (considering whether the president and chief executive officer of a corporation acted in his "official corporate capacity") (alteration omitted).

[8] *See infra* note 17.

broader than in the case of an officer with less sweeping functions. But that is because the higher the post, the broader the range of responsibilities and duties, and the wider the scope of discretion, it entails.").

Our court then compounded the error. We said that the scope of the office of the President of the United States "is governed by the District of Columbia's *respondeat superior* law" but concluded that "the District's law regarding vicarious liability is sufficiently unclear that we are unable to predict with any confidence how the District's highest court—the D.C. Court of Appeals—would resolve this issue." *Carroll v. Trump*, 49 F.4th 759, 766-67 (2d Cir. 2022). So the Second Circuit asked the municipal D.C. court to answer the following certified question: "Under the laws of the District, were the allegedly libelous public statements made, during his term in office, by the President of the United States, denying allegations of misconduct, with regards to events prior to that term of office, within the scope of his employment as President of the United States?" *Id.* at 781. In other words, our court asked whether under the local laws of the District of Columbia the President of the United States had acted within the scope of his employment.

The D.C. Court of Appeals answered the question only "by affirming that the District of Columbia generally adheres to § 228 of the Restatement (Second) of Agency's traditional view of the scope-of-employment inquiry of *respondeat superior*, although our case precedents construe more expansively some of the concepts set forth therein." *Trump v. Carroll*, 292 A.3d 220, 240 (D.C. 2023). For example, the Restatement provides that "an employer is liable for an employee's tortious conduct in circumstances where the conduct is of the kind the person is employed to perform," but the law of the District of Columbia recognizes that "[m]any employees have

informal responsibilities that are as integral to their employment as their formal responsibilities, and therefore are just as sound of a basis for applying *respondeat superior* liability." *Id.* at 230 (internal quotation marks and alteration omitted).

This purported clarification did not clarify very much, except perhaps to make it more obvious that the President was acting within the scope of his office when responding to reporters at the White House. Nevertheless, according to the panel, this trivial clarification from a local court in D.C. provided "a new legal and factual record" that allowed Attorney General Garland to reconsider the certification of Attorney General Barr. *Carroll v. Trump*, 148 F.4th 110, 120 (2023). Yet the panel further held that Attorney General Bondi was *not* allowed to reconsider the certification of Attorney General Garland: "The government determined that certification was not appropriate under the *respondeat superior* standard as clarified by the D.C. Court of Appeals and explicitly so advised the District Court. It cannot now change course on appeal. The government has waived its right to bring this belated motion." *Id.* The panel made several errors by forbidding Attorney General Bondi from making a motion under the Westfall Act.

## A

First, the waiver holding made no sense. The panel opinion said that "our law of waiver does not permit a party to withdraw an objection in the district court and then attempt to reassert that objection on appeal, with the benefit of hindsight." *Carroll*, 148 F.4th at 120. But the United States has never been "a party" to this litigation, and the Attorney General's certification under the Westfall Act is not an objection, pleading, or argument of a litigant. Congress enacted a statute that authorizes the Attorney General to make a scope-of-

employment certification, and the statute does not prohibit the Attorney General—or a successive Attorney General—from making a new certification based on a revised assessment of the law or the facts. "Nothing in the [Westfall Act] contemplates anything like the embellishment the [Second] Circuit has adopted. And it is long since settled that a reviewing court is generally not free to impose additional judge-made procedural requirements on agencies that Congress has not prescribed and the Constitution does not compel." *Garland v. Ming Dai*, 593 U.S. 357, 365 (2021) (internal quotation marks omitted).

At the same time, the panel opinion said that Attorney General Garland—unlike Attorney General Bondi—was entitled to conclude that "[t]he prior certification and motion to substitute have been overtaken by events" given "the D.C. Court of Appeals' clarification of the standard for respondeat superior liability under D.C. law," such that "[t]he Attorney General should therefore be given the opportunity to decide anew whether to certify that Mr. Trump was acting within the scope of his office as President at the time of the incidents out of which the plaintiff's claim arose." *Carroll*, 148 F.4th at 114 (quoting Letter, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. June 9, 2023), ECF No. 166; Letter, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. July 11, 2023), ECF No. 177-1).

Subsequent to Attorney General Garland's withdrawal of the Barr certification, however, the United States held an election in which the government's assessment of this sort of litigation was a matter of public debate.[9] If the clarification of the D.C. Court of Appeals justified a reconsideration of the government's position, then

---

[9] *See, e.g.*, Jonathan Turley, *Donald Trump Just Won the Greatest Jury Verdict in American History*, The Hill (Nov. 6, 2024).

so did the election. A "changed view" of the government may be "related to the election of a new President of a different political party" because a "change in administration brought about by the people casting their votes is a perfectly reasonable basis for an executive agency's reappraisal of the costs and benefits of its programs." *Motor Vehicle Manufacturers Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 59 (1983) (Rehnquist, J., concurring in part and dissenting in part). The Attorney General was entitled to "evaluate priorities in light of the philosophy of the administration." *Id*. There was no principled justification for holding that Attorney General Barr's certification decision could be revisited by Attorney General Garland but Attorney General Garland's certification decision could not be revisited by Attorney General Bondi.

The panel opinion indicated that, after Attorney General Garland's withdrawal of the Barr certification, President Trump himself could have petitioned for the district court "to find and certify that the employee was acting within the scope of his office or employment." 28 U.S.C. § 2679(d)(3). The panel said that "[b]y declining to seek such relief, Trump waived his right to now bring this motion." *Carroll*, 148 F.4th at 119-20. In fact, President Trump did seek such relief. On June 9, 2023, Attorney General Garland indicated that the prior certification had been "overtaken by events." *Id.* at 114. On June 27, 2023, President Trump raised as an affirmative defense that he "made the challenged statements within the scope of his employment, and is therefore immune from suit under the Westfall Act."[10] Regardless, whether the employee has sought certification

---

[10] Defendant's Answer to Plaintiff's First Amended Complaint, Affirmative Defenses and Counterclaim at 22 ¶ 19, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. June 27, 2023), ECF No. 171.

under § 2679(d)(3) cannot operate as a waiver of the authority of the Attorney General to certify under § 2679(d)(1) or (d)(2).[11]

## B

Second, the panel opinion misinterpreted the Westfall Act to *prohibit* a substitution based on Attorney General Bondi's certification. According to the panel opinion, when a case begins in federal court, the Attorney General may move for substitution at any time—including after trial. When a case begins in state court, however, the Attorney General's motion for substitution "must be made *before trial*" even if, as in this case, the trial occurred in federal court. *Carroll*, 148 F.4th at 119. That differential treatment of substitution motions by the Attorney General is arbitrary and lacks a basis in the statute.

Pursuant to the Westfall Act, there is no time limitation on a motion for substitution when the case begins in federal court. The statute provides that:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his

---

[11] Moreover, we do not normally require a litigant to make a futile motion before a district court. *See New York, N.H. & H.R. Co. v. Iannotti*, 567 F.2d 166, 180 (2d Cir. 1977) ("The law does not require that one act in vain."). The district court had already rejected the certification of Attorney General Barr, it treated the withdrawal of the certification by Attorney General Garland as dispositive, and it indicated that it would not entertain further motions on the issue after the government withdrew its certification. *See* Order, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. June 13, 2023), ECF No. 169 ("In all the circumstances, any further submission by the United States (including any new or amended certification and/or motion to substitute) and/or the defendant with respect to substitution of the United States for the defendant shall be served and filed no later than July 13, 2023.").

11

office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a United States district court shall be deemed an action against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(1). Everyone agrees that the Attorney General may make a certification pursuant to § 2679(d)(1) and a substitution may occur even after a trial has concluded.[12] When the case begins in a state court, however, the case may be removed to federal court only until the trial has begun in state court:

Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court *shall be removed without bond at any time before trial by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or*

---

[12] *See, e.g.*, *Sullivan v. United States*, 21 F.3d 198, 205 (7th Cir. 1994) ("Section 2679(d)(1), … which applies to suits against government employees commenced in federal court, also places no limitation on the point at which the Attorney General must certify that the employee was acting within the scope of his employment."); *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994) ("[T]he Attorney General may file a certification under § 2679(d)(1) whenever he or she concludes that an employee defendant was acting within the scope of his or her employment at the relevant time or times."); *Sowell v. Am. Cyanamid Co.*, 888 F.2d 802, 805 (11th Cir. 1989) ("Here, the Department of Justice has determined that Harrison was acting within the scope of his employment, a determination which is obviously correct in light of the testimony *at trial*. Therefore, it follows that the United States should be substituted for the federal employee.") (emphasis added).

*proceeding is pending*. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant. This certification of the Attorney General shall conclusively establish scope of office or employment for purposes of removal.

28 U.S.C. § 2679(d)(2) (emphasis added). It makes sense that removal would need to occur before trial in a state court. Otherwise, a federal court of appeals would be reviewing state-court trial proceedings. But the same logic does not apply to substitution, and indeed Congress provided for substitution in a separate sentence—not modified by the "at any time before trial" language—with language that parallels the provision for substitution in § 2679(d)(1). "Congress does not use the same words to accomplish the opposite objective," *Everytown for Gun Safety Support Fund v. ATF*, 984 F.3d 30, 34 (2d Cir. 2020), and there is no reason to believe that the substitution language in the two provisions does not have the same scope. The straightforward way to read § 2679(d)(2) is that when the Attorney General makes a certification, (1) the action shall be removed at any time before trial, and (2) the United States shall be substituted as the defendant. The statute does not say, as the panel opinion held, that any certification must be made before trial. "Congress spoke in discrete sentences in § 2679(d)(2) first of removal, then of substitution." *De Martinez*, 515 U.S. at 432.

