24-644
*Carroll v. Trump*

CHIN, *Senior Circuit Judge*, in support of the denial of rehearing *en banc*:

As a member of the three-judge panel that decided this case, I write to more fully explain why our two *per curiam* decisions in this case were correct, and why a majority of our Court appropriately declined to rehear those decisions *en banc*.[1]

These are the third and fourth times our Court has voted to deny *en banc* rehearing of rulings in this case, which concerns defamation and sexual assault claims brought by E. Jean Carroll against Donald Trump. The two *per curiam* decisions at issue in this round of *en banc* voting -- the fifth and sixth opinions by our Court in this case -- arise from two related suits. The first ("*Carroll I*") asserted defamation claims based on statements made by Trump in June 2019 while he was President, and the second ("*Carroll II*") asserted a sexual assault claim as well as defamation claims based on statements made by Trump in October 2022 after he left office. Although *Carroll I* was filed first, *Carroll II* was tried first; in May 2023, the jury in *Carroll II* found, following a nine-day trial, that Trump sexually abused Carroll at Bergdorf Goodman in 1996 by digitally penetrating her and that he defamed her with comments he made in 2022 after

---

[1] As a senior judge, I have no vote on whether to rehear a case *en banc*. *See* 28 U.S.C. § 46(c); Fed. R. App. P. 40(c). Pursuant to this Court's protocols, however, senior judges who were members of the panel deciding the case that is subject to the *en banc* petition may file a statement expressing their views where, as here, an active judge on this Court has filed a dissent from the denial of a petition for rehearing *en banc*.

he left office.  The jury awarded Carroll $5 million in compensatory and punitive damages, and this Court affirmed, *Carroll v. Trump*, 124 F.4th 140 (2d Cir. 2024) (*per curiam*) ("*Carroll 4*"), and denied rehearing *en banc*, 141 F.4th 366 (2d Cir. 2025).[2]

*Carroll I* was tried in January 2024.  The jury awarded Carroll $83.3 million in compensatory and punitive damages.  On appeal of the judgment, the panel issued two decisions.  First, in April 2025, while the appeal was pending and after it had been fully briefed, Trump moved before us to substitute the United States as the defendant under the Westfall Act, 28 U.S.C. § 2679.  The panel denied the motion by order last June, and issued an opinion explaining our reasoning in August.  *Carroll v. Trump*, 148 F.4th 110 (2d Cir. 2025) (*per curiam*) ("*Carroll 5*").  Second, in September, the panel rejected Trump's attempt to reassert a defense based on presidential immunity, and affirmed the district court's rulings and the jury's damages award.  *Carroll v. Trump*, 151 F.4th 50 (2d Cir. 2025) (*per curiam*) ("*Carroll 6*").  It is these two panel rulings -- *Carroll 5* and *Carroll 6* -- that are the subject of these *en banc* petitions.

Trump and the United States have petitioned for rehearing of *Carroll 5*,[3] and Trump has petitioned for rehearing of *Carroll 6*.[4]  Neither petition identifies how

---

[2]     As in our panel opinions, I refer to the six decisions of this Court as *Carroll 1-6*, numbered in chronological order.  As previously indicated, *supra* at 1, I refer to the two underlying suits as *Carroll I* (defamation claims based on June 2019 statements) and *Carroll II* (sexual assault claim and defamation claims based on October 2022 statements).

[3]     Petition for Panel Rehearing and *En Banc* Determination of the United States and President Donald J. Trump, *Carroll v. Trump*, No. 24-644 (2d Cir. Aug. 22, 2025), Dkt. No. 132.

[4]     Petition for Rehearing *En Banc* of President Donald J. Trump, *Carroll v. Trump*, No.

our decisions conflict with precedent of this Circuit, another Circuit, or the Supreme Court, or pose a question of "exceptional importance" justifying *en banc* review. *See* Fed. R. App. P. 40(b)(2)(A)-(D).

The dissent goes further than either of the filed petitions, challenging rulings in our decisions, as well as prior decisions of this Court, that neither Trump nor the Government contests in their petitions for rehearing. *En banc* review of these issues, which were not raised by the petitioning parties, was properly denied. *See Trump v. Illinois*, 607 U.S. ---, 146 S. Ct. 432, 437 (2025) (Alito, *J.*, dissenting from denial of stay) ("If a party passes up what seems to us a promising argument, we do not assume the role of advocate. Instead, we normally decide the questions that the parties choose to present."); *Castro v. United States*, 540 U.S. 375, 386 (2003) (Scalia, *J.*, concurring in part and concurring in judgment) ("Our adversary system is designed around the premise that the parties know what is best for them, and are responsible for advancing the facts and arguments entitling them to relief.").

A familiar principle cautions that rehearing *en banc* is "not favored," and is indeed exceedingly rare in our Circuit. Fed. R. App. P. 40(c); *see generally* Jon O. Newman, *In Banc Practice in the Second Circuit: The Virtues of Restraint,* 50 Brook. L. Rev. 365 (1984). I write to respond in greater detail to some of Trump's and the dissent's

---

24-644 (2d Cir. Sep. 23, 2025), Dkt. No. 138. The Government filed an *amicus* brief on the presidential immunity issue. Brief for the United States as *Amicus Curiae*, *Carroll v. Trump*, No. 24-644 (2d Cir. Sep. 29, 2025), Dkt. No. 139.

arguments, which a majority of this Court correctly determined did not warrant *en banc* review.

## BACKGROUND

The full history of this litigation is detailed in *Carroll 6*, 151 F.4th at 59-66. I summarize it as relevant here.

On June 21, 2019, *New York* magazine published an excerpt from Carroll's book in which she alleged that Trump sexually assaulted her at Bergdorf Goodman in 1996. Trump -- who was serving his first term as President at the time -- responded mere hours later, asserting that "[he'd] never met [Carroll] in [his] life," "[f]alse accusations diminish the severity of real assault," and "people should pay dearly for such false accusations." *Id.* at 60. The next day, Trump told a reporter: "It's a totally false accusation. I have absolutely no idea who [Carroll] is." *Id.* at 61. Two days after that, *The Hill* released an interview in which Trump stated: "I'll say it with great respect: Number one, she's not my type. Number two, it never happened. It never happened, OK?" *Id.*

In November 2019, Carroll filed *Carroll I* in state court alleging defamation based on these statements. In September 2020, the Government intervened pursuant to the Westfall Act, which permits the United States to be substituted as the defendant in certain tort suits against federal employees. The then-Attorney General certified that Trump made the allegedly defamatory statements while acting "within the scope of his

employment," removed the case to the Southern District of New York, and moved to substitute the United States for Trump as the defendant. *Carroll 5,* 148 F.4th at 113. The district court denied the motion to substitute, Trump appealed, and the Westfall Act issue was litigated for the next four years, including in the D.C. Court of Appeals. *See id.; see also Carroll v. Trump,* 49 F.4th 759 (2d Cir. 2022) ("*Carroll 1*") (certifying question of D.C. scope of employment law)*; Trump v. Carroll,* 292 A.3d 220 (D.C. 2023) (answering certified question); *Carroll v. Trump,* 66 F.4th 91 (2d Cir. 2023) (*per curiam*) ("*Carroll 2*") (remanding to district court with instructions to apply clarified law).