The interpretation of the panel opinion is at odds with not only the text but also the structure of the statute. "[T]o foreclose needless shuttling of a case from one court to another," Congress made "certification conclusive for purposes of removal." *Id.* at 433 n.10 (internal quotation marks and alterations omitted). That means that § 2679(d)(2) authorizes two different steps: (1) removal, which is

automatic and conclusive, and (2) substitution, which occasions further judicial review. The panel itself emphasized that "[c]ertification is conclusive for purposes of the removal to federal court, but the question of substitution is subject to judicial review." *Carroll*, 148 F.4th at 113. Given this two-step process, there is no reason to expect removal and substitution to occur simultaneously or even to result from the same certification decision. This very case was removed to federal court—where the trial occurred—because Attorney General Barr's certification was conclusive for purposes of removal. But the United States was not substituted as the defendant because Attorney General Garland later decided not to certify for purposes of substitution. The panel insisted that because "*removal* must be accomplished before trial" it follows that "the *certification* must be made before trial, too." *Id.* at 116. But that conclusion does not follow because—as this case illustrates—the removal and the substitution may occur at different times and be governed by different certifications.

The panel opinion insisted that its counterintuitive reading found support in the "broader role and purpose of the Westfall Act," which it defined narrowly as "supplant[ing] the jury in covered cases because FTCA cases are subject to bench trials." *Id.* at 117 (internal quotation marks omitted). "Logically," it said, the substitution "must occur prior to trial" because "[s]upplanting the jury as factfinder has little utility in a case, like this one, that has already been tried to a jury." *Id.* But in the enacted statement of purpose, Congress said that the purpose of the Westfall Act is "to protect Federal employees from personal liability for common law torts committed within the scope of their employment" based on the congressional finding that "[t]he prospect of such liability will seriously undermine the morale and well being of Federal employees, impede the ability of agencies to

14

carry out their missions, and diminish the vitality of the Federal Tort Claims Act as the proper remedy for Federal employee torts." 102 Stat. at 4563-64. The need to protect federal employees does not disappear—and might become more urgent—once a trial has occurred. That is why § 2679(d)(1) does not require that a motion for substitution be made only before trial, and it is why § 2679(d)(2) does not logically do so either. It would *undermine* the congressional purpose if the plaintiff's mere election to file a complaint in state rather than federal court would restrict the ability of the United States to provide a defense.

The panel opinion also created a circuit split. The D.C. Circuit has held that when a case is timely removed to federal court, a new case is "commenced" in the district court that allows "the United States to substitute itself for [the federal employee defendant] pursuant to 28 U.S.C. § 2679(d)(1)." *Wasserman v. Rodacker*, 557 F.3d 635, 639 (D.C. Cir. 2009). The D.C. Circuit explained that "[w]hile any case removed from a state court necessarily originated outside of district court, its removal creates a federal civil case … with a procedural beginning and end. … According to the applicable rules of civil procedure, [the federal] action commenced in the district court when removal was effected and the complaint was received by the clerk." *Id.* (citing Fed. R. Civ. P. 3, 5(d)(2)). As a result, "§ 2679(d)(1) applies" to the removed action and that provision "allows the United States to replace [the federal employee] as the party defendant to the tort claims." *Id.* Under that rule, § 2679(d)(1) would apply to this

15

removed case and there would indisputably be no time limitation on the ability of the United States to move for substitution.[13]

It is unsustainable for the availability of Westfall Act substitution to depend on whether the case ends up in the D.C. Circuit or the Second Circuit. The panel might quibble over the details of decisions of the D.C. Circuit and other circuits applying the Westfall Act. But this case either would have come out differently in the D.C. Circuit or would have come out differently in the other circuits if President Trump had simply removed the case on the basis of diversity before the United States moved for substitution. *See Wasserman*, 557 F.3d at 639; *Flohr*, 84 F.3d at 388 n.4; *Melo*, 912 F.2d at 640 n.15. If the circuit courts would reach different outcomes on the same facts, there is a split. I would rehear this case *en banc* to reach a result that is consistent with rather than contrary to the interpretation of the Westfall Act that prevails in the other circuits.

## C

Third, the panel opinion invoked these procedural and statutory obstacles to avoid facing the fact that the certifications of Attorneys General Barr and Bondi were correct. When a court

---

[13] The Eleventh Circuit has also said that § 2679(d)(1) "governs not only actions that are 'commenced' in district court (under any statute giving the court subject matter jurisdiction to hear the case) but also any case properly removed to district court." *Flohr v. Mackovjak*, 84 F.3d 386, 388 n.4 (11th Cir. 1996). It qualified the statement by saying that the removal must be "under a removal statute other than 28 U.S.C. § 2679(d)," but that would mean President Trump could have removed this case on the basis of diversity and then the United States could have obtained substitution. *Id.*; *see also Melo v. Hafer*, 912 F.2d 628, 640 n.15 (3d Cir. 1990) (allowing certification under § 2679(d)(1) after the employee "removed the action pursuant to other provisions of the United States Code").

considers a Westfall Act certification that a driver or doctor was acting within the scope of federal employment, the question is whether the driver was driving on government business or the doctor was treating patients as part of his federal employment. It is not whether the government employment specifically required him to hit a pedestrian or to injure a patient. As the Westfall Act puts it, the certification is that "the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose." 28 U.S.C. § 2679(d)(1)-(2). The overall conduct, not the incident itself, must be within the scope of the office or employment. *See Ballenger*, 444 F.3d at 664 (explaining that a focus on whether the "allegedly defamatory statement *itself* was not conduct of the kind he is employed to perform" reflects "a misunderstanding of D.C. scope-of-employment law (not to mention the plain text of the Westfall Act), which directs courts to look beyond alleged intentional torts themselves").[14]

As a result—even assuming that the conventional framework applicable to drivers and doctors applies to the President of the United States—the question here is whether it is within the scope of the President's office to issue press releases or to respond to press inquiries. That is not a difficult question. "It is 'incontestable' that the Presidency comes with the power to use the office's 'bully pulpit.'"

---

[14] It would render the applicable case law incoherent to focus on whether the allegedly tortious conduct itself was part of the employee's duties. *See, e.g.*, *Johnson v. Weinberg*, 434 A.2d 404, 409 (D.C. 1981) (concluding that a reasonable jury could find that a laundromat employee acted within the scope of his employment when he shot a customer during a dispute over missing shirts); *Lyon v. Carey*, 533 F.2d 649, 652 (D.C. Cir. 1976) (concluding that a jury reasonably found that a mattress deliveryman acted within the scope of his employment when he assaulted and raped a customer following a delivery-related dispute).

*Associated Press v. Budowich*, No. 25-5109, 2025 WL 1649265, at *12 (D.C. Cir. June 6, 2025) (quoting *Blassingame v. Trump*, 87 F.4th 1, 14-15 (D.C. Cir. 2023)). When the President engages in "public communications," he is discharging "official responsibilities" and acting within the scope of his office. *Trump*, 603 U.S. at 629.[15]

The D.C. Circuit has held that "[s]peaking to the press during regular work hours in response to a reporter's inquiry falls within the scope of a congressman's 'authorized duties.'" *Ballenger*, 444 F.3d at 664. For that reason, even a statement the congressman made during the conversation that "elaborated on the reasons why he and his wife had separated" fell within the scope of his office. *Id.* at 662. For a defamation claim based on such a remark, "the proper defendant under the Westfall Act is the United States." *Id.* at 666.

In this case, the district court rejected the notion that the President's remarks to the press could fall within the scope of his office because the President does not have an employer at whose behest he makes the remarks. *See Carroll*, 498 F. Supp. 3d at 449-50. But the D.C. Circuit had no problem concluding that the congressman's remarks—even about his personal affairs—were "actuated, even in part, to serve the master" because "even a *partial* desire to serve the master is sufficient," and the congressman "wanted to maintain the continued trust and respect of his constituents in order to preserve his ability to carry out his legislative

---

[15] *See also Wilson v. Libby*, 535 F.3d 697, 712 (D.C. Cir. 2008) (explaining that executive branch officials who "spoke to the press" to address "criticism of the Executive's handling of pre-war intelligence" engaged in conduct "of the type that the defendants were employed to perform" and therefore the conduct "was in the defendants' scope of employment regardless of whether it was unlawful or contrary to the national security of the United States").

responsibilities." *Ballenger*, 444 F.3d at 665 (internal quotation marks and alterations omitted). The D.C. Circuit recognized that the congressman's "conduct was motivated—at least in part—by a legitimate desire to discharge his duty as a congressman." *Id.* President Trump explained that he made the remarks giving rise to this case for similar reasons: "I just wanted to defend myself, my family, and frankly, the presidency." App'x 2109.

The Fifth Circuit has also decided that a congressman's "statements, including the alleged defamatory remarks and even assuming such remarks are defamatory, [which] were made in the context of an interview addressing [matters of public concern], clearly fell within the course and scope of his position as a Member of Congress." *Williams v. United States*, 71 F.3d 502, 507 (5th Cir. 1995). The Sixth Circuit has decided that legislators' social media posts describing high school students as exemplifying "blatant hate" and a lack of "common decency" were "calculated to serve the interests of Defendants' constituents (i.e., employers) by informing them of Defendants' views." *Does 1-10 v. Haaland*, 973 F.3d 591, 594, 602 (6th Cir. 2020). And the Third Circuit has held that commissioners of the United States Semiquincentennial Commission acted within the scope of their employment when allegedly "engaging in a campaign of libel, slander, and smearing" that involved statements made "in interactions with the press." *Giordano v. Hohns*, 159 F.4th 179, 183, 201 (3d Cir. 2025) (alteration omitted). Other courts have reached similar conclusions.[16] The decision in this case—regarding the President of the United States—stands alone on the other side.