When the case was remanded to the district court in 2023, the district court issued an order giving the Government and Trump an opportunity to address Westfall certification and substitution within a thirty-day window. *Carroll 5*, 148 F.4th at 114. The Government did so and wrote that, in light of the D.C. Court of Appeals' decision and new factual developments, "the Department of Justice is declining to certify under the Westfall Act, 28 U.S.C. § 2679(d), that defendant Donald J. Trump was acting within the scope of his office and employment as President of the United States" when he made the statements in question. *Id.* (citation modified). Trump did not respond at all. *Id.*

No further action was taken on the Westfall issue until April 2025, when the Government and Trump jointly moved, in our Court, to substitute the United States for Trump under the Westfall Act. *Id.* The panel denied the motion in *Carroll 5*. *Id.*

5

While the Westfall Act appeals were pending, litigation on the merits continued in *Carroll I*, including over the import of presidential immunity. Trump did not assert presidential immunity as a defense in his state court answer or amended answer after removal, instead invoking it for the first time on summary judgment in December 2022. *Carroll 6*, 151 F.4th at 62. The district court denied Trump's attempt to assert immunity at that point, reasoning that, *inter alia*, he had waived it by failing to raise it in earlier responsive pleadings. A different panel of this Court affirmed in a consolidated interlocutory appeal, *Carroll v. Trump*, 88 F.4th 418, 434-35 (2d Cir. 2023) ("*Carroll 3*"), and the majority of active judges voted to deny rehearing *en banc*, No. 23-1045, 2024 WL 96249 (2d Cir. Jan. 8, 2024). *Carroll 3* held that presidential immunity is waivable and non-jurisdictional, and that Trump had waived it here -- rulings that the panel then adhered to in *Carroll 6* as binding law of the case, and that Trump and the dissent now again ask us to reconsider *en banc*.

While the appeals of *Carroll I* were proceeding, Carroll filed *Carroll II* based on the Adult Survivors Act for sexual assault and for defamation based on a different statement Trump made in October 2022, when he was no longer President. In that statement, Trump called Carroll's allegations "a Hoax and a lie" and repeated that she "is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance." *Carroll 6*, 151 F.4th at 63. As noted above, the *Carroll II* jury found that Trump sexually abused Carroll in 1996

6

and that he defamed her in 2022.  We affirmed in *Carroll 4*, and the Court again denied *en banc* review.  124 F.4th at 150, *reh'g en banc denied*, 141 F.4th 366 (2d Cir. 2025).

Proceedings then restarted in *Carroll I.*  In light of the jury verdict in *Carroll II,* the district court granted summary judgment for Carroll on her defamation claim in part because Trump was collaterally estopped from disputing whether he sexually abused Carroll in 1996, whether his June 2019 statements were false, and whether the statements were made with actual malice.  *See Carroll 6*, 151 F.4th at 68-71. The district court concluded in the alternative that even if Trump was not collaterally estopped from disputing actual malice, Carroll was still entitled to summary judgment because a reasonable jury could only so conclude on the record before the court.  *Id.* at 71.  Trump did not challenge the district court's alternative holding on appeal.  *Id.*  The case then went to trial on damages in January 2024.  *Id.* at 64.  Carroll testified for two days, describing the onslaught of attacks and death threats she had received since the statements, the loss of her job at *Elle* and other sources of income, and her inability to afford stronger personal security measures despite fearing for her physical safety.  *Id.* In addition, Carroll's expert testified that running a successful campaign to repair her reputation would cost between $7.2 and $12.1 million.  *Id.*

The jury also heard evidence that Trump had continued to make disparaging statements about Carroll during the four years that *Carroll I* was pending. These included comments made by Trump leading up to the *Carroll II* trial (repeating

that he had "no idea who this woman is," and that the "Bergdorf Goodman" "stuff" is "all made-up"), immediately after the *Carroll II* verdict (calling the lawsuit "the greatest witch hunt of all time"), and while the *Carroll I* trial was taking place ("I am going to the Biden encouraged Witch Hunt in Lower Manhattan to fight against a FAKE Case from a woman I have never met, seen, or touched . . . ."). *See id.* at 64-65 (citations modified). After testifying in *Carroll I,* Trump was warned on multiple occasions by the district court to stop making audible comments about the case near the jury, and he walked out during Carroll's closing argument. *Id.*

The jury awarded Carroll $11 million for the "reputation repair program," $7.3 million for other compensatory damages, and $65 million in punitive damages -- a total of $83.3 million. *Id.*

## DISCUSSION

I begin with a discussion of *Carroll 5,* the panel's decision concerning substitution under the Westfall Act. I then discuss *Carroll 6,* the panel's decision on presidential immunity, the district court's rulings, and the damages award in *Carroll I.*

## I. *The Westfall Act Decision* (Carroll 5)

The Westfall Act permits the United States to be substituted as the defendant in certain tort suits against federal employees if the alleged conduct occurred within the "scope of [the employee's] office or employment." 28 U.S.C. § 2679(d). If the

8

United States were to be substituted as the defendant in this case, Carroll's defamation claims -- which have been litigated now for more than six years -- would be barred by the Federal Tort Claims Act (the "FTCA"), which does not waive sovereign immunity for the tort of defamation. *See* 28 U.S.C. § 2680(h); *Carroll 1,* 49 F.4th at 766.

The Westfall Act lays out a process for obtaining substitution in three types of cases: (1) cases filed in federal court where the Attorney General has "certified" that the employee was acting with his scope of employment (§ 2679(d)(1)), (2) cases filed in state court where the Attorney General has issued such a certification (§ 2679(d)(2)), and (3) cases where the Attorney General has declined to issue a certification, regardless of the court in which the case commenced (§ 2679(d)(3)).