---

[16] *See Musgrave v. Mace*, No. 25-1823, 2025 WL 4482991, at *2 (D.S.C. Aug. 20, 2025) (noting that the federal courts "have consistently held that

19

The Attorney General's certification "constitute[s] *prima facie* evidence that the employee was acting within the scope of his employment," *Ballenger*, 444 F.3d at 662, and a "plaintiff challenging the government's scope-of-employment certification bears the burden of coming forward with specific facts rebutting the certification," *id.* (quoting *Stokes v. Cross*, 327 F.3d 1210, 1214 (D.C. Cir. 2003)). The plaintiff in this case cannot meet that burden.

It is strange to think that the scope of the office of President of the United States should be decided by reference to state employment law, and the Supreme Court may want to consider whether that is how the Westfall Act applies to the President.[17] But even under the

_____

statements made to the press and on social media are within the scope of employment of members of Congress" and "have reasoned that press interviews are part of a congressperson's job"); *see also Chapman v. Rahall*, 399 F. Supp. 2d 711, 715 (W.D. Va. 2005) (explaining that a congressman's "remarks, made to the media to ensure his effectiveness as a legislator, can fairly and reasonably be deemed to be an ordinary and natural incident or attribute of his job as a legislator" and "were therefore made within the scope of his employment") (internal quotation marks omitted); *Operation Rescue Nat'l v. United States*, 975 F. Supp. 92, 108-09 (D. Mass. 1997) (explaining that by making remarks "in response to questions posed by the media," a senator "was providing political leadership and a basis for voters to judge his performance in office" and "the Westfall Act provides Senator Kennedy immunity for his remarks"), *aff'd*, 147 F.3d 68 (1st Cir. 1998).

[17] *Cf. Trump*, 603 U.S. at 639-40 ("[U]nlike anyone else, the President is a branch of government, and the Constitution vests in him sweeping powers and duties."); *Nixon*, 457 U.S. at 756 ("Under the Constitution and laws of the United States the President has discretionary responsibilities in a broad variety of areas, many of them highly sensitive. In many cases it would be difficult to determine which of the President's innumerable 'functions' encompassed a particular action."); *Trump v. Vance*, 591 U.S. 786, 800-01 (2020) ("[T]he Constitution guarantees 'the entire independence of the

framework that applies to other government employees, the motion of the United States for substitution should have been granted. I would rehear the case *en banc* and grant the motion for substitution.

## II

As noted above, the panel in this case determined that the "clarification" of *respondeat superior* liability by the D.C. Court of Appeals created a "new legal and factual record" that allowed Attorney General Garland to submit a new certification decision in place of the prior certification by Attorney General Barr. *Carroll*, 148 F.4th at 120. But when it came to the merits, the same panel determined that the clarification of the doctrine of presidential immunity by the Supreme Court of the United States in *Trump v. United States* was so inconsequential that President Trump should not be allowed to revisit that issue. "*Trump* did not announce new law when it observed that presidential immunity is rooted in the structural separation of powers," the panel said. "It simply reaffirmed long-established principles." *Carroll*, 151 F.4th at 67. According to the panel, *Trump v. United States* provided no intervening change in law that would allow the President to make an argument about presidential immunity that he could not have raised earlier. *See id*. So the panel decided that it would not reconsider the issue of presidential immunity or its prior determination that President Trump had waived his immunity defense. *See id.* at 65-68.

---

General Government from any control by the respective States.' As we have often repeated, 'States have no power to retard, impede, burden, or in any manner control the operations of the constitutional laws enacted by Congress.' It follows that States also lack the power to impede the President's execution of those laws.") (citations and alteration omitted) (quoting *Farmers' & Mechanics' Sav. Bank v. Minnesota*, 232 U.S. 516, 521 (1914); *McCulloch v. Maryland*, 17 U.S. (4 Wheat.) 316, 436 (1819)).

In fact, the prior determination that President Trump waived the defense was incorrect. But even if he had waived it, the claim that *Trump v. United States* provided no meaningful clarification about the scope of presidential immunity is wrong. If there is one thing on which the proponents and the critics of *Trump v. United States* agree, it is that the decision made a difference to the law of presidential immunity. Another panel of our court has vacated and remanded the decision of a district court because that court did "not appear to have adequately considered whether *Trump v. United States* represented a change in controlling law." *New York v. Trump*, 158 F.4th 458, 466 (2d Cir. 2025). At least that much should have occurred here.

## A

There was no waiver of the immunity defense. President Trump consistently raised the defense of presidential immunity throughout this litigation. He did so in his initial answer to the complaint,[18] a motion for summary judgment,[19] a motion to amend the answer to raise presidential immunity more specifically if

---

[18] *See* Answer at 11 ¶ 149, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Sept. 15, 2020), ECF No. 14-69 ("The alleged defamatory statements are privileged or protected by one or more immunities … under the Constitution of the United States.").

[19] *See* Memorandum in Support of Defendant's Motion for Summary Judgment at 3-4, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Dec. 22, 2022), ECF No. 109 ("It is blackletter law that a President is entitled to absolute immunity from damages liability predicated on his official acts. … Presidential immunity serves a vital function for the office of the presidency.") (internal quotation marks omitted); *id.* at 19 ("[I]n accordance with long-established Supreme Court precedent, Defendant is entitled to absolute immunity from damages liability.") (internal quotation marks omitted).

necessary,[20] an answer to the amended complaint,[21] and his appeal.[22] The Supreme Court has explained that to the extent that *legislative* immunity may be waived, "waiver can be found only after explicit and unequivocal renunciation of the protection." *United States v. Helstoski*, 442 U.S. 477, 491 (1979). The Court emphasized that "[t]he ordinary rules for determining the appropriate standard of waiver do not apply" to an immunity designed "to preserve the constitutional structure of separate, coequal, and independent branches of government." *Id*. Like legislative immunity, presidential "immunity from damages liability predicated on his official acts" is "rooted in the constitutional tradition of the separation of powers." *Nixon*, 457 U.S. at 749. There is no reason to conclude that the waiver of presidential immunity may be any less explicit and unequivocal than the legislative analogue.

In this case, however, the Second Circuit held that presidential immunity may be waived unintentionally through inadvertence. Our

---

[20] *See* Reply Memorandum of Law in Further Support of Defendant's Motion for Summary Judgment at 5, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Jan. 19, 2023), ECF No. 122 ("[S]hould this Court accept Plaintiff's position regarding waiver, Defendant should be permitted to assert presidential immunity as a defense in the interest of justice."); *see also Carroll*, 680 F. Supp. 3d at 504 ("In the alternative, Mr. Trump argues that the Court should construe his motion for summary judgment as a motion for leave to amend his answer to resurrect the previously waived absolute presidential immunity defense.").

[21] *See* Defendant's Answer to Plaintiff's First Amended Complaint, *supra* note 10, at 20-21 ¶ 1 ("[T]he alleged defamatory statements are privileged and protected under the doctrine of presidential absolute immunity.").

[22] *See* Brief for Appellant at 7, *Carroll v. Trump*, No. 24-644 (2d Cir. Sept. 20, 2024), ECF No. 51.1 ("[T]he doctrine of absolute Presidential immunity bars any liability.").

court held that the reference to constitutional immunity in the President's initial answer was too general to invoke presidential immunity, and the President "unduly delayed in raising presidential immunity as a defense" in a more specific filing. *Carroll v. Trump* (*Carroll 3*), 88 F.4th 418, 429-30 (2d Cir. 2023). The panel opinion adhered to that decision on two grounds. First, the panel concluded that there has been no "intervening change of law" on presidential immunity. *Carroll*, 151 F.4th at 68. Second, the panel concluded that "[e]ven assuming a waiver of presidential immunity must be 'explicit and unequivocal,' surely Trump's concession in *Carroll 3*—that if presidential immunity were waivable, he waived it—meets this standard." *Id.* at 68 n.12.

By making that second point, the panel opinion relied on a statement of counsel at oral argument in the *Carroll 3* appeal. In response to questioning, counsel for President Trump accepted the counterfactual premises of the question that (1) presidential immunity is subject to ordinary waiver rules applicable to any defense, (2) President Trump was properly denied leave to amend his answer to specify the defense of presidential immunity rather than constitutional immunities generally, and (3) no amended complaint was ever filed such that President Trump never filed a new answer in response. Based on those premises, counsel answered that the statement in President Trump's initial answer might have been too general for presidential immunity to have been "properly raised at that point."[23] Counsel immediately added, however, that "given the

---

[23] Oral Argument Audio Recording at 10:30, *Carroll v. Trump*, No. 23-1045 (2d Cir. Oct. 23, 2023).

filing of the amended complaint," the defense "was properly raised" even under ordinary waiver rules.[24]

That exchange during oral argument in no way established an "explicit and unequivocal renunciation of the protection" of presidential immunity. *Helstoski*, 442 U.S. at 491. The premise of the question was that the ordinary rules allowing waiver by inadvertence or oversight would apply in this context. But "[t]he ordinary rules for determining the appropriate standard of waiver do not apply." *Id.* The panel in *Carroll 3* did not believe that anything said at oral argument qualified as an intentional renunciation of presidential immunity. The *Carroll 3* opinion expressly stated that "we express no view on whether Defendant intended to relinquish his presidential immunity defense." *Carroll 3*, 88 F.4th at 422 n.1. The panel opinion in this case erred by treating the counterfactual statement of counsel at oral argument as an explicit and unequivocal renunciation of presidential immunity. It was not.