*Carroll I* was filed in state court, a situation covered by § 2679(d)(2). That sub-section provides:

> Upon certification by the Attorney General that the defendant employee was acting within the scope of his office or employment at the time of the incident out of which the claim arose, any civil action or proceeding commenced upon such claim in a State court shall be removed without bond *at any time before trial* by the Attorney General to the district court of the United States for the district and division embracing the place in which the action or proceeding is pending. Such action or proceeding shall be deemed to be an action or proceeding brought against the United States under the provisions of this title and all references thereto, and the United States shall be substituted as the party defendant.

28 U.S.C. § 2679(d)(2) (emphasis added).

Sub-section (d)(2) contemplates a three-step process: the Attorney General first issues a scope-of-employment certification, then removes the case to federal court,

9

and lastly moves for the United States to be substituted as the defendant. As our decision in *Carroll 5* explains, the critical time limitation in (d)(2) is that certification and removal must occur "before trial" for subsequent substitution to be proper. *See* 148 F.4th at 116-17.

Initially, *Carroll I* followed the three-step process outlined above: Carroll filed her defamation suit in state court, the Attorney General issued a Westfall Act certification about a year later and removed the case, and the district court considered and denied the Government's motion to substitute. *See* 49 F.4th at 760-61; *see also De Martinez v. Lamagno*, 515 U.S. 417, 434 (1995) (noting that while certification is conclusive for purposes of removal, substitution is subject to judicial review). All of this occurred at the preliminary stages of the case, well "before trial." *Carroll 5*, 148 F.4th at 116-17.

The typicality ended there, as the Westfall issues were then litigated in three courts over the course of four years. *See id.* at 113-14. The critical juncture for present purposes was when the Westfall Act issue was presented on remand before the district court in June and July 2023. At that time, the Attorney General expressly declined to issue a Westfall certification or to otherwise seek substitution, and Trump did not take any action with respect to certification or substitution. *Id.* at 114; *see* 28 U.S.C. § 2679(d)(3) (allowing the employee to petition for certification where the Attorney General has declined to certify). The Westfall issue lay settled until April 2025, when the Government and Trump revived their efforts to have the United States

10

substituted as the defendant in the case by moving for that relief in *this* Court. *Carroll 5*, 148 F.4th at 114.

The *Carroll 5* panel denied the Government's post-trial motion to substitute for three separate reasons: (1) the Government and Trump had waived substitution by failing to request it before the district court prior to trial; (2) the 2025 request was untimely under the Westfall Act; and (3) as a matter of equity in light of the procedural posture of the case. *See id.* at 116-21. These rulings were correct as a matter of law and did not warrant *en banc* review.

### A. Trump and the Government waived their right to certify and substitute.

I begin, as does the dissent, with waiver.[5] Both the Government and Trump waived their right to seek substitution. Although the district court gave them an opportunity in June 2023 to weigh in on the issue, the Government explicitly elected not to seek substitution, and Trump took no action -- neither seeking certification or substitution at the time, nor otherwise objecting to the Government's decision. *Id.* at 114. They did not raise the issue again until after the case had been tried, judgment had been entered, an appeal was taken, and the appeal had been fully briefed on the merits. *Id.*

---

[5] I note, however, that rehearing *en banc* on the basis of waiver was not warranted in any event because it was presented in the alternative to our statutory holding. *See Carroll 5*, 148 F.4th at 119.

11

The dissent suggests that the panel decision treats the Attorneys General in different administrations inconsistently, because we permitted Attorney General Garland's "withdrawal" of certification in 2023, but denied Attorney General Bondi's attempt to issue a new certification in 2025. *See* Menashi, *J.*, dissenting from the denial of reh'g *en banc* ("Dissent") at 9. This ignores two important realities. *First*, Garland's decision not to certify followed substantive legal developments in this case, including the D.C. Court of Appeals' intervening decision clarifying its *respondeat superior* law, a remand from our Court to apply that law (*Carroll 2*), and an order for additional briefing by the district court. No such legal developments preceded Bondi's post-trial certification. *Second*, and more importantly, Garland's withdrawal occurred "before trial" -- the critical time limitation for certification and substitution under § 2679(d)(2). That is the dispositive reason why the Bondi certification, which occurred fifteen months *after* trial, was untimely under the statute.

Contrary to the dissent's contention, the Government does not escape the express time limitations of § 2679(d)(2) simply because it is not "a party" to the litigation. *See* Dissent at 8. Indeed, the entire mechanism of the Westfall Act contemplates that the Government is initially *not* a party to a suit brought against an employee-defendant, but has rights and obligations to assert its interests under the Act. The fact that Congress authorized the Attorney General to issue certifications does not

12

mean that the Attorney General cannot waive this statutory right.[6]  After all, the dissent appears to agree that if the Government failed to *remove* an action "before trial," as is expressly required by § 2679(d)(2), it would waive its statutory right to do so.  *See* Dissent at 13.  There is no reason to treat certification or substitution any differently.

As noted in *Carroll 5*, Trump also had the option to petition the district court for certification under § 2679(d)(3) after the Government declined to certify in 2023.  148 F.4th at 119.  If the Attorney General refuses to certify, sub-section (d)(3) provides that "the employee may at any time *before trial* petition the court" to certify and substitute.  28 U.S.C. § 2679(d)(3) (emphasis added).  Here, the district court even solicited "any further submission by . . . the defendant with respect to substitution," and Trump took no action.  *Carroll 5,* 148 F.4th at 114 (citation modified).  On this point, even the dissent does not dispute that a *litigant* like Trump can waive his right to petition for certification and substitution.  Indeed, Courts of Appeals have routinely held that litigants waive their rights to assert a Westfall certification position on appeal where they have taken a contrary position below.[7]

---

[6]      *Cf., e.g.*, *United States v. Coonan*, 826 F.2d 1180, 1184 (2d Cir. 1987) (statutory right to detention hearing within five days of initial appearance under Bail Reform Act is waivable); *Lilly v. City of New York*, 934 F.3d 222, 237 (2d Cir. 2019) ("[I]t is not against public policy for litigants to waive their statutory rights to attorney's fees . . . ."); *United States v. Tigano*, 880 F.3d 602, 611 (2d Cir. 2018) ("[A] defendant may waive his statutory right to a speedy trial by failing to raise it . . . .").

[7]      *See, e.g., Jakuttis v. Town of Dracut*, 95 F.4th 22, 35-36 (1st Cir. 2024); *Beary v. Harris Cnty.*, No. 24-20371, 2025 WL 1577820, at *4 (5th Cir. June 4, 2025).