**B**

The most glaring error of the panel opinion, however, was its dismissal of *Trump v. United States* as too insignificant to justify reconsideration of the application of presidential immunity to this case. Everyone except for the panel in this appeal believes that *Trump v. United States* materially affected the law of presidential immunity.[25]

---

[24] *Id.*

[25] *See, e.g.*, *Trump*, 603 U.S. at 657 (Sotomayor, J., dissenting) (arguing that the decision "reshapes the institution of the Presidency"); Saikrishna Bangalore Prakash, *The Fearless Executive, Crime, and the Separation of Powers*, 111 Va. L. Rev. 1, 4 (2025) (explaining that "[i]n *Trump v. United States*, the Supreme Court supplied some answers" to "profound questions about the nature of our government" and effected "a bestowal of a capacious

By "[e]xplaining only that nothing in the Supreme Court's opinion affects the previous conclusion" about "the bounds of executive authority," the panel opinion "bypassed what we consider to be important issues bearing on the ultimate issue" of presidential immunity. *Trump*, 158 F.4th at 469 (internal quotation marks and alterations omitted).

The Supreme Court in *Trump v. United States* recognized that "only a limited number of our prior decisions guide determination of the President's immunity." 603 U.S. at 610. It therefore provided important clarifications. The President has immunity for "official actions" but not "unofficial ones." *Id.* at 617. Yet "some Presidential conduct—for example, speaking to and on behalf of the American people—certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision," so presidential immunity "extends to the 'outer perimeter' of the President's official responsibilities, covering actions so long as they are 'not manifestly or palpably beyond his authority.'" *Id.* at 618 (citation and alteration omitted) (quoting *Blassingame*, 87 F.4th at 13).

immunity"); Robert Delahunty & John Yoo, *The Presidential Immunity Decision*, 2024 Harv. J.L. & Pub. Pol'y Per Curiam 34, at *1 (2024) ("In *Trump v. United States*, the Supreme Court issued one of the most resounding defenses of executive power in its history.") (footnote omitted); Shalev Gad Roisman, *Trump v. United States and the Separation of Powers*, 173 U. Pa. L. Rev. Online 33, 33 (2025) ("*Trump v. United States* is a blockbuster decision that has been reviled and celebrated by different quarters of American society."); Jack Goldsmith, *The Presidency After Trump v. United States*, 2024 Sup. Ct. Rev. 1, 3 (2024) (noting "the novelty in these rulings and their potentially very broad implications"); Akhil Reed Amar, *Something Has Gone Deeply Wrong at the Supreme Court*, The Atlantic (July 2, 2024); Laurence H. Tribe, *The Trump Decision Reveals Deep Rot in the System*, N.Y. Times (July 1, 2024).

26

And the immunity prevents not only liability for official acts but also the use of evidence of official acts even when the jury is ultimately asked to evaluate "charges that purport to be based only on his unofficial conduct." *Id.* at 631. In that way, the immunity is implicated whenever the "President's immune conduct" is subjected to "examination by a jury." *Id.* The government in *Trump* believed that it could introduce evidence of official acts, but the Supreme Court explained that the government's "proposal threatens to eviscerate the immunity we have recognized" and that "[i]t would permit a prosecutor to do indirectly what he cannot do directly—invite the jury to examine acts for which a President is immune." *Id.*

The panel in this case decided that when "the D.C. Court of Appeals clarified the standard for *respondeat superior* liability," the new legal landscape justified the reconsideration of earlier decisions regarding the scope of the presidential office. *Carroll*, 148 F.4th at 119. It would seem to follow from that premise that when the Supreme Court clarified the scope of presidential immunity, the new legal landscape likewise justified the reconsideration of earlier decisions about the defense of presidential immunity. But the panel insisted that it did not. *See Carroll*, 151 F.4th at 68 ("In the absence of any intervening change of law on this issue, adhering to our prior decision would not work a manifest injustice."). That was wrong. Indeed, a subsequent panel of our court has recognized that it was wrong. *See Trump*, 158 F.4th at 466 (concluding that a district court "does not appear to have adequately considered whether *Trump v. United States* represented a change in controlling law").[26]

---

[26] The panel opinion suggested that the relevant question might be whether *Trump v. United States* represented an intervening change in law on the

The decision in *Trump v. United States* makes clear that President Trump has a serious claim that the district court conducted the trial in this case in violation of presidential immunity. The Supreme Court explained that "most of a President's public communications are likely to fall comfortably within the outer perimeter of his official responsibilities." *Trump*, 603 U.S. at 629. To the extent that a public communication would fall outside those responsibilities, it would be because there may "be contexts in which

---

specific issue of "whether presidential immunity could be waived or forfeited." *Carroll*, 151 F.4th at 66. That is not the relevant question. When an intervening change in law alters the availability of a claim or a defense, an earlier failure to invoke that claim or defense cannot operate as a waiver. "[T]he mere failure to interpose such a defense prior to the announcement of a decision which might support it cannot prevent a litigant from later invoking such a ground" because "an effective waiver must … be one of a 'known right or privilege.'" *Curtis Pub. Co. v. Butts*, 388 U.S. 130, 143 (1967) (quoting *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)). If *Trump v. United States* authorized a broader defense of presidential immunity than was previously available, the President cannot be said to have waived that defense by failing to raise it before *Trump v. United States* was decided. Just as *Trump v. United States* did not specifically address the issue of waiver, it did not address what qualifies as "good cause" for a delay in filing a notice of removal under 28 U.S.C. § 1455(b)(1). But our court held that a district court did "not appear to have adequately considered whether *Trump v. United States* represented a change in controlling law that could support a finding of good cause." *Trump*, 158 F.4th at 466-67. The decision in *Trump v. United States* could support a finding of good cause because it altered the scope of presidential immunity—and therefore provided broader grounds for removal than were previously available. The principle is that a defendant cannot be faulted for failing to raise a ground for removal that was not previously available. In this case, the decision in *Trump v. United States* provided a broader defense of presidential immunity than was previously available, but the panel opinion faulted the President for failing to raise a defense based on that decision before the decision was issued.

28

the President, notwithstanding the prominence of his position, speaks in an unofficial capacity—perhaps as a candidate for office or party leader." *Id.* To distinguish those contexts, a court must engage in "the classification of each communication" based on, for example, "who was involved in transmitting the electronic communications" or "what else was said contemporaneous to the excerpted communications." *Id.* at 630. This is a "fact specific" inquiry that entails an "objective analysis of 'content, form, and context,'" *id.* at 629 (quoting *Snyder v. Phelps*, 562 U.S. 443, 453 (2011)), and a recognition that "there is not always a clear line between the President's personal and official affairs," *id.* (alteration omitted) (quoting *Mazars*, 591 U.S. at 868).

Neither the district court nor our court engaged in the contextual analysis that the Supreme Court has said is required. Instead, the district court said that a "comment about government action, public policy, or even an election is categorically different than a comment about an alleged sexual assault that took place roughly twenty years before the president took office." *Carroll*, 498 F. Supp. 3d at 453. According to the district court, such a comment can never be said in an official capacity because "President Trump's views on the plaintiff's sexual assault allegation may be interesting to some, but they reveal nothing about the operation of government." *Id.* The Supreme Court, however, has explained that the President is "expected to comment on those matters of public concern that may not directly implicate the activities of the Federal Government." *Trump*, 603 U.S. at 629. His "speaking to and on behalf of the American people certainly can qualify as official even when not obviously connected to a particular constitutional or statutory provision," *id.* at 618 (citation omitted), and "even when no specific federal responsibility requires his communication," *id.* at 627.

At a minimum, the President should be able to argue that the newly clarified doctrine of presidential immunity precludes liability in this case. The district court performed an acontextual and unpersuasive analysis, and the Second Circuit refused even to consider the arguments. It cannot be said that the same arguments were previously available. *Cf. In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 243 (2d Cir. 2016) ("[T]he intervening authority must have established an argument that was 'not known to be available' to the party seeking to excuse waiver at the first opportunity that the party had to raise the argument.") (quoting *Gucci Am., Inc. v. Weixing Li*, 768 F.3d 122, 135 (2d Cir. 2014)). The decision in *Trump v. United States* allowed the President to argue that his "public communications" fall "within the outer perimeter of his official responsibilities" even "when no specific federal responsibility requires his communication." *Trump*, 603 U.S. at 627-29. And it allowed him to argue that he has a defense of presidential immunity based on the use of evidence of such official acts regardless of the ultimate reason for liability. [27] The

---

[27] *Compare Trump*, 603 U.S. at 631 ("If official conduct for which the President is immune may be scrutinized to help secure his conviction, even on charges that purport to be based only on his unofficial conduct, the intended effect of immunity would be defeated. … Use of evidence about such conduct, even when an indictment alleges only unofficial conduct, would thereby heighten the prospect that the President's official decisionmaking will be distorted.") (internal quotation marks omitted), *with United States v. Nixon*, 418 U.S. 683, 709 (1974) ("[I]t is imperative to the function of courts that compulsory process be available for the production of evidence needed either by the prosecution or by the defense."); *Trump*, 603 U.S. at 656 (Barrett, J., concurring in part) ("[T]he rules of evidence are equipped to handle that concern on a case-by-case basis. … I see no need to depart from that familiar and time-tested procedure here."); *id.* at 681 (Sotomayor, J., dissenting) (arguing that the majority's "draconian

intervening change in law that supported these arguments—not some development in waiver doctrine—required reconsideration of the presidential immunity defenses. *See supra* note 26.

President Trump raises strong arguments based on *Trump v. United States*. The jury in this case imposed liability for statements made in a press release from the White House Press Office[28] and made by the President in a press briefing on the south lawn of the White House.[29] The officials and entities involved in distributing the statements—as well as the context, involving direct inquiries to the White House and other comments on matters of public policy—indicate that the President was speaking in an official capacity. Even if he were not, the records of the statements—documents issued from the White House Press Office—appear to be evidence of official acts.