**B.** **The Government's April 2025 certification was untimely.**

*Carroll 5*'s primary holding is that the text of the Westfall Act does not permit certification and substitution after trial.  Again, § 2679(d)(2) provides: "Upon certification by the Attorney General . . . any civil action . . . in a State court shall be removed . . . at any time *before trial*."  28 U.S.C. § 2679(d)(2) (emphasis added).  The natural reading of this language is that certification and removal must happen "before trial" for any subsequent substitution to occur.

The dissent acknowledges -- as it must -- that removal must occur before trial.  *See* Dissent at 13.  But it goes on to argue that this limitation does not apply to certification or substitution.  *Id.*  This is incorrect.  If removal must occur before trial, so too must certification, because certification is what prompts the removal in the first place.  *See Carroll 5*, 148 F.4th at 116; *Sullivan v. United States*, 21 F.3d 198, 205 (7th Cir. 1994) (citation modified) (noting that (d)(2) "permits removal, and therefore certification, at any time before trial").[8]  Moreover, sub-section (d)(3) similarly requires certification "at any time *before trial*" and substitution only "[u]pon such certification."  § 2679(d)(3) (emphasis added).  Accordingly, the Government's post-trial certification was untimely under the text of (d)(2).  And because substitution can only occur

---

[8]     The dissent selectively cites to *Sullivan* elsewhere to support its reading of sub-section (d)(1).  *See* Dissent at 12 & n.12.  Sub-section (d)(1), however, governs cases filed in *federal* court, and therefore does not apply here.

following proper certification and removal, the Government could not move to substitute, after trial and on appeal of the merits, based on an untimely certification.

The dissent next argues that our holding creates a circuit split, pointing to the D.C. Circuit's decision in *Wasserman v. Rodacker*, 557 F.3d 635, 639 (D.C. Cir. 2009). *See* Dissent at 15. The dissent contends that, under *Wasserman*, Carroll's case is actually governed by § 2679(d)(1), which applies to cases commenced in *federal* court.[9] For support, the dissent draws on a line in *Wasserman* stating that "when a case is timely removed to federal court, a new case is 'commenced' in the district court that allows 'the United States to substitute itself for [the federal employee] pursuant to 28 U.S.C. § 2679(d)(1).'" *Id.* (citing *Wasserman*, 557 F.3d at 639).

In *Wasserman*, a *pro se* plaintiff who was arrested by a U.S. Park Police officer for walking his dogs without a leash sued the officer in the D.C. Superior Court,

---

[9]     The dissent cites to three cases analyzing the timing of certification and substitution under sub-section (d)(1), which does not contain the "before trial" language present in (d)(2). *See* Dissent at 12 n.12. Two of those decisions pertain to certification and substitution issues in cases initiated before the Westfall Act was enacted, *see Sullivan*, 21 F.3d at 205-06; *Sowell v. Am. Cyanamid Co.*, 888 F.2d 802, 804-05 (11th Cir. 1989), and the other decision concerns whether district courts may permit reasonable discovery and order an evidentiary hearing to resolve issues presented in a Westfall Act certification that conflict with what is alleged in a complaint, *Melo v. Hafer*, 13 F.3d 736, 747 (3d Cir. 1994). These holdings are of questionable relevance to this case. As to the dissent's arguments about (d)(1), it is an open question in our Circuit as to whether that sub-section also requires that certification and substitution occur before trial, and at least one other Circuit has held that it does. *See Brown v. Armstrong*, 949 F.2d 1007, 1012 (8th Cir. 1991) ("[C]hallenges to the Attorney General's certification must be resolved before trial, as soon after the motion for substitution as practicable, even if an evidentiary hearing is needed to resolve relevant fact disputes."). Regardless, we did not decide that question in *Carroll 5*, and indeed did not make any holding as to the interpretation or operation of (d)(1).

alleging that the officer violated his constitutional and civil rights. 557 F.3d at 636-37.

The officer removed the case to the D.C. District Court pursuant to 28 U.S.C. § 1441 and

§ 1442. *Id.* at 637.[10]  Notably, removal and substitution both occurred before trial. *Id.*

The D.C. Circuit held that certification and substitution was proper on "two grounds" --

either because when the officer's case was removed, the action was "commenced . . . in a

United States district court" for purposes of (d)(1), or because the D.C. Superior Court

should be considered a "state court" for purposes of (d)(2). *Id.* at 639.

To force a circuit split, the dissent would have us adopt an implausibly

broad reading of *Wasserman*'s first ground, and completely ignore the second.

*Wasserman* indeed states that when the officer's case was removed, the action was

"commenced . . . in a United States district court." *Id.* at 639.  But the D.C. Circuit clearly

was not holding that every state court case removed pursuant to (d)(2) then, upon

removal, becomes a new federal case governed by (d)(1) -- an interpretation that would

render (d)(2) entirely superfluous.  That is an implausible reading, not least because

removal in *Wasserman* was effected by 28 U.S.C. § 1441 and § 1442, not the Westfall Act.

Instead, *Wasserman* resolved the narrow question of whether federal employees who are

sued in the D.C. Superior Court -- as opposed to any state court -- are entitled to

certification and substitution under § 2679(d).  *See id.* at 639-40.  And the dissent

---

[10]    The notice of removal was also filed on the behalf of the United States, but states that the defendant, identified as Rodacker (the police officer), was removing the case pursuant to § 1441 and § 1442. *See Wasserman*, 557 F.3d at 637.

16

altogether ignores the D.C. Circuit's alternative holding that the D.C. Superior Court is a state court for purposes of (d)(2), a proposition that "seemed obvious" under that circuit's caselaw. *Id.* at 638-39 (noting that in no prior cases did the D.C. Circuit even see a need to "elaborate on the reasons why the Superior Court was a State court under the Westfall Act").

In any event, there is no question that Carroll initiated her action here in state court, or that her action was removed after certification pursuant to (d)(2). *Carroll 5* thus accords with *Wasserman* in reasoning that removals of actions filed *in state court* are effectuated under (d)(2) and are therefore subject to its time limitations. This reading is consistent both with precedent of our Court interpreting substantially similar language in related statutes, and with that of other Circuits interpreting § 2679(d). *See Carroll 5*, 148 F.4th at 118-19 (collecting cases).

Nor does our holding misconstrue or undermine the Westfall Act's purpose, which is to "relieve covered employees from the cost and effort of defending the lawsuit, and to place those burdens on the Government's shoulders." *Id.* at 117 (quoting *Osborn v. Haley*, 549 U.S. 225, 252 (2007)). Despite the dissent's contentions, *see* Dissent at 14, requiring certification and substitution before trial does not undercut the Westfall Act's purpose of immunizing employees in covered suits. That the Westfall Act creates immunity does not mean that it does so indefinitely, especially given the Supreme Court's repeated instruction that "[i]mmunity-related issues" under the Act

17

"should be decided at the earliest opportunity." *Osborn*, 549 U.S. at 253. I see no reason why enforcing the limitations Congress enacted would upset this purpose.