At the trial, counsel for Carroll emphasized the official character of the statements as evidence of the harm Carroll had suffered. In her opening statement, counsel said that the President was "[s]peaking from the White House" and "used the most famous platform on earth to lie about what he had done." App'x 1100. "He said these things from the White House. The White House, a place where presidents have signed laws, declared wars, decided the fate of the nation." *Id.* In her summation, she said that the President had "attacked her integrity and her honesty" while "[w]ielding his position as president." *Id.* at 1781. Carroll's complaint alleged that "the most powerful man on the planet" used "that platform" of the presidency "to attack her integrity." *Id.* at 71-72. She won summary

---

approach to official-acts evidence" is "extraordinary" and "has no basis in law").

[28] App'x 1887; *see* https://perma.cc/K8LC-TWBG.

[29] App'x 584-96; *see* https://perma.cc/3A8E-V97R.

judgment on the ground that the "statements, *especially when issued by the sitting President* and broadcast widely, would inevitably tend to expose Ms. Carroll to hatred and contempt or to induce an unsavory opinion of her in the minds of a substantial number of people in the community."[30]

These statements indicate that the jury was invited to scrutinize and to punish official acts of the President.[31] But no court has even considered that question. At the very least, the President is entitled to have a court evaluate whether and to what extent this trial implicated presidential immunity as the Supreme Court elaborated the doctrine in *Trump v. United States*. The panel opinion refused to conduct any analysis on the application of presidential immunity. I would rehear the case *en banc* in order to do so.

## C

The President was denied a fair trial in yet another respect. The district court imposed a judgment of \$87 million in damages for allegedly defamatory statements that President Trump made to reporters at the White House in June 2019. But the district court decided that President Trump was not even entitled to a trial on

---

[30] *Carroll v. Trump*, 690 F. Supp. 3d 396, 405 (S.D.N.Y. 2023) (alteration omitted) (emphasis added) (quoting Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment at 17, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Aug. 2, 2023), ECF No. 190).

[31] *See Carroll v. Trump*, 731 F. Supp. 3d 626, 634-35 (S.D.N.Y. 2024) (upholding the award of punitive damages because "there was evidence that Mr. Trump used the office of the presidency—the loudest 'bully pulpit' in America and possibly the world—to issue multiple statements castigating Ms. Carroll" and because "[t]he jury could have found that Mr. Trump wielded his position as arguably the most powerful and famous man in the world to broadcast his lies to millions of dedicated followers").

whether those statements were defamatory or spoken with actual malice. It denied him that trial because the district court had held a separate trial over whether different statements made via social media in October 2022 were defamatory and spoken with actual malice. Because of that other trial concerning the 2022 statements, the district court "ruled that Trump was barred from disputing … whether his June 2019 statements were false or defamatory, and whether he acted with actual malice in making those statements." *Carroll*, 151 F.4th at 64. The district court instructed the jury that the President was guilty of defamation for the 2019 statements and held a trial limited to how much he should be required to pay in damages. The jury returned a record-setting damages award.

That is not how trials are supposed to work. Even putting aside the problems with the first trial, [32] that trial at most could have established that the 2022 statements were defamatory and said with actual malice. The district court nevertheless concluded that the "truth or falsity of Mr. Trump's 2019 statements" depends "on whether Ms. Carroll lied about Mr. Trump sexually assaulting her," so "[t]he jury's finding that she did not therefore is binding in this case and precludes Mr. Trump from contesting the falsity of his 2019 statements." *Carroll*, 690 F. Supp. 3d at 406. But the jury did not make

---

[32] The district court in the first trial unjustifiably excluded evidence of President Trump's state of mind, allowed the introduction of propensity evidence to establish liability, and overrode the mandate of Rule 403 to exclude stale witness testimony. "The result was a jury verdict based on impermissible character evidence and few reliable facts. No one can have any confidence that the jury would have returned the same verdict if the normal rules of evidence had been applied." *Carroll*, 141 F.4th at 386 (Menashi, J., dissenting from the denial of rehearing en banc).

that finding. The accusation to which President Trump responded in 2019 was the publication of "an excerpt from Ms. Carroll's then-forthcoming book, in which Ms. Carroll wrote that Mr. Trump raped her." *Carroll v. Trump*, 124 F.4th 140, 151 (2d Cir. 2024). The jury in the first trial concluded that President Trump did not rape her. As the panel opinion recounts, "[t]he jury answered the first question [on the special verdict form]—whether Trump raped Carroll—in the negative." *Carroll*, 151 F.4th at 70. The jury found President Trump liable only for sexual abuse, and both the district court and our court "acknowledged that the jury could conceivably have found that Trump sexually abused Carroll only through nonconsensual kissing or pulling down her tights." *Id.*

But the district court, on its own, determined "that such a finding would be inconsistent with the jury's $2 million compensatory damages award." *Id.* So the district court decided that "the jury *implicitly* found[] that Mr. Trump deliberately and forcibly penetrated Ms. Carroll's vagina with his fingers." *Carroll v. Trump*, 683 F. Supp. 3d 302, 307 (S.D.N.Y. 2023) (emphasis added). In the second trial, therefore, "[t]he district court told the jury that it must accept as true that 'Mr. Trump sexually abused Ms. Carroll by forcibly inserting his fingers into her vagina without her consent.'" *Carroll*, 151 F.4th at 69 (quoting App'x 1851). No jury ever made that finding—and, more important, a similar chain of inferences from the verdict could as easily lead to the conclusion that the initial jury determined that Carroll was *not* telling the truth about being raped because that jury determined that she was *not* raped.

The panel opinion defended the decision of the district court to deny President Trump a trial as an application of Rule 49(a) of the Federal Rules of Civil Procedure. According to the panel opinion, because the special verdict form in the first trial "did not request the

jury to make a finding on the specific sexual conduct that he committed," when following trial President Trump argued "that the damages were excessive because the jury could have found that he had engaged in less serious sexual acts, the district court made a finding on this issue." *Carroll*, 151 F.4th at 70 (citation omitted). And its finding was "entitled to preclusive effect" in the second defamation case. *Id.* at 71.

It is true that following the first trial the district court needed to resolve a motion for "a new trial or remittitur" based on the damages award. *Carroll*, 683 F. Supp. 3d at 324. But no court has ever given preclusive effect to a Rule 49(a) finding made to resolve a remittitur motion. That is because Rule 49(a) has no application under these circumstances. Rule 49(a) "was designed to have the court supply an omitted subsidiary finding which would complete the jury's determination or verdict." *Kinnel v. Mid-Atl. Mausoleums, Inc.*, 850 F.2d 958, 965 (3d Cir. 1988); *see Kerman v. City of New York*, 374 F.3d 93, 120 (2d Cir. 2004) ("Rule 49 permits the trial court, in some circumstances, to supply an omitted finding that would *complete a jury's verdict*.") (emphasis added). When, for example, "no individual elements of a misrepresentation cause of action were specifically framed for the jury to answer, … the district court could 'fill in' those subsidiary elements when the jury returned a verdict" finding that the defendant committed misrepresentation. *Kinnel*, 850 F.2d at 965. "Subsumed within that ultimate jury finding were the five elements of misrepresentation … each of which could be deemed to have been supplied by the court in accordance with the jury's judgment once the jury's ultimate verdict was known." *Id.* at 965-66.

In this case, the district court did not make its finding to complete the jury's verdict. When President Trump made the motion for remittitur, the verdict was already complete. No inferences were

necessary. "Remittitur is 'the process by which a court compels a plaintiff to choose between reduction of an excessive verdict and a new trial.'" *Cross v. N.Y.C. Transit Auth.*, 417 F.3d 241, 258 (2d Cir. 2005) (quoting *Earl v. Bouchard Transp. Co.*, 917 F.2d 1320, 1328 (2d Cir. 1990)). To determine whether remittitur is appropriate, "a district court reviews the evidence presented at trial in support of the challenged damage award and compares the award to other New York cases in which evidence of similar injuries was presented." *Presley v. USPS*, 317 F.3d 167, 173 (2d Cir. 2003). That involves a comparison of the evidentiary records in comparable cases.[33] But it does not involve entering new factual findings on behalf of the jury under Rule 49(a). No such findings would be subsidiary to a jury verdict. And because remittitur is a question of New York state law, *see Presley*, 317 F.3d at 173 (citing N.Y. C.P.L.R. § 5501(c)), it would not make sense for a court to rely on a federal rule to conduct the analysis.

In this case, no jury ever made a finding about digital penetration, and such a finding was not subsidiary to any verdict entered by any jury. Instructing one jury that it must accept a fact that was not necessarily decided in a previous trial—as the district court did here—is legally erroneous. For the purposes of issue preclusion, "[w]hen a fact is not *necessarily* determined in a former trial, the possibility that it *may* have been does not prevent re-examination of that issue." *United States v. Hamilton*, 118 F.4th 655, 660 (5th Cir. 2024) (emphasis added) (quoting *United States v. Brackett*, 113 F.3d 1396, 1398 (5th Cir. 1997)). The "inquiry does not focus on what the jury *may* have decided, but rather on what it *must* have decided." *Id.* (quoting

---

[33] *See, e.g.*, *Nivar v. Sadler*, No. 13-CV-7141, 2016 WL 3647957, at *4-6 (S.D.N.Y. July 1, 2016); *Szabo v. Rodriquez*, No. 09-CV-2048, 2012 WL 6161936, at *3-4 (E.D.N.Y. Dec. 11, 2012).

*United States v. Sarabia*, 661 F.3d 225, 232 (5th Cir. 2011)).[34] Here, the district court gave preclusive effect to an issue that was neither actually decided by the jury nor essential to the previous judgment. That was an error.