    *C.*    **Carroll 5** *contained no substantive scope-of-employment or substitution analysis.*

The final "error" alleged by the dissent is not actually about this decision at all. Instead, the dissent advances a new theory of the President's scope of employment not asserted by any of the parties, and criticizes three prior decisions of three different courts applying well-settled law that scope of employment questions under the Westfall Act are determined according to state *respondeat superior* law. *See Carroll v. Trump,* 498 F. Supp. 3d 422 (S.D.N.Y. 2020) (the district court's 2020 decision on the Government's initial motion for substitution); *Carroll 1,* 49 F.4th 759 (this Court's 2022 decision certifying the scope-of-employment question); *Trump v. Carroll*, 292 A.3d 220 (D.C. 2023) (the D.C. Court of Appeals' decision clarifying its *respondeat superior* law).

The dissent asserts that these three courts all erred by looking to state law to analyze whether Trump's statements were made within his scope of employment. *See* Dissent at 20. But to be clear, the panel's decision in *Carroll 5* did not address this question. It merely held that the Government's attempt to certify and substitute post-trial was untimely under the Westfall Act. *Carroll 5* therefore created no split on any substantive scope of employment law with the D.C. Circuit or any other circuit, notwithstanding the dissent's suggestions otherwise. *Contra id.* at 18-19. Moreover,

even assuming the panel *had* weighed in on the scope-of-employment issue, the applicable law is well-settled and did not merit *en banc* review. The principle that the dissent calls "bizarre" and "strange" -- that federal courts should resolve scope of employment questions under the FTCA in accordance with state *respondeat superior* law -- *see id.* at 6, 20, is based on the text of the FTCA itself[11] and has been applied consistently by this and every other Court of Appeals for decades.[12]

The dissent instead urges us to adopt a new scope-of-employment test that applies only when the "employee" is the President. *See id.* at 4-6. Tellingly, even the *Government* did not make this argument below, and instead urged application of D.C. *respondeat superior* law.[13] And neither the Government nor Trump argued for such a new test in their *en banc* petition, which appropriately limited its challenges to our

---

[11]  The FTCA provides federal courts with "exclusive jurisdiction of civil actions on claims against the United States, for money damages, . . . for [tortious conduct] of any employee of the Government while acting within the scope of his office or employment, under circumstances *where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred*." 28 U.S.C. § 1346(b)(1) (emphases added). Accordingly, the Act expressly incorporates state substantive law.

[12]  *See, e.g., Hamm v. United States*, 483 F.3d 135, 138 (2d Cir. 2007) ("scope of employment" is defined "by the respondeat superior law of the jurisdiction in which the accident occurred") (citation modified); *Fountain v. Karim,* 838 F.3d 129, 135 (2d Cir. 2016) (same). Every other Circuit also looks at state *respondeat superior* law. *See Aversa v. United States*, 99 F.3d 1200, 1208 (1st Cir. 1996); *Lomando v. United States*, 667 F.3d 363, 374 (3d Cir. 2011); *Jamison v. Wiley*, 14 F.3d 222, 237 (4th Cir. 1994); *Palmer v. Flaggman*, 93 F.3d 196, 202 (5th Cir. 1996); *Chandonais v. U.S. Dep't of Air Force*, No. 90-2103, 934 F.2d 322 (table), 1991 WL 93096 (6th Cir. June 3, 1991); *St. John v. United States*, 240 F.3d 671, 676 (8th Cir. 2001); *Saleh v. Bush*, 848 F.3d 880, 888 (9th Cir. 2017); *Hockenberry v. United States*, 42 F.4th 1164, 1170 (10th Cir. 2022); *Bennett v. United States*, 102 F.3d 486, 489 (11th Cir. 1996); *Plevnik v. Sullivan*, 146 F.4th 1174, 1182 (D.C. Cir. 2025).

[13]  *See Carroll 1*, 49 F.4th at 766 ("The parties all agree that the second issue presented (scope of employment) is governed by the District of Columbia's *respondeat superior* law.").

19

actual holding on the timeliness of certification.[14]  As reflected by the vote of the majority of active judges on this Court, there is no reason to convene *en banc* to consider a legal theory -- not advanced by any party -- that would contravene statutory text, our own precedent, and the law in every other Court of Appeals.

*        *        *

At bottom, I agree with the dissent that "the same rules should apply equally to all defendants."  *Id.* at 3 (quoting *Carroll*, 141 F.4th at 368 (Menashi, *J.*, dissenting from the denial of rehearing *en banc*)).  The fact of the matter is that no other defendant would be permitted to move to substitute the United States in his place, fifteen months after trial and the entry of judgment against him.  The Court appropriately declined to convene *en banc* to revisit this issue.

## II.    *The Merits Decision* **(Carroll 6)**

A month after the panel issued *Carroll 5,* we decided the merits of the appeal in which Trump and the United States again requested substitution.  In *Carroll 6,* the panel concluded that it was bound by this Court's prior holding on presidential immunity, affirmed the district court's summary judgment rulings and jury instructions, and upheld the jury's award of $83.3 million in compensatory and punitive

---

[14]    *See generally* Petition for Panel Rehearing and *En Banc* Determination of the United States and President Donald J. Trump, *supra* note 3.

20

damages.  151 F.4th at 59.

Trump petitioned for *en banc* review of our rulings on presidential immunity, for which the Government has also filed an *amicus* brief, and on punitive damages.[15]  The dissent argues our Court should also have conducted *en banc* review of the district court's grant of partial summary judgment for Carroll on two elements of liability not raised by Trump for rehearing: its jury instructions on punitive damages, and the jury's compensatory damages award.  *See* Dissent at 32-49.  To the extent the dissent goes further in challenging our decisions than the parties did, those criticisms are unpersuasive.

I begin by discussing immunity and punitive damages, the two rulings challenged by Trump.  I then address the dissent's additional opposition to our rulings regarding summary judgment, jury instructions, and compensatory damages.

A.      **Carroll 3** *was binding law of the case on presidential immunity.*

In 2023, a previous panel of our Court confronted as a matter of first impression the question of whether presidential immunity could be waived.  *Carroll 3*, 88 F.4th at 425.  At that time, Trump had asserted that presidential immunity was categorically not waivable, and did not even brief the argument that his actions in this case did not constitute waiver.  *See id.* at 429 & n.52.