And in this case, the failure to follow the law of issue preclusion raises Seventh Amendment concerns. The conclusion of the district court about the implicit factual finding invaded the province of the jury. "[T]he drawing of legitimate inferences from the facts" is one of the "jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The district court "could not itself determine the issues of fact … for this would cut off the plaintiff's unwaived right to have the issues of fact determined by a jury." *Balt. & Carolina Line, Inc. v. Redman*, 295 U.S. 654, 658 (1935). "While it is correct practice for the judge to instruct in an absolute form on an admitted state of the case, he is not authorized to take from the jury the right of weighing the evidence bearing on controverted facts." *Mut. Life Ins. Co. v. Snyder*, 93 U.S. 393, 394-95 (1876). The district court here made its own inference based on a debatable record and gave it preclusive effect in a new proceeding. The district court thereby acted as the jury in addition to the judge.[35]

---

[34] *See Postlewaite v. McGraw-Hill*, 333 F.3d 42, 48 (2d Cir. 2003) ("[I]n order for a judgment to be preclusive, the issue in question must have been actually decided, and its determination must have been essential to the judgment. If an issue was not actually decided in the prior proceeding, or if its resolution was not necessary to the judgment, its litigation in a subsequent proceeding is not barred by collateral estoppel.") (citation omitted).

[35] The panel opinion asserted that the truth or falsity of President Trump's 2019 statements "did not turn on the specific sexual act he committed." *Carroll*, 151 F.4th at 69 n.15. Carroll accused him of rape. The first jury

**D**

The ambiguous conclusion of the first jury with respect to the truth or falsity of Carroll's accusation and President Trump's denial was not the only problem with imposing automatic liability on President Trump without a trial. The district court further determined that "[t]he verdict in *Carroll II* established also that Mr. Trump's 2019 statements were made with actual malice." *Carroll*, 690 F. Supp. 3d at 407.

That makes no sense. Actual malice means that the defendant made the statement "with knowledge that it was false or with reckless disregard of whether it was false or not." *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 174 (2d Cir. 2001) (quoting *New York Times Co. v. Sullivan*, 376 U.S. 254, 280 (1964)). It must be established with "clear and convincing evidence" that "the defendant in fact entertained serious doubts as to the truth of his publication." *Id.* Because the showing depends on the state of mind of the speaker at the time of publication, we have specifically held that "information acquired after the publication of defamatory material cannot be relevant to the publisher's state of mind of his alleged malice at the time of publication." *Herbert v. Lando*, 781 F.2d 298, 306 (2d Cir. 1986). In violation of these principles, the district court held that a determination that President Trump spoke with actual malice in 2022

---

determined that he did not commit rape but a sexual abuse. The panel opinion identified these 2019 statements: "'Shame on those who make up false stories of assault to try to get publicity for themselves,' 'I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened,' and '[f]alse accusations diminish the severity of real assault.'" *Id.* at 69 n.14. The truth or falsity of these statements turns on whether the particular accusation that Carroll made—of rape—was true or false.

necessarily means that he spoke with actual malice when making a different statement after just hearing the accusation *three years earlier*.[36] It is "self-evident" that any verdict about a defendant's state of mind in 2022 does not predetermine a verdict about his state of mind three years earlier. *Herbert*, 781 F.2d at 306.

The panel opinion did not even attempt to defend the decision of the district court. The panel opinion instead endorsed "the district court's alternative holding that Carroll satisfied her burden at summary judgment on the element of actual malice." *Carroll*, 151 F.4th at 71. But the reasoning of the panel opinion on this point was no more defensible. The panel opinion held that President Trump "acted with, at a minimum, reckless disregard for the truth" because he did not undertake an independent investigation of Carroll's accusations before issuing a denial:

> In his deposition testimony, Trump admitted that prior to making his 2019 statements, he never read Carroll's book or the *New York* magazine publication, never contacted Bergdorf Goodman's, never did any research on Carroll, and never had anyone working for him research Carroll. He also admitted that, before issuing his 2019 statements, he had no knowledge of Carroll's book deal, financial circumstances, or political affiliation.

*Id.* at 71-72. None of that established actual malice. "The reckless conduct needed to show actual malice 'is not measured by whether a reasonably prudent man would have published, or would have

---

[36] *See Carroll*, 690 F. Supp. 3d at 408 ("Accordingly, as Ms. Carroll argues, 'no reasonable person could believe that Mr. Trump acted with actual malice in October 2022, but lacked it in June 2019.'") (alterations omitted) (quoting Memorandum of Law in Support of Plaintiff's Motion for Partial Summary Judgment, *supra* note 30, at 20).

investigated before publishing,' but by whether there is sufficient evidence 'to permit the conclusion that the defendant in fact entertained serious doubts as to the truth of his publication.'" *Church of Scientology*, 238 F.3d at 174 (quoting *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968)). President Trump was not required to read Carroll's book before speaking in order to avoid liability for defamation. Carroll instead was required to identify clear and convincing evidence that President Trump spoke without subjectively "believing the truth of the publication." *Karedes v. Ackerley Grp., Inc.*, 423 F.3d 107, 114 (2d Cir. 2005) (quoting Sack on Defamation: Libel, Slander, and Related Problems § 5.5.1.1 (3d ed. 2005)).

In every other defamation case, the actual malice standard raises "the plaintiff's burden of proof to an almost impossible level." *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 771 (1985) (White, J., concurring in the judgment). In the first trial against President Trump, however, "the district court excluded evidence of the defendant's contemporaneous state of mind, ensuring that the plaintiff easily met the actual malice standard." *Carroll*, 141 F.4th at 368 (Menashi, J., dissenting from the denial of rehearing en banc). In this case, the district court went even further—imposing liability for actual malice without any evidence or any trial at all. It was not a fair judicial proceeding.

### E

On top of the errors already discussed, the panel opinion upheld an unlawful and grossly excessive award of damages. The damages award in this case included (1) damages that were unauthorized under New York law, (2) compensatory damages that were duplicative, and (3) an overall award that was record-breakingly excessive.

**1**

In New York, a showing of actual malice "is insufficient by itself to justify an award of punitive damages, because that malice focuses on the defendant's state of mind in relation to the truth or falsity of the published information." *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 82 N.Y.2d 466, 479 (1993). The "common-law malice" that "would allow an award of punitive damages" involves "the defendant's mental state in relation to the plaintiff and the motive in publishing the falsity." *Id.* at 479-80. For an award of punitive damages, the plaintiff must establish that the statements were made with common-law malice so that those damages serve "to punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." *Id.* at 479-80 (quoting *Vassiliades v. Garfinckel's*, 492 A.2d 580, 593 (D.C. 1985)).

In this case, "the district court instructed the jury that '[a] statement is made maliciously … if it is made with a deliberate intent to injure or out of hatred, ill will or spite, or in willful, wanton, or reckless disregard of another's rights.'" *Carroll*, 151 F.4th at 77 (quoting App'x 1857). President Trump requested that the jury be instructed that, to award punitive damages, the malicious intent to injure must be the speaker's sole motivation. The district court rejected that request,[37] and the panel opinion held that it was right to do so. According to the panel opinion, the New York courts impose a requirement that "common law malice must be 'the one and only

---

[37] *See Carroll*, 731 F. Supp. 3d at 631 ("[T]he persuasive evidence is that New York's highest court would reject defendant's contention that the Court should have instructed the jury that it could award punitive damages only if it found that Mr. Trump was motivated *solely* by a desire to injure Ms. Carroll.").

41

cause for the publication'" only "to overcome a conditional or qualified privilege against a defamation suit." *Carroll*, 151 F.4th at 75-76 (quoting *Liberman v. Gelstein*, 80 N.Y.2d 429, 439 (1992)).

President Trump's position has support in the case law,[38] and in any event the panel opinion was wrong that no qualified privilege applied in this case. When a speaker defends himself against an accusation of wrongful conduct, a qualified privilege arises that allows liability for defamation "only if a jury could reasonably conclude that 'malice was the one and only cause for the publication.'" *Liberman*, 80 N.Y.2d at 439 (quoting *Stukuls v. New York*, 42 N.Y.2d 272, 282 (1977)). As President Trump explained to the district court, "in these types of circumstances, New York courts have recognized a qualified privilege of reply when accused of charges of unlawful activity."[39] That is correct: "New York courts recognize a qualified privilege of reply" based on the speaker's "right to defend himself" from accusations of wrongful conduct. *Giuffre v. Dershowitz*,

---

[38] *See, e.g.*, *Morsette v. The Final Call*, 309 A.D.2d 249, 256 (1st Dep't 2003) ("[A] triable issue of common-law malice is raised only if a reasonable jury could find that the speaker was *solely* motivated by a desire to injure plaintiff, and … there must be some evidence that the animus was the one and only cause for the publication.") (internal quotation marks omitted); *Verdi v. Dinowitz*, 204 A.D.3d 627, 627 (1st Dep't 2022) ("The pleadings allege that the defamatory statements were made with political and racial motivations, as well as a desire to shift blame, rather than, as required for punitive damages in a defamation claim, that defendant was motivated solely by malice.").

[39] Memorandum of Law in Support of Defendant's Motion for Summary Judgment at 34, *Carroll v. Trump*, No. 20-CV-7311, 2022 WL 21889346 (S.D.N.Y. Dec. 22, 2022), ECF No. 109 (citing *Kane v. Orange Cnty. Pubs.*, 232 A.D.2d 526, 527 (2d Dep't 1996)).

410 F. Supp. 3d 564, 574 (S.D.N.Y. 2019). One of our colleagues has explained the privilege this way:

> [A] person also has a right to defend himself or herself from charges of unlawful activity. An individual is privileged to publish defamatory matter in response to an attack upon his or her reputation; the speaker is given more latitude in such a situation than if the statements were not provoked.