---

[15]      *See* Petition for Rehearing *En Banc* of President Donald J. Trump, *supra* note 4, at 4, 16; Brief for the United States as Amicus Curiae, *supra* note 4.

21

The *Carroll 3* panel explained in an extensive opinion that, contrary to Trump's argument, presidential immunity is "not jurisdictional" and is instead "treated like other forms of immunity that [Trump] does not dispute are waivable." *Id.* at 429. It then held that Trump waived his immunity defense here by, among other things, failing to assert it in his answer to Carroll's complaint in state court and conceding to it at oral argument. *Id.* at 429-30. Rehearing *en banc* was denied, with no active judge calling for a vote. *Carroll v. Trump*, No. 23-1045, 2024 WL 96249 (2d Cir. Jan. 8, 2024).

Two years later in *Carroll 6*, we adhered to these rulings when Trump again asserted that presidential immunity cannot be waived. 151 F.4th at 66. In this appeal, Trump also argued for the first time that even if immunity could be waived, such waiver requires an "explicit and unequivocal renunciation." *Id.* (citation modified). The panel rejected this renewed argument because *Carroll 3* was law of the case, and because the Supreme Court's decision in *Trump v. United States,* 603 U.S. 593 (2024) ("*Trump*"), did not alter the prevailing law on whether and how presidential immunity could be waived.

Although the dissent critiques our Court's decision in *Carroll 3,* the panel was bound to follow it as law of the case. Under our Circuit's precedent, we revisit issues explicitly or implicitly decided on prior appeal only when there is an "intervening change of controlling law" that creates "a clear conviction of error with respect to a point of law on which [the] previous decision was predicated," when there

is new evidence, or "to correct a clear error or to prevent manifest injustice." *United States v. Aquart*, 92 F.4th 77, 87, 93 (2d Cir. 2024) (citation modified). None of those justifications were present here.

*Carroll 3* pertained to waiver. Accordingly, the question is whether *Trump* "made clear a change in prevailing Circuit law" on that issue, and if it did so in a manner that "departed *significantly* from controlling precedent." *Id.* at 92 (citation modified). The answer is no. *Trump* -- a case about the scope of presidential immunity in criminal prosecutions -- said nothing about whether or how immunity could be waived in a civil case. That observation does not discount the magnitude of *Trump*'s impact on other dimensions of presidential immunity.[16] But to the extent *Trump* changed the prevailing law on the scope of such immunity, no part of it "departed significantly" from the prior law concerning waiver on which *Carroll 3* relied. *Id.* at 92 (citation modified).

---

[16] The dissent points to another decision of this Court in which our colleagues remanded a case to the district court with instructions to consider "whether *Trump v. United States* represented a change in controlling law." Dissent at 22 (quoting *New York v. Trump*, 158 F.4th 458, 466 (2d Cir. 2025) (per curiam)). The dissent omits the end of the quoted sentence from *New York v. Trump*, which explains that *Trump* may have changed "controlling law *that could support a finding of good cause*." 158 F.4th at 466-67 (emphasis added). As can be surmised when the instruction is read in full, the question in *New York v. Trump* was whether Trump's untimely attempt to remove his criminal hush money prosecution could be excused for "good cause" because the prosecution was one "for or relating to" his official acts as President. *Id.* at 467. The panel noted that whether removal was proper turned on whether the State relied on evidence "relate[d] to immunized official acts" in a manner precluded by the intervening decision in *Trump*. *Id.* at 468. On the other hand, despite the dissent's attempts at recharacterization, *Trump* does not change the prevailing law laid down by *Carroll 3*, which did not discuss whether the 2019 statements fell within the bounds of Trump's official responsibilities as President.

In arguing that both *Carroll 3* and *Carroll 6* were incorrect, the dissent mischaracterizes both opinions as deciding a question not analyzed by either decision -- whether Trump's 2019 statements about Carroll *would* be covered by presidential immunity had he not waived the defense. But neither *Carroll 3* nor *Carroll 6* opined on the scope of presidential immunity, or analyzed whether Trump's 2019 statements were protected by it. So the question of whether *Trump* "materially affected the law of presidential immunity," Dissent at 25, is simply not the relevant inquiry.

*Carroll 3* remains law of the case. But even if it did not, we appropriately declined to convene *en banc* to craft new law on waiver. Trump argued, for the first time on appeal in *Carroll 6*, that any waiver of presidential immunity requires an "explicit and unequivocal renunciation." *See* 151 F.4th at 66 (citation modified). For this new argument, he relies on *United States v. Helstoski*, 442 U.S. 477 (1979), a case decided over forty years ago holding that legislative immunity under the Speech and Debate Clause could only be waived in this manner. *Id.* at 490-91. Trump (and the dissent) now argue that presidential immunity should also be subject to this waiver standard, because something in *Trump* transformed presidential immunity into the type of structural constitutional immunity that is on par with the Speech or Debate immunity at issue in *Helstoski*. *See* Dissent at 23; Petition for Rehearing *En Banc* of President Donald J. Trump at 11, *Carroll v. Trump*, No. 24-644 (2d Cir. Sep. 23, 2025) ("Trump Petition").

As *Carroll 6* explained and as *Trump* itself reasoned, the notion that

24

presidential immunity derives from structural separation of powers principles existed

long before the Supreme Court's decision in *Trump*. *See Carroll 6*, 151 F.4th at 66; *Trump*,

603 U.S. at 611-13, 638 (discussing and quoting, *inter alia, United States v. Nixon*, 418 U.S.

683 (1974); *Nixon v. Fitzgerald*, 457 U.S. 731 (1982)). To the extent *Trump* reaffirmed that

presidential immunity is "rooted in the constitutional tradition of the separation of

powers," it did not identify a new structural source of this immunity that would

heighten the bar for waiver. *See Carroll 6*, 151 F.4th at 67. Nor does *Trump* suggest that

the standard for waiving presidential immunity should or must mirror, for example,

congressional abrogations of state sovereign immunity derived from the text of the

Eleventh Amendment. *Contra* Trump Petition at 12.