*Id.* (alteration omitted) (quoting Sack on Defamation: Libel, Slander, and Related Problems § 9.2.1 (5th ed. 2017)). And the Second Restatement of Torts puts it this way:

> A conditional privilege exists … when the person making the publication reasonably believes that his interest in his own reputation has been unlawfully invaded by another person and that the defamatory matter that he publishes about the other is reasonably necessary to defend himself. … Thus the defendant may publish in an appropriate manner anything that he reasonably believes to be necessary to defend his own reputation against the defamation of another, including the statement that his accuser is an unmitigated liar.

Restatement (Second) of Torts § 594 cmt. k (1977). The "general rule" in New York is that a defamation defendant "had the right to repel the attack upon it and to retort upon its assailant, in case such retort was a necessary part of its defense or fairly arose out of the charges made against it." *Collier v. Postum Cereal Co.*, 150 A.D. 169, 178 (1st Dep't 1912). The privilege of "reply to defamatory attack" is "available to one who has been defamed in the first instance, and who, in response to the attack, responds in kind." *Shenkman v. O'Malley*, 2 A.D.2d 567, 574 (1st Dep't 1956). The privilege means that "[t]he defendant plainly had the right to characterize the plaintiff's

charges as false, and mere vehemence, even exaggerated statement, will not as matter of law destroy the privilege or necessarily present a question of fact." *Collier*, 150 A.D. at 178. The privilege also entails "the right to impugn the motives of its assailant," *id.*, because the accuser has placed those motives at issue.[40]

The qualified privilege of reply is well-established.[41] In this case, President Trump responded to an accusation that he committed rape by denying the charge, by stating "that his accuser is an unmitigated liar," Restatement (Second) of Torts § 594 cmt. k, and by "impugn[ing] the motives of [his] assailant," *Collier*, 150 A.D. at 178.

---

[40] *See Shenkman*, 2 A.D.2d at 574 ("One who makes a public attack upon another subjects his own motives to discussion. It is a contradiction in terms to say that the one attacked is privileged only to speak the truth and not to make a counterattack, or that legitimate self-defense consists only in a denial of the charge or a statement of what is claimed to be the truth respecting its subject-matter. One in self-defense is not confined to parrying the thrusts of his assailant. Of course, the counterattack must not be unrelated to the charge, but surely the motives of the one making it are pertinent.") (quoting *Collier*, 150 A.D. at 178).

[41] *See Kane*, 232 A.D.2d at 527 ("[S]ince the open letter was the funeral director's response to unfavorable publicity against him—publicity concededly generated 'with the cooperation of plaintiffs'—it was covered by a qualified privilege."); *Fowler v. New York Herald Co.*, 184 A.D. 608, 611 (1st Dep't 1918) (explaining that when "he was denounced by the plaintiff publicly as an imposter, the defendant's natural course" was to mount a defense "even if such defense called forth a revelation or explanation of the infirmities or peculiarities of the plaintiff" and that "[t]he defendant had a qualified privilege so to do"); *see also Phifer v. Foe*, 443 P.2d 870, 871 (Wyo. 1968) ("After an attack on a defendant by a plaintiff, defendant has a right to defend himself against plaintiff's charges, even if he defames the plaintiff in so doing."); J.A. Bryant, *Libel and Slander: Qualified Privilege of Reply to Defamatory Publication*, 41 A.L.R.3d 1083 (Originally published in 1972).

Even putting aside presidential immunity,[42] that was a qualifiedly privileged communication.[43]

The district court rejected the application of the privilege of reply on the ground that "any such claim of a qualified privilege … depends on weighing the evidence of Mr. Trump's motives for making the allegedly defamatory statements." *Carroll v. Trump*, 680 F. Supp. 3d 491, 516 n.103 (S.D.N.Y. 2023). That was wrong. Once the qualified privilege attaches, the question of whether the defendant exceeded the privilege is submitted to the jury: "Whether the defendant in its publication *went beyond its legal privilege and should be charged with malice* was a question of fact for the jury, both in determining defendant's liability and also in determining the amount of punitive damages which should be awarded in case liability were found." *Fowler*, 184 A.D. at 611 (emphasis added).[44]

The panel opinion held that the district court did not need to instruct the jury that common-law malice must have been the sole reason for the allegedly defamatory statement. But that is *how* the jury must determine whether the defendant exceeded the privilege. As the panel opinion explained, "if 'the defendant's statements were made to further the interest protected by the privilege,' it does not matter if

---

[42] *See* Restatement (Second) of Torts § 591 cmts. a-b.

[43] *See id.* § 594 cmt. k.

[44] *See also Mencher v. Chesley*, 193 Misc. 829, 832 (N.Y. Sup. Ct. 1948) ("Plaintiff contends … that the defendant in any event went beyond his legal privilege in repelling the attack and that consequently his privilege affords him no protection. The court does not agree with plaintiff's contention. It seems that the reply made by the defendant was relevant to the issues made by plaintiff, and that the question whether the defendant went beyond his privilege is one of fact for the jury to determine, and that it cannot be disposed of as a matter of law.").

the 'defendant *also* despised plaintiff.'" *Carroll*, 151 F.4th at 76 (quoting *Liberman*, 80 N.Y.2d at 439). It stands to reason that a speaker would have animosity toward someone who accused him of criminal wrongdoing.

Because the jury was not instructed that it needed to "conclude that malice was the one and only cause for the publication," *Liberman*, 80 N.Y.2d at 439 (internal quotation marks omitted), the jury instructions were erroneous and the award of damages—especially the punitive damages award—was improper.[45]

**2**

In addition to the unauthorized damages, this case involved a duplicative compensatory damages award. The jury was instructed that it should calculate compensatory damages in two steps. "First, it was asked to assign a dollar amount to the 'damages attributable to the June 21 and 22 statements,'" excluding something called "the reputation repair program." *Carroll*, 151 F.4th at 79 (emphasis omitted) (quoting App'x 1856). "Second, it was asked to fill in the amount of damages, if any, that it awarded 'for the reputation repair program.'" *Id.* (emphasis omitted) (quoting App'x 1856). "The jury awarded Carroll $7.3 million in compensatory damages other than for the reputation repair program and $11 million for the reputation program itself." *Id.*

In other words, the jury awarded compensatory damages both for the cost attributable to the harm and for the cost of repairing the harm and thereby making the plaintiff whole. The panel opinion held that this was permissible because "there is a difference between the

---

[45] Nor was the privilege defeated by a showing of actual malice. *See supra* Part II.D.

costs required to *repair* an individual's reputation and the costs arising from the damaged reputation itself." *Id.* at 81.

No, there is not. These are two ways of measuring the same harm. It is well-established throughout the law that "compensatory damages may be measured by *either* (1) cost of repair or (2) diminution in value." *Lichtefeld v. Mactec Eng'g & Consulting, Inc.*, 239 F. App'x 97, 102 (6th Cir. 2007) (emphasis added).[46] It cannot be both. "A basic principle of compensatory damages is that an injury can be compensated only once." *Bender v. City of New York*, 78 F.3d 787, 793 (2d Cir. 1996).

The district court believed that the jury awarded "$11 million in *reputational* and $7.3 million in *non-reputational* compensatory damages." *Carroll*, 731 F. Supp. 3d at 634 (emphasis added). But that

---

[46] *See, e.g.*, *Scribner v. Summers*, 138 F.3d 471, 472 (2d Cir. 1998) ("Under New York law, 'the proper measure of damages for permanent injury to real property is the lesser of the decline in market value and the cost of restoration.'") (quoting *Jenkins v. Etlinger*, 55 N.Y.2d 35, 39 (1982)); *Rainbow Travel Serv., Inc. v. Hilton Hotels Corp.*, 896 F.2d 1233, 1242-43 (10th Cir. 1990) ("Awarding [the plaintiff] both the full extent of injury to its good will, however, *and* the means to repair that damage amounts to a double recovery."); *Ostano Commerzanstalt v. Telewide Sys., Inc.*, 880 F.2d 642, 649 (2d Cir. 1989) ("[T]he plaintiffs cannot recover both benefit-of-the-bargain damages for breach of contract and warranty *and* out-of-pocket expenses for fraud. Such a double recovery would put them in a better position than they would have been in had the contract been satisfactorily performed."); *O'Brien Bros. v. The Helen B. Moran*, 160 F.2d 502, 505 (2d Cir. 1947) ("The damages sustained by an automobile in a collision may be established by showing the reasonable cost of the repairs necessary to restore it to its former condition, although the general rule is that the measure of damages to personal property is the difference between its market value immediately before and immediately after the injury.") (quoting *Gass v. Agate Ice Cream, Inc.*, 264 N.Y. 141, 143 (1934)).

led to President Trump's argument that "the $7.3 million award was limited to emotional distress damages." *Carroll*, 151 F.4th at 80. The panel opinion rejected that argument on the ground that the $7.3 million provided compensation for "*other* reputational harms—such as the loss of Carroll's career at *Elle*, the reduction in freelance work, and the cost of increased security measures." *Id.* But the "reputation repair program" was expressly designed to compensate Carroll for those harms. The expert report providing the basis for the program describes her career at *Elle*,[47] her freelance work,[48] and the harms to those interests.[49] The expert testified that the "reputation repair program" aimed to be "an appropriate means of removing any harm that would have been caused by the June 24th statement."[50] And Carroll's attorneys described the program as "a series of public relations steps necessary to fix the harm that Donald Trump's defamatory statements caused."[51] There is no evident distinction

---

[47] *See, e.g.*, Expert Report of Professor Ashlee Humphreys, PhD, at 4, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Aug. 2, 2023), ECF No. 192-9 ("Once a popular advice columnist at *Elle* Magazine, Ms. Carroll had invested many years in forming and maintaining a person brand as a wise, personable, and insightful truth-seeker. As a celebrated writer, she had a broad readership, reaching about 4.5 million *Elle* readers.").