The dissent contends that Trump did not waive immunity here. But that

argument is clearly belied by the record. Presidential immunity was not raised for the

first three years of this case. *See Carroll 3*, 88 F.4th at 430. Trump did not mention

immunity in his answer to Carroll's complaint in state court.[17] He did not invoke

immunity when he moved to amend his answer after the case was removed in 2022. *See*

---

[17]    The dissent points to Trump's answer in his state court motion to stay the proceedings, in which he raised an affirmative defense that he was "immune, under the Supremacy Clause of the United States Constitution, from suit in state court while serving as President of the United States" and that "[t]he alleged defamatory statements [were] privileged or protected by one or more immunities . . . under the Constitution of the United States." Dissent at 22 n.18; *see Carroll 6*, 151 F.4th at 62 n.7. This vague, passing reference to "one or more immunities" is insufficient to meet the requirements to assert an affirmative defense in a responsive pleading under state or federal civil procedure rules. *See Carroll v. Trump*, 680 F. Supp. 3d 491, 499 n.22 (S.D.N.Y. July 5, 2023) (collecting cases).

25

*Carroll 6,* 151 F.4th at 62. Instead, Trump argued that presidential immunity barred liability for the first time in his summary judgment papers filed in December 2022 and January 2023. *Id.* In *Carroll 3,* this Court affirmed the district court's ruling that Trump waived his presidential immunity defense by failing to invoke it in his first state court answer -- a decision that Trump did not even challenge in that appeal. 88 F.4th at 429 & n.52. Moreover, Trump's counsel conceded at that oral argument that "assuming the defense of presidential immunity is waivable, Defendant had waived that defense." *Id.* at 430. If any other litigant had failed to raise an affirmative defense in this way, there would be no question as to whether he waived his right to assert it.

In sum, *Carroll 3* correctly held that presidential immunity is waivable and that Trump waived it here. The dissent points to no change in controlling law on waiver that renders *Carroll 3* inapplicable law of the case.

B. *The jury's punitive damages award was correct.*

The only other argument Trump raises in his petition is that the $65 million punitive damages award in this case -- representing about a 3.6:1 ratio to the $18.3 million total compensatory award -- was grossly excessive. *See* Trump Petition at 16. Trump and the dissent argue that the award violates due process under our decision in *Turley v. ISG Lackawanna, Inc.,* 774 F.3d 140 (2d Cir. 2014). Trump Petition at 17; Dissent at 49-50. It does not.

Nowhere in *Turley* did we pronounce a "rule" that "no more than an

26

amount of punitive damages 'equal to compensatory damages' could follow."  Dissent at 51 (quoting *Turley*, 774 F.3d at 165).  In fact, we affirmed a 2:1 ratio of punitive to compensatory damages in *Turley* itself, while reasoning that awards of a ratio lower than 4:1 generally do not violate due process in other types of cases.  *See* 774 F.3d at 165-66; *see also State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 425 (2003).  We explained that a lower ratio for cases like *Turley* -- which involved a Title VII hostile work environment claim -- was appropriate because the award for emotional damages was "imprecise because of the nature of the injury," and because the overall award was "high when compared with similar cases."  774 F.3d at 165.

This is not a hostile work environment case, but instead one for defamation arising out of sexual abuse.  And Carroll's injuries are not "imprecise" like the intangible emotional damages in *Turley*.  Instead, these compensatory damages were quantified based on extensive testimony about the loss of Carroll's career at *Elle* and other sources of income, and the concrete cost of rehabilitating her reputation.  *Carroll 6*, 151 F.4th at 64.  Beyond labeling the comparator cases to which our decision cites as "highly idiosyncratic," Dissent at 53, the dissent does not point to any basis for ignoring them, especially when the Supreme Court has noted our history of "providing for sanctions of double, treble, or quadruple damages to deter and punish."  *State Farm,* 538 U.S. at 425.

27

Critically, "the most important indicium" of a punitive damages award's reasonableness is "the degree of reprehensibility of the defendant's conduct." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 575 (1996); *accord* Dissent at 51. The dissent further characterizes Trump's conduct as merely statements "*respond[ing]* to an accusation that Carroll published," to which "no reasonable person could have expected anything other than a vehement denial." Dissent at 52 (emphasis in original). But as detailed in *Carroll 6*, the record showed that Trump made multiple statements over many years accusing Carroll of lying for political and financial gain, and suggesting that Carroll was too unattractive for Trump to have sexually assaulted her. 151 F.4th at 83. As a result of Trump's statements, Carroll was harassed and humiliated, subjected to death threats, and feared for her physical safety for years. *Id.* And Trump showed no remorse, continuing his attacks against Carroll during and after two federal trials, and even proclaiming two days into the *Carroll I* trial that he would continue to defame her "a thousand times." *Id.* at 84. Together, this conduct went far beyond a "vehement denial."

### C.     *The district court's summary judgment rulings were correct.*

Trump's petition for rehearing ended there, but the dissent further critiques each remaining aspect of our decision in *Carroll 6*. I address these briefly in turn.

After the jury in *Carroll II* found that Trump had sexually abused Carroll in 1996 and had defamed her in his 2022 statement, the district court granted partial

28

summary judgment for Carroll in *Carroll I* on the liability elements of her defamation claim -- namely, that Trump's 2019 statements were (a) false and (b) made with actual malice. *See Carroll 6*, 151 F.4th at 68.

On falsity, the district court held that Trump was collaterally estopped from relitigating the falsity of his statements based on the jury's findings in *Carroll II.* The jury in *Carroll II* was given a special verdict form and asked to decide among three theories of liability: whether Trump (1) raped, (2) sexually abused, or (3) forcibly touched Carroll. *Id*. It answered no to (1) but yes to (2). *Id.* Trump did not request a special finding from the jury on the specific sexual conduct constituting "sexual abuse," thereby permitting the district court to make that determination pursuant to Rule 49(a)(3). *Id.* Accordingly, when Trump moved for remittitur, the district court held that the jury implicitly found that Trump had digitally penetrated Carroll, and made the same finding itself in the alternative -- a conclusion that was well-supported by the record in this respect. *See id.* at 69-71. Contrary to the dissent's contention, we are permitted to treat a district court's Rule 49 findings in the same manner as typical findings of fact subject to clear error review. *See Roberts v. Karimi*, 251 F.3d 404, 407-08 (2d Cir. 2001). There was therefore nothing improper about according this finding preclusive effect.

Moreover, the dissent does not actually dispute the reasoning behind our holding -- that Trump was precluded from relitigating the falsity of the 2019 statements

29

because their truth or falsity did not turn on the specific sexual act Trump committed. As *Carroll 6* explains, the truth or falsity of both the 2019 and 2022 statements depended on whether Carroll was lying about being sexually abused by Trump in 1996, not *how* he abused her. 151 F.4th at 69.[18] There is no question that the *Carroll II* jury found that Trump's 2022 statements about not knowing or sexually abusing Carroll were false. Accordingly, the 2019 statements -- including that he "never met [Carroll] in [his] life" and that the abuse "never happened" -- were equally false. *Id.* at 69 & n.14.