[48] *See, e.g., id.* at 6 ("Her work was featured in numerous major publications including *Rolling Stone*, *GQ*, and *Playboy*.").

[49] *See, e.g., id.* at 45 ("One in four *Elle* readers being receptive to [Trump's] Statements is a considerable portion of readers to critically damage Ms. Carroll's brand as a columnist for the magazine.").

[50] Deposition Transcript of Ashlee Humphreys at 12:5-9, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Dec. 13, 2023), ECF No. 237-2.

[51] Trial Transcript of 1/26/24, at 708:17-19, *Carroll v. Trump*, No. 20-CV-7311 (S.D.N.Y. Feb. 27, 2024), ECF No. 301.

between the cost of reputation repair and the cost of a damaged reputation.

**3**

On top of the duplicative compensatory damages award of $18.3 million, the jury awarded $65 million in punitive damages, which the district court refused to remit. *See Carroll*, 731 F. Supp. 3d at 628. That resulted in a ratio of 3.6:1—an amount so "grossly excessive," *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 417 (2003), that even the panel opinion acknowledged that it "approaches the upper limit of reasonableness," *Carroll*, 151 F.4th at 84. And that is before one recognizes that the compensatory damages award was inflated with a double recovery and the damages award was based on insufficient jury findings under New York law.

"[T]he Constitution imposes a substantive limit on the size of punitive damages awards." *Honda Motor Co. v. Oberg*, 512 U.S. 415, 420 (1994). In particular, "[t]he Due Process Clause of the Fourteenth Amendment prohibits the imposition of grossly excessive or arbitrary punishments on a tortfeasor." *State Farm*, 538 U.S. at 416. "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty that a State may impose." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 574 (1996). "To the extent an award is grossly excessive, it furthers no legitimate purpose and constitutes an arbitrary deprivation of property." *State Farm*, 538 U.S. at 417.

Apart from that constitutional guarantee, our court purports to "exercise relatively stringent control over the size of punitive awards in order to ensure that such damages are 'fair, reasonable, predictable, and proportionate,' to avoid extensive and burdensome social costs,

and to reflect the fact that punitive awards are imposed without the protections of criminal trials." *Turley v. ISG Lackawanna, Inc.*, 774 F.3d 140, 164 (2d Cir. 2014) (quoting *Payne v. Jones*, 711 F.3d 85, 93 (2d Cir. 2013)). Under that standard, "a degree of excessiveness less extreme than 'grossly excessive' will support remanding for a new trial or remittitur of damages." *Id.* (internal quotation marks omitted). We have said that we exercise strict "supervisory powers" over such awards, *id.*, such that "the degree of discretion enjoyed by trial courts in these matters is relatively narrow," *id.* (quoting *Payne*, 711 F.3d at 100).

So much for that. The panel opinion in this case abdicated our purported supervisory responsibility. We previously claimed that when "the compensatory damages award is imprecise because of the nature of the injury and high when compared with similar cases, 'a lesser ratio, perhaps *only equal to compensatory damages*, can reach the outermost limit of the due process guarantee.'" *Id.* at 165 (emphasis added) (quoting *State Farm*, 538 U.S. at 425). The compensatory damages award in this case is nothing if not imprecise. As the panel itself explained, "the jury was broadly instructed to decide the 'fair and just compensation for the injury to Ms. Carroll's reputation and the *humiliation and mental anguish in her public and private lives* that was caused by' Trump's statements." *Carroll*, 151 F.4th at 79 (alterations omitted) (emphasis added).

We have before us a full trial record and the opinion of an appellate court, yet no one can coherently describe the harms that the compensatory damages award was designed to remedy that are distinct from the "reputation repair program." Nor is it clear why the measure of compensatory damages for reputational harm should involve the purported cost of running a nationwide public-relations campaign designed to persuade Republicans not to believe what

President Trump said about Carroll.[52] Even if some leeway to measure compensatory damages were justified given the imprecision involved—though it is hard to justify *that much* leeway—the panel opinion could at least have adhered to the *Turley* rule that no more than an amount of punitive damages "equal to compensatory damages" could follow. *Turley*, 774 F.3d at 165 (quoting *State Farm*, 538 U.S. at 425). It did not even do that.

The Supreme Court has said that "the most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct," *Gore*, 517 U.S. at 575, and it has "instructed courts to determine the reprehensibility of a defendant by considering" certain factors, *State Farm*, 538 U.S. at 419. One is whether "the harm caused was physical as opposed to economic." *Id.* The allegedly defamatory 2019 statements did not inflict a physical injury. Another is whether "the tortious conduct evinced an indifference to or a reckless disregard of the health or

---

[52] *See Carroll*, 151 F.4th at 64 ("Professor Ashley Humphreys, Carroll's reputation repair expert, testified that Trump's statements were viewed by between 85.8 and 104 million people and that it would cost between $7.2 and $12.1 million to run a successful campaign to repair Carroll's reputation."); *id.* at 81 (explaining that "Professor Humphreys's damages estimate was based" on "the amount it would take to run a successful reputation repair campaign aimed at changing the minds of people who believed Trump's false statements about Carroll. As Professor Humphreys testified at trial, a reputation repair campaign consists of hiring 'a number of trusted sources' who are tasked with sharing positive messages about 'the attitude that you want to change.'") (quoting App'x 1460); Expert Report of Professor Ashlee Humphreys, *supra* note 47, at 45 ("76% of Republicans polled either found the allegations of sexual harassment and sexual assault made against Mr. Trump to be not credible or needed more information about the claims, which I consider to mean that they are receptive to believing the Statements in this case.").

51

safety of others," *id.*, such as the deceptive sale of an unsafe product, *see Gore*, 517 U.S. at 576. The 2019 statements involved denials of wrongdoing in a press release and comments to reporters. A third is whether "the harm was the result of intentional malice, trickery, or deceit, or mere accident." *State Farm*, 538 U.S. at 419. In the 2019 statements, President Trump *responded* to an accusation that Carroll published in *New York* magazine and to reporters' questions about it. The district court said that a jury could find that "'the degree of reprehensibility' of Mr. Trump's conduct was remarkably high, perhaps unprecedented." *Carroll*, 731 F. Supp. 3d at 634. But no reasonable person could have expected anything other than a vehement denial.

The panel opinion decided that the punitive damages award in this case is "not out of step" with awards in "comparable defamation suits." *Carroll*, 151 F.4th at 85. It identified a default judgment against Mayor Giuliani relating to the 2020 election, *see Freeman v. Giuliani*, 691 F. Supp. 3d 32, 71 (D.D.C. 2023), which resulted in punitive damages of $75 million, *see Freeman v. Giuliani*, 732 F. Supp. 3d 30, 41 (D.D.C. 2024). It identified a state-court "award of $321,650,000 in common law punitive damages in the form of attorneys' fees to 11 plaintiffs against Alex Jones" related to Sandy Hook. *Carroll*, 151 F.4th at 85 (citing *Lafferty v. Jones*, 229 Conn. App. 487, 493 (2024)). It turns out, however, that "[i]n Connecticut, common-law punitive damages, also called exemplary damages, primarily are compensatory in nature." *Lafferty v. Jones*, No. 18-6046436, 2022 WL 18110184, at *3 (Conn. Super. Ct. Nov. 10, 2022); *see also Iino v. Spalter*, 192 Conn. App. 421, 466 (2019). And the panel opinion explained that "a New York state trial court awarded Louis Bacon $100 million in punitive damages against fashion mogul Peter Nygard for defamation" even though "that judgment was vacated and remanded due to a defect in

52

service of process." *Carroll*, 151 F.4th at 85 (citing *Bacon v. Nygard*, 232 A.D.3d 407, 407-08 (1st Dep't 2024)). In fact, the appellate court vacated the default judgment "granting plaintiff summary judgment on his claims without opposition submitted by defendant" as well as "the related Special Referee order awarding damages." *Bacon*, 232 A.D.3d at 407.[53]

The point of "[c]omparing the punitive damages award and the civil or criminal penalties that could be imposed for comparable misconduct" is to identify an "indicium of the reasonableness of a punitive damages award." *Gore*, 517 U.S. at 583, 575. The panel had to search for these highly idiosyncratic cases to find anything remotely comparable to the punitive damages award here—and even then, the cases involved either default judgments or non-punitive damages. That is an indictment of rather than a justification for the panel's conclusion that the grossly excessive award was reasonable.

At a minimum, our court should eliminate the double recovery in the compensatory damages award and adhere to our precedent in allowing punitive damages in an amount no greater than "equal to compensatory damages." *Turley*, 774 F.3d at 165 (quoting *State Farm*, 538 U.S. at 425).

---

[53] The unopposed judgment resulted in "the highest defamation judgment in New York State history" based on findings of a special referee that the defendant "executed a global, decade-long, multi-media defamation campaign 'to personally and professionally destroy Bacon.'" Susman Godfrey, Press Release, Susman Godfrey Secures $203 Million Win for Louis Bacon in Defamation Suit Against Peter Nygard (Oct. 4, 2023), https://perma.cc/X4XT-NVZP.

\*　　\*　　\*

In this case, (1) the United States should have been substituted as the defendant, (2) the district court should have considered the defense of presidential immunity, (3) President Trump should not have been denied a trial on liability, (4) the jury should have been properly instructed on common-law malice, (5) the compensatory damages should have been limited to a single recovery, and (6) the grossly excessive punitive damages award should have been remitted. Put together, these proceedings represent a manifest miscarriage of justice. I would rehear the case *en banc*. I dissent from the decision of the court not to do so.

54