On actual malice, the district court held that even if Trump were not precluded from relitigating actual malice, Carroll was still entitled to summary judgment because Trump failed to raise a triable issue of fact as to whether he knew that his 2019 statements were false or acted with reckless disregard to their truth or falsity. *Id.* at 71. Trump failed to challenge this alternative holding on appeal, and as noted in our opinion, that fact alone merited affirmance. *Id.* Nonetheless, *Carroll 6* went on to conclude that Trump had indeed raised no genuine issue of material fact as to actual malice. *Id.* Although the dissent chides this as "not a fair judicial proceeding,"

---

[18]    In the 2019 statements, Trump said: "I've never met [Carroll] in my life," "[s]hame on those who make up false stories of assault to try to get publicity for themselves," "I would like to thank Bergdorf Goodman for confirming that they have no video footage of any such incident, because it never happened," and "[f]alse accusations diminish the severity of real assault." *Carroll 6*, 151 F.4th at 69 n.14 (citation modified). In the 2022 statement, Trump said: "She completely made up a story that I met her . . . and, within minutes, 'swooned' her. It is a Hoax and a lie," "it never happened," and "for the record, E. Jean Carroll is not telling the truth, is a woman who I had nothing to do with, didn't know, and would have no interest in knowing her if I ever had the chance." *Id.*

Dissent at 40, it also fails to point to any disputed facts on this issue. Indeed, given the preclusive effect of the first jury's finding that Trump did sexually abuse Carroll, there is abundant evidence of actual malice here.[19]

On this record, a reasonable juror could only conclude that Trump made his statements about Carroll knowing they were false or with reckless disregard of their truth or falsity. *See Celle v. Filipino Rep. Enters. Inc.,* 209 F.3d 163, 182 (2d Cir. 2000).

**D.** ***The remaining challenges to the jury's damages award are meritless.***

The dissent further challenges two additional elements of the jury's damages award not raised in the petition for rehearing.

First, the panel opinion explains why punitive damages awarded here were permitted under New York law. Just as Trump did initially on appeal, the dissent conflates the role of common law malice for purposes of recovering punitive damages and for overcoming a qualified or conditional privilege under New York law. *See* Dissent at 41-45. There are two distinct concepts at play. New York law recognizes certain qualified privileges when it comes to defamation that can be overcome if

---

[19] Over the course of six years, Trump called Carroll's allegations "a Hoax and a lie" and suggested that it was made up "for the sake of publicity," said he had "never met [Carroll] in [his] life" despite there being a photo of them together in the 1980s, labeled this case "a complete con job," accused Carroll of being "very deranged" and a "wack job," and vowed to "sue her" during a deposition in this very case. *Carroll 6*, 151 F.4th at 60, 63, 69 n.14, 72 n.20. He repeatedly disparaged Carroll leading up to and during both trials, called the case a "witch hunt" and a "con job" within earshot of the jury, and walked out of the courtroom during Carroll's summation. *Id.* at 65.

common law malice was "the one and only cause for the publication." *Liberman v. Gelstein*, 605 N.E.2d 344, 350 (N.Y. 1992) (citation modified). This is not true for punitive damages, the purpose of which is to "punish a person for outrageous conduct which is malicious, wanton, reckless, or in willful disregard for another's rights." *Prozeralik v. Cap. Cities Commc'ns, Inc.*, 626 N.E.2d 34, 42 (N.Y. 1993) (citation modified). As *Carroll 6* explains, New York law does not import the "sole motivation" requirement for overcoming a qualified privilege into the punitive damages context. *See* 151 F.4th at 76 (citation modified); *Prozeralik*, 626 N.E.2d at 42 (explaining that punitive damages are allowed when behavior "measure[s] up to the level of outrage or malice underlying the public policy"); N.Y. Pattern Jury Instr. -- Civil 3:30 (2024) (containing no "sole motivation" requirement for punitive damages). Our decision also addressed how the case on which the dissent relies made this very mistake and was acknowledged to be an outlier by New York authorities. *See* Dissent at 42 n.38; *Carroll 6*, 151 F.4th at 76-77 & n.28 (discussing *Morsette v. "The Final Call,"* 764 N.Y.S.2d 416 (1st Dep't 2003)). The dissent's repeated invocations of *Liberman* and other cases about qualified privilege do not change the fact that punitive damages here were permitted under New York law.[20]

---

[20] The dissent also contends that the district court erred in its punitive damages instruction because Trump's statements were protected by the qualified privilege of reply under New York law. *See* Dissent at 40-45. Trump waived this argument by failing to assert it as an affirmative defense below, *see Carroll v. Trump*, 680 F. Supp. 3d 491, 517 n.103 (S.D.N.Y. 2023) ("[Trump's] argument [regarding the qualified privilege of reply] arguably has been waived because it was not raised in his answer . . . ."), and by failing to pursue the issue on appeal or in his petition for rehearing *en banc*. In any event, the question of whether Trump's remarks were privileged

Second, the compensatory damages awarded in this case were not duplicative. The *Carroll I* jury was asked to quantify two distinct categories of damages. The first category was damages that Carroll suffered because of the defamatory statements, including her "humiliation and mental anguish," loss of her career at *Elle* and other sources of income, and ongoing economic injury, excluding the costs of the reputation repair program. *Carroll 6*, 151 F.4th at 79-80. The second was the cost of the reputation repair program itself -- i.e., compensatory damages required to *fix* the damage Trump caused to Carroll's reputation. *Id.* As we noted, the latter costs "are distinct from the other damages that flowed from the reputational harm." *Id.* at 81. The dissent fails to acknowledge that the district court instructed the jury that it could "not award compensatory damages more than once for the same injury," *id.* (citation modified), an instruction we "presume[]" the jury followed. *United States v. Salameh*, 152 F.3d 88, 116 (2d Cir. 1998) (citation modified).

## CONCLUSION

These two *per curiam* decisions mark the due conclusion of two related cases that have been litigated in our Circuit for over six years. Neither Trump nor the Government identified any rulings by the panel that, upon review, conflict with

---

under New York law is irrelevant to the standard for awarding punitive damages, which, as explained in *Carroll 6* and again above, may be awarded without a "sole motivation" finding.

33

34

precedent from our Circuit, another Circuit, or the Supreme Court, or raise questions of

exceptional importance.  To the extent the dissent goes further than the relevant parties

did in critiquing our rulings, we appropriately declined to expend our collective judicial

resources to review them.  The Court correctly denied these petitions for rehearing *en*

*banc.